3900 Kilroy Airport Way
Suite 100
Long Beach, CA 90806-6816

562 426-9544
FAX 562 988-3183
www.scs-energy.com

# SCS ENERGY

**SCS Engineers**

# Service Purchase Order 06-SO00030

**DATE**   9/8/17

| TO | SHIP TO | BILL TO |
|---|---|---|
| ISM Industries, Inc. (HOLD)   0185766<br>ISM INDUSTRIES INC<br>16645 IH 10<br>Vidor, TX 77662<br>PHONE 409-769-7841<br>FAX 409-769-7748<br>E-MAIL tgreen@ismfab.com | University of CA, UC Biomethane<br>Program<br>Woolworth Road Landfill<br>10580 Woolworth Road<br>Keithville, LA 71047 | SCS Energy<br>Corporate Accounts Payable<br>3900 Kilroy Airport Way<br>Suite 100<br>Long Beach, CA 90806<br>PHONE 562-426-9544<br>FAX 562-988-3183<br>E-MAIL accountspayable@scsengineers.com |

| P.O. NUMBER | ORDER DATE | BUYER | PAY TERMS | EXCESS RECV | EXCESS % | EXCESS AMOUNT |
|---|---|---|---|---|---|---|
| 06-SO00030 | 9/8/17 | Ferguson, Tanisha | 45 30 | N | | |

**DESCRIPTION**

GPP - Gas Processing Plant Less Electrical and Rigging at Both Sites:

Construction Scope items 1-6 & 14 per Description and Exhibits A through N.

**AGREEMENT TERMS**

EFFECTIVE START DATE          EFFECTIVE END DATE          NOT TO EXCEED

PLEASE ACKNOWLEDGE THIS ORDER BY SIGNING AND RETURNING THE ACKNOWLEDGEMENT COPY. BY SIGNING
SUBCONTRACTOR AGREES THAT SUBCONTRACT WILL FURNISH THE SERVICES HEREIN SUBJECT TO THE TERMS AND
CONDITIONS ON THE FOLLOWING PAGES OF THIS SERVICE ORDER AND ANY ADDITIONAL TERMS NOTED HEREIN.

STEARNS, CONRAD AND SCHMIDT
CONSULTING ENGINEERS, INC.
Signature _____

Print   **Ted Wheeler**        Date 9/24/17

SUBCONTRACTOR
Signature _____

Print  Floyo Burnside   Date 9-19-17

| Seq | Description | Quantity | Unit Price | Net Amount | Due Date |
|---|---|---|---|---|---|
| 1 | Demo & Rough Grade | 1.00 | 72,240.00 | 72,240.00 | |
| 2 | Structural - Concrete | 1.00 | 525,000.00 | 525,000.00 | |
| 3 | Structural - Steel Pipe Rack and Mise, Pipe Supports, Fab | 1.00 | 247,300.00 | 247,300.00 | |
| 4 | Mechanical Undergroind HDPE | 1.00 | 288,750.00 | 288,750.00 | |
| 5 | Relocation of Existing Flare | 1.00 | 71,662.00 | 71,662.00 | |
| 6 | Mechanical and Piping Above Grade | 1.00 | 314,150.00 | 314,150.00 | |
| 7 | SCS Rigging and Setting Equipment - BOTH SITES GCP/GPP | 1.00 | 142,000.00 | 142,000.00 | |
| 8 | ISM Adder for Disposal and Haul Off | 1.00 | 23,500.00 | 23,500.00 | |
| 9 | Bonds (Estimate to be confirmed) | 1.00 | 25,270.00 | 25,270.00 | |
| | | | **Total** | 1,709,872.00 | |

Exhibit 3

**TERMS AND CONDITIONS FOR SERVICE ORDER FOR CONSTRUCTION SERVICES FOR**
**UC BIOMETHANE PROJECT, SHREVEPORT, LA**

SCS Project 06214001.07                                                            UC Project PH7006

**Article 1 - Description of Work:** Subcontractor agrees to perform all work, labor and services and to provide and furnish all supplies, materials, equipment, machinery, tools, utilities, transportation and other facilities of any kind and description required to promptly and efficiently complete the work required under this Service Order for Construction Services ("Service Order"), as further described in Exhibit, Scope of Work (the "Work"). In respect to the Work covered by this Service Order, Subcontractor shall comply with the terms and conditions of SCS Engineer's ("SCS") contract with the Regents of the University of California ("UC" or the "Owner"), hereafter referred to as the "Prime Contract", which are set forth in Exhibit titled Flowdowns. The Prime Contract is attached hereto as Exhibit titled UC Agreement and incorporated by reference herein.

**Article 2 - Changes:** SCS may unilaterally, or by agreement with Subcontractor, without notice to sureties, order changes in the Work consisting of additions, deletions, or other modifications of the Work, and the contract price and work schedule shall be adjusted accordingly. A written change order signed by SCS will be required in order to effect any adjustment in the contract price or work schedule under this Service Order. Daily logs, reports of Work Orders signed at the job site or elsewhere will serve only as an acknowledgement that the Work has been performed, not as a change order. Subcontractor shall perform Work as changed without delay.

**Article 3 - Inspection and Testing:** If any portion of the Work is to be inspected, tested or approved by or for any governmental authority, Subcontractor shall give SCS timely notice thereof so SCS may observe such inspection, test or approval. Subcontractor shall bear all costs of such inspections, tests or approvals, and shall deliver to SCS all certificates of inspection, testing or approval obtained from any governmental authority.

**Article 4 - Job Site:** Subcontractor shall not unreasonably encumber the job site with any materials, equipment or other property. Subcontractor shall not damage or endanger any property or work of SCS, the Owner or any other contractor at the job site. Subcontractor shall at all times keep the job site free from accumulation of construction waste materials and rubbish from the Work, and shall remove such waste materials and rubbish from the job site daily or reimburse SCS for such removal. If Subcontractor fails to completely clean up the job site at the completion of the Work, SCS may do so and the cost thereof shall be charged to Subcontractor and credited against the contract price. Subcontractor shall be solely responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the Work at the job site and elsewhere. Subcontractor and his employees shall comply with all applicable federal, state, local and any other legally required safety and health standards, orders, rules, regulations and laws in performing the Work.

**Article 5 - Work Schedule:** Subcontractor shall proceed with the Work in a prompt and diligent manner, in accordance with SCS' schedule which may be revised from time to time to coordinate with other project activities. Subcontractor agrees to commence, to continue with sufficient personnel and equipment, and to complete the Work in compliance with the schedule, and agrees that time is of the essence with respect to the work schedule. Subcontractor shall coordinate the Work to be performed by it with SCS, the Owner and any other contractors whose activities and schedules might affect its Work or the work schedule. Subcontractor shall be entitled to additional compensation for compliance with schedule revisions or damages for delay only to the extent SCS is entitled to and recovers such additional compensation or damages from the Owner.

Page 1

**Article 6 - Invoices:** Subcontractor shall submit all invoices for the Work performed in duplicate to SCS for review and approval.  All invoices shall be accompanied by labor and/or material releases, in a form approved by SCS, executed by Subcontractor, for labor or materials provided through the date of the invoice.  SCS shall pay Subcontractor the amount of the approved invoice ~~forty-five (45)~~ days after the receipt, review and approval of the invoice.                                                              Thirty (30)

*[handwritten: Wheeler  9/18/2017]*

One invoice for 15% of the SO total shall be submitted upon award and provision of all required bonds and insurance documents.

Subcontractor shall be liable for all sales, use, consumer and other similar taxes, including FICA and bond costs and workmens' compensation, incurred in performing the Work under this Service Order.  Partial payments *[TRW]* may be made to Subcontractor in the amount of 90% of the Work in place, which has been approved by SCS and the Owner.  Upon payment of 90% of the total contract price to Subcontractor, the balance of invoices submitted and approved will be paid forty-five (45) days after the total completion by Subcontractor and final inspection and acceptance by SCS and the Owner of the Subcontractor's Work.

The acceptance by Subcontractor of final payment shall operate as a complete release of SCS as to all claims and all liability to Subcontractor for all things done or furnished in connection with the Work performed by Subcontractor under this Service Order.  SCS reserves the right to pay any funds owed Subcontractor in the form of a check or checks made jointly payable to Subcontractor and one or more of Subcontractor's material suppliers, laborers or subcontractors, if any.  Any payment made to Subcontractor prior to total completion and final acceptance by SCS of Subcontractor's Work shall not be construed or operate as acceptance of Subcontractor's Work nor as a waiver of any claim by SCS arising out of Subcontractor's failure to meet its warranty hereunder or to comply strictly with the provisions of this Service Order.  No payment by SCS, however, whether final or otherwise, shall operate in any manner to release Subcontractor or his surety, if any, from any remaining obligations under this Service Order or from any performance and/or materials and labor bond.

SCS may withhold payment of money otherwise due to Subcontractor, in whole or in part, for the following reasons: ( 1) Defective Work that has not been remedied, (2) Omission of Work required by this Service Order, (3) Third party claims (such as mechanic's liens or stop notices) filed or reasonable evidence indicating the probable filing of such claims, (4) Failure of Subcontractor to make payments properly to other subcontractors for labor, materials or equipment, (5) Reasonable evidence that the Work cannot  be completed for the unpaid balance of the contract price, (6) Damage to SCS, the Owner or another contractor, (7) Persistent failure to perform the Work in accordance with this Service Order, (8) Reasonable evidence that the Work cannot be completed within the work schedule,  (9) Any dispute or controversy between Subcontractor and the Owner or another contractor, or (10) Any other cost or liability which SCS has incurred or, in SCS' reasonable opinion, may incur for which Subcontractor may be responsible.  When the basis for the above withholding has been removed, SCS shall pay Subcontractor the amount withheld less any expenses incurred or damages sustained (including attorney fees) by SCS as a result of the withholding, the cause of the withholding or the removal of the cause of the withholding.  Any payment made by SCS directly to any laborer, materialman or contractor shall be deemed payment to Subcontractor credited against the contract price due Subcontractor hereunder.

**Article 7 - Investigation:** By signing this Service Order, Subcontractor represents that it is fully qualified to perform the Work in accordance with this Service Order and agrees that it has satisfied itself, by its own investigation and research, regarding all conditions affecting the Work to be performed, the materials and/or labor to be furnished, and the remediation, testing and/or handling of any hazardous substances, including all laws, standards and requirements of all governmental entities, and as to the meaning and intention of the plans, technical specifications and other documents relating to the Work, and that it has visited and familiarized itself with the conditions at the job site.

Page 2

**Article 8 - Governmental Compliance and Permits:** Subcontractor and its employees, agents, representatives and subcontractors, if any, shall comply with all applicable federal, state, local and other governmental entity laws, statutes, ordinances, standards, rules, regulations, orders and decisions in the performance of the Work under this Service Order.  Subcontractor shall obtain, unless otherwise notified by SCS at its expense all federal, state, local and other governmental approvals, permits, licenses, inspections and variances required for the performance and completion of the Work by Subcontractor hereunder.

**Article 9 - Warranty:** Subcontractor warrants to SCS that the Work will be of good quality, free from faults and defects in workmanship or otherwise, and in strict conformance with the requirements and obligations of this Service Order, and that all materials, supplies, and equipment furnished will be new. All Work not conforming to the requirements of this warranty will be deemed defective, and Subcontractor shall redo, replace or repair all defective Work at no cost to SCS.  In lieu of remedying any such defective Work, Subcontractor, with the consent of SCS, may pay SCS the cost to redo, replace or repair the defective Work.  All available manufacturers' and suppliers' warranties shall be obtained by Subcontractor and assigned to SCS and Owner, as necessary, and Subcontractor shall assist SCS and/or Owner upon request in enforcing any such warranties.

**Article 10 - Indemnity:** To the fullest extent permitted by law, Subcontractor shall indemnify, defend and hold harmless SCS and Owner and their respective officers, directors, agents, representatives, assigns and employees from and against any and all claims, obligations, liens, encumbrances, liabilities, penalties, causes of action, and all costs and expenses incurred in connection therewith (including, without limitation, orders, judgments, fines, forfeitures, amounts paid in settlement and attorneys' fees and expenses), whether for injury, illness or death to persons, damage or destruction of property, infringement or violation of any patent right, or for any other claim or action of any kind or nature whatsoever, arising out of or in connection with the Work performed under this Service Order by Subcontractor, its employees, agents, representatives and subcontractors, if any.  Upon written request from SCS, Subcontractor shall defend, at his own expense, any suit brought against SCS or Owner in connection with any claim covered by this indemnity.  Subcontractor acknowledges and agrees that One Hundred Dollars ($ 100.00) of the Service Order compensation represents the specific consideration paid by SCS for all the indemnifications from Subcontractor pursuant to this Service Order.

**Article 11 - Insurance:** Subcontractor shall purchase and maintain, for the protection of Subcontractor, UC, and SCS, during the term of this Service Order, at the Subcontractor's expense, the following insurance coverages and levels:

.1      Workers Compensation and Employer's Liability
This insurance shall protect the Subcontractor against all claims under applicable state workers' compensation laws.  Subcontractor shall also be protected against claims for injury, disease, or death to employees which, for any reason, may not fall within the provisions of a state workers' compensation law.  The policy shall include an "all states" or "other states" endorsement.

.2      The liability limits shall not be less than:
        Workers' Compensation         Statutory
        Employers Liability           $1,000,000 each occurrence

.3      Commercial General Liability
This insurance shall be written on an occurrence type policy and shall protect the Subcontractor, SCS and UC against claims for personal injury including bodily injury, death and property damage.  This
Page 3

policy shall include a contractual liability endorsement that specifically confirms the contractual liability assumed by the Subcontractor under Article 10, Indemnification, hereof, and a completed operations and products liability endorsement to remain in effect for the period of the applicable statute of limitations/repose after final payment.  Limits of liability will not be less than $2 million in combined single limit for bodily injury and property damage.

.4     Automobile Liability Policy

This insurance shall be written on an occurrence type policy and shall protect the Subcontractor, SCS and UC against all claims for injuries arising out of use of any auto including own, hired, or non-owned autos.  Limits of liability will not be less than $2 million in combined single limits for bodily injury and property damage.

.5     Professional Liability Insurance

To the extent Subcontractor provides engineering or other professional services, Subcontractor shall at all times during the term of this Service Order and for 3 years thereafter, maintain and keep in force professional liability insurance (Errors & Omissions) in an amount not less than $5 million per claim to cover the professional liability of the Subcontractor for Work performed under this Service Order.

.6     Additional Insured

All insurance coverages furnished under this Service Orderr, with the exception of workers' compensation and professional liability, shall include SCS and UC as an additional insured with respect to the activities of the Subcontractor.

Stearns, Conrad and Schmidt, Consulting Engineers, Inc.
3900 Kilroy Airport Way, Suite 100, Long Beach, CA 90806

University of California, Office of the President
1111 Broadway, suite 1450, Oakland, CA  94607

.7     Waiver of Subrogation

The Subcontractor shall require their insurance carrier to waive all rights of subrogation against SCS, UC, their employees, directors and officers.

The above insurance policies shall contain cross liability provisions and shall name SCS and UC as additional insured in each liability policy with respect to all activities arising out of the performance of the Work by or on behalf of Subcontractor under this Service Order.  Such liability coverages shall be primary to any insurance maintained by SCS or UC.  All such insurance policies shall be written by insurance companies satisfactory to SCS.  Certificates of Insurance confirming all of the insurance coverages required to be maintained by Subcontractor shall be filed with SCS prior to Subcontractor commencing any Work, and such certificates shall provide SCS with thirty (30) days written notice of cancellation or material change in coverage.

**Article 12 - Nondisclosure of Information:** Subcontractor acknowledges that information received pursuant to this Service Order shall be treated by Subcontractor as confidential, proprietary and/or trade secrets of SCS.  Subcontractor agrees not to publicize, release or disclose to any third party or to the public, in any manner or form, whether during the term of this Service Order or any time thereafter, any information regarding the performance or completion of the Work under this Service Order, or the results or data obtained from the Work, without the specific prior written consent of SCS.

Page 4

**Article 13 - Noncompliance:** SCS may, by written notice to Subcontractor, immediately terminate this Service Order if Subcontractor shall: ( 1) Be adjudged a bankrupt, or make a general assignment for the benefit of creditors, or have a receiver appointed due to his insolvency, (2) Abandon the Work hereunder, (3) Fail in any respect to prosecute the Work according to the current schedule, (4) Persistently refuse or fail to supply enough properly skilled employees or proper equipment or materials, ( 5) Fail to make prompt payment for materials or labor, or to subcontractors, if any, (6) Persistently disregard laws, ordinances, rules, regulations or orders of any governmental entity, (7) Sublet any portion of the Work or assign this Service Order, in whole or part, without the prior written consent of SCS, or (8) Breach any term of this Service Order. Thereafter, if the unpaid balance of the contract price exceeds the cost of completing Subcontractor's Work, including compensation for SCS' services and expenses caused thereby, such excess shall be paid to Subcontractor. If such costs exceed the unpaid balance, Subcontractor shall promptly pay the difference to SCS upon receipt of written notice of such excess. This payment obligation shall survive the termination of this Service Order. In the event of the failure by Subcontractor to comply with any of the provisions of this Service Order, SCS may give written notice of default to Subcontractor with respect to any such failure. If Subcontractor fails to cure such default within ~~two (2)~~ working days or within the time specified in the notice, whichever period is shorter, SCS shall have the option, without terminating this Service Order or the obligations hereunder of Subcontractor, of completing the Work or any portion thereof itself or having the Work, in whole or in part, completed by any third party. The cost of the Work performed shall be deducted from the contract price, and if the cost of completing such Work exceeds the unpaid balance, of the contract price, Subcontractor shall promptly pay the difference to SCS upon receipt of written notice of such excess. Subcontractor shall be liable for all expense s incurred and damages suffered by SCS as a result of Subcontractor's default, and the exercise of any such option by SCS shall not release Subcontractor from such liability.

*[handwritten margin note: replace "2 working days" with "five (5) working days" Ted Wheeler SCS Energy 9/18/2017]*

**Article 14 - Termination for Convenience:** SCS shall have the right to terminate all or any portion of this Service Order for convenience by providing Subcontractor a written notice of termination, to be effective upon receipt by Subcontractor. If Subcontractor is terminated for convenience, Subcontractor shall be entitled to be paid a portion of the contract price based on the reasonable value of Work properly performed prior to termination, plus reasonable direct close-out costs. If SCS wrongfully exercises its rights under Article 13 above, the wrongful termination shall be treated as one for convenience pursuant to this Article 14 and Subcontractor's remedy under this Section shall be exclusive.

**Article 15 - Disputes:** In the event of a dispute involving the Prime Contract or the Owner, Subcontractor shall be obligated to pursue the matter in accordance with the disputes resolution procedures under the Prime Contract. In such case, upon approval by SCS of Subcontractor's claim, the Subcontractor's claim will be handled either: a) as a pass-through claim against the Owner in SCS' name or (2) by SCS on behalf of Subcontractor, at SCS' sole option. In the event of such claim by Subcontractor, SCS shall be entitled to offset any recovery by its cost (including attorney fees) and expenses incurred in reviewing and coordinating Subcontractor's claim. Subject to the foregoing, Subcontractor's entitlement to recovery shall be limited to the amounts actually received by SCS from Owner in payment on behalf of Subcontractor's claim. In the event of a dispute between SCS and Subcontractor, the matter shall be resolved through litigation. In the event of a dispute, Subcontractor shall proceed with the Work in accordance with SCS direction, without disruption or delay.

**Article 16 - General Provisions:** Subcontractor shall not sublet the performance of any portion or all of the Work nor assign this Service Order in whole or part, without the prior written consent of SCS. Subject to this limitation, this Service Order shall inure to the benefit of and be binding upon the parties hereto and their successors, assigns and heirs. Subcontractor's relationship to SCS in the

Page 5

performance of the Work under this Service Order shall be that of an independent contractor.

This Service Order shall be interpreted under and governed by the laws of the State in which the Work is performed. To the extent of partial and /or final payments made to Subcontractor, Subcontractor waives its right to file a lien against the Project property. Subcontractor further agrees, at its expense, to take all necessary actions to discharge any liens filed by Subcontractor's subcontractors, suppliers, vendors, employees or any other party performing Work on the Project for Subcontractor.

SCS is hereby granted sole and complete ownership of all reports, drawings, renderings and other documents prepared by Subcontractor under this Service Order.

Subcontractor understands and acknowledges the potential for contact with hazardous substances in the conduct of Services and certifies that its employees engaged in the Services have completed health and safety training courses specified by the Occupational Safety and Health Administration and with environmental protection agencies as necessary for performance of the Services hereunder. Subcontractor additionally shall assure compliance with SCS' site safety plans, or other health and safety rules applicable to the Services.

Notwithstanding any failure to sign and return the acknowledgement copy of this Service Order or Subcontractor's use of any other acknowledgement form not signed by SCS, this Service Order and the documents incorporated in or attached hereto represent the entire contract for the performance of the Work between SCS and Subcontractor. No verbal agreement or conversation between the parties either before or after the execution of this Service Order shall affect or modify any of the provisions contained herein. This Service Order may be amended or modified only be a subsequent written instrument signed by SCS.

If either party engages legal counsel to enforce this Service Order the prevailing party shall be entitled to receive all costs and expenses, including reasonable attorney fees incurred as a result of such action.

In the event any provision of this Service Order is determined to be invalid the remaining provisions of this Service Order shall continue in full force and effect.

**Article 17- Parties To Service Order:** For the purposes of this Service Order, the term "SCS Engineers" shall mean SCS Engineers P.C. for projects North Carolina, and Stearns, Conrad and Schmidt Consulting Engineers, Inc. for all other projects.

**Article 18 – Performance & Payment Bonds:** Subcontractor shall furnish bonds covering the faithful performance of this Service Order (Performance Bond) and payment of obligations arising hereunder (Payment Bond) in a form and content satisfactory to SCS. SCS and the Owner shall be named as obligees. The Payment Bond and Performance Bond (collectively, the "Bonds") shall each be in the amount of 100% of the contract price, and shall be in effect within five (5) days after the Service Order is signed by SCS and, in any event, before Subcontractor commences Work under the Service Order. The Bonds shall remain in effect throughout Subcontractor's performance of the Work and until all of Subcontractor's obligations, including warranties, under the Service Order have been fulfilled to the satisfaction of SCS. The surety company(ies) used by Subcontractor shall be solvent and a legal surety in the State of Louisiana. All premiums for the Bonds shall be paid by Subcontractor. To the extent applicable, the Bonds shall comply with all requirements of §4812 of the Louisiana Private Works Act (La R.S. 9:4801, et seq.).

# SERVICE ORDER 06-SO00030

## DESCRIPTION

## GPP - GAS PROCESSING PLANT LESS ELECTRICAL AND RIGGING AT BOTH SITES

## CONSTRUCTION SCOPES 1, 2, 3, 4, 5, 6 AND 14

## UC BIOMETHANE PROGRAM

Date:  August 30, 2017

The scope of this SO for construction services to be provided by Seller are by scope and order value as follows.

| Item | Scope RFP reference Item, Description | Amount |
|------|----------------------------------------|--------|
| | **GPP** | |
| 1 | 1.   Demo & Rough Grade | 72,240 |
| 2 | 2.   Structural – concrete | 525,000 |
| 3 | 3.   Structural – Steel pipe rack and misc. pipe supports, fab and | 247,300 |
| 4 | 4.   Mechanical Underground HDPE | 288,750 |
| 5 | 5.   Relocation of existing flare | 71,662 |
| 6 | 6.   Mechanical and piping above grade | 314,150 |
| | | |
| | **Both sites:** | |
| 7 | 14.  SCS Rigging and Setting equipment - BOTH SITES GCP/GPP | 142,000 |
| 8 | ISM adder for disposal and haul off | 23,500 |
| 9 | Bonds (estimate, to be confirmed) | $    25,270 |
| | | |
| | **ORDER TOTAL** | **$ 1,709,872** |

This order is based on the SCS Drawings provided with the RFPs.  Changes from these bid documents to the IFC to be issued will constitute a change order if scope or cost is changed.

In addition to the SCS drawings, this Service Order includes the following documents.

- The Service Order and this Description document

- Exhibit A. Service Order for Construction Services_UC 06 26 2017, Rev 1

- Exhibit B:  UC Prime Contract Flowdowns – Construction 06 17 2017

- Exhibit C:  UC Agreement Redacted 7 22 2016 w Cos

- Exhibit D:  UC Mechanical Equipment List 06 16 2017

- Exhibit E: UC Electrical Equipment List_06 15 2017

- Exhibit F: Scope 00 UC Construction Scope Breakdown for Purchase

- Exhibit G: Scope 01 Demolition and Grading for Construction GPP

- Exhibit H: Scope 02 Structural Construction at GPP

- Exhibit I: Scope 03 Structural Steel Fabrication & Installation at GPP

- Exhibit J: Scope 04 Mechanical Underground Piping Construction at GPP

- Exhibit K: Scope 05 Relocation of Existing Flare & Air Compressor at GPP

- Exhibit L: Scope 06 Mechanical Construction at GPP

- Exhibit M: Scope 14 Rigging and Equipment Installation at GCP and GPP

- Exhibit N: ISM Proposal 17-032 UC Biomethane Project, Rev. 3, 8 18 2017

- Exhibit O: Schedule 08 31 2017

**TERMS AND CONDITIONS FOR SERVICE ORDER FOR CONSTRUCTION SERVICES FOR**
**UC BIOMETHANE PROJECT, SHREVEPORT, LA**

**SCS Project 06214001.07**                                    **UC Project PH7006**

**Article 1 - Description of Work:** Subcontractor agrees to perform all work, labor and services and to provide and furnish all supplies, materials, equipment, machinery, tools, utilities, transportation and other facilities of any kind and description required to promptly and efficiently complete the work required under this Service Order for Construction Services ("Service Order"), as further described in Exhibit, Scope of Work (the "Work"). In respect to the Work covered by this Service Order, Subcontractor shall comply with the terms and conditions of SCS Engineer's ("SCS") contract with the Regents of the University of California ("UC" or the "Owner"), hereafter referred to as the "Prime Contract", which are set forth in Exhibit titled Flowdowns. The Prime Contract is attached hereto as Exhibit titled UC Agreement and incorporated by reference herein.

**Article 2 - Changes:** SCS may unilaterally, or by agreement with Subcontractor, without notice to sureties, order changes in the Work consisting of additions, deletions, or other modifications of the Work, and the contract price and work schedule shall be adjusted accordingly. A written change order signed by SCS will be required in order to effect any adjustment in the contract price or work schedule under this Service Order. Daily logs, reports of Work Orders signed at the job site or elsewhere will serve only as an acknowledgement that the Work has been performed, not as a change order. Subcontractor shall perform Work as changed without delay.

**Article 3 - Inspection and Testing:** If any portion of the Work is to be inspected, tested or approved by or for any governmental authority, Subcontractor shall give SCS timely notice thereof so SCS may observe such inspection, test or approval. Subcontractor shall bear all costs of such inspections, tests or approvals, and shall deliver to SCS all certificates of inspection, testing or approval obtained from any governmental authority.

**Article 4 - Job Site:** Subcontractor shall not unreasonably encumber the job site with any materials, equipment or other property. Subcontractor shall not damage or endanger any property or work of SCS, the Owner or any other contractor at the job site. Subcontractor shall at all times keep the job site free from accumulation of construction waste materials and rubbish from the Work, and shall remove such waste materials and rubbish from the job site daily or reimburse SCS for such removal. If Subcontractor fails to completely clean up the job site at the completion of the Work, SCS may do so and the cost thereof shall be charged to Subcontractor and credited against the contract price. Subcontractor shall be solely responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the Work at the job site and elsewhere. Subcontractor and his employees shall comply with all applicable federal, state, local and any other legally required safety and health standards, orders, rules, regulations and laws in performing the Work.

**Article 5 - Work Schedule:** Subcontractor shall proceed with the Work in a prompt and diligent manner, in accordance with SCS' schedule which may be revised from time to time to coordinate with other project activities. Subcontractor agrees to commence, to continue with sufficient personnel and equipment, and to complete the Work in compliance with the schedule, and agrees that time is of the essence with respect to the work schedule. Subcontractor shall coordinate the Work to be performed by it with SCS, the Owner and any other contractors whose activities and schedules might affect its Work or the work schedule. Subcontractor shall be entitled to additional compensation for compliance with schedule revisions or damages for delay only to the extent SCS is entitled to and recovers such additional compensation or damages from the Owner.

Page 1

**Article 6 - Invoices:** Subcontractor shall submit all invoices for the Work performed in duplicate to SCS for review and approval.  All invoices shall be accompanied by labor and/or material releases, in a form approved by SCS, executed by Subcontractor, for labor or materials provided through the date of the invoice.  SCS shall pay Subcontractor the amount of the approved invoice forty-five (45) days after the receipt, review and approval of the invoice.

Subcontractor shall be liable for all sales, use, consumer and other similar taxes, including FICA and workmens' compensation, incurred in performing the Work under this Service Order. Partial payments may be made to Subcontractor in the amount of 90% of the Work in place, which has been approved by SCS and the Owner.  Upon payment of 90% of the total contract price to Subcontractor, the balance of invoices submitted and approved will be paid forty-five (45) days after the total completion by Subcontractor and final inspection and acceptance by SCS and the Owner of the Subcontractor's Work.

The acceptance by Subcontractor of final payment shall operate as a complete release of SCS as to all claims and all liability to Subcontractor for all things done or furnished in connection with the Work performed by Subcontractor under this Service Order.  SCS reserves the right to pay any funds owed Subcontractor in the form of a check or checks made jointly payable to Subcontractor and one or more of Subcontractor's material suppliers, laborers or subcontractors, if any.  Any payment made to Subcontractor prior to total completion and final acceptance by SCS of Subcontractor's Work shall not be construed or operate as acceptance of Subcontractor's Work nor as a waiver of any claim by SCS arising out of Subcontractor's failure to meet its warranty hereunder or to comply strictly with the provisions of this Service Order.  No payment by SCS, however, whether final or otherwise, shall operate in any manner to release Subcontractor or his surety, if any, from any   remaining obligations under this Service Order or from any performance and/or materials and labor bond.

SCS may withhold payment of money otherwise due to Subcontractor, in whole or in part, for the following reasons: ( 1) Defective Work that has not been remedied, (2) Omission of Work required by this Service Order, (3) Third party claims (such as mechanic's liens or stop notices) filed or reasonable evidence indicating the probable filing of such claims, (4) Failure of Subcontractor to make payments properly to other subcontractors for labor, materials or equipment, (5) Reasonable evidence that the Work cannot  be completed for the unpaid balance of the contract price, (6) Damage to SCS, the Owner or another contractor, (7) Persistent failure to perform the Work in accordance with this Service Order, (8) Reasonable evidence that the Work cannot be completed within the work schedule,  (9) Any dispute or controversy between Subcontractor and the Owner or another contractor, or (10) Any other cost or liability which SCS has incurred or, in SCS' reasonable opinion, may incur for which Subcontractor may be responsible.  When the basis for the above withholding has been removed, SCS shall pay Subcontractor the amount withheld less any expenses incurred or damages sustained (including attorney fees) by SCS as a result of the withholding, the cause of the withholding or the removal of the cause of the withholding.  Any payment made by SCS directly to any laborer, materialman or contractor shall be deemed payment to Subcontractor credited against the contract price due Subcontractor hereunder.

**Article 7 - Investigation:** By signing this Service Order, Subcontractor represents that it is fully qualified to perform the Work in accordance with this Service Order and agrees that it has satisfied itself, by its own investigation and research, regarding all conditions affecting the Work to be performed, the materials and/or labor to be furnished, and the remediation, testing and/or handling of any hazardous substances, including all laws, standards and requirements of all governmental entities, and as to the meaning and intention of the plans, technical specifications and other documents relating to the Work, and that it has visited and familiarized itself with the conditions at the job site.

**Article 8 - Governmental Compliance and Permits:** Subcontractor and its employees, agents, representatives and subcontractors, if any, shall comply with all applicable federal, state, local and other governmental entity laws, statutes, ordinances, standards, rules, regulations, orders and decisions in the performance of the Work under this Service Order.  Subcontractor shall obtain, unless otherwise notified by SCS at its expense all federal, state, local and other governmental approvals, permits, licenses, inspections and variances required for the performance and completion of the Work by Subcontractor hereunder.

**Article 9 - Warranty:** Subcontractor warrants to SCS that the Work will be of good quality, free from faults and defects in workmanship or otherwise, and in strict conformance with the requirements and obligations of this Service Order, and that all materials, supplies, and equipment furnished will be new. All Work not conforming to the requirements of this warranty will be deemed defective, and Subcontractor shall redo, replace or repair all defective Work at no cost to SCS.  In lieu of remedying any such defective Work, Subcontractor, with the consent of SCS, may pay SCS the cost to redo, replace or repair the defective Work.  All available manufacturers' and suppliers' warranties shall be obtained by Subcontractor and assigned to SCS and Owner, as necessary, and Subcontractor shall assist SCS and/or Owner upon request in enforcing any such warranties.

**Article 10 - Indemnity:** To the fullest extent permitted by law, Subcontractor shall indemnify, defend and hold harmless SCS and Owner and their respective officers, directors, agents, representatives, assigns and employees from and against any and all claims, obligations, liens, encumbrances, liabilities, penalties, causes of action, and all costs and expenses incurred in connection therewith (including, without limitation, orders, judgments, fines, forfeitures, amounts paid in settlement and attorneys' fees and expenses), whether for injury, illness or death to persons, damage or destruction of property, infringement or violation of any patent right, or for any other claim or action of any kind or nature whatsoever, arising out of or in connection with the Work performed under this Service Order by Subcontractor, its employees, agents, representatives and subcontractors, if any.  Upon written request from SCS, Subcontractor shall defend, at his own expense, any suit brought against SCS or Owner in connection with any claim covered by this indemnity.  Subcontractor acknowledges and agrees that One Hundred Dollars ($ 100.00) of the Service Order compensation represents the specific consideration paid by SCS for all the indemnifications from Subcontractor pursuant to this Service Order.

**Article 11 - Insurance:** Subcontractor shall purchase and maintain, for the protection of Subcontractor, UC, and SCS, during the term of this Service Order, at the Subcontractor's expense, the following insurance coverages and levels:

.1      Workers Compensation and Employer's Liability
This insurance shall protect the Subcontractor against all claims under applicable state workers' compensation laws.  Subcontractor shall also be protected against claims for injury, disease, or death to employees which, for any reason, may not fall within the provisions of a state workers' compensation law.  The policy shall include an "all states" or "other states" endorsement.

.2      The liability limits shall not be less than:
        Workers' Compensation          Statutory
        Employers Liability            $1,000,000 each occurrence

.3      Commercial General Liability
This insurance shall be written on an occurrence type policy and shall protect the Subcontractor, SCS and UC against claims for personal injury including bodily injury, death and property damage.  This
Page 3

policy shall include a contractual liability endorsement that specifically confirms the contractual liability assumed by the Subcontractor under Article 10, Indemnification, hereof, and a completed operations and products liability endorsement to remain in effect for the period of the applicable statute of limitations/repose after final payment.  Limits of liability will not be less than $2 million in combined single limit for bodily injury and property damage.

.4      Automobile Liability Policy
This insurance shall be written on an occurrence type policy and shall protect the Subcontractor, SCS and UC against all claims for injuries arising out of use of any auto including own, hired, or non-owned autos.  Limits of liability will not be less than $2 million in combined single limits for bodily injury and property damage.

.5      Professional Liability Insurance
To the extent Subcontractor provides engineering or other professional services, Subcontractor shall at all times during the term of this Service Order and for 3 years thereafter, maintain and keep in force professional liability insurance (Errors & Omissions) in an amount not less than $5 million per claim to cover the professional liability of the Subcontractor for Work performed under this Service Order.

.6      Additional Insured
All insurance coverages furnished under this Service Orderr, with the exception of workers' compensation and professional liability, shall include SCS and UC as an additional insured with respect to the activities of the Subcontractor.

Stearns, Conrad and Schmidt, Consulting Engineers, Inc.
3900 Kilroy Airport Way, Suite 100, Long Beach, CA 90806

University of California, Office of the President
1111 Broadway, suite 1450, Oakland, CA  94607

.7      Waiver of Subrogation
The Subcontractor shall require their insurance carrier to waive all rights of subrogation against SCS, UC, their employees, directors and officers.

The above insurance policies shall contain cross liability provisions and shall name SCS and UC as additional insured in each liability policy with respect to all activities arising out of the performance of the Work by or on behalf of Subcontractor under this Service Order.  Such liability coverages shall be primary to any insurance maintained by SCS or UC.  All such insurance policies shall be written by insurance companies satisfactory to SCS.  Certificates of Insurance confirming all of the insurance coverages required to be maintained by Subcontractor shall be filed with SCS prior to Subcontractor commencing any Work, and such certificates shall provide SCS with thirty (30) days written notice of cancellation or material change in coverage.

**Article 12 - Nondisclosure of Information:** Subcontractor acknowledges that information received pursuant to this Service Order shall be treated by Subcontractor as confidential, proprietary and/or trade secrets of SCS.  Subcontractor agrees not to publicize, release or disclose to any third party or to the public, in any manner or form, whether during the term of this Service Order or any time thereafter, any information regarding the performance or completion of the Work under this Service Order, or the results or data obtained from the Work, without the specific prior written consent of SCS.

Page 4

**Article 13 - Noncompliance:** SCS may, by written notice to Subcontractor, immediately terminate this Service Order if Subcontractor shall: ( 1) Be adjudged a bankrupt, or make a general assignment for the benefit of creditors, or have a receiver appointed due to his insolvency, (2) Abandon the Work hereunder, (3) Fail in any respect to prosecute the Work according to the current schedule, (4) Persistently refuse or fail to supply enough properly skilled employees or proper equipment or materials, ( 5) Fail to make prompt payment for materials or labor, or to subcontractors, if any, (6) Persistently disregard laws, ordinances, rules, regulations or orders of any governmental entity, (7) Sublet any portion of the Work or assign this Service Order, in whole or part, without the prior written consent of SCS, or (8) Breach any term of this Service Order. Thereafter, if the unpaid balance of the contract price exceeds the cost of completing Subcontractor's Work, including compensation for SCS' services and expenses caused thereby, such excess shall be paid to Subcontractor. If such costs exceed the unpaid balance, Subcontractor shall promptly pay the difference to SCS upon receipt of written notice of such excess. This payment obligation shall survive the termination of this Service Order. In the event of the failure by Subcontractor to comply with any of the provisions of this Service Order, SCS may give written notice of default to Subcontractor with respect to any such failure. If Subcontractor fails to cure such default within two (2) working days or within the time specified in the notice, whichever period is shorter, SCS shall have the option, without terminating this Service Order or the obligations hereunder of Subcontractor, of completing the Work or any portion thereof itself or having the Work, in whole or in part, completed by any third party. The cost of the Work performed shall be deducted from the contract price, and if the cost of completing such Work exceeds the unpaid balance of the contract price, Subcontractor shall promptly pay the difference to SCS upon receipt of written notice of such excess. Subcontractor shall be liable for all expense s incurred and damages suffered by SCS as a result of Subcontractor's default, and the exercise of any such option by SCS shall not release Subcontractor from such liability.

**Article 14 - Termination for Convenience:** SCS shall have the right to terminate all or any portion of this Service Order for convenience by providing Subcontractor a written notice of termination, to be effective upon receipt by Subcontractor. If Subcontractor is terminated for convenience, Subcontractor shall be entitled to be paid a portion of the contract price based on the reasonable value of Work properly performed prior to termination, plus reasonable direct close-out costs. If SCS wrongfully exercises its rights under Article 13 above, the wrongful termination shall be treated as one for convenience pursuant to this Article 14 and Subcontractor's remedy under this Section shall be exclusive.

**Article 15 - Disputes:** In the event of a dispute involving the Prime Contract or the Owner, Subcontractor shall be obligated to pursue the matter in accordance with the disputes resolution procedures under the Prime Contract. In such case, upon approval by SCS of Subcontractor's claim, the Subcontractor's claim will be handled either: a) as a pass-through claim against the Owner in SCS' name or (2) by SCS on behalf of Subcontractor, at SCS' sole option. In the event of such claim by Subcontractor, SCS shall be entitled to offset any recovery by its cost (including attorney fees) and expenses incurred in reviewing and coordinating Subcontractor's claim. Subject to the foregoing, Subcontractor's entitlement to recovery shall be limited to the amounts actually received by SCS from Owner in payment on behalf of Subcontractor's claim. In the event of a dispute between SCS and Subcontractor, the matter shall be resolved through litigation. In the event of a dispute, Subcontractor shall proceed with the Work in accordance with SCS direction, without disruption or delay.

**Article 16 - General Provisions:** Subcontractor shall not sublet the performance of any portion or all of the Work nor assign this Service Order in whole or part, without the prior written consent of SCS. Subject to this limitation, this Service Order shall inure to the benefit of and be binding upon the parties hereto and their successors, assigns and heirs. Subcontractor's relationship to SCS in the

Page 5

performance of the Work under this Service Order shall be that of an independent contractor.

This Service Order shall be interpreted under and governed by the laws of the State in which the Work is performed. To the extent of partial and /or final payments made to Subcontractor, Subcontractor waives its right to file a lien against the Project property. Subcontractor further agrees, at its expense, to take all necessary actions to discharge any liens filed by Subcontractor's subcontractors, suppliers, vendors, employees or any other party performing Work on the Project for Subcontractor.

SCS is hereby granted sole and complete ownership of all reports, drawings, renderings and other documents prepared by Subcontractor under this Service Order.

Subcontractor understands and acknowledges the potential for contact with hazardous substances in the conduct of Services and certifies that its employees engaged in the Services have completed health and safety training courses specified by the Occupational Safety and Health Administration and with environmental protection agencies as necessary for performance of the Services hereunder. Subcontractor additionally shall assure compliance with SCS' site safety plans, or other health and safety rules applicable to the Services.

Notwithstanding any failure to sign and return the acknowledgement copy of this Service Order or Subcontractor's use of any other acknowledgement form not signed by SCS, this Service Order and the documents incorporated in or attached hereto represent the entire contract for the performance of the Work between SCS and Subcontractor. No verbal agreement or conversation between the parties either before or after the execution of this Service Order shall affect or modify any of the provisions contained herein. This Service Order may be amended or modified only be a subsequent written instrument signed by SCS.

If either party engages legal counsel to enforce this Service Order the prevailing party shall be entitled to receive all costs and expenses, including reasonable attorney fees incurred as a result of such action.

In the event any provision of this Service Order is determined to be invalid the remaining provisions of this Service Order shall continue in full force and effect.

**Article 17- Parties To Service Order:** For the purposes of this Service Order, the term "SCS Engineers" shall mean SCS Engineers P.C. for projects North Carolina, and Stearns, Conrad and Schmidt Consulting Engineers, Inc. for all other projects.

**Article 18 – Performance & Payment Bonds:** Subcontractor shall furnish bonds covering the faithful performance of this Service Order (Performance Bond) and payment of obligations arising hereunder (Payment Bond) in a form and content satisfactory to SCS. SCS and the Owner shall be named as obligees. The Payment Bond and Performance Bond (collectively, the "Bonds") shall each be in the amount of 100% of the contract price, and shall be in effect within five (5) days after the Service Order is signed by SCS and, in any event, before Subcontractor commences Work under the Service Order. The Bonds shall remain in effect throughout Subcontractor's performance of the Work and until all of Subcontractor's obligations, including warranties, under the Service Order have been fulfilled to the satisfaction of SCS. The surety company(ies) used by Subcontractor shall be solvent and a legal surety in the State of Louisiana. All premiums for the Bonds shall be paid by Subcontractor. To the extent applicable, the Bonds shall comply with all requirements of §4812 of the Louisiana Private Works Act (La R.S. 9:4801, et seq.).

ATTACHMENT

Service Order for Construction Services Prime Contract Flow Down Provisions

In accordance with the Service Order for Construction Services, the following provisions of the Prime Contract between SCS and The Regents of the University of California, dated April 7, 2016, for the Shreveport Biomethane Facility, apply to Sub-consultant's Services:

| Authorization for Turnkey Purchase | |
|---|---|
| Article 3 | |
| Article 8 | |
| Article 10.1 | |
| Article 10.3 | |
| Article 10.4 | |
| Article 10.5 (as modified) | Design Builder and its Sub-consultants have carefully reviewed the following exhibits to the Design Build Authorization: (1) Scope of Work (including Applicable Codes, Rules and Regulations, Energy Requirements, etc.); (2) the Performance Specifications; (3) Design Criteria; (4) Drawings; and (5) Acceptance Test Procedure. |
| Article 10.6 | |
| Article 10.8 | |
| Article 10.9 | |
| General Conditions | |
| Article 1.1 | |
| Article 1.2 | |
| Article 1.3 | |
| Article 3.1.1 | |
| Article 3.2.7 | |
| Article 3.2.8 | |
| Article 3.2.11 | |
| Article 3.2.12 | |
| Article 3.4 | |
| Article 3.7 | |
| Article 3.10.3 | |
| Article 3.10.4 | |
| Article 3.10.7 | |
| Article 3.14 | |
| Article 3.15 | |
| Article 3.16.9 | |
| Article 3.19 | |
| Article 3.20 | |
| Article 3.21 | |
| Article 3.22 | |
| Article 3.23 | |

| | |
|---|---|
| Article 3.24 | |
| Article 3.27 | |
| Article 3.28 | |
| Article 4.2 | |
| Article 4.3 | |
| Article 4.4 | |
| Article 4.5 | |
| Article 4.7 | |
| Article 5.2 | |
| Article 5.3 | |
| Article 7.1 | |
| Article 7.2 | |
| Article 7.3 | |
| Article 7.4 | |
| Article 8.4 | |
| Article 8.5 | |
| Article 9.9 | |
| Article 9.9.4 | |
| Article 10 | |
| Article 12.1 | |
| Article 12.2 | |
| Article 13.2 | |
| Article 13.3 | |
| Article 13.4 | |
| Article 14.1 | |
| Article 14.7 | |
| Article 15.1 | |
| Article 15.7 | |
| Article 15.9 | |
| **Exhibit:  Scope of Work** | |
| **Exhibit:  Acceptance Test Procedure** | |
| **Exhibit:  Subcontractor Claim Certification** | |
| **Exhibit:  Design Criteria** | |
| **Exhibit:  List of Drawings** | |
| **Exhibit:  Release of Lien** | |
| **Exhibit:  Performance & Payment Bonds** | |
| **Exhibit:  Performance Specifications** | |

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

## AUTHORIZATION FOR TURNKEY PURCHASE

This AUTHORIZATION FOR TURNKEY PURCHASE (hereinafter the "Authorization") is made as of the   7th day of April,   2016, between THE REGENTS OF THE UNIVERSITY OF CALIFORNIA (the "University") and Stearns, Conrad and Schmidt Consulting Engineers, Inc. dba SCS Energy ("SCS") pursuant to the existing Professional Services Agreement between University and SCS dated April 11, 2013.

whose facility is:                    University of California, Office of the President

whose address for notices is:         Energy & Sustainability
                                      University of California, Office of the President
                                      1111 Franklin St
                                      Oakland, CA 94607

and Design Builder:                   Stearns, Conrad and Schmidt Consulting Engineers, Inc. dba SCS Energy

Design Builder's Representative is:   Theodore R. Wheeler, P.E.
                                      Senior Project Manager

whose address for notices is:         3900 Kilroy Airport Way, Suite 100
                                      Long Beach, California 90806

Authorization
Turnkey Purchase DB:A          1

DocuSign Envelope ID: EE3D18E0-3B43-472F-B433-2726754F0C1A

Project Name: Shreveport Biomethane Facility                                    Project No.: PH7006

for the Project:                              Shreveport Biomethane Facility

                                              University of California

                                              10580 Woolworth Rd

                                              Keithville, LA 71047

University's Responsible Administrator:       Rachael Nava

                                              Executive Vice President – Chief Operating

                                              Officer

University's Representative is:               Nicholas Balistreri

                                              Energy & Utility Manager

whose address for notices is:                 Energy & Sustainability

                                              University of California

                                              1111 Franklin St

                                              Oakland, CA 94607

Authorization
Turnkey Purchase DB:A                         2

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

University and Design Builder hereby agree as follows:

## ARTICLE 1   WORK

Design Builder shall provide all work required by the Contract Documents (the "Work") including, without limitation, designing and constructing the Project in compliance with the Criteria Documents as defined in General Conditions Article 1.1.25.  Design Builder agrees to do additional Work arising from changes ordered by the University pursuant to Article 7 of the General Conditions.  The Work will be performed in Phases identified as follows:

Phase 1 – Design Development Documents

Phase 2 – Construction Documents

Phase 3 – Construction

Subject to the terms and conditions of the Contract Documents, the University shall purchase the Project for the Contract Sum.

## ARTICLE 2   OPTIONS

The University may exercise its option for performance of the Work under Phases 2 and 3 by providing a written Notice to Proceed to the Design Builder for performance under either or both of the Phases. The Option for Phase 2 may be exercised not later than 60 days after the expiration of Phase 1 Time if Design Builder completed acceptable Design Development Documents within the Phase 1 Time.  If the Design Builder has not completed acceptable Design Development Documents within the Phase 1 Time, then the University may, but need not, accept a late provision of the Design Development Documents and, if

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

the Design Development Documents are subsequently accepted by the University, then the University may exercise the Option for Phase 2 within 5 business days of said acceptance.

The Option for Phase 3 may be exercised not later than 60 days after the expiration of Phase 2 Time if Design Builder completed and submitted acceptable Construction Documents within the Phase 2 Time.   If the Design Builder has not completed and submitted acceptable Construction Documents within the Phase 2 Time, then the University may, but need not, accept a late submittal of the Construction Documents and, if the Construction Documents are subsequently approved by the University, then the University may exercise the Option for Phase 3 within 5 business days of said approval.

The University's "OPTIONS" rights under this Article 2 are independent of the "Termination for Convenience" rights as set forth in Article 13, section 13.4 of the General Conditions. As such, if the University opts to not proceed with Phase 2 after the completion of Phase 1, Design Builder's right of recovery is limited to the Contract Sum for Phase 1.   If the University opts to not proceed with Phase 3 after the completion of Phases 1 and 2, Design Builder's right of recovery is limited to the Contract Sum for Phases 1 and 2.

The University retains the right to terminate this Authorization for convenience at any time in accordance with Article 13 of the General Conditions.

ARTICLE 3   CONTRACT DOCUMENTS

"Contract Documents" means the Preliminary Schedule, this Authorization, General Conditions, Exhibits, Performance Specifications, Drawings, Drawings, Notice of Contract, Notice to Proceed, Change Orders, Notice of Completion, the Criteria Documents, and all other documents identified in this Authorization that together form the contract between University and Design Builder for the Work (the "Authorization", sometimes referred to as the "Contract").   This Authorization, consisting of the Contract Documents, constitutes the

complete agreement between University and Design Builder and supersedes any previous agreements or understandings with the exception of the provisions of the existing Professional Services Agreement including the Exhibits and Appendices between University and SCS dated April 11, 2013 and applicable written authorizations issued pursuant thereto. In the event of a conflict between the provisions of the existing Professional Services Agreement including the Exhibits and Appendices between University and SCS dated April 11, 2013 and applicable written authorizations issued pursuant thereto, and this Authorization (including all of the Contract Documents defined in the first sentence of this Article), this Authorization shall control.

This Authorization includes the following Exhibits attached hereto and made a part hereof:

Acceptance Test Procedure

Air Liquide Warranty [for Gas Processing Membranes]

Application for Payment after Acceptance Testing

Application for Payment upon Final Completion

Assumptions & Qualifications

Certificate of Insurance

Certificate of Substantial Completion

Change Order

Cost Breakdown

Cost Proposal

Critical Spares

Design Builder Claim Certification

Design Criteria

Drawings

Field Order

Final Payment Conditional Release of Lien

Letter of Design Review

List of Drawings

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

List of Subcontractors

Notice of Completion

Notice of Contract

Notice to Proceed

Payment after Acceptance Testing Conditional Release of Lien

Payment Bond

Performance Bond

Performance Certificate

Performance Specifications

Preliminary Schedule

Scope of Work

Subcontractor Claim Certification

Unconditional Final Payment Release of Lien

University Furnished Information

Vilter Warranty [for Gas Compression Plant]

## ARTICLE 4   CONTRACT SUM

Subject to the provisions of the Contract Documents University shall pay to Design Builder, for the performance of the Work, the "Contract Sum".

If the University elects to exercise its Options for Phases 2 and 3, then the Contract Sum for the Work of Phases 1, 2 and 3 shall be:

1. The Actual Cost of the Work as defined in General Conditions Article 1.1.60, which includes ████████ for insurance and ████████ for bonds;

2. Plus Compensable Delay;

Authorization
Turnkey Purchase DB:A                          6

Project Name: Shreveport Biomethane Facility                                    Project No.: PH7006

3. Minus Liquidated Damages;

4. Minus University damages (such as back charges) properly assessed against Design Builder prior to Final Completion;

5. Plus the Design Builder Fee as defined in General Conditions Article 1.1.63, subject to any limitations on the Design Builder Fee with respect to Change Orders or otherwise;

6. Plus the Cost Savings as defined in General Conditions Article 1.1.61.

Notwithstanding the forgoing, the sum of the following amounts shall not exceed ▮▮▮▮▮▮▮▮ (hereinafter this not to exceed amount shall be referred to as the "Guaranteed Maximum Price" or "GMAX"):

.1      The Actual Cost of the Work; and

.2      Compensable Delay; and

.3      The Design Builder Fee.

The GMAX shall be reduced by the amount of any properly assessed Liquidated Damages. The GMAX shall be reduced by the amount of any University damages (such as backcharges) properly assessed against Design Builder prior to Final Completion.

If the University elects not to exercise its Option for Phases 2 and 3, then the Contract Sum (for Phase 1 Work) shall be ▮▮▮▮▮▮▮▮

If the University elects its option for Phase 2, and elects not to exercise its Option for Phase 3, then the Contract Sum (for Phase 1 and Phase 2 Work) shall be ▮▮▮▮▮▮▮▮.

Authorization
Turnkey Purchase DB:A                          7

Project Name: Shreveport Biomethane Facility                                    Project No.: PH7006

## ARTICLE 5  CONTRACT TIME

Design Builder shall commence the Work for Phase 1 on the date specified in the Notice to Proceed for Phase 1 and fully complete the work within 45 days, the "Phase 1 Time." The Contract Time at award is the Phase 1 Time.

The time allowed for the completion of Phases 2 and 3 shall be as follows:

Phase 2 – The Design Builder shall commence the Work for Phase 2 on the date specified in the Notice to Proceed for Phase 2 and fully complete the Work for Phase 2 within 250 days, the "Phase 2 Time." If the University exercises its Option for Phase 2, the Phase 2 Time will be added to the then Contract Time plus any days between the completion of Phase 1 and the exercise of the Option for Phase 2 to establish a revised Contract Time for completion of Phases 1 and 2.

Phase 3 – The Design Builder shall commence the Work for Phase 3 on the date specified in the Construction Notice to Proceed for Phase 3 and fully complete the Work for Phase 3 within 410 days, the "Phase 3 Time." If the University exercises its Option for Phase 3, the Phase 3 Time will be added to the Contract Time for completion of Phases 1 and 2, plus any days between the completion of Phase 2 and the exercise of the Option for Phase 3 to establish a revised Contract Time for completion of all Phases. In the event that the Option for Phase 3 is exercised prior to the completion of Phase 2, the revised Contract Time will be the number of days from the start of Phase 1 to the exercise of the option for Phase 3, plus the number of days specified herein for the completion of Phase 3.

By signing this Authorization, Design Builder represents to University that i) the Phase 1 Time, Phase 2 Time, and Phase 3 Time are reasonable for completion of the Work of the respective Phase; ii) the Contract Time (as defined above) is reasonable for completion of the Work of all the Phases; and iii) Design Builder will complete the Work within the

DocuSign Envelope ID: EF3D7859-3B42-472F-B43F-272675AE0C1A

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

Contract Time.  Design Builder's representation is subject to the assumptions regarding the Work for Phases 1, 2 and 3 set forth in the Criteria Documents.

## ARTICLE 6   LIQUIDATED DAMAGES

If University has exercised its option for Phase 3 and Design Builder fails to complete the Work for Phase 3 within the Contract Time, Design Builder shall pay to University, as liquidated damages and not as a penalty, the applicable amount(s) indicated below as "Liquidated damage daily rate for Phase 3" for each day after the expiration of the Contract Time that the Work remains incomplete.  After Substantial Completion, the liquidated damages daily rate for Phase 3 shall be changed to the sum indicated below. University and Design Builder agree that if the Work is not completed within the Contract Time, University's damages would be extremely difficult or impracticable to determine and that said amounts indicated below are reasonable estimates of and reasonable sums for such damages.  University may deduct any liquidated damages due from Design Builder from any amounts otherwise due to Design Builder under the Contract Documents.  This provision shall not limit any right or remedy of University in the event of any other default of Design Builder other than failing to complete the Work within the Contract Time.  This Article 6 will only apply if the University exercises its Option for Phase 3.

Liquidated damages daily rate for Phase 3  -  $ 2,500.00   (on or before Substantial Completion)

Liquidated damages daily rate for Phase 3  -  $ 1,500.00  (after Substantial Completion).

## ARTICLE 7   COMPENSABLE DELAY

If Design Builder is entitled to an increase in the Contract Sum as a result of a Compensable Delay, determined pursuant to Articles 7 and 8 of the General Conditions, the Contract Sum will be increased by the sums indicated below per day for each day for

Authorization
Turnkey Purchase DB:A                    9

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

which such compensation is payable. This Article 7 will apply only if the University exercises its Option for Phase 3 and only to the extent that Design Builder fulfills requisites proving entitlement to Compensable Delay.

Compensable delay daily rate for Phase 3 <u>before</u> Substantial Completion  -  $2,500.00

Compensable delay daily rate for Phase 3 <u>after</u> Substantial Completion  -  $1,500.00

The daily rates shown above will be the total amount of Design Builder entitlement for each day of compensable delay.  The University will pay the daily rate of compensation only for the actual number of days of compensable delay, as defined in the General Conditions.

ARTICLE 8   ASSIGNMENT

If this Authorization is terminated prior to the exercise of the University's Option for Phase 3, the Design Builder shall execute an assignment to the University of all contracts with Design Professionals for work to be performed on Phases 1 and 2, said assignment being subject to the provisions of Article 1.2 in the General Conditions.

ARTICLE 9   DUE AUTHORIZATION

The person or persons signing this Authorization on behalf of Design Builder hereby represent and warrant to University that this Authorization is duly authorized, signed, and delivered by Design Builder.

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

## ARTICLE 10   DESIGN BUILDER'S COVENANTS AND REPRESENTATIONS

Without superseding, limiting, or restricting any other representation or warranty set forth elsewhere in the Contract Documents, or implied by operation of law, the Design Builder makes the following covenants and representations to University:

10.1    Design Builder and all of its Design Professionals and subcontractors are properly certificated, licensed and qualified to perform the Work required by the Contract Documents.

10.2    Design Builder accepts the relationship of trust and confidence with the University established by the Contract Documents.    Design Builder will cooperate with University.

10.3    Design Builder and its Design Professionals have carefully examined the site of the Project and the adjacent areas, have suitably investigated the nature and location of the Construction Work and have satisfied themselves as to the general and local conditions which will be applicable, including but not limited to: (1) conditions related to site access and to the transportation, disposal, handling and storage of materials; (2) the availability of labor, water, power and roads; (3) normal weather conditions; (4) observable physical conditions at the site and existing site conditions including: size, utility capacities and connection options of external utilities; (5) the surface conditions of the ground and (6) the character and availability of the equipment and facilities which will be needed prior to and during the performance of Construction Work.

10.4    Design Builder and its Design Professionals have suitably reviewed the site survey, record documents, seismic data, preliminary geotechnical and other

Authorization
Turnkey Purchase DB:A                    11

Project Name: Shreveport Biomethane Facility                                      Project No.: PH7006

test reports, environmental documents and any other documentation furnished by University in the Exhibits.

10.5    Design Builder and its Design Professionals have carefully prepared and reviewed the following exhibits to the Design Build Authorization: (1) Scope of Work (including Applicable Codes, Rules and Regulations, Energy Requirements, etc.); (2) the Performance Specifications; (3) Design Criteria; (4) Drawings; and (5) Acceptance Test Procedure. Design Builder acknowledges that these Exhibits establish the scope, level of quality, design intent and the procedures for the development of the design to a state of 100% completion.

Design Builder agrees that (1) the Exhibits depict and describe a design for the Project which is partially complete and may vary in degree of completion from 5% to 95% depending on the particular Project; (2) it will manage, coordinate and fully complete the design; (3) Design Builder will cause its Design Professionals to describe and depict the final design for the Project, as approved by the University, in Construction Documents which will include all information required by the building trades to complete the construction (other than such details customarily developed by others during construction) and (4) it will manage and timely construct the Project in consideration for the University's payment of the Contract Sum.

10.6    Design Builder also agrees that time is of the essence for the performance of the Work.

10.7    Design Builder agrees that all Construction Documents will be complete, coordinated, and accurate as necessary for the Design Builder to construct the Facility.

Authorization
Turnkey Purchase DB:A                          12

Project Name: Shreveport Biomethane Facility                     Project No.: PH7006

10.8    Design Builder agrees that all materials, equipment and furnishings incorporated into or used in the Construction Work will be of good quality, new (unless otherwise required or permitted by the Contract Documents) and free of liens, claims and security interests of third parties. If required by the University, Design Builder will furnish satisfactory evidence as to the kind and quality of the materials, equipment and furnishings.

10.9    Design Builder agrees that the Work will be of good quality, free of defects and will conform with the requirements of the Contract Documents. Work not conforming to the requirements of the Contract Documents, including substitutions in design or construction may be considered defective.

10.10   Design Builder agrees to correct any error(s), omission(s), or deficiencies in the Contract Documents or Construction Documents at no additional cost to University; however, this provision in no way limits the liability of Design Builder.

ARTICLE 11   LIMITATION OF LIABILITY

IN NO EVENT SHALL EITHER PARTY BE LIABLE, UNDER ANY LEGAL THEORY, TO THE OTHER PARTY, FOR DAMAGES EXCEEDING ████████, SUBJECT TO THE FOLLOWING:

1. NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR LOST PROFITS, BUSINESS INTERRUPTION, LOST OPPORTUNITY, LOST REVENUE, LOSS OF USE AND/OR PUNITIVE DAMAGES OF ANY NATURE.

Authorization
Turnkey Purchase DB:A                     13

Project Name: Shreveport Biomethane Facility                                    Project No.: PH7006

2.  LIABILITY SHALL NOT BE LIMITED BY INSURANCE.

3.  LIABILITY LIMITS SHALL NOT APPLY TO THIRD PARTY CLAIMS FOR
PERSONAL INJURY, WRONGFUL DEATH, OR PROPERTY DAMAGES,
INCLUDING RELATED CONTRIBUTION AND INDEMNITY CLAIMS BY THE
PARTIES TO THIS AUTHORIZATION.  FOR PURPOSES OF THIS ARTICLE 11,
EMPLOYEES OF THE PARTIES ARE THIRD PARTIES.

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

THIS AUTHORIZATION is entered into by University and Design Builder as of the date set forth above.

UNIVERSITY:                                DESIGN BUILDER:

THE REGENTS OF THE UNIVERSITY              Stearns, Conrad and Schmidt Consulting
OF CALIFORNIA                              Engineers, Inc.

                                           A Virginia Corporation

By: *Rachael Nava*        4/5/2016         By: *Jim Walsh*         4/4/2016
(Signature)                                (Signature)

Rachael Nava                               Jim Walsh
(Printed Name)                             (Printed Name)

Executive  Vice  President  -  Chief       President
Operating Officer                          (Title)
(Title)

                                           Design  Builder's  Louisiana  Contractor
                                           License(s):

                                           Stearns, Conrad and Schmidt, Consulting
                                           Engineers, Inc.
                                           (Thomas W. A. Barham)

Authorization
Turnkey Purchase DB:A                      15

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

General No. 30469

(Classification and License Number)

06/29/2016

(Expiration Date)

Design-Builder's   Employer   Identification
No:

**54-0913440**

Attach notary acknowledgment for all signatures of Design Builder.  If signed by other than the sole proprietor, a general partner, or corporate officer, attach original notarized Power of Attorney or Corporate Resolution.

Authorization
Turnkey Purchase DB:A                    16

Project Name: Shreveport Biomethane Facility                    Project No.:  PH7006

## GENERAL CONDITIONS

(Turnkey Purchase Contract)

TABLE OF CONTENTS

Page

**RECITALS** ................................................................................................................... 5

**ARTICLE 1     GENERAL PROVISIONS**

1.1     Basic Definitions ................................................................................................... 6
1.2     Copyright Ownership and Use of Contract Documents ........................................ 19
        1.2.2   Construction Documents............................................................................ 20
        1.2.3   Indemnification ........................................................................................ 20
1.3     Interpretation........................................................................................................ 20

**ARTICLE 2     UNIVERSITY**

2.1     Fees for Permits.................................................................................................... 22
2.2     Access to Project Site .......................................................................................... 22
2.3     Not Used............................................................................................................... 22
2.4     Not Used............................................................................................................... 22
2.5     University's Right to Replace University's Representative.................................... 23

**ARTICLE 3     DESIGN BUILDER**

3.1     Review of Contract Documents and Field Conditions by Design Builder .............. 23
3.2     Supervision and Construction Procedures ........................................................... 24
3.3     Labor and Materials ............................................................................................. 25
3.4     Design Builder's Warranty .................................................................................... 26
3.5     Taxes.................................................................................................................... 26
3.6     Permits, Fees, and Notices .................................................................................. 26
3.7     Applicable Code Requirements ............................................................................ 27
3.8     Superintendent .................................................................................................... 28

**General Conditions**
**Turnkey Purchase DB:A**

| | | |
|---|---|---|
| 3.9 | Project Manager | 28 |
| 3.10 | Hazardous Materials | 28 |
| 3.11 | Construction Documents | 30 |
| 3.12 | Monthly Reports | 31 |
| 3.13 | Other Reports | 32 |
| 3.14 | Notice of Labor Dispute | 32 |
| 3.15 | Guarantee | 32 |
| 3.16 | Schedules Required of Design Builder | 33 |
| 3.17 | As-Built Documents | 35 |
| 3.18 | Documents and Samples at Project Site | 36 |
| 3.19 | Shop Drawings, Product Data, and Samples | 36 |
| 3.20 | Use of Site and Clean Up | 38 |
| 3.21 | Cutting, Fitting, and Patching | 38 |
| 3.22 | Access to Work | 38 |
| 3.23 | Royalties and Patents | 39 |
| 3.24 | Differing Site Conditions | 39 |
| 3.25 | Concealed, Unforeseen, or Unknown Conditions or Events | 40 |
| 3.26 | University Furnished Information | 40 |
| 3.27 | Liability for and Repair of Damaged Work | 41 |
| 3.28 | Indemnification | 41 |

**ARTICLE 4     ADMINISTRATION OF THE CONTRACT**

| | | |
|---|---|---|
| 4.1 | Administration of the Contract by University's Representative | 43 |
| 4.2 | Design Builder Change Order Requests | 45 |
| 4.3 | Claims | 48 |
| 4.4 | Assertion of Claims | 50 |
| 4.5 | Decision of University's Representative on Claims | 51 |
| 4.6 | Mediation | 53 |
| 4.7 | Arbitration | 53 |
| 4.8 | Waiver | 55 |

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

## ARTICLE 5     SUBCONTRACTORS

5.1     Award of Subcontracts and Other Contracts for Portions of the Work ...................................... 55

5.2     Subcontractor Relations ........................................................................................... 56

5.3     Contingent Assignment of Subcontracts ...................................................................... 57

## ARTICLE 6     NOT USED

## ARTICLE 7     CHANGES IN THE WORK

7.1     Changes ............................................................................................................... 58

7.2     Changes Definitions ............................................................................................... 58

7.3     Change Order Procedures ........................................................................................ 59

7.4     Field Orders .......................................................................................................... 62

7.5     Variation in Quantity of Unit Price Work .................................................................... 64

7.6     Waiver ................................................................................................................. 64

## ARTICLE 8     CONTRACT TIME

8.1     Commencement of the Work ..................................................................................... 64

8.2     Progress and Completion ........................................................................................ 64

8.3     Delay ................................................................................................................... 66

8.4     Adjustment of the Contract Time for Delay ................................................................. 66

8.5     Compensation for Delay ......................................................................................... 69

8.6     Waiver ................................................................................................................. 70

## ARTICLE 9     PAYMENTS AND COMPLETION

9.1     Cost Breakdown .................................................................................................... 70

9.2     Payment after Substantial Completion and Upon Completion of Acceptance Testing or Provisional Acceptance Testing ...................................................................................... 70

9.3     Application for Payment after Acceptance Testing or Provisional Acceptance Testing ............ 71

9.4     Certificate for Payment ........................................................................................... 72

9.5     Not Used .............................................................................................................. 74

9.6     Not Used .............................................................................................................. 74

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                Project No.:  PH7006

| | | |
|---|---|---|
| 9.7 | Substantial Completion | 74 |
| 9.8 | Final Completion and Final Payment | 76 |
| 9.9 | Acceptance Testing | 76 |
| | 9.9.1   Performance Certificate | 76 |
| | 9.9.2   Procedure for Acceptance Test | 77 |
| | 9.9.3   Delayed Test | 77 |
| | 9.9.4   Retesting | 78 |
| | 9.9.5   Failure to Pass Acceptance Testing | 78 |

**ARTICLE 10    PROTECTION OF PERSONS AND PROPERTY**

| | | |
|---|---|---|
| 10.1 | Safety Precautions and Programs | 80 |
| 10.2 | Safety of Persons and Property | 80 |
| 10.3 | Emergencies | 81 |

**ARTICLE 11    INSURANCE AND BONDS**

| | | |
|---|---|---|
| 11.1 | Design Builder's Insurance | 81 |
| 11.2 | Not Used | 88 |
| 11.3 | Notice of Contract and Bond Requirement | 88 |

**ARTICLE 12    UNCOVERING AND CORRECTION OF WORK**

| | | |
|---|---|---|
| 12.1 | Uncovering of Work | 89 |
| 12.2 | Correction of Defective Work and Guarantee to Repair Period | 90 |
| 12.3 | Limited Warranties | 92 |

**ARTICLE 13    TERMINATION OR SUSPENSION OF THE CONTRACT**

| | | |
|---|---|---|
| 13.1 | Termination by Design Builder | 92 |
| 13.2 | Termination by University for Cause | 93 |
| 13.3 | Suspension by University for Convenience | 95 |
| 13.4 | Termination by University for Convenience | 95 |

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

## ARTICLE 14    STATUTORY AND OTHER REQUIREMENTS

14.1    Nondiscrimination ........................................................................................................ 97

14.2    Prevailing Wage Rates................................................................................................. 98

14.3    Payroll Records............................................................................................................ 99

14.4    Apprentices ................................................................................................................ 100

14.5    Not Used..................................................................................................................... 101

14.6    Not Used..................................................................................................................... 101

14.7    Other Jurisdictions ..................................................................................................... 102

14.8    Patient Health Information.......................................................................................... 102

## ARTICLE 15    MISCELLANEOUS PROVISIONS

15.1    Governing Law and Venue .......................................................................................... 102

15.2    Successors and Assigns ............................................................................................. 102

15.3    Rights and Remedies................................................................................................... 103

15.4    Survival........................................................................................................................ 103

15.5    Amendments................................................................................................................ 103

15.6    Severability of Provisions ........................................................................................... 103

15.7    University's Right to Audit............................................................................................ 104

15.8    Methods of Delivery for Specified Documents............................................................ 104

15.9    Time of the Essence ................................................................................................... 105

15.10   Mutual Duty to Mitigate............................................................................................... 105

## RECITALS

In consideration of the mutual agreements, covenants and conditions set forth below, the adequacy of which is hereby acknowledged, Design Builder and University agree as follows:

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                    Project No.:  PH7006

## ARTICLE 1

## GENERAL PROVISIONS

### 1.1    BASIC DEFINITIONS

#### 1.1.1    APPLICABLE CODE REQUIREMENTS

The term "Applicable Code Requirements" means all laws, statutes, the most recent building codes, ordinances, rules, regulations, and lawful orders of all public authorities having jurisdiction over University, Design Builder, any Subcontractor, the Project, the Project site, the Work, or the prosecution of the Work.

#### 1.1.2    APPLICATION FOR PAYMENT

The term "Application for Payment" means the submittal from Design Builder wherein payment for certain portions of the completed Work is requested in accordance with Article 9 of the General Conditions.

#### 1.1.3    ENGINEER OF RECORD

The term "Engineer of Record" means the Design Professional identified herein that is appropriately licensed and employed or commissioned by the Design Builder to prepare design documents and construction documents.   The term "Engineer of Record" shall be used interchangeably with the term "Architect of Record" as defined in the Contract Documents. The Engineer of Record is: Robert D. Viers, P.E.

#### 1.1.4    NOT USED

#### 1.1.5    BUILDING OFFICIAL

The term "Building Official" means the building official of the City of Shreveport or other state or local authority having jurisdiction.   The term "University's Building Official" wherever used in the Contract Documents shall mean "Building Official".

#### 1.1.6    CEQA

The term "CEQA" means the California Environmental Quality Act, Public Resources Code Section 21000 et seq.

#### 1.1.7    CERTIFICATE FOR PAYMENT

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

The term "Certificate for Payment" means the form signed by University's Representative attesting to the Design Builder's right to receive payment for certain completed portions of the Work in accordance with Article 9 of the General Conditions.

### 1.1.8   CERTIFICATE OF SUBSTANTIAL COMPLETION
See Article 9.7 of the General Conditions.

### 1.1.9   CHANGE ORDER
See Article 7.2 of the General Conditions.

### 1.1.10   CHANGE ORDER REQUEST
The term "Change Order Request" means a proposal for a Change Order submitted by the Design Builder to the University, either at the request of the University, or at the Design Builder's own initiative.

### 1.1.11   CLAIM
See Article 4.3 of the General Conditions.

### 1.1.12   COMPENSABLE DELAY
The term "Compensable Delay" means a delay that entitles the Design Builder to an adjustment of the Contract Sum, the GMAX and an adjustment of the Contract Time pursuant to Articles 7 and 8 of the General Conditions.

### 1.1.13   CONSTRUCTION DOCUMENTS
The term "Construction Documents" means the plans and specifications prepared by the Design Builder for the Project, approved by the University. The Construction Documents shall set forth in detail all items necessary to complete the construction (other than such details customarily provided by others during construction) of the Project in accordance with the Contract Documents (subject to their completion following commencement of the Construction Phase). All amendments and modifications to the Plans and Specifications must be approved by the University in writing.

### 1.1.14   CONSTRUCTION DOCUMENTS PHASE
The term "Construction Documents Phase" means the period of time set forth in the Authorization beginning with the issuance of the Notice to Proceed for Phase 2. This term is also referred to within the Contract Documents as "Phase 2" and the two terms may be used interchangeably. The scope of the Construction Documents Phase is further defined in the Scope of Work Exhibit. The term "Phase 2 Time" is defined in Article 5 of the Authorization.

---

General Conditions
Turnkey Purchase DB:A

Project Name: Shreveport Biomethane Facility                    Project No.:  PH7006

1.1.15   CONSTRUCTION NOTICE TO PROCEED

The term "Construction Notice to Proceed" means the written notice given by the University to the Design Builder advising that the Site is available to the Design Builder and directing the Design Builder to commence the Construction Phase of the Project.

1.1.16   CONSTRUCTION PHASE

The term "Construction Phase" means the period of time set forth in the Authorization beginning with the issuance of the Construction Notice to Proceed and ending on the date of Final Completion of the Project. This term is also referred to within the Contract Documents as "Phase 3" and the two terms may be used interchangeably.   The scope of the Construction Phase is further defined in the Scope of Work Exhibit. The term "Phase 3 Time" is defined in Article 5 of the Authorization.

1.1.17   CONSTRUCTION WORK

The term "Construction Work" means that portion of the Work consisting of the provision of labor, materials, furnishings, equipment and services in connection with the construction of the Project as set forth in the Contract Documents.

1.1.18   CONTRACT

The term "Contract" shall have the meaning identified in Article 3 of the Authorization.

1.1.19   CONTRACT DOCUMENTS

The term "Contract Documents" means all documents listed in Article 3 of the Authorization.

1.1.20   CONTRACT MILESTONE

The term "Contract Milestone" means any requirement in the Contract Documents that reflects a planned point in time for the start or completion of a portion of the Work measured from i) the date of any of the Notices to Proceed or ii) the date of another Contract Milestone defined in the Contract Documents, as applicable.

1.1.21   CONTRACT SCHEDULE

The term "Contract Schedule" means the graphical representation of a practical plan, in accordance with the Contract Documents to perform and complete the Work within the Contract Time.   The detailed requirements for the Contract Schedule are stated in Article 3 of the General Conditions.

1.1.22   CONTRACT SUM

The term "Contract Sum" is defined in Article 4 of the Authorization.

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

### 1.1.23  CONTRACT TIME

The term "Contract Time" means the number of days set forth in the Authorization within which Design Builder must achieve Final Completion of the Work, as adjusted by Change Order.

### 1.1.24  COST OF EXTRA WORK

See Article 7.3 of the General Conditions.

### 1.1.25  CRITERIA DOCUMENTS

The term "Criteria Documents" means the portions of the Contract Documents which constitute an outline of design requirements, Scope of Work Performance Specifications and Drawings as follows:

   1.1.25.1 Design Criteria Exhibit

   1.1.25.2 Performance Specifications Exhibit

   1.1.25.3 Scope of Work Exhibit

   1.1.25.4 NOT USED

   1.1.25.5 Acceptance Testing Procedure

   1.1.25.6 Drawings identified on the List of Drawings

### 1.1.26  DAY

The term "day," as used in the Contract Documents, shall mean calendar day, unless otherwise specifically provided.

### 1.1.27  DEFECTIVE WORK

The term "Defective Work" means Work that does not conform to the requirements of the Contract Documents.

### 1.1.28  DESIGN BUILDER

The term "Design Builder" means the person or firm identified as such in the Authorization and is referred to throughout the Contract Documents as if singular in number.

### 1.1.29  DESIGN BUILDER FEE

See Article 1.1.63 of the General Conditions.

**General Conditions**
**Turnkey Purchase DB:A**

DocuSign Envelope ID: EE3D18E0-3B43-472E-B433-2726754F0C1A

Project Name: Shreveport Biomethane Facility                    Project No.:  PH7006

## 1.1.30   DESIGN DEVELOPMENT PHASE

The term "Design Development Phase" shall mean the period of time set forth in the Authorization beginning with the issuance of the Notice to Proceed for Phase 1.  This term is also referred to within the Contract Documents as "Phase 1" and the two terms may be used interchangeably.  The scope of the Design Development Phase is further defined in the "Scope of Work" Exhibit.  The term "Phase 1 Time" is defined in Article 5 of the Authorization.

## 1.1.31   DESIGN MATERIALS

The term "Design Materials" shall mean any and all documents, shop drawings, electronic information, including computer programs and computer generated materials, data, plans, drawings, sketches, illustrations, specifications, descriptions, models and other information developed, prepared, furnished, delivered or required to be delivered by, or for, the Design Builder: (1) to the University under the Contract Documents; or (2) developed or prepared by or for the Design Builder specifically to discharge its duties under the Contract Documents.

## 1.1.32   DESIGN PROFESSIONAL

The term "Design Professional" shall mean individuals or entities that will provide Design Builder with the required architectural, engineering, and other professional services required for the coordinated design of the Project and the administration of construction.

## 1.1.33   DESIGN WORK

The term "Design Work" shall mean the portion of the Work consisting of the design services and design deliverables required to be provided in connection with the design of the Project as set forth in the Contract Documents.

## 1.1.34   DRAWINGS

The term "Drawings" means the graphic and pictorial portions of the Contract Documents showing the design, location, and dimensions of the Work, generally including plans, elevations, sections, details, schedules, and diagrams.  The Drawings are listed in the List of Drawings.

## 1.1.35   EXCUSABLE DELAY

The term "Excusable Delay" means a delay that entitles the Design Builder to an adjustment of the Contract Time but not an adjustment of the Contract Sum or GMAX, pursuant to Articles 7 and 8 of the General Conditions.

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

## 1.1.36  EXTRA WORK

The term "Extra Work" means Work beyond or in addition to the Work required by the Contract Documents.

## 1.1.37  FIELD ORDER

See Article 7.2 of the General Conditions.

## 1.1.38  FINAL COMPLETION

The term "Final Completion" means the date at which the Work has been fully completed in accordance with the requirements of the Contract Documents pursuant to Article 9.8 of the General Conditions.

## 1.1.39  GUARANTEE TO REPAIR PERIOD

See Article 12.2 of the General Conditions.

## 1.1.40  GOVERNMENTAL APPROVALS

The term "Governmental Approvals" means those governmental (including agency) approvals necessary for the completion and operation of the Project.

## 1.1.41  HAZARDOUS MATERIAL

The term "Hazardous Material" means any substance or material identified as hazardous under any applicable state or federal statute governing handling, disposal and/or cleanup of any such substance or material.

## 1.1.42  INDEMNIFIED PARTIES

The term "Indemnified Parties" means the University, its agents, officers, representatives, consultants, and employees.

## 1.1.43  NOT USED

## 1.1.44  OPTIONS

See Article 2 of the Authorization.

## 1.1.45  PROJECT

The term "Project" means the total design and construction of the Work under the Contract and all other work, labor, equipment, and materials necessary to accomplish the Project.  The Project may include design or construction work performed by University or by Separate Contractors.

---

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                    Project No.:  PH7006

### 1.1.46  SEPARATE CONTRACTOR

The term "Separate Contractor" means a person, or firm, under separate contract with the University performing other work related to the Project.

### 1.1.47  SHOP DRAWINGS, PRODUCT DATA, AND SAMPLES

See Article 3.19 of the General Conditions.

### 1.1.48  SPECIFICATIONS

The term "Specifications" means that portion of the Contract Documents consisting of the written requirements for materials, equipment, construction systems, standards and workmanship for the Work, and performance of related services.

### 1.1.49  SUBCONTRACTOR

The term "Subcontractor" means a person or firm that has a contract with Design Builder or with a Subcontractor of the Design Builder to perform a portion of the Work.  Unless otherwise specifically provided, the term Subcontractor includes Subcontractors of all tiers.

### 1.1.50  SUBSTANTIAL COMPLETION

See Article 9.7 of the General Conditions.

### 1.1.51  SUPERINTENDENT

The term "Superintendent" means the person designated by Design Builder to represent Design Builder at the Project site, in accordance with Article 3 of the General Conditions.

### 1.1.52  TIER

The term "tier" means the contractual level of a Subcontractor or supplier or consultant with respect to Design Builder.  For example, a first-tier Subcontractor is under subcontract with Design Builder, a second-tier Subcontractor is under subcontract with a first-tier Subcontractor, and so forth.

### 1.1.53  UNEXCUSABLE DELAY

The term "Unexcusable Delay" means a delay that does not entitle the Design Builder to an adjustment of the Contract Sum or GMAX and does not entitle the Design Builder to an adjustment of the Contract Time.

### 1.1.54  UNILATERAL CHANGE ORDER

See Article 7.2 of the General Conditions.

---

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

### 1.1.55  UNIVERSITY

The term "University" or "the University" means The Regents of the University of California, Owner of the Project.

### 1.1.57  UNIVERSITY'S REPRESENTATIVE

The term "University's Representative" means the person or firm identified as such in the Authorization.

### 1.1.58  UNIVERSITY'S RESPONSIBLE ADMINISTRATOR

The term "University's Responsible Administrator" means the person, or his or her authorized designee, who is authorized to execute the Authorization, Change Orders, Field Orders, and other applicable Contract Documents on behalf of the University.

### 1.1.59  WORK

The term "Work" means all labor, materials, equipment, tools, and services, including Design Professional services, and other requirements of the Contract Documents as modified by Change Order, whether completed or partially completed, provided or to be provided by Design Builder to fulfill Design Builder's obligations.  The Work may constitute the whole or a part of the Project.

### 1.1.60  ACTUAL COST OF WORK

1.  The term "Actual Cost of the Work" shall mean the actual costs necessarily and reasonably incurred by Design Builder for proper execution of and directly related to performance of the Work for Phases 1, 2 and 3 limited to the following:

    .1      Labor and Statutory Payments:  The actual cost for all straight time wages and salaries for employees employed at the Project site, or at fabrication/supplier sites off the Project site, or employees employed for the benefit of the Project incurred as a result of the performance of the Work.

    .2      Fringe Benefits and Payroll Taxes:  The actual cost for all fringe benefits and payroll taxes for employees employed at the Project site, or at fabrication/supplier sites off the Project site, or employees employed for the benefit of the Project which accrue by reason of their employment in the performance of the Work, as required by existing valid labor, or written company agreements.

    .3      Overtime:  The actual cost of overtime wages or salaries and fringe benefits, for

---

**General Conditions**
**Turnkey Purchase DB:A**

employees employed at the Project site, or at fabrication/supplier sites off the Project site, or employees employed for the benefit of the Project, incurred as a result of the performance of the Work.

.4      Tests:  The actual cost of testing if required by the Contract Documents.

.5      Materials, Equipment, Consumables and Services:  The actual cost to Design Builder of all subcontractor, supplier, manufacturer, distributor and other third party (collectively "Third Parties") provided materials, equipment, consumables, services and other charges of any nature (provided that such materials, equipment and consumables, services and other charges are not required herein to be included in the Design Builder Fee) for construction of the Work (including Change Order Work), including the cost of transportation of materials, equipment, labor, and consumables to the Work site, as evidenced by Third Party invoices submitted to Design Builder pursuant to Design Builder's subcontracts or purchase agreements with Subcontractors, Suppliers and other Third Parties.  Such costs, including costs for Change Order Work, shall be charged at the lowest price reasonably available to the Design Builder but in no event shall such costs unreasonably exceed competitive costs obtainable from other subcontractors, suppliers, manufacturers, distributors and or other Third Parties for comparable goods and services.  All discounts, rebates, and refunds and all returns from sale of surplus materials and consumable items shall accrue to University and Design Builder shall make provisions so that they may be obtained.  In addition to the forgoing limits on actual costs, Change Order Work performed by a subcontractor whose subcontract exceeds ███ $50,000 shall be subject to the following absolute limits:  subcontractor markups (including, but not limited to, markups for profit and overhead) shall not exceed 30% for subcontractor actual labor costs as calculated under Articles 1.1.60.1.1, 1.1.60.1.2 and 1.1.60.1.3, and shall not exceed 15% for all other actual subcontractor costs.

.6      Not Used

.7      Rental Equipment:  The actual cost of rental of all construction equipment, whether owned or hired at not more than prevailing rental rates, which rental accrues during the period in which such equipment is used directly in the performance of the Work, transportation of such equipment to the Work site, costs of loading and unloading, costs of installation, dismantling and removal thereof and minor repairs and replacements during its use on the Work, all in accordance with rental agreements therefor.  Prevailing rates shall be determined by reference to industry publications such as Army Corp of

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

Engineers Construction Equipment Ownership and Operating Expense Schedule. Publication #EP 1110-1-8. Rental rates shall be computed in a way that results in the reasonable least cost, typically meaning, for example, that weekly rates would be used (in lieu of daily or hourly rates) for equipment anticipated to be rented for a week.

.8      Engineering Services:  Design, engineering or architectural services, the actual amount paid to independent contractors professionally engaged in rendering such services.

.9      Utilities:  Utility companies' charges for utilities consumed during construction of the Work and hookup and installation charges.

.10     Field Office Expenses:  The actual cost of supplies and materials directly used by Design Builder and Third Parties for field offices during construction for the benefit of the Project.  Field Office Expenses shall include, but not limited to, construction trailers, temporary sanitation services, temporary construction fencing, security services, and other miscellaneous office and field equipment necessary to execute the work.

.11     Sales Taxes:  All sales taxes, gross receipts taxes, use taxes, excise taxes, and permit fees, for materials and equipment incorporated into the Work or incurred directly in connection with the Work, excepting professional licenses and general business licenses.

.12     Actual cost of royalties and permits due to the performance of the Work.  This shall include all permits, inspection fees, plan check fees, utility permits, demolition permits, easements, and government approvals for the construction, use or occupancy of permanent structures required in connection with the Work.

.13     Actual cost for revisions in the Design Development Documents or Construction Documents, when such revisions are requested by the University after completion of the Design Development Documents or Construction Documents and are inconsistent with approvals or instructions previously given by University. Actual cost for revisions made necessary by adjustments in University's program or project budget shall be computed at the hourly rates specified in the Design Professional Rate Schedule in the Exhibits. Notwithstanding the preceding, Design Builder shall not be compensated for revisions to Design Development Documents or Construction Documents resulting from Design Builder errors or omissions.

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

.14     Interest on capital employed and money borrowed for the construction of the Project. Interest shall be charged at a fixed rate of Five Percent per annum. Interest shall not be compounded except annually. University reserves the right to capitalize the interest as part of the cost of construction.

.15     Insurance and bonds:   The amounts set forth in the Authorization.   After execution of the Authorization, the amount set forth in the Authorization for insurance may be increased by not more than 10%, commensurate with post execution increases in the cost of insurance invoiced and submitted in writing to the University within the Contract Time. Except as set forth in the preceding sentence, after execution of the Authorization, no additional payments shall be made for insurance or bonds, except for Extra Work, in which case the cost of insurance and bonds shall not exceed 2% of items .1 through .13 above.

.2   Notwithstanding the provisions in 1.1.60.1, the following costs are considered non-reimbursable and are to be included in the Design Builder Fee along with any and all non-reimbursable general and administrative costs, overhead, and profit.

.1     During the Construction Phase, which shall be deemed to start on the date that the University issues a Notice to Proceed for the complete Construction Phase Scope of Work, Design Builder's labor Costs of:

.1     Superintendent(s); Assistant Superintendent(s); Project Manager(s); Scheduler(s); and Estimator(s). However, Design Builder's costs for Project Engineering, is reimbursable for services rendered up to the maximum number of hours defined in the Contract Documents. Project Engineering consists of reviewing subcontractor submittals, responding to requests for information and change orders, updating drawings, performing field quality assurance of materials and equipment, preparing reports under section 3.12 and 3.13, or otherwise providing similar services which are not duplicative of service rendered by subcontractors.

.2     Cost of executive officer salaries and travel expenses of executive officers not directly engaged in the performance of the Work.

.3     Costs of employee bonus, deferred compensation, and profit sharing plans.

.4     Negligence.

.5     Indemnification Amounts

.6     Warranty and Punch List Work.

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                    Project No.:  PH7006

.7        Business licenses

.8        Design Builder's small tools; Computer and data processing personnel and equipment; Office expenses including staff, materials and supplies, telephone, facsimile, copier equipment; Federal, state, or local business income and franchise taxes;

.9        Design Builder Overhead and Profit (including without limitation all overhead including home office overhead and field office overhead.)

.10       Costs and expenses of any kind or item not specifically and expressly included in paragraph 1.1.60.1.

1.1.61  COST SAVINGS

The term "Cost Savings" shall mean Total Cost Savings multiplied by 25 %.

1.1.62  TOTAL COST SAVINGS

The term "Total Cost Savings" shall mean the amount by which the Guaranteed Maximum Price or GMAX (as defined in Article 4 of the Authorization) exceeds the sum of the following:

.1        The Actual Cost of the Work;

.2        Compensable Delay;

.3        The Design Builder Fee.

The Total Cost Savings is capped and shall not exceed 10% of the Guaranteed Maximum Price.

1.1.63  DESIGN BUILDER FEE

The "Design Builder Fee" shall include the full amount of compensation for all indirect costs and expenses of Design Builder and the general contractor (including without limitation all overhead and profit) for its own Work and the Work of all Subcontractors and all costs and expenses not included in items 1 through 15 of Article 1.1.60, whether or not such costs and expenses are specifically referred to therein.

The "Design Builder Fee" is:

.1        ▓▓▓▓% for allowable labor costs, under Article 1.1.60, incurred in performing Phases 1, 2 and 3 of Design Builder labor.

.2        ▓▓▓▓% for allowable costs, other than labor costs, insurance costs, interest, and bond costs, under Article 1.1.60, incurred in performing Phases 1 and 2.

General Conditions
Turnkey Purchase DB:A

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

.3      ███ % for all allowable costs, other than items 14 and 15, under Article 1.1.60 incurred in performing Phase 3.

.4      ███ for costs for obtaining initial insurance policies and bond documents and ███ for each annual renewal of insurance policies and bond documents costs during Phase 3 up to a maximum of two renewals.

See the applicable Application for Payment, which sets forth a spread sheet showing the methodology for breakdown of the Contract Sum, the GMAX, the Actual Cost of the Work and see the Cost Proposal Exhibit for the breakdown of cost of any Change Orders.

1.1.64  ACCEPTANCE TESTING
The term "Acceptance Testing" shall mean all the tests required by the Contract Documents during the prove-out phase to validate the full functionality and operation of the Work in accordance with the performance specifications and requirements of the Contract Documents.

1.1.65  PERFORMANCE CERTIFICATE
The term "Performance Certificate" shall mean a certificate issued by the University, the University's Representative, or the University's Master Engineer declaring the Acceptance Testing was performed successfully and the Work is fully functional and operational.

1.1.66  NOTICE OF COMPLETION
The term "Notice of Completion" shall mean a notice prepared by the University pursuant to Article 9.8 when the Work reaches Final Completion.

1.1.68  MASTER ENGINEER
The term "Master Engineer" shall mean the entity hired by the University to perform services under the Master Engineer Agreement.

1.1.69  PROJECT SITE
The term "Project Site" shall mean the land on which any portion of the Project is situated as shown in the Drawings. .

1.1.70  MEP
The term "MEP" shall mean Mechanical, Electrical and Plumbing.

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                          Project No.: PH7006

## 1.2     COPYRIGHT, OWNERSHIP AND USE OF CONTRACT DOCUMENTS

1.2.1  For use on this Project only, Design Builder hereby assigns to the University all right, title, and interest,  including, but not limited to, copyright and all copyright rights, in all Deliverables created by Design Builder in its  performance under this Authorization and/or delivered to the University hereunder and shall execute any documents necessary to effectuate such assignment, with the exception that Design Builder hereby grants to the University an irrevocable, fully-paid up, royalty-free license to use any document provided to the University including without limitation any document known as a " detail", for such documents where Design Builder has the lawful right to grant such license.  In circumstances where Design Builder cannot legally grant the foregoing license, Design Builder shall use best efforts to obtain permission to grant the foregoing license, and if requested by University, provide supporting documentation.  Design Builder warrants that it has the lawful right to grant the forgoing license to the University.  In the event Design Builder uses any individual who is not a full-time employee of Design Builder or entity to perform any work required of it pursuant to this Authorization, Design Builder shall require said individual or entity to sign an agreement containing identical wording as the foregoing with the exception that word "Design Builder" is to be replaced with the individual's or entity's name.  The Deliverables constitute all written and other tangible expressions, including, but not limited to, drawings, documents, reports, surveys, renderings, exhibits, models, prints, photographs, etc. provides by Design Builder in its performance of the Services.  All Deliverables furnished by the Design Builder hereunder shall be and shall remain the property of the University.  In the event of Authorization termination by either party for any reason, as provided under this Authorization, the University will have the right to receive, and the Design Builder shall promptly provide to the University,  all drawings, documents, reports, surveys, renderings, exhibits, models, prints, photographs, and other materials prepared by the Design Builder for the services under this Authorization.  In the event of termination, and any dispute regarding the amount to be paid under this Authorization notwithstanding, the University retains the right to receive and use any such documents or materials any dispute regarding the amount to be paid under this Authorization notwithstanding.   Notwithstanding any provision of this Authorization, Design Builder warrants that University shall have the unlimited right, without the obligation to pay royalties, to utilize the Construction Documents as set forth in Article 1.2.2.2. Design Builder shall defend, indemnify, and hold harmless University from any and all claims that University's use of the Construction Documents under Article 1.2.2.2 are inconsistent with the forgoing warranty.  The provisions of this Article shall survive the term and termination of this Authorization.

DocuSign Envelope ID: EE3D18E0-3B43-472E-B433-2726754E0C1A

Project Name: Shreveport Biomethane Facility          Project No.:  PH7006

## 1.2.2 CONSTRUCTION DOCUMENTS

.1   Design Builder, upon request, shall provide copies of the Construction Documents in electronic form as required by University for review purposes. University reserves the right to reasonably select the type of document reproduction.

.2   University may use the Construction Documents, without Design Builder's consent, in connection only with this Project, including without limitation, future additions, expansions, renovations, alterations, connections, repairs, information, reference, use, or occupancy.

## 1.2.3 INDEMNIFICATION

.1   University will defend, indemnify and save harmless Design Builder and Design Professional and their officers, agents and employees from any costs or claims for damages arising from University's use, on other projects, of the Construction Documents, the Drawings and Specifications, or the designs depicted in them.

.2   Notwithstanding paragraph 1.2.3.1, University will not defend, indemnify or save harmless Design Builder nor Design Professional nor their officers, agents, or employees from any costs or claims asserted or imposed by any person or entity claiming that University's use of the Construction Documents, the Drawings and Specifications, or the designs depicted in them is contrary to or in violation of any copyright, patent, trade secret, trade name, trademark, or any proprietary, contractual or legal right pertaining to their use.

## 1.3     INTERPRETATION

1.3.1   The intent of the Contract Documents is to include all necessary criteria to establish the scope and quality for completion of the Work by the Design Builder.   The Contract Documents are complementary and what is required by one shall be as binding as if required by all.  Performance by the Design Builder shall be required to the extent consistent with, and reasonably inferable from, the Contract Documents.

1.3.2   In the case of conflict between terms of the Contract Documents, the following order of precedence shall apply:

.1   The Authorization shall control over the General Conditions.

.2   The General Conditions shall control over the Exhibits.

**General Conditions**
**Turnkey Purchase DB:A**

DocuSign Envelope ID: EE3D1BE9-2B42-472E-B433-2726754F0C1A

Project Name: Shreveport Biomethane Facility                Project No.: PH7006

    .3    Where no order of precedence is stated, the more expensive of the requirements shown or specified shall be controlling.

1.3.3    The University and Design Builder acknowledge that the Contract Documents may differ in some respect(s) from each other.  The University and Design Builder explicitly agree that documents having the higher quality requirements control over any conflicting requirements of other documents.

1.3.4    Organization of the Specifications into various subdivisions and the arrangement of the Drawings shall not control Design Builder in dividing the Work among Subcontractors or in establishing the extent of work to be performed by any trade.

1.3.5    Unless otherwise stated in the Contract Documents, technical words and abbreviations contained in the Contract Documents are used in accordance with commonly understood design professional and construction industry meanings; and non-technical words and abbreviations are used in accordance with their commonly understood meanings.

1.3.6    The Contract Documents may omit modifying words such as "all" and "any," and articles such as "the" and "an," but the fact that a modifier or an article is absent from one statement and appears in another is not intended to affect the interpretation of either statement.  The use of the word "including," when following any general statement, shall not be construed to limit such statement to specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation," "but not limited to," or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that could reasonably fall within the broadest possible scope of such general statement.

1.3.7    Whenever the context so requires, the use of the singular number shall be deemed to include the plural and *vice versa*.  Each gender shall be deemed to include any other gender, and each shall include corporation, partnership, trust, or other legal entity, whenever the context so requires.  The captions and headings of the various subdivisions of the Contract Documents are intended only for reference and convenience and in no way define, limit, or prescribe the scope or intent of the Contract Documents or any subdivision thereof.

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                    Project No.:  PH7006

## ARTICLE 2

**UNIVERSITY**

### 2.1   FEES FOR PERMITS

2.1.1    Except as otherwise provided in the Contract Documents, Design Builder will obtain (in University's name) and pay for any local building permits, inspection fees, plan checking fees, utility permits, demolition permits, easements, and government approvals for the use or occupancy of permanent structures required in connection with the Work.  Subject to compliance with the requirements of the Contract Documents for changes in the Work, Design Builder will be entitled to an adjustment in the Contract Time, the Contract Sum and/or the GMAX in the event that an action by a state or local authority having jurisdiction in issuing permits and/or approvals delays the Work and/or increases Design Builder's costs for the Work for reasons not related to errors and omissions of the Design Builder, or its subconsultants/subcontractors.   Normal and expected time taken to process permits, grant approvals, and the like, shall not be cause for an adjustment of the Contract Time, the Contract Sum, or the GMAX.

2.1.2    Design Builder will be furnished, free of charge, such copies of the Contract Documents as University deems reasonably necessary for execution of the Work.

### 2.2   ACCESS TO PROJECT SITE

2.2.1    University will provide, as reasonably required by the Work, but in no event later than the date designated in the Construction Notice to Proceed, access to the lands and facilities upon which the construction Work is to be performed, including such access to other lands and facilities designated in the Contract Documents for use by Design Builder.

### 2.3   NOT USED

### 2.4   NOT USED

### 2.5   UNIVERSITY'S RIGHT TO REPLACE UNIVERSITY'S REPRESENTATIVE

2.5.1    University may at any time and from time to time, without prior notice to or approval of Design Builder, replace University's Representative with a new University's Representative.  Upon receipt of notice from University informing Design Builder of such replacement and identifying the new University's

---

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

Representative, Design Builder shall recognize such person or firm as University's Representative for all purposes under the Contract Documents.

## ARTICLE 3

## DESIGN BUILDER

### 3.1    REVIEW OF CONTRACT DOCUMENTS AND FIELD CONDITIONS BY DESIGN BUILDER; SINGLE POINT RESPONSIBILITY OF DESIGN BUILDER

3.1.1    In addition to the examination and reviews performed, and obligations assumed, incidental to making the representations set forth in Article 10 of the Authorization, Design Builder shall carefully study and compare each of the Contract Documents with the others and with information furnished by University, and shall promptly report in writing to University's Representative any errors, inconsistencies, or omissions in the Contract Documents or inconsistencies with Applicable Code Requirements observed by Design Builder.

3.1.2    Design Builder is responsible for the design and construction of the Project and shall provide all services pursuant to this Contract in a manner consistent with the standard of care applicable to those who specialize in providing such services for projects of the type, scope, and complexity of the Project (including its contracting mode).  The Design Builder shall be solely responsible for any and all design errors including, but without limitation, errors, inconsistencies or omissions in the Construction Documents.  Design Builder shall take field measurements, verify field conditions, and carefully compare with the Contract Documents such field measurements, conditions, and other information known to Design Builder before commencing the Work.  Errors, inconsistencies, or omissions discovered at any time shall be promptly reported in writing to University's Representative.

3.1.3    If Design Builder performs any design and/or construction activity which it knows, or should know, involves an error, inconsistency, or omission referred to in Articles 3.1.1 and 3.1.2 above, without notifying and obtaining the written consent of University's Representative, Design Builder shall be responsible for the resultant losses, including, without limitation, the costs of correcting Defective Work.

3.1.4    The University does not assume any obligation to employ the Design Builder's services or pay Design Builder royalties of any type as to future programs that may result from the Work performed under this Contract.

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

3.1.5    Design Builder shall be responsible for all plotting, printing, copying and distribution cost of any and all documents required in connection with the Work.

3.1.6    Design Builder agrees that it has single point responsibility for the design and construction of this Project.

## 3.2    DESIGN, SUPERVISION AND CONSTRUCTION PROCEDURES

3.2.1    Design Builder shall supervise, coordinate, and direct the Work using Design Builder's best skill and attention.  Design Builder shall be solely responsible for, and have control over, the entire design effort, construction means, methods, techniques, sequences, procedures, and the coordination of all portions of the Work, including, but without limitation, landscape and site work, utilities, and building systems.

3.2.2    Design Builder shall be responsible to University for acts and omissions of Design Builder's agents, employees, and Subcontractors, and their respective agents and employees.

3.2.3    Design Builder shall not be relieved of its obligation to perform the Work in accordance with the Contract Documents either by acts or omissions of University or University's Representative in the administration of the Contract, or by tests, inspections, or approvals required, or performed, by persons or firms other than Design Builder.

3.2.4    Design Builder shall be responsible for inspection of all portions of the Work, including those portions already performed under this Contract, to determine that such portions conform to the requirements of the Contract Documents and are ready to receive subsequent Work.

3.2.5    To facilitate communications and the management of the design process, the Design Builder shall establish and maintain a local office for the duration of the design process.  During Phases 1 and 2, local is considered to be within California.   During Phase 3 the local office shall be the on-site construction trailer.

3.2.6    The Design Builder is not required to produce the entire Construction Documents package in the local office; however, the Design Builder shall provide the appropriate management and design staff in the local office to provide the University with the current status of, and the capability to properly update, the design documents.

**General Conditions**
**Turnkey Purchase DB:A**

DocuSign Envelope ID: 1F53D18F0-3B43-472F-B433-272675AE50C1A

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

3.2.7    The Design Builder is required to deliver to the University, if requested, any and all design materials including, but not limited to, calculations, preliminary drawings, construction drawings, shop drawings, electronic media data, sketches, illustrations, specifications, descriptions, models, mock ups, and other information developed, prepared, furnished, or delivered in the prosecution of the design work. Reproduction and labor expenses for supplying such documents are to be included in the Actual Cost of the Work.

3.2.8    Design Builder shall at all times participate in, and implement, any measures as may be required by any environmental laws applicable to the Project.  The cost of such compliance shall be an allowable cost under Article 1.1.60, and the Contract Sum and GMAX shall be increased accordingly unless such cost results from Design Builder errors, omissions, or stormwater and other pollution prevention measures required by state and local authorities having jurisdiction.

3.2.9    Design Builder is responsible for preparation of the Construction Documents for the entire Project.

3.2.10   Design Builder is responsible for construction of the entire Project as required by the Contract Documents.

3.2.11   Design Builder shall at all times maintain good discipline and order among its employees and subcontractors.  Design Builder shall provide competent, fully qualified personnel to perform the Work.

3.2.12   Design Builder shall protect the property against liens from its Subcontractors and material and equipment suppliers to the fullest extent provided by applicable law including but not limited to executing and filing appropriate documents both prior to commencing construction and after Final Completion. Design Builder shall also obtain conditional lien releases and waivers from every Subcontractor regardless of tier and all material and equipment suppliers prior to each Application for Payment.  Design Builder shall also obtain unconditional releases after Payment after Substantial Completion and conditional releases on the full amount of the Actual Cost of Work prior to submitting the final Application for Payment.

## 3.3    LABOR AND MATERIALS

3.3.1    Unless otherwise provided in the Contract Documents, Design Builder shall provide and pay for all professional services, other services, labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation, and other things necessary for proper execution and

---

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                    Project No.:  PH7006

completion of the Work, whether temporary or permanent and whether or not incorporated or to be incorporated in the Work.

## 3.4    DESIGN BUILDER'S WARRANTY

3.4.1    Except for the Work subject to Article 12.3, for a period of two years from the date of Substantial Completion of the Project, Design Builder warrants to University that all labor, materials,   services, equipment and furnishings used in, or incorporated into, the Construction Work will be of good quality, new (unless otherwise required or permitted by the Contract Documents or approved by University), that the Work will  meet applicable landfill gas-to-energy industry standards and be free from defects and that all Work will conform with the requirements of the Contract Documents.  If required by University's Representative, Design Builder shall furnish satisfactory evidence of compliance with this warranty. Further, the type, quality and quantum of such evidence shall be within the reasonable discretion of the University's representative.   Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective.  Upon Design Builder's receipt of all payments due under this Agreement, Design Builder further warrants to University that all labor, materials, services, equipment and furnishings used in, or incorporated into, the Construction Work will be free of liens, claims and security interests of third parties.

## 3.5    TAXES

3.5.1    Design Builder shall pay all sales, consumer, use, income, payroll and similar taxes for the Work or portions thereof provided by Design Builder.

## 3.6    PERMITS, FEES, AND NOTICES

3.6.1    University shall secure the CEQA environmental documentation.

3.6.2    Except as set forth in Article 3.6.3, and subject to Article 2.1.1, Design Builder shall secure such other permits, approvals, licenses, and inspections necessary for the proper execution and performance of the Work, including the lawful operation of the Project for its intended purpose.

Design Builder shall deliver to University all original licenses, permits, and approvals obtained by Design Builder in connection with the Work prior to the final payment or upon termination of the Contract, whichever is earlier.

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

3.6.3 The following permits/authorizations shall be obtained by University, City of Shreveport, or Renovar, as noted.

3.6.3.1 LDEQ, Air Quality Division, Title V Permit - City of Shreveport or Renovar

3.6.3.2 LDEQ, Groundwater Division, Landfill Operation - City of Shreveport or Renovar

3.6.3.3 USACE & Louisiana Division of Archeology, permits related to wetlands and/or Cultural Resources - University

3.6.3.3.1 University shall purchase wetlands mitigation credits required for USACE permits.

## 3.7    APPLICABLE CODE REQUIREMENTS

3.7.1    Design Builder shall perform the Work in accordance with the following Applicable Code Requirements and all code requirements listed in the Scope of Work:

.1  All laws, statutes, the most recent building codes, ordinances, rules and regulations applicable to this Project in Louisiana, and all lawful orders of all California public authorities having jurisdiction over University (to the extent the orders of the California public entities have been disclosed to Design Builder by the University prior to the start of Phase I work).

.2  All Applicable Code Requirements relating to nondiscrimination, labor, employment, payroll records, apprentices, and work day.

3.7.2    Design Builder shall comply with and give notices required by all Applicable Code Requirements, including all environmental laws and all notice requirements.   Design Builder shall promptly notify University's Representative in writing if Design Builder becomes aware during the performance of the Work that the Contract Documents are at variance with Applicable Code Requirements.

3.7.3    If Design Builder performs Work which it knows or should know is contrary to Applicable Code Requirements, without prior notice to University and University's Representative, Design Builder shall be responsible for such Work and any resulting damages including, without limitation, the costs of correcting Defective Work.

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                    Project No.:  PH7006

## 3.8    SUPERINTENDENT

3.8.1    Design Builder shall employ a competent Superintendent satisfactory to University who shall be in attendance at the Project site at all times during the performance of the Construction Work.  Failure to maintain a Superintendent on the Project site at all times Work is in progress shall be considered a material breach of this Contract, entitling University to terminate the Contract or, alternatively, issue a stop Work order until the Superintendent is on the Project site.

3.8.2    The Superintendent approved for the Project must be able to read, write and verbally communicate in English.  The Superintendent may not perform the Work of any trade, pick-up materials, or perform any Work not directly related to the supervision and coordination of the Construction Work at the Project site when Work is in progress.  In addition, the Design Builder will provide all Project Staffing shown in the Exhibits for the time periods stipulated.

## 3.9    PROJECT MANAGER

Design Builder shall employ a Project Manager who shall be designated in the Project Staffing list shown in the Exhibits.  Design Builder's Project Manager shall represent Design Builder and communications given to, and received from, Project Manager shall be binding on Design Builder.  The Design Builder will provide all Project Staffing shown in the Exhibits for the time periods stipulated.

## 3.10    HAZARDOUS MATERIALS

3.10.1   The Design Builder agrees that it will be responsible for investigating and performing remedial actions on all hazardous materials and other related environmental requirements located on the Project Site.  For the purposes of this Contract, Hazardous Materials shall also include, but are not limited to, Underground Storage Tanks.  The University agrees that the Design Builder cannot be considered a hazardous materials generator of any such materials in existence on the Project Site at the time it is given possession of the Project Site.  "Underground Storage Tank" shall have the definition assigned to that term by Section 9001 of RCRA, 42 U.S.C. Section 6991, and also shall include: any tank of one thousand one hundred (1,100) gallons or less capacity used for storing motor fuel; any tank used for storing heating oil for consumption on the premises where stored; any septic tank; and any pipes connected to the above items.

3.10.2   The University shall not be responsible for any Hazardous Material brought to the Project Site by the Design Builder.

---

**General Conditions**
**Turnkey Purchase DB:A**

DocuSign Envelope ID: 6E3D1B50-2B48-472E-B433-2726754F0C1A

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

3.10.3  If the Design Builder: (i) introduces and/or discharges a Hazardous Material onto the Project Site in a manner not specified by the Contract Documents; and/or (ii) negligently disturbs a Hazardous Material identified in the Contract Documents, the Design Builder shall hire a qualified remediation contractor at Design Builder's sole cost to eliminate the condition as soon as possible.  Under no circumstance shall the Design Builder perform Work for which it is not qualified.  University, in its sole discretion, may require the Design Builder to retain at Design Builder's cost an independent testing laboratory.

3.10.4  If the Design Builder encounters a Hazardous Material which may cause foreseeable injury or damage, Design Builder shall immediately: (i) secure or otherwise isolate such condition; (ii) stop all Work in connection with such material or substance (except in an emergency situation); and (iii) notify University (and promptly thereafter confirm such notice in writing).

3.10.5  NOT USED

3.10.6  The University shall indemnify and hold harmless the Design Builder from and against claims, damages, losses and expenses, arising from a Hazardous Material on the Project site, if such Hazardous Material: (i) was not shown on the Contract Documents; (ii) was not referenced in the University Furnished Information Exhibit; (iii) was not brought to the site by Design Builder; and (iv) exceeded OSHA Permissible Exposure Levels or levels which would classify the material as a hazardous waste under federal or applicable state law.  The indemnity obligation in this Article shall not apply to:

    .1  Claims, damages, losses or expenses arising from the breach of contract, negligence or willful misconduct of Design Builder, its suppliers, its Subcontractors of all tiers and/or any persons or entities working under Design Builder; and

    .2  Claims, damages, losses or expenses arising from a Hazardous Material subject to Article 3.10.2.

3.10.7  In addition to the requirements in Article 3.28, Design Builder shall defend, indemnify and hold harmless the University from and against claims, damages, losses and expenses, arising from a Hazardous Material on the Project Site, if such Hazardous Material exceeded OSHA Permissible Exposure Levels or levels which would classify the material as a hazardous waste under federal or applicable state law and the Hazardous Material meets one of the following three conditions(i) the Hazardous Material was shown on the Contract Documents (ii) the Hazardous Material was referenced in the University Furnished Information Exhibit; or (iii) the Hazardous Material was brought to the Project

Project Name: Shreveport Biomethane Facility                    Project No.:  PH7006

Site by Design Builder.  Nothing in this paragraph shall obligate the Design Builder to indemnify University to the extent of the negligence of the University, its officers, agents, or employees.

## 3.11    CONSTRUCTION DOCUMENTS

3.11.1  Construction Documents

.1   Upon receipt of the Notice to Proceed for Phase 2, the Design Builder shall instruct the Engineer of Record to commence the design of the Project and the preparation of the Construction Documents.  The Construction Documents shall provide information customarily necessary in documents for projects of similar size, complexity, and quality.  The Construction Documents shall include all information required by the building trades to complete the construction of the Project, other than such details customarily developed by others during construction.  The University's review of the construction documents shall be conducted in accordance with the approved Contract Schedule with procedures set forth in Article 3.16 of the General Conditions relating to Schedule.  Such review shall not relieve the Design Builder from its responsibilities under this Contract.  Such review shall not be deemed an approval or waiver by the University of any deviation from, or of the Design Builder's failure to comply with, any provision or requirement of the Contract Documents, unless such deviation or failure has been identified as such in writing in the document submitted by the Design Builder and approved by the University.

.2   However, it is acknowledged by the parties hereto that inherent in a design build concept that the production and review of Construction Documents may be a continuing process with portions thereof completed at different times.  Construction Documents for major equipment having a long lead time and designated for early procurement will constitute a Construction Documents package.  The Design Builder will limit the Construction Document packages for construction to a reasonable number, not more than three, unless approved in writing by the University.  Contract Schedule shall indicate the times for the University to review the completion of each such portion of the Construction Documents and a reasonable time for review of same.

.3   The Design Builder shall submit completed packages of the Construction Documents for review by the University of California, the Louisiana State Fire Marshal, and any other federal, state or local authority having jurisdiction at the times indicated on the Contract Schedule and as defined in the Scheduling Specification.  Review meetings between the Design Builder and the University of California to review the Construction Document packages, shall be scheduled and held so as not to delay the Work. After reviewing the Construction Documents package for

---

Project Name: Shreveport Biomethane Facility                    Project No.:  PH7006

conformance to the Criteria Documents, the University will issue a Construction Notice to Proceed to the Design Builder.

.4   The Construction Documents for hazardous and/or toxic abatement efforts and demolition activity (if applicable) shall be of sufficient clarity and shall be fully detailed when submitted to the University for review.  It is understood and agreed by Design Builder and University that hazardous and/or toxic abatement efforts are not anticipated and are not included in the Contract Sum or GMAX.  Provided that Design Builder has performed an examination of the Project Site using good engineering practices and further provided that Design Builder properly performs its due diligence responsibilities, consisting of environmental site assessment (ESA Phase 1), all Work performed by Design Builder or its subcontractors in hazardous materials abatement efforts shall be considered Differing Site Conditions per 3.24 of the General Conditions.

3.11.2  NOT USED

3.11.3  Field Engineering

.1   The Design Builder shall retain and pay expenses of a civil engineer or land surveyor to establish on the Project Site the required reference points and benchmarks.  The engineer or land surveyor shall be licensed in the State of Louisiana.

.2   The Design Builder shall locate and protect control points prior to starting Work on the Project site and preserve permanent reference points during construction, and shall require the engineer or surveyor to replace control points which become lost or destroyed.

3.11.4   NOT USED

**3.12    MONTHLY REPORTS**

3.12.1  The Design Builder shall prepare and submit to the University, during both the Construction Documents Phase and the Construction Phase, monthly reports on the Work accomplished during the prior monthly period.  Such reports shall be prepared in a manner and in a format approved by the University, and shall be submitted within 20 days after the end of the month.  The monthly report shall include Design Builder's standard accounting statement of Project costs; the monthly report will be discussed and reviewed by the UC and the Design Builder at each monthly project meeting.  The monthly report shall also set forth the Design Builder's projected progress for the forthcoming month.

**General Conditions**
**Turnkey Purchase DB:A**

DocuSign Envelope ID: EE3D18E0-3B43-472F-B433-2726754E0C1A

Project Name: Shreveport Biomethane Facility                    Project No.:  PH7006

## 3.13    OTHER REPORTS

3.13.1  The Design Builder will cooperate with the University in preparation of all or part of, project reports that may be required by the State Public Works Board and other state or federal agencies.

## 3.14    NOTICES OF LABOR DISPUTE

3.14.1  If Design Builder has knowledge that any actual or potential labor dispute is delaying, or threatens to delay, the timely performance of the Work, Design Builder shall immediately give notice including all relevant information to the University.

3.14.2  Design Builder agrees to insert the substance of this Article including this Article 3.14.2, in any subcontract to which a labor dispute may delay the timely performance of the Work, except that each subcontract shall provide that in the event its timely performance is delayed or threatened by delay by any actual or potential labor dispute, the subcontractor shall immediately notify the next higher tier subcontractor or Design Builder, as the case may be, of all relevant information concerning the dispute.

## 3.15    GUARANTEE

3.15.1  Except for the Work subject to Article 12.3, the Design Builder guarantees the Work will be completed in accordance with the requirements of the Contract Documents, and will remain free of defects in workmanship and materials for a period of two (2) years from the date of Substantial Completion.  The Design Builder shall repair or replace any and all work, together with any adjacent work that may have been damaged or displaced, which was not in accordance with the requirements of the Contract Documents, or that may be defective in its workmanship or material within the guarantee period specified in the Contract Documents, without any expense whatsoever to the University; ordinary wear and tear and abuse excepted.

3.15.2  The Design Builder further agrees, within fourteen (14) days, or as such shorter period as may be designated for emergency repairs, after being notified in writing by the University, of any work not in accordance with the requirements of the Contract Documents or any defects in the Work, that the Design Builder shall commence and execute, with due diligence, all work necessary to fulfill the terms of the guarantee.  If the University finds that the Design Builder fails to perform any of the work under the guarantee, the University may elect to have the work completed at the Design Builder's expense and the Design Builder will pay costs of the work upon demand.  The University will be entitled to all costs,

General Conditions
Turnkey Purchase DB:A

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

including consultants' expenses necessarily incurred upon the Design Builder's refusal to pay the above costs.

3.15.3 Notwithstanding the foregoing Article 3.15.2, in the event of an emergency constituting an immediate hazard to health or safety of University employees, property, or licensees, the University may undertake, at the Design Builder's expense and without prior notice, all work necessary to correct such hazardous condition(s) when it is caused by work of the Design Builder not being in accordance with the requirements of the Contract Documents.

## 3.16     SCHEDULES REQUIRED OF DESIGN BUILDER

3.16.1  The Design Builder shall develop its required Contract schedules for review and approval by University.

3.16.2  Design Builder shall submit an initial Contract Schedule and updated Contract Schedules to University's Representative in the form and within the time limits required by the Contract Documents, or, if no such time period is specified, within a reasonable period of time. University's Representative will determine acceptability of the Contract Schedule and updated Contract Schedules within the time limits required by the Contract Documents, or if no such time period is specified, within a reasonable period of time.   If University's Representative deems the Contract Schedule or updated Contract Schedule unacceptable, it shall specify in writing to Design Builder the basis for its objection.

3.16.3  The Contract Schedule and updated Contract Schedules shall represent a practical plan to complete the Work within the Contract Time.  Schedules showing the Work completed in less than the Contract Time as reflected in the Preliminary Schedule may be acceptable if judged by University's Representative to be practical.  Schedules showing the Work completed beyond the Contract Time may be submitted under the following circumstances:

    .1      If accompanied by a Change Order Request seeking an adjustment of the Contract Time consistent the requirements of paragraph 8.4 for Adjustment of the Contract Time for Delay; or

    .2      If the Contract Time has passed, or if it is a practical impossibility to complete the Work within the Contract Time, then the updated Contract Schedule or fragnet schedule shall show completion at the earliest practical date.  University's Representative will render a decision promptly and in any case within ten (10) days after the later of the receipt of the updated Contract Schedule or fragnet Schedule.

**General Conditions**
**Turnkey Purchase DB:A**

DocuSign Envelope ID: EE3D18E9-2B43-4725-B433-2726754E0C1A

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

3.16.4  If a Contract Schedule showing the Work completed in less than the Contract Time is accepted, Design Builder shall not be entitled to extensions of the Contract Time for Excusable Delays or Compensable Delays or to adjustments of the Contract Sum or GMAX for Compensable Delays until such delays extend the Final Completion of the Work beyond the expiration of the Contract Time.

3.16.5  Design Builder shall prepare and keep current, to the reasonable satisfaction of University's Representative, a schedule of submittals that is in the form contained in the Exhibits, as required by the Specifications, and that is coordinated with the Contract Schedule.

3.16.6  The Contract Schedule and the updated Contract Schedules shall meet the following requirements:

    .1      Schedules must be suitable for monitoring progress of the Work.

    .2      Schedules must provide necessary data about the timing of University decisions and University furnished items.

    .3      Schedules must be in sufficient detail to demonstrate adequate planning of the Work.

    .4      Schedules must represent a practical plan to perform and complete the Work within the Contract Time.

3.16.7  University's Representative's review of the form and general content of the Contract Schedule and updated Contract Schedules is for the purpose of determining if the above-listed requirements have been satisfied.

3.16.8  Design Builder shall plan, develop, supervise, control, and coordinate the performance of the Work so that its progress and the sequence and timing of Work will permit its completion within the Contract Time, any Contract milestones and any Contract phases.

3.16.9  In preparing the Preliminary Contract Schedule, the Contract Schedule, and updated Contract Schedules, Design Builder shall obtain such information and data from Subcontractors as may be required to develop a reasonable and appropriate schedule for performance of the work and shall provide such information and data to the University's Representative upon request.  Design Builder shall continuously obtain from Subcontractors information and data about the planning for, and progress of, the Work and the delivery of equipment, shall coordinate and integrate such information and data into

**General Conditions**
**Turnkey Purchase DB:A**

DocuSign Envelope ID: 5E3D18E0-3B43-472F-B423-2726754F0C1A

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

updated Contract Schedules, as appropriate, and shall monitor the progress of the Work and the delivery of equipment.

3.16.10 Design Builder shall act as the expediter of potential and actual delays, interruptions, hindrances, or disruptions for its own forces and those forces of Subcontractors, regardless of tier.

3.16.11 Design Builder shall cooperate with University's Representative in the development of the Contract Schedule and updated Contract Schedules. Design Builder shall plan and schedule all of its Work based on the assumption that the University will exercise its Option for Phase 3 within 30 days of the completion of Phase 2 unless otherwise directed in writing by the University. After the University exercises its Option for Phase 3, the Design Builder shall modify its Contract Schedule to reflect the actual date that the University exercises its Option for Phase 3.

3.16.12 University's Representative's acceptance of or its review comments about any schedule or scheduling data shall not relieve Design Builder from its sole responsibility to plan for, perform, and complete the Work within the Contract Time. Acceptance of or review comments about any schedule shall not transfer responsibility for any schedule to University's Representative or University nor imply their agreement with (1) any assumption upon which such schedule is based or (2) any matter underlying or contained in such schedule. Failure of University's Representative to discover errors or omissions in schedules that it has reviewed, or to inform Design Builder that Design Builder, Subcontractors, or others are behind schedule, or to direct or enforce procedures for complying with the Contract Schedule shall not relieve Design Builder from its sole responsibility to perform and complete the Work within the Contract Time and shall not be a cause for an adjustment of the Contract Time, GMAX or the Contract Sum.

## 3.17   AS-BUILT DOCUMENTS

3.17.1 Design Builder shall maintain one (1) set of As-built drawings and specifications, which shall be kept up-to-date during the Work of the Contract. All changes which are incorporated into the Work which differ from the documents as drawn and written and approved shall be noted on the As-built set. Notations shall reflect the actual materials, equipment and installation methods used for the Work; each revision shall be initialed and dated by Superintendent. Prior to filing of the Notice of Completion, each drawing and the specification cover shall be signed by Design Builder and dated, attesting to the completeness of the information noted therein. As-built Documents shall be turned over to the University's Representative and shall become part of the Record Documents as required by the Scope of Work.

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                    Project No.:  PH7006

### 3.18    DOCUMENTS AND SAMPLES AT PROJECT SITE

3.18.1   Design Builder shall maintain the following at the Project site:

    .1    One as-built copy of the Contract Documents, in good order and marked to record current changes and selections made during construction.

    .2    The current accepted Contract Schedule.

    .3    Shop Drawings, Product Data, and Samples.

    .4    All other required submittals.

These documents shall be available to University's Representative and shall be delivered to University's Representative for submittal to University upon the earlier of Final Completion or termination of the Contract.

3.18.2   Maintaining electronic versions of these documents at the Project Site or via site-accessible cloud storage shall be acceptable.

### 3.19    SHOP DRAWINGS, PRODUCT DATA, AND SAMPLES

3.19.1   Definitions:

    .1    *Shop Drawings* are drawings, diagrams, schedules, and other data specially prepared for the Work by Design Builder or a Subcontractor to illustrate some portion of the Work.

    .2    *Product Data* are illustrations, standard schedules, performance charts, instructions, brochures, diagrams, and other information furnished by Design Builder to illustrate or describe materials or equipment for some portion of the Work.

    .3    *Samples* are physical examples that illustrate materials, equipment, or workmanship and establish standards by which the Work will be judged.

3.19.2   Shop Drawings, Product Data, Samples, and similar submittals are not Contract Documents. Their purpose is to demonstrate, for those portions of the Work for which submittals are required, how

---

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

Design Builder proposes to conform to the information given and the design concept expressed in the Contract Documents.

3.19.3  Design Builder shall review, approve, and submit to University's Representative Shop Drawings, Product Data, Samples, and similar submittals required by the Contract Documents with reasonable promptness

3.19.4   University review of Shop Drawings, Product Data, Samples, and similar submittals required by the Contract Documents is for information and records only and does not constitute an approval right or a hold point for design, procurement, fabrication, installation or commissioning of the Work.

.1    Materials and equipment incorporated in the Work shall match the Design Builder approved samples within tolerances appropriate to the items, and as may be described in the Contract Documents.

.2    As used in section 3.19, the term "submit" shall mean to make accessible for viewing and download by the University, University's Representative and University's consultants via an online web portal hosted by Design Builder, at the same time as the submittal is made available or accessible to anyone.   The Design Builder will notify the University's Representative when new or revised documents are uploaded to the web portal.

3.19.5  By approving and submitting Shop Drawings, Product Data, Samples, and similar submittals, Design Builder represents that it has determined or verified materials and field measurements and conditions related thereto, and that it has checked and coordinated the information contained within such submittals with the requirements of the Contract Documents and Shop Drawings for related Work.

3.19.6  If Design Builder discovers any conflicts, omissions, or errors in Shop Drawings or other submittals, Design Builder shall notify University's Representative.  Design Builder shall be responsible to correct any conflicts, omissions, or errors in Shop Drawings or other submittals by making the corrected versions accessible per 3.19.4.

3.19.7  Design Builder shall not be relieved of responsibility for deviations from requirements of the Contract Documents by University's Representative's review of Shop Drawings, Product Data, Samples, or similar submittals, unless Design Builder has specifically informed University's Representative in writing of such deviation at the time of submittal and University's Representative has given written approval of the specific deviation.  Design Builder shall not be relieved of responsibility for errors or

---

**General Conditions**
**Turnkey Purchase DB:A**

DocuSign Envelope ID: 5E3D1859-3B43-472F-B433-2726754F0C1A

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

omissions in Shop Drawings, Product Data, Samples, or similar submittals by University's Representative's review, acceptance, comment, or approval thereof.

3.19.8  Design Builder shall direct specific attention, in writing or on resubmitted Shop Drawings, Product Data, Samples, or similar submittals, to revisions.

## 3.20   USE OF SITE AND CLEAN UP

3.20.1  Design Builder shall confine operations at the Project site to areas permitted by law, ordinances, permits, and the Contract Documents.  Design Builder shall not unreasonably encumber the Project site with materials or equipment.

3.20.2  Design Builder shall, during performance of the Work, keep the Project site and surrounding area free from the accumulation of excess dirt, waste materials, and rubbish caused by Design Builder. Design Builder shall remove all excess dirt, waste material, and rubbish caused by the Design Builder; tools; equipment; machinery; and surplus materials from the Project site and surrounding area at the completion of the Work.

3.20.3  Personnel of Design Builder and Subcontractors shall not occupy, live upon, or otherwise make use of the Project site during any time that Work is not being performed at the Project site, except as otherwise provided in the Contract Documents.

## 3.21   CUTTING, FITTING, AND PATCHING

3.21.1  Design Builder shall do all cutting, fitting, or patching of the Work required to make all parts of the Work come together properly and to allow the Work to receive or be received by work of Separate Contractors shown upon, or reasonably implied by, the Contract Documents.

3.21.2  Design Builder shall not endanger the Work, the Project, or adjacent property by cutting, digging, or otherwise.  Design Builder shall not cut or alter the work of any Separate Contractor without the prior consent of University's Representative.

## 3.22   ACCESS TO WORK BY UNIVERSITY

3.22.1  University, University's Representative, their consultants, and other persons authorized by University will at all times have access to the Work wherever it is in preparation or progress.  Design Builder shall provide safe and proper facilities for such access and for inspection.

General Conditions
Turnkey Purchase DB:A

DocuSign Envelope ID: 5E3D1850-3B43-472F-B423-27B675AE0C1A

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

### 3.23    ROYALTIES AND PATENTS

3.23.1  Design Builder shall pay all royalties and license fees required for the performance of the Work. Design Builder shall defend suits or claims resulting from Design Builder's or any Subcontractor's infringement of patent rights and shall indemnify, defend and hold harmless University and University's Representative from losses on account thereof.

### 3.24    DIFFERING SITE CONDITIONS

3.24.1  If Design Builder encounters any of the following conditions at the site, Design Builder shall immediately notify the University's Representative in writing of the specific differing conditions before they are disturbed and before any affected Work is performed, and permit investigation of the conditions:

.1  Subsurface or latent physical conditions at the site which differ materially from those indicated in this Contract, or

.2  Unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inherent in work of the character provided for in the Contract, or if not indicated in this Contract, referenced in the University Furnished Information Exhibit, a copy of which has been provided to Design Builder

3.24.2  Design Builder shall be entitled to an adjustment to the Contract Sum, the GMAX and/or Contract Time as the result of extra costs and/or delays resulting from a materially differing site condition, if and only if Design Builder fulfills the following conditions:

.1    Design Builder fully complies with Article 3.24.1 above; and

.2    Design Builder fully complies with Article 4 of the General Conditions (including the timely filing of a Change Order Request and all other requirements for Change Orders Requests and Claims).

3.24.3  Adjustments to the Contract Sum, the GMAX and/or Contract Time shall be subject to the procedures and limitations set forth in Articles 7 and 8 of the General Conditions.

---

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                    Project No.:  PH7006

### 3.25    CONCEALED, UNFORESEEN, OR UNKNOWN CONDITIONS OR EVENTS

3.25.1  Except and only to the extent provided otherwise in Articles 3.24, and Articles 7 and 8 of the General Conditions, by signing the Authorization, Design Builder agrees:

    .1    To bear the risk of concealed, unforeseen or unknown conditions and events, if any, which may be encountered in performing the Contract; and

    .2    That Design Builder's Price Proposal Form for the Contract was made with full knowledge of this risk.

In agreeing to bear the risk of concealed, unforeseen or unknown conditions and events, Design Builder understands that, except and only to the extent provided otherwise in Articles 3.24, 7 and 8 of the General Conditions, concealed, unforeseen or unknown conditions shall not excuse Design Builder from its obligation to achieve full completion of the Work within the Contract Time, and shall not entitle the Design Builder to an adjustment of the Contract Sum or the GMAX.

3.25.2  If, as the result of concealed, unforeseen or unknown conditions or events, the University issues a Change Order or Field Order that changes design details from those details depicted in the Criteria Documents, Design Builder shall be entitled, subject to compliance with all the provisions of the Contract, including those set forth in Articles 4, 7 and 8 of the General Conditions, to an adjustment of the Contract Sum, the GMAX and Contract Time.

### 3.26    UNIVERSITY FURNISHED INFORMATION

3.26.1  Any information referenced in the University Furnished Information Exhibit is subject to the following provisions:

    .1    To the extent such reliance is reasonable; Design Builder may rely on the information set forth in in the documents set forth in the University Furnished Information Exhibit.

    .2    The information set forth in the documents referred to in the University Furnished Information Exhibit is made available for the convenience of Design Builder and is not a part of the Contract.

DocuSign Envelope ID: 5E3D1B50-3B43-472F-B413-2726754F0C1A

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

## 3.27    LIABILITY FOR AND REPAIR OF DAMAGED WORK

3.27.1    Subject to the limitations of liability provisions in Article 11 of the Authorization, Design Builder shall be liable for damages and losses to the Project (whether by fire, theft, vandalism, earthquake, flood or otherwise) prior to University's acceptance of the Work as fully completed pursuant to Article 9.8 of the General Conditions.

3.27.2    Design Builder shall promptly repair and replace any Work or materials damaged or destroyed for which the Design Builder is liable under Article 3.27.1 above.

## 3.28    INDEMNIFICATION

3.28.1    Design Builder shall indemnify, defend and hold harmless University, University's consultants, University's Representative, University's Representative's consultants, and their respective directors, officers, agents, and employees from and against losses (including without limitation the cost of repairing defective work and remedying the consequences of defective work) arising out of, resulting from, or relating to the following:

.1    The breach by Design Builder of its obligations under the Contract.

.2    The inaccuracy of any representation or breach of any warranty by Design Builder given in accordance with or contained in the Contract Documents.

.3    Any claim of damage or loss by any Subcontractor against University arising out of any alleged act or omission of Design Builder or any other Subcontractor, or anyone directly or indirectly employed by Design Builder or any Subcontractor.

.4    Any claim of damage or loss resulting from Hazardous Materials introduced, discharged, or disturbed by Design Builder as required per Article 3.10.7.

3.28.2    The University shall not be liable or responsible for any accidents, loss, injury (including death) or damages happening or accruing during the term of the performance of the Work herein referred to or in connection therewith, to persons and/or property, and Design Builder shall fully indemnify, defend and hold harmless University and protect the University from and against the same as provided in paragraph 3.28.1 above.  In addition to the liability imposed by law upon the Design Builder for damage or injury (including death) to persons or property by reason of the negligence of the Design Builder, its officers, agents, employees or Subcontractors, which liability is not impaired or otherwise affected hereby, the

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                    Project No.:  PH7006

Design Builder shall defend, indemnify, hold harmless, release and forever discharge the University, its officers, employees, and agents from and against and waive any and all responsibility of same for every expense, liability, or payment by reason of any damage or injury (including death) to persons or property suffered or claimed to have been suffered through any negligent act, omission, or willful misconduct of the Design Builder, its officers, agents, employees, or any of its Subcontractors, or anyone directly or indirectly employed by either of them or from the condition of the premises or any part of the premises while in control of the Design Builder, its officers, agents, employees, or any of its Subcontractors or anyone directly or indirectly employed by either of them, arising out of the performance of the Work called for by this Contract.  Design Builder agrees that this indemnity and hold harmless shall apply even in the event of negligence of University, its officers, agents, or employees, regardless of whether such negligence is contributory to any claim, demand, loss, damage, injury, expense, and/or liability; but such indemnity, defense and hold harmless shall not apply to the extent (under principles of comparative fault) of the active negligence of University, its officers, agents, or employees; or (ii) to the extent that the University shall indemnify and hold harmless the Design Builder for Hazardous Materials pursuant to Article 3.10.6 .

3.28.3  In claims against any person or entity indemnified under this Article 3.28 that are made by an employee of Design Builder or any Subcontractor, a person indirectly employed by Design Builder or any Subcontractor, or anyone for whose acts Design Builder or any Subcontractor may be liable, the indemnification obligation under this Article 3.28 shall not be limited by any limitation on amount or type of damages, compensation, or benefits payable by or for Design Builder or any Subcontractor under workers' compensation acts, disability benefit acts, or other employee benefit acts.

3.28.4  The indemnification obligations under this Article 3.28 shall not be limited by any assertion or finding that the person or entity indemnified is liable by reason of a non-delegable duty.

3.28.5  Design Builder shall indemnify University from and against losses resulting from any claim of damage made by any Separate Contractor against University arising out of the negligent acts, omissions, willful misconduct or breach of contract of Design Builder, any Subcontractor, anyone directly or indirectly employed by either of them, or anyone for whose acts either of them may be liable.

3.28.6  NOT USED

3.28.7  Design Builder shall indemnify, defend, and hold harmless University and its Regents, officers, employees, agents, and representatives (collectively, "Indemnitee"), against all liability, demands, claims, costs, damages, injury including death, settlements, and expenses (including without limitation, interest and penalties) incurred by Indemnitee arising out of the performance of services or Design Builder's other

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

obligations under this Contract, but only in proportion to and to the extent such losses are caused by or result from (1) the negligent acts or omissions of Design Builder, its officers, agents, employees, subcontractors, consultants, or any person or entity for whom Design Builder is responsible (collectively, "Indemnitor"); (2) the breach by Indemnitor of any of the provisions of this Contract; or (3) willful misconduct by Indemnitor.

3.28.8  The indemnification obligations under this Article 3.28 shall not be limited by any assertion or finding that (1) the person or entity indemnified is liable by reason of non-delegable duty, or (2) the losses were caused in part by the negligence of, breach of contract by, or violation of law by Indemnitee.  The obligation to defend shall arise regardless of any claim or assertion that Indemnitee caused or contributed to the losses.  Indemnitor's reasonable defense costs (including attorney and expert fees) incurred in providing a defense for Indemnitees shall be reimbursed by University except to the extent such defense costs arise, under principles of comparative fault, from Indemnitor's (a) negligent acts or omissions; (b) breach of any of the provisions of this Contract; or (c) willful misconduct.

3.28.9  Design Builder shall indemnify, defend, and save harmless Indemnitee from and against all loss, cost, expense, royalties, claims for damages or liability, in law or in equity, including, without limitation, attorney's fees, court costs, and other litigation expenses that may at any time arise or be set up for any infringement (or alleged infringement) of any patent, copyright, trade secret, trade name, trademark or any other proprietary right of any person or entity in consequence of the use on the Project by Indemnitee of the Design Materials or Construction Documents (including any method, process, product, concept specified or depicted) supplied by Indemnitor in the performance of this Contract.

3.28.10 Nothing in this Contract, including the provisions of this Article 3, shall constitute a waiver or limitation of any rights which Indemnitee may have under applicable law, including without limitation, the right to implied indemnity

## ARTICLE 4

## ADMINISTRATION OF THE CONTRACT

### 4.1    ADMINISTRATION OF THE CONTRACT BY UNIVERSITY'S REPRESENTATIVE

4.1.1    University's Representative will provide limited administration of the Contract as provided in the Contract Documents and will be the representative of University.  University's Representative will have authority to act on behalf of University only to the extent provided in the Contract Documents.

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                    Project No.:  PH7006

The University shall designate, from time to time, one or more representatives authorized to act on the University's behalf with respect to the Project, together with the scope of his/her respective authority. Functions for which this Contract provides will be performed by the University may be delegated by the University only by written notice to the Design Builder from the University.  The Design Builder shall not be entitled to rely on directions (nor shall it be required to follow the directions) from anyone outside the scope of that person's authority as set forth in written authorization pursuant to this Contract.  Directions and decisions made by University's Representative within his/her respective authority shall be binding on the University.

4.1.2    During the term of this Contract, University's Representative shall have the right to review Design Builder's Design Professionals' Work at such intervals as defined in the Contract Documents.  However, no actions taken during such review or site visit by University's Representative shall relieve Design Builder of any of its obligations of single-point responsibility for the design and construction of this Project nor form the basis for a Claim if such actions extend the Contract Completion Date beyond the Contract Time.

4.1.3    University's Representative will not have control over, will not be in charge of, and will not be responsible for design or construction means, methods, techniques, sequences, or procedures, or for safety precautions and programs in connection with the Work, since these are solely Design Builder's responsibility.

4.1.4    Except as otherwise provided in the Contract Documents or when direct communications have been specifically authorized, University and Design Builder shall communicate through University's Representative.   Except when direct communication has been specifically authorized in writing by University's Representative, communications by Design Builder with University's consultants and University's Representative's consultants shall be through University's Representative.  Communications by University and University's Representative with Subcontractors will be through Design Builder. Communications by Design Builder and Subcontractors with Separate Contractors shall be through University's Representative.  Design Builder shall not rely on oral or other non-written communications.

4.1.5    NOT USED

4.1.6    University's Representative will have the authority to reject the Work, or any portion thereof, which does not conform to the Contract Documents.  University's Representative will have the authority to stop the Work, or any portion thereof.  Whenever University's Representative considers it necessary, or advisable, for implementation of the intent of the Contract Documents, University's Representative will have the authority to require additional inspection or testing of the Work in accordance with the Contract

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                     Project No.: PH7006

Documents, whether or not such Work is fabricated, installed, or completed. However, no authority of University's Representative conferred by the Contract Documents nor any decision made in good faith either to exercise, or to not exercise such authority, will give rise to a duty or responsibility of University or University's Representative to Design Builder, or any person or entity claiming under, or through, Design Builder.

4.1.7     University's Representative will have the authority to conduct inspections as provided in the Contract Documents and to determine the dates of Substantial Completion and Final Completion; will receive for review and approval any records, written warranties, and related documents required by the Contract Documents and assembled by Design Builder; and will issue a final Certificate For Payment upon Design Builder's compliance with the requirements of the Contract Documents.

4.1.8     University's Representative will be, in the first instance, the interpreter of the requirements of the Contract Documents and the judge of performance thereunder by Design Builder. Should Design Builder discover any conflicts, omissions, or errors in the Construction Documents or the Contract Documents; have any questions about the interpretation or clarification of the Contract Documents; question whether Work is within the scope of the Contract Documents; then, before proceeding with the Work affected, Design Builder shall notify University's Representative in writing and request interpretation, or clarification. University's Representative's response to questions and requests for interpretations, clarifications, instructions, or decisions will be made with reasonable promptness. Should Design Builder proceed with the Work affected before receipt of a response from University's Representative, any portion of the Work which is not done in accordance with University's Representative's interpretations, clarifications, instructions, or decisions shall be removed or replaced and Design Builder shall be responsible for all resultant losses.

## 4.2     DESIGN BUILDER CHANGE ORDER REQUESTS

4.2.1     Design Builder may request changes to the Contract Sum, the GMAX and/or Contract Time for Extra Work, materially differing site conditions, or delays to Final Completion of the Work.

4.2.2     Conditions precedent to obtaining an adjustment of the Contract Sum, the GMAX, and/or Contract Time payment of money, or other relief with respect to the Contract Documents, for any other reason, are:

.1     Timely submission of a Change Order Request that meets the requirements of Articles 4.2.3.1 and 4.2.3.2 below; and

---

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                                Project No.: PH7006

      .2    If requested, timely submission of additional informational requested by the University's Representative pursuant to Article 4.2.3.3 below.

4.2.3    Change Order Request:

4.2.3.1 A Change Order Request will be deemed timely submitted if, and only if, it is preceded by a written notice of a change (including a written description of the rough order of magnitude, with respect to cost and time impacts of the change) within 7 days from the date the Design Builder discovers, or reasonably should discover the circumstances giving rise to the change. The Change Order Request itself must be submitted within a reasonable time not to exceed 20 days from the date the Design Builder discovers, or reasonably should discover the circumstances giving rise to the Change Order Request, unless additional time is allowed in writing by University's Representative for submission of the Change Order Request, provided that if:

      .1    The Change Order Request includes compensation sought by a Subcontractor; AND

      .2    The Design Builder requests in writing to the University's Representative, within the allowed time period, additional time to permit Design Builder to conduct an appropriate review of the Subcontractor Change Order Request, then the time period for submission of the actual Change Order Request shall be extended by a reasonable number of days specified in writing by the University's Representative.

4.2.3.2 A Change Order Request must state that it is a Change Order Request, state and justify the reason for the request, and specify the amount of any requested adjustment of the Contract Sum, the GMAX, Contract Time, and/or other monetary relief. If the Design Builder requests an adjustment to the Contract Sum or other monetary relief, the Design Builder shall submit the following with the Change Order Request:

      .1    A completed Cost Proposal in the form contained in the Exhibits meeting the requirements of Article 7 of the General Conditions; OR

      .2    A partial Cost Proposal and a declaration of what required information is not then known to Design Builder. If Design Builder failed to submit a completed Cost Proposal with the Change Order Request, Design Builder shall submit a completed Cost Proposal meeting the requirements of Article 7 within 7 days of the date the Design Builder submitted the Change Order Request unless additional time is allowed by the University's Representative.

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                    Project No.:  PH7006

To the extent reasonably possible, Design Builder shall include in all Change Order Requests, a written analysis of potential offsetting changes or mitigation measures that, to the extent reasonably consistent with the objectives of this Project, will allow the Project to proceed without increasing the GMAX or the Contract Sum.

4.2.3.3 Upon request of University's Representative, Design Builder shall submit such additional information as may be requested by University's Representative for the purpose of evaluating the Change Order Request.  Such additional information may include:

.1    If Design Builder  seeks an adjustment of the Contract Sum, the GMAX, or other monetary relief, actual cost records for any changed or extra costs (including without limitation, payroll records, material and rental invoices and the like), shall be submitted by the deadline established by the University's Representative, who may require such actual cost records to be submitted  and reviewed, on a daily basis, by the University's Representative and/or representatives of the University's Representative.

.2    If Design Builder seeks an adjustment of the Contract Time, written documentation demonstrating Design Builder's entitlement to a time extension under Article 8.4, which shall be submitted within 15 days of the date requested.  If requested, Design Builder may submit a fragnet in support of its request for a time extension.  The University may, but is not obligated to, grant a time extension on the basis of a fragnet alone which, by its nature, is not a complete schedule analysis.  If deemed appropriate by University Representative, Design Builder shall submit a more detailed schedule analysis in support of its request for a time extension.

.3    If Design Builder seeks an adjustment of the Contract Sum, the GMAX, or other monetary relief for delay, written documentation demonstrating Design Builder's entitlement to such an adjustment under Article 7.3.9 of the General Conditions, which shall be submitted within 15 days of the date requested.

.4    Any other information requested by the University's Representative for the purpose of evaluating the Change Order Request, which shall be submitted by the deadline established by the University's Representative.

4.2.4    University's Representative will make a decision on a Change Order Request, within a reasonable time, after receipt of a Change Order Request.  In the event the Change Order Request is submitted pursuant to Article 8.4.1, the University's Representative shall promptly review and accept or

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

reject it within thirty (30) days. A final decision is any decision on a Change Order Request which states that it is final. If University's Representative issues a final decision denying a Change Order Request in whole or in part, Design Builder may contest the decision by filing a timely Claim under the procedures specified in Article 4.3 of the General Conditions.

4.2.5    Design Builder may file a written demand for a final decision by University's Representative on all or part of any Change Order Request as to which the University's Representative has not previously issued a final decision pursuant to Article 4.2.4 of the General Conditions; such written demand may not be made earlier than the 30th day after submission of the Change Order Request. Within 30 days of receipt of the demand, University's Representative will issue a final decision on the Change Order Request. The University's Representative's failure to issue a decision within the 30-day period shall be treated as the issuance, on the last day of the 30-day period, of a final decision to deny the Change Order Request in its entirety.

### 4.3    CLAIMS

4.3.1    The term "Claim" means a written demand or assertion by Design Builder seeking an adjustment or interpretation of the terms of the Contract Documents, payment of money, extension of time, or other relief with respect to the Contract Documents, including a determination of disputes or matters in question between University and Design Builder arising out of or related to the Contract Documents or the performance of the Work. However, the term "Claim" shall not include, and the Claims procedures provided under this Article 4, including but not limited to arbitration, shall not apply to the following:

.1    Claims respecting penalties for forfeitures prescribed by statute or regulation that a government agency is specifically authorized to administer, settle, or determine.

.2    Claims respecting bodily injury, personal injury, death, reimbursement, or other compensation arising out of or resulting from liability for bodily injury, personal injury or death.

.3    Claims by University, except as set forth in Article 4.7.4 of the General Conditions.

.4    Claims respecting stop notices.

4.3.2    A Claim arises upon the issuance of a written final decision denying in whole or in part Design Builder's Change Order Request pursuant to Article 4.2.4 of the General Conditions.

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility          Project No.: PH7006

4.3.3    A Claim must include the following:

     .1    A statement that it is a Claim and a request for a decision pursuant to Article 4.5 of the General Conditions.

     .2    A detailed factual narrative of events fully describing the nature and circumstances giving rise to the Claim, including but not limited to, necessary dates, locations, and items of work affected.

     .3    A certification, executed by Design Builder, that the claim is filed in good faith. The certification must be made on the Claim Certification form, included in the Exhibits to the Contract. The language of the Claim Certification form may not be modified.

     .4    A certification, executed by each Subcontractor claiming not less than 5% of the total monetary amount sought by the claim, that the subcontractor's portion of the claim is filed in good faith. The certification must be made on the Claim Certification form, included in the Exhibits to the Contract. The language of the Claim Certification form may not be modified.

     .5    A statement demonstrating that a Change Order Request was timely submitted as required by Article 4.2.4 of the General Conditions.

     .6    If a Cost Proposal or declaration was required by Article 4.2.3 of the General Conditions, a statement demonstrating that the Cost Proposal or the declaration was timely submitted as required by Article 4.2.3 of the General Conditions.

     .7    A detailed justification for any remedy or relief sought by the Claim, including to the extent applicable, the following:

         .1    If the Claim involves Extra Work, an estimate of the costs must include the amounts claimed, including the items specified in Article 1.1.60.1 of the General Conditions. The cost breakdown must be provided even if the costs claimed have not been incurred when the Claim is submitted. To the extent costs have been incurred when the Claim is submitted, the Claim must include actual cost records (including without limitation, payroll records, material and rental invoices and the like) demonstrating that costs claimed have actually been incurred. To the extent costs have not yet been incurred at the time the Claim is submitted, actual cost records must be submitted on a current basis not less than once a month during any periods costs are incurred. A cost record

General Conditions
Turnkey Purchase DB:A

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

will be considered current if submitted within 30 days of the date the cost reflected in the record is incurred. At the request of the University's Representative, claimed extra costs may be subject to further verification procedures (such as having an inspector verify the performance of alleged Extra Work on a daily basis). The cost breakdown must include an itemization of costs for i) labor including names, classifications, regular hours and overtime hours worked, dates worked, and other pertinent information; ii) materials stored or incorporated in the work including invoices, purchase orders, location of materials either stored or incorporated into the work, dates materials were transported to the project or incorporated into the work, and other pertinent information; and iii) itemization of machinery and equipment including make, model, hours of use, dates of use and equipment rental rates of any rented equipment.

.2    Design Builder shall be responsible for all errors and omissions contained within the Construction Documents.

.3    If the Claim involves an extension of the Contract Time, written documentation demonstrating the Design Builder's entitlement to a time extension under Article 8.4 of the General Conditions, including the specific dates for which a time extension is sought and the specific reasons for entitlement of a time extension.

.4    If the Claim involves an adjustment of the Contract Sum or GMAX for delay, written documentation demonstrating the Design Builder's entitlement to such an adjustment under Article 7.3.9 of the General Conditions, including but not limited to, a detailed time impact analysis of the Contract Schedule. The Contract Schedule must demonstrate Design Builder's entitlement to such an adjustment under Article 7.3.9 of the General Conditions.

## 4.4    ASSERTION OF CLAIMS

4.4.1    Claims by Design Builder shall be first submitted to University's Representative for decision.

4.4.2    Notwithstanding the making of any Claim or the existence of any dispute regarding any Claim, unless otherwise directed by University's Representative, Design Builder shall not cause any delay, cessation, or termination in or of Design Builder's performance of the Work, but shall diligently proceed with performance of the Work in accordance with the Contract Documents.

4.4.3    Design Builder shall submit a Claim in writing, together with all supporting data specified in Article

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

4.3.3 of the General Conditions, to University's Representative as soon as possible but not later than 30 days after the date the Claim arises under Article 4.3.2 of the General Conditions, provided that after written notification to the University's Representative within such time period, the time period for submission of the Claim shall be extended by the number of days specified in writing by the University's Representative where the Claim includes compensation sought by a Subcontractor and the Design Builder requests an extension of time to permit it to discharge its responsibilities to conduct an appropriate review of the Subcontractor claim.

4.4.4    Design Builder agrees that a good faith effort to comply with the requirements of Articles 4.2, 4.3, and 4.4 of the General Conditions are conditions precedent to Design Builder's right to arbitrate or litigate a Claim. Design Builder specifically agrees to assert no Claims in arbitration or litigation unless there has been a good faith effort to comply with Articles 4.2, 4.3, and 4.4 of the General Conditions. The failure of Design Builder to make a good faith effort to comply with the requirements of Articles 4.2, 4.3 and 4.4 of the General Conditions constitutes a failure by Design Builder to exhaust its administrative remedies with the University, thereby denying any court or arbitration panel of jurisdiction to adjudicate the Claim.

## 4.5    DECISION OF UNIVERSITY'S REPRESENTATIVE ON CLAIMS

4.5.1    University's Representative will timely review Claims submitted by Design Builder. If University's Representative determines that additional supporting data are necessary to fully evaluate a Claim, University's Representative will request such additional supporting data in writing. Such data shall be furnished no later than 10 days after the date of such request. University's Representative will render a decision promptly and in any case within 30 days after the later of the receipt of the Claim or the deadline for furnishing such additional supporting data; provided that, if the amount of the Claim is in excess of $50,000, the aforesaid 30-day period shall be 60 days. Failure of University's Representative to render a decision by the applicable deadline will be deemed a decision denying the Claim on the date of the deadline. The decision of University's Representative will be final and binding unless appealed in accordance with Articles 4.5.2, 4.5.3, and 4.5.4 of the General Conditions.

The University's Representative's decision on a Claim or dispute will include a statement substantially as follows:

"This is a decision under Article 4.5 of the General Conditions of your contract. If you are dissatisfied with the decision, and if you complied with the procedural requirements for asserting claims specified in Article 4 of the General Conditions of your contract, you may have the right to arbitrate or litigate this decision. If you fail to take appropriate action within 30 days of the date of this decision, the decision shall become final and binding and not subject to further appeal."

**General Conditions**
**Turnkey Purchase DB:A**

DocuSign Envelope ID: 5E3D1850-3B43-472F-B432-2736754E0C1A

Project Name: Shreveport Biomethane Facility                          Project No.: PH7006

4.5.2    If either Design Builder or University disputes University's Representative's decision on a Claim, such party (the "Disputing Party") must either provide a written notice of its election to arbitrate or provide written notice of its election to litigate the Claim within 30 days after the decision of University's Representative or, if no decision has been issued, within 30 days from the date of the applicable deadline in Article 4.5.1 of the General Conditions for University's Representative to render a decision.

4.5.3    If a demand for arbitration or, if applicable, notice of election to litigate is not given by either party within 30 days after the decision of University's Representative, University's Representative's decision on the Claim will be final and binding and not subject to appeal or challenge.

4.5.4    If the Disputing Party gives timely notice of its election to arbitrate the University's Representative's decision on a Claim, Disputing Party shall have the right, within 120 days after a Notice of Completion, or a Notice of Cessation, as applicable, is filed for the Contract, to make a demand for arbitration in accordance with Article 4.7 of the General Conditions. Failure to perfect a Claim for which a timely election to arbitrate has been made by the timely filing of a demand for arbitration and timely payment of all applicable and required fees to American Arbitration Association ("AAA") shall result in the University's Representative's decision on said Claim becoming final and binding and not subject to appeal or challenge. If the Disputing Party makes a timely demand for arbitration, and the amount of the Claim in question, when combined with all other Claims, if any, which are the subject of previously filed demands for arbitration that have not been resolved by settlement or arbitration award, is $100,000 or more, then the other party may elect to litigate all such Claims by filing a written notice with the AAA within 30 days after its receipt of notice from AAA of the Disputing Party's demand for arbitration of the Claim that raises the total amount of Claims subject to arbitration to $100,000 or more. If the other party fails to give notice of its election to litigate within such 30-day period, it shall be deemed to have consented to arbitration and waived the right to litigate. If after commencement of arbitration the amount of unresolved Claims in arbitration are allowed to be increased to $100,000 or more, through an AAA-allowed amendment or otherwise, either party may elect to litigate within 30 days following the date that the electing party first receives written notification from AAA that total Claims in arbitration equal or exceed $100,000. If neither party gives notice of its election to litigate within such 30-day period as applicable, then both parties shall be deemed to have consented to arbitration and waived the right to litigate.

4.5.5    Any litigation shall be filed in the Superior Court of the State of California for the County of Los Angeles

4.5.6    The parties will attempt in good faith to resolve any controversy or Claim arising out of or relating to this Contract by negotiation.

General Conditions
Turnkey Purchase DB:A

Project Name: Shreveport Biomethane Facility                    Project No.:  PH7006

## 4.6    MEDIATION

4.6.1    The parties may agree to mediate any controversy or Claim arising out of or relating to this Contract.

## 4.7    ARBITRATION

4.7.1    A demand for arbitration pursuant to Article 4.5 of the General Conditions shall be in writing and shall include a copy of the Claim presented to University's Representative pursuant to Article 4.4 of the General Conditions and a copy of the decision of University's Representative pursuant to Article 4.5 of the General Conditions, if any.  The demand shall state the amount in controversy, if any, and state the remedy sought.    The demand shall identify the University's Responsible Administrator as the representative of the responding party and the Office of the General Counsel as counsel for the responding party.  The demand shall be filed with the AAA and shall not be deemed to have been made until all applicable fees have been paid to the AAA by the demanding party.  Copies of the demand and attachments shall be sent to University's Responsible Administrator as the representative of the responding party and the University's Office of General Counsel as attorney for the responding party, at the addresses set forth in the Authorization, at the time the demand for arbitration is initiated with the AAA.

4.7.2    Except as modified by this Article 4.7, arbitration shall be initiated and conducted in accordance with the Construction Industry Arbitration Rules of the AAA then in effect.  The following additional modifications shall be made to the aforesaid AAA rules:

> .1    Civil discovery shall be permitted for the production of documents and taking of depositions.  Other discovery may be permitted at the discretion of the arbitrator.  All disputes regarding discovery shall be decided by the arbitrator.

> .2    University's Representative and/or University's consultants, shall, if required by agreement with University, upon demand by University join in and be bound by the Arbitration.  University's Representative and University's consultants will have the same rights in any arbitration proceeding as are afforded by the AAA rules to Design Builder and University.

> .3    Design Builder's sureties shall be bound by any arbitration award and may join in any arbitration proceeding.

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                Project No.:  PH7006

.4    Except as provided in Articles 4.7.2.2. and 4.7.2.3 above, no Subcontractor or other person shall have a right or obligation to join in, or be a party to, any arbitration proceeding provided for in this Article 4 either directly, by joinder, by consolidation or actions, by counterclaim or cross-claim, or otherwise without the express written consent of University, Design Builder, and the joining party.

.5    If more than one demand for arbitration is made by a party with respect to Claims referred to University's Representative, all such Claims shall be consolidated into a single arbitration unless the parties otherwise agree in writing.

.6    If total Claims are less than $50,000, AAA expedited procedures as modified by this Article 4 shall apply.  If total Claims are between $50,000 and $100,000 they shall be heard by a single arbitrator who shall be an attorney.  If total Claims are in excess of $100,000 and are submitted to arbitration, either by agreement or by failure to elect litigation, the controversy shall be heard by a panel of three arbitrators, one of whom shall be an attorney.

.7    No arbitrator shall be appointed and no discovery may be commenced prior to the date of Final Completion unless University and Design Builder otherwise agree.

.8    The exclusive forum for determining arbitrability shall be the Superior Court of the State of California. AAA shall not submit to any arbitrator any matter concerning the arbitrability of the dispute if the arbitrability is contested.

.9    If the expedited procedures of the AAA are applicable, the AAA shall submit simultaneously to each party an identical list of 7 proposed arbitrators drawn from the National Panel of Commercial Arbitrators, and each party may strike 3 names from the list on a peremptory basis and return the list to AAA within 10 days from the date of receipt.

4.7.3    Unless University and Design Builder otherwise agree in writing, the arbitration decision shall be binding upon the parties, made under and in accordance with the laws of the State of California, supported by substantial evidence, and in writing.  If the total of all Claims or cross-Claims submitted to arbitration is in excess of $50,000, the award shall contain the basis for the decision, findings of fact, and conclusions of law. Any arbitration award shall be subject to confirmation, vacation, or correction under the procedures and on the grounds specified in the California Code of Civil Procedure including without limitation Section 1296. The expenses and fees of the arbitrators and the administrative fees of the AAA shall be divided among the parties equally.  Each party shall pay its own counsel fees, witness fees, and other expenses incurred for its own benefit.

Project Name: Shreveport Biomethane Facility                    Project No.:  PH7006

4.7.4    University may, but is not required to, assert as a counterclaim any matter arising out of the claims asserted by Design Builder in the arbitration.  University's failure to assert any such counterclaim in the arbitration shall be without prejudice to the University's right to assert the counterclaim in litigation or other proceeding.

## 4.8    WAIVER

4.8.1    A waiver of, or failure by, University or University's Representative to enforce any requirement in this Article 4, including, without limitation, the requirements in Articles 4.2, 4.3, 4.4, and 4.5 in connection with any Claim shall not constitute a waiver of, and shall not preclude the University or University's Representative from enforcing, such requirements in connection with any other Claims.

4.8.2    The Design Builder agrees and understands that no oral approval, either express or implied, of any Claim shall be binding upon University unless and until such approval is ratified by execution of a written Change Order.

## ARTICLE 5

## SUBCONTRACTORS

### 5.1    AWARD OF SUBCONTRACTS AND OTHER CONTRACTS FOR PORTIONS OF THE WORK

5.1.1    Design Builder shall maintain and submit to the University for review an evaluation sheet listing all 1st tier Subcontractors or suppliers which were considered for the Project and giving the reason for selecting the successful Subcontractor or supplier for that portion of work.  Design Builder shall submit to the University's Representative within thirty (30 days after selecting each Subcontractor or supplier): (1) a copy of each 1st tier subcontract or purchase order/agreement with any Subcontractor, Supplier and Third Party and (2) an Expanded List of all Subcontractors and suppliers, along with their respective addresses, telephone numbers, e-mail addresses and contractor's license numbers.  The Expanded List of Subcontractors and suppliers shall be provided no later than thirty (30) days after the date which University provides Letter of Design Review.  If the Project is to proceed on a fast track/phased basis as identified in the exhibits, then a Letter of Design Review will be issued by the University for each such design submittal associated with a particular phase and identified in the exhibits.

Design Builder shall update the Expanded List of Subcontractors within 30 days of adding a new Subcontractor or supplier.  Any Subcontractors or suppliers who have performed Work on the Project

---

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

shall remain on the Expanded List of Subcontractors and Suppliers with a notation as to the respective dates of performance.

The University acknowledges that Design Builder has prior experience with certain subcontractors and suppliers on this Project which Design Builder intends to utilize on the Project.

5.1.2    The University has the right to request all documentation that supports the Design Builder's selection of a Subcontractor.  The University shall have the right of final approval as to the qualification(s) of a Subcontractor to perform its designated scope of work.  Within the University's sole discretion, any Subcontractor may be deemed not qualified to perform work on the Project if University or University's Representative determines that the Subcontractor fails to meet the requirements of the Contract Documents, or for any other reason.

5.1.3    The Subcontractors listed by Design Builder shall only be substituted in strict accordance with the "Subletting and Subcontracting Fair Practices Act" and upon the written consent of the University.  Only upon compliance with the "Subletting and Subcontracting Fair Practices Act" and with the written consent of the University shall a substitution be made.

5.1.4    Any increase in the cost of the Work resulting from the replacement or substitution of a Subcontractor pursuant to above Article 5.1.3 or as required by the University or University's Representative pursuant to above Article 5.1.2, shall be borne solely by Design Builder.  Design Builder shall not be entitled to any increase in Contract Sum or GMAX or an extension of Contract Time due to such replacement or substitution.

## 5.2    SUBCONTRACTOR RELATIONS

5.2.1    Any part of the Work performed for Design Builder by a first-tier Subcontractor shall be pursuant to a written subcontract.  To the extent mutually agreed by Design Builder and Subcontractor, each such subcontract shall require the Subcontractor, to the extent of the Work to be performed by the Subcontractor, to be bound to Design Builder by the terms of the Contract Documents, to assume toward Design Builder all the obligations and responsibilities which Design Builder assumes towards University by the Contract Documents, and to perform such portion of the Work in accordance with the Contract Documents. Each such subcontract shall preserve and protect the rights of University under the Contract Documents, with respect to the Work to be performed by Subcontractor, so that subcontracting thereof will not prejudice such rights.  Design Builder shall cause each such subcontract to expressly include the following requirements:

---

**General Conditions**
**Turnkey Purchase DB:A**

DocuSign Envelope ID: 5E3D185D-3B43-472F-B423-2726754F0C1A

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

.1    Subcontractor waives all rights that Subcontractor may have against University for damages caused by fire or other perils covered by builder's risk property insurance carried by Design Builder or University, except for such rights Subcontractor may have to the proceeds of such insurance held by University under Article 11 of the General Conditions.

.2    University, and entities and agencies designated by University, will have access to and the right to audit, at University's cost, Subcontractor's books, records, contracts, correspondence, instructions, drawings, receipts, vouchers, purchase orders, and memoranda relating to Change Orders. Subcontractor shall preserve all such records and other items for a period of at least 3 years after Final Completion.

.3    Subcontractor recognizes the rights of University under Article 5.3 of the General Conditions, Contingent Assignment of Subcontracts, and agrees, upon notice from University that University has elected to accept said assignment and to retain Subcontractor pursuant to the terms of the subcontract, to complete the unperformed obligations under the subcontract and, if requested by University, to execute a written agreement confirming that Subcontractor is bound to University under the terms of the subcontract.

.4    Design Builder is responsible for reviewing and coordinating the Work of and among his subcontractors and Design Professionals. This review and coordination includes, but is not limited to, resolution of any inconsistencies, errors or omissions.

5.2.2    Upon the request of University, Design Builder shall promptly furnish to University a true, complete, and executed copy of any subcontract.

5.2.3    Nothing contained in the Contract Documents shall create any contractual relationship between any Subcontractor and University, except when, and only to the extent that, University elects to accept the assignment of the subcontract with such Subcontractor pursuant to Article 5.3 of the General Conditions, Contingent Assignment of Subcontracts.

## 5.3    CONTINGENT ASSIGNMENT OF SUBCONTRACTS

5.3.1    Design Builder hereby assigns to University all its interest in first-tier subcontracts now or hereafter entered into by Design Builder for performance of any part of the Work. The assignment will be effective upon acceptance by University in writing and only as to those subcontracts which University designates in writing. University may accept said assignment at any time during the course of the Work and prior to Final Completion in the event of a suspension or termination of Design Builder's rights under

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

the Contract Documents. Such assignment is part of the consideration to University for entering into the Contract with Design Builder and may not be withdrawn prior to Final Completion.

**ARTICLE 6**

**NOT USED**

**ARTICLE 7**

**CHANGES IN THE WORK**

**7.1    CHANGES**

7.1.1    University may, from time to time, order or authorize additions, deletions, and other changes in the Work by Change Order or Field Order without invalidating the Contract and without notice to sureties. Absence of such notice shall not relieve such sureties of any of their obligations to University.

7.1.2    Design Builder may request a Change Order under the procedures specified in Article 4.2 of the General Conditions.

7.1.3    A Field Order may be issued by University, does not require the agreement of Design Builder, and shall be valid with or without the signature of Design Builder.

7.1.4    Design Builder shall proceed promptly with any changes in the Work, unless otherwise provided in the relevant Change Order or Field Order.

**7.2    CHANGES DEFINITIONS**

7.2.1    A Change Order is a Contract Document (as shown in the Exhibits) which has been signed by both University and Design Builder, and states their agreement, as applicable, to any of the following:

    .1    A change in the Work.

    .2    The amount of an adjustment of the Contract Sum and the GMAX.

    .3    The amount of an adjustment of the Phase 2 Fee or Phase 3 Fee.

General Conditions
Turnkey Purchase DB:A

DocuSign Envelope ID: 5E3D1B5D-2B48-472F-B433-2726754F0C1A

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

      .4    The amount of an adjustment of the Contract Time.

      .5    The amount of an adjustment of the Phase 2 Time or Phase 3 Time.

      .6    A modification to any other Contract term or condition.

7.2.2    A Unilateral Change Order may also be issued by University, without Design Builder's signature, where University determines that a change in the Work requires an adjustment of the Contract Sum, the GMAX or Contract Time as University believes to be properly due Design Builder, even though no agreement has been reached between University and Design Builder with regard to such change in the Work.

7.2.3    A Field Order (as shown in the Exhibits) is a Contract Document issued by the University that orders the Design Builder to perform Work.  A Field Order may, but need not, constitute a change in the Work and may, but need not, entitle Design Builder to an adjustment of the Contract Sum, the GMAX or Contract Time.

## 7.3    CHANGE ORDER PROCEDURES

7.3.1    Design Builder shall provide a Change Order Request and Cost Proposal pursuant to Article 4.2 of the General Conditions and this Article 7.3.  Adjustments of the Contract Sum, the GMAX resulting from Extra Work and Deductive Work shall be determined using one of the methods described in this Article 7.3.  Adjustments of the Contract Time shall be subject to the provisions in Article 8 of the General Conditions. Design Builder's obligation to provide Cost Proposals shall be subject to the following:

      .1    The obligation of Design Builder to provide Cost Proposals is not Extra Work, and shall not entitle the Design Builder to an adjustment of the Contract Sum, the GMAX or Contract Time.

      .2    The failure of Design Builder to timely provide a Cost Proposal pursuant to Article 4.2 of the General Conditions and this Article 7.3.1 is a material breach of the Contract.  Design Builder shall be responsible for any delay in implementing a change for which Design Builder failed to timely provide a Cost Proposal consistent with the requirements of Article 4.2 of the General Conditions and this Article 7.3.1.

7.3.2    The term "Cost of Extra Work" as used in this Article 7.3 shall have the same meaning as the, term "Actual Cost of the Work" as defined in Article 1.1.60.

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                    Project No.:  PH7006

7.3.3    NOT USED

7.3.4    NOT USED

7.3.5    Adjustments to the Contract Sum and the GMAX for Extra Work shall be computed on the basis of one or more of the following:

.1    Where the Work involved is covered by Unit Prices contained in the Contract Documents, by application of the Unit Prices to the quantities of the items involved.

.2    Where the Work involved is not covered by Unit Prices contained in the Contract Documents, by application of the Unit Prices agreed upon by University and Design Builder.

.3    Where the Work involved consists of revisions to the Design Development Documents or the Construction Documents when such revisions are inconsistent with approvals or instructions previously given by University, including revisions made necessary by adjustments in University's program or project budget, by application of the hourly rates reflected in the Design Professional Rate Schedule.

.4    Where Articles 7.3.5.1, 7.3.5.2 and 7.3.5.3 above are not applicable, a mutually agreed upon lump sum supported by a Cost Proposal pursuant to Article 7.3.1 of the General Conditions.

.5    If University and Design Builder cannot agree upon a lump sum, by the sum of the following:

.1 The Cost of Extra Work;

.2 The Design Builder Fee applied to the Cost of Extra Work, except that the Design Builder Fee shall not be applied to Subcontractor markup under Article 1.1.60.1.5 for any Subcontractor whose subcontract exceeds $50,000;

.3 If applicable, Compensable Delay at the daily rate set forth in the Authorization.

7.3.6    As a condition to Design Builder's right to an adjustment of the Contract Sum and the GMAX, pursuant to Article 7.3.5.5 above, Design Builder must keep daily detailed and accurate records itemizing each element of cost and shall provide substantiating records and documentation, including time cards

---

General Conditions
Turnkey Purchase DB:A

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

and invoices.  Such records and documentation shall be submitted to and approved by University's Representative on a daily basis.

7.3.7    For Work to be deleted by Change Order, the reduction of the Contract Sum and the GMAX shall be computed on the basis of one or more of the following:

    .1    Unit Prices stated in the Contract Documents.

    .2    Unit Prices agreed upon by University and Design Builder.

    .3    Where Unit Prices are not applicable, a lump sum agreed upon by University and Design Builder, based upon the actual costs which would have been incurred in performing the deleted portions of the Work as calculated in accordance with Articles 7.3.2 above and supported by a Cost Proposal pursuant to Article 7.3.1 above.

7.3.8    If any one Change involves both Extra Work and Deleted Work in the same portion of the Work, a Design Builder Fee will not be allowed if the deductive cost exceeds the additive cost.  If the additive cost exceeds the deductive cost, a Design Builder Fee will be allowed only on the difference between the two amounts.

7.3.9    The Contract Sum and the GMAX will be adjusted for a delay if, and only if, Design Builder demonstrates that all of the following four conditions are met:

    .1    **Condition Number One**:  The delay results in an extension of the Contract Time pursuant to Article 8.4.1 of the General Conditions.

    .2    **Condition Number Two**:  The delay is caused solely by one, or more of the following:

        .1    An error or omission in the Contract Documents caused by University and not as a result of Design Builder's failure to conform to criteria documents, performance standards, Construction Documents, or Contract Documents; or

        .2    The University's decision to change the scope of the Work, where such decision is not the result of any default or misconduct of the Design Builder; or

        .3    The University's decision to suspend the Work, where such decision is not the result of any default or misconduct of the Design Builder; or

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

    .4    The failure of the University (including the University acting through its consultants, Design Professionals, Separate Contractors or the University's Representative) to perform any Contract obligation where the failure to so perform is not the result of any default or misconduct of the Design Builder.

    .5    A materially differing site condition pursuant to Article 3.24 of the General Conditions.

    .3    <u>Condition Number Three</u>:  The delay is not concurrent with a delay that is caused by an event other than those listed in Article 7.3.9.2 above.

    .4    <u>Condition Number Four</u>:  The delay is not caused, in whole or in part, by an event which occurs during the performance of Phase 1.

7.3.10  For each day of delay that meets all four conditions prescribed in Article 7.3.9 above, the Contract Sum and the GMAX will be adjusted by the daily rate included in the Authorization and specifically identified as the rate to be paid to Design Builder for Compensable Delays as agreed upon for Phase 3.

7.3.11  Except as provided in Articles 7 and 8, Design Builder shall have no claim for damage or compensation for any delay, interruption, hindrance, or disruption.

7.3.12  If for any reason one or more of the conditions prescribed in Article 7.3.9 above is held legally unenforceable, the remaining conditions must be met as a condition to obtaining an adjustment of the Contract Time under Article 7.3.10 above.

## 7.4    FIELD ORDERS

7.4.1    Field Orders issued by the University's Representative shall be subject to the following:

    .1    A Field Order may state that it does or does not constitute a change in the Work.

    .2    If the Field Order states that it does not constitute a change in the Work and the Design Builder asserts that the Field Order constitutes a change in the Work, in order to obtain an adjustment of the Contract Sum, the GMAX or Contract Time for the Work encompassed by the Field Order, Design Builder must follow all procedures set forth in Article 4 of the General Conditions, starting with the requirement of submitting a timely written notice of change within 7 days of Design Builder's receipt of the Field Order, followed by submission of a

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

timely Change Order Request within 20 days of Design Builder's receipt of the Field Order; failure to make a good faith effort to follow those procedures is a bar to any Claim for an adjustment of the Contract Sum, the GMAX or Contract Time arising from performance of the Work described in the Field Order.

.3    If the Field Order states that it does constitute a change in the Work, the Work described in the Field Order shall be considered Extra Work and the Design Builder shall be entitled to an adjustment of the Contract Sum, the GMAX and Contract Time, calculated under and subject to Design Builder's compliance with the procedures for verifying and substantiating costs and delays in Articles 7 and 8 of the General Conditions.

.4    In addition, if the Field Order states that it does constitute a change in the Work, the Field Order may or may not contain University's estimate of adjustment of Contract Sum, the GMAX and/or Contract Time.  If the Field Order contains an estimate of adjustment of Contract Sum, the GMAX or Contract Time, the Field Order is subject to the following:

.1    The Design Builder shall not exceed the University's estimate of adjustment to Contract Sum, the GMAX or Contract Time without written authorization by University's Representative.

.2    If the Design Builder asserts that the change in the Work encompassed by the Field Order may entitle Design Builder to an adjustment of Contract Sum, the GMAX or Contract Time in excess of the University's estimate, in order not to be bound by University's estimate Design Builder must follow all procedures set forth in Article 4 of the General Conditions, starting with the requirement of submitting a timely written notice of change within 7 days of Design Builder's receipt of the Field Order, followed by submission of a timely Change Order Request within 20 days of Design Builder's receipt of the Field Order; failure to make a good faith effort follow those procedures is a bar to any Claim for an adjustment of the Contract Sum, the GMAX or Contract Time, in excess of the University's estimate, arising from performance of the Work described in the Field Order.

7.4.2    Upon receipt of a Field Order, Design Builder shall promptly proceed to perform the Work as ordered in the Field Order notwithstanding any disagreement by the Design Builder concerning whether the Work is extra.

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                     Project No.: PH7006

**7.5    VARIATION IN QUANTITY OF UNIT PRICE WORK**

7.5.1    University has the right to increase or decrease the quantity of any Unit price item for which an estimated quantity is stated in the Cost Proposal.

**7.6    WAIVER**

7.6.1    A waiver of, or failure by, University or University's Representative to enforce any requirement in this Article 7, including, without limitation, the requirements in Articles 7.3.6, 7.3.8, 7.3.9, 7.3.10, 7.3.11, or 7.3.12 in connection with any adjustment of the Contract Sum, the GMAX, will not constitute a waiver of, and will not preclude the University, or University's Representative, from enforcing such requirements in connection with any other adjustments of the Contract Sum or the GMAX.

7.6.2    The Design Builder agrees and understands that no oral approval, either express or implied, of any adjustment of the Contract Sum or the GMAX by University or its agents shall be binding upon University unless and until such approval is ratified by execution of a written change order.

**ARTICLE 8**

**CONTRACT TIME**

**8.1    COMMENCEMENT OF THE WORK**

8.1.1    The date of commencement of the Phase of the Work shall be set forth in the applicable Notice to Proceed.   The date of commencement of the Work shall not be postponed by the failure of Design Builder, Subcontractors, or of persons or firms for whom Design Builder is responsible, to act.

**8.2    PROGRESS AND COMPLETION**

8.2.1    By signing the Authorization:

.1    Design Builder represents to University that the Contract Time is reasonable for performing the Work and that Design Builder is able to perform the Work within the Contract Time.

General Conditions
Turnkey Purchase DB:A

DocuSign Envelope ID: 5E3D18E0-2B43-472E-B433-2726754E0C1A

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

.2      Design Builder agrees that University is purchasing the right to have the Design Builder present on the Project site for the full duration of the Contract Time applicable to the Construction Phase, even if Design Builder could finish the Contract in less than the Contract Time.

Adverse weather, as defined in the General Conditions, in excess of the following number of days will be granted a Contract Time extension pursuant to Article 8.4 of the General Conditions:

January – 4 days
February – 4 days
March – 4 days
April – 4 days
May – 5 days
June – 5 days
July – 5 days
August – 5 days
September – 4 days
October – 3 days
November – 3 days
December – 4 days

8.2.2    Design Builder shall not, except by agreement or instruction of University in writing, commence operations on the Project site or elsewhere prior to the effective date of insurance required by Article 11 of the General Conditions to be furnished by Design Builder.  The dates of commencement and Final Completion of the Work shall not be changed by the effective date of such insurance.

8.2.3    Design Builder shall proceed expeditiously with adequate forces and shall achieve Final Completion of the Work within the Contract Time.  If University's Representative determines and notifies Design Builder that Design Builder's progress is such that Design Builder will not achieve Final Completion of the Work within the Contract Time, Design Builder shall immediately and at no additional cost to University, take all measures necessary, including working such overtime, additional shifts, Sundays, or holidays as may be required to ensure that Design Builder will achieve Final completion of the Work within the Contract Time.  Upon receipt of such notice from University's representative, Design Builder shall immediately notify University's Representative of all measures to be taken to ensure Final Completion of the Work within the Contract Time.  Design Builder shall reimburse University for any extra costs or expenses (including the reasonable value of any services provided by University's employees) incurred by University as the result of such measures.

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                    Project No.:  PH7006

## 8.3     DELAY

8.3.1     Except and only to the extent provided otherwise in the Contract Documents, Design Builder agrees:

> .1   To bear the risk of delays to the Work; and

> .2   That Design Builder's Proposal for the Contract was made with full knowledge of this risk.

In agreeing to bear the risk of delays to the Work, Design Builder understands that, except and only to the extent provided otherwise in the Contract Documents, the occurrence of events that delay the Work shall not excuse Design Builder from its obligation to achieve Final Completion of the Work within the Contract Time, and shall not entitle the Design Builder to an adjustment of the Contract Sum or the GMAX.

## 8.4     ADJUSTMENT OF THE CONTRACT TIME FOR DELAY

8.4.1     Subject to Article 8.4.2 below, the Contract Time will be extended for each day of delay for which Design Builder demonstrates that all of the following four conditions have been met; a time extension will not be granted for any day of delay for which Design Builder fails to demonstrate compliance with the four conditions:

> .1   **Condition Number One**:  The delay is critical.  A delay is critical if and only to the extent it delays a work activity that cannot be delayed without delaying Final Completion of the Work to a date that is beyond the Contract Time.

> .2   Condition Number Two:  Within a reasonable time not to exceed 7 days of the date the Design Builder discovers or reasonably should discover an act, error, omission or unforeseen condition or event causing the delay is likely to have an impact on the critical path of the Project, (even if the Design Builder has not yet been delayed when the Design Builder discovers or reasonably should discover the critical path impact of the act, error, omission or unforeseen condition giving rise to the delay) the Design Builder submits a written notice of a change (including a written description of the rough order of magnitude, with respect to cost and time impacts of the change), followed by a timely and complete Change Order Request, submitted no later than 13 days after the deadline for submission of the notice of change, that meets the requirements of Article 4.2 of the General Conditions.

**General Conditions**
**Turnkey Purchase DB:A**

DocuSign Envelope ID: EE3D18E0-3B43-4725-B423-2726754E0C1A
Case 2:19-cv-01134-JAK-JC   Document 1-3   Filed 11/09/18   Page 100 of 377   Page ID #:140

Project Name: Shreveport Biomethane Facility                    Project No.:  PH7006

.3   **Condition Number Three**:  The delay is not caused by:

    .1   A concealed, unforeseen or unknown condition or event except for a materially differing site condition pursuant to Article 3.24 of the General Conditions; or

    .2   The financial inability, misconduct or default of the Design Builder, a Subcontractor or supplier; or

    .3   The unavailability of materials or parts; or

    .4   An error or omission in the Contract Documents caused by Design Builder or Design Builder's Design Consultants.

.4   **Condition Number Four**:  The delay is caused by:

    .1   Fire; or

    .2   Strikes, boycotts, or like obstructive actions by labor organizations; or

    .3   Force Majeure.  As used herein, Force Majeure shall be limited to any circumstance not within the reasonable control of the Design Builder only if and to the extent that such circumstance, despite the exercise of reasonable diligence and the observance of good practice, cannot be, or be caused to be, prevented, avoided or removed by the Design Builder; that such circumstance materially and adversely affects the ability of the Design Builder to perform its obligations under this Authorization; and the Design Builder has taken all reasonable precautions, due care and reasonable alternative measures in order to avoid the effect of such event on the Design Builder's ability to perform its obligations under this Authorization and to mitigate the consequences thereof; or

    .4   A materially differing site condition pursuant to Article 3.24 of the General Conditions; or

    .5   An error or omission in the Contract Documents caused by the University; or

    .6   The University's decision to change the scope of the Work, where such decision is not the result of any default or misconduct of the Design Builder; or

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

.7    The University's decision to suspend the Work, where such decision is not the result of any default or misconduct of the Design Builder; or

.8    The failure of the University (including the University acting through its consultants, Design Professionals, Separate Contractors or the University's Representative) to perform any Contract obligation unless such failure is due to Design Builder's default or misconduct.

.9    "Adverse weather" but only for such days of adverse weather, or on-site conditions caused by adverse weather,  that are in excess of the number of days specified in Article 8.2.1.   In order for a day to be considered a day of adverse weather for the purpose of determining whether Design Builder is entitled to an adjustment in Contract Time, both of the following conditions must be met:

    .1    The day must be a day in which, as a result of adverse weather, less than one half day of critical path work is performed by Design Builder; and

    .2    The day must be identified in the Contract Schedule as a scheduled work day.

8.4.2    If and only if a delay meets all four conditions prescribed in Article 8.4.1 above, then a time extension will be granted for each day that Final Completion of the Work is delayed beyond the Contract Time, subject to the following:

.1    When two or more delays (each of which meet all four conditions prescribed in Article 8.4.1 above) occur concurrently on the same day, and each such concurrent delay by itself without consideration of the other delays would be critical, then all such concurrent delays shall be considered critical. For the purpose of determining whether and to what extent the Contract Time should be adjusted pursuant to this Article 8.4.2, such concurrent critical delays shall be treated as a single delay for each such day.

.2    Design Builder shall be entitled to a time extension for a day of delay that meets all four requirements of Article 8.4.1 above if the delay is concurrent with a delay that does not meet all four conditions of Article 8.4.1 above.

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

8.4.3    If for any reason one or more of the four conditions prescribed in Article 8.4.1 above is held legally unenforceable, then all remaining conditions must be met as a condition to obtaining an extension of the Contract Time under Article 8.4.2 above.

## 8.5    COMPENSATION FOR DELAY

8.5.1    To the maximum extent allowed by law, any adjustment of the Contract Sum or GMAX as the result of delays shall be limited to the amounts specified in Article 7 of the General Conditions.  Such adjustment shall, to the maximum extent allowed by law, constitute payment in full for all delay related costs (including costs for disruption, interruption and hindrance, general conditions, on and off-site overhead and profit) of Design Builder, its Suppliers and Subcontractors of all tiers and all persons and entities working under or claiming through Design Builder in connection with the Project.

8.5.2    By signing the Authorization, the parties agree that the University is buying the right to do any or all of the following, which are reasonable and within the contemplation of the parties:

    .1    To order changes in the Work, regardless of the extent and number of changes, including without limitation:

        .1    Changes to correct errors or omissions caused by University, if any, in the Contract Documents.

        .2    Changes resulting from the University's decision to change the scope of the Work subsequent to execution of the Contract.

        .3    Changes due to unforeseen conditions.

    .2    To suspend the Work or any part thereof.

    .3    To delay the Work, including without limitation, delays resulting from the failure of the University or the University's Representative to timely perform any Contract obligation and delays for University's convenience.

8.5.3 Nothing in Article 8.5.2 is intended to limit Design Builder's right to a Change Order on account of the University's exercise of rights under 8.5.2, subject to Design Builder's compliance with the conditions and procedures in the Contract Documents for adjustments to the Contract Sum, the Contract, Time, and the GMAX.

**General Conditions**
**Turnkey Purchase DB:A**

## 8.6    WAIVER

8.6.1    A waiver of, or failure by, University or University's Representative to enforce any requirement in this Article 8, including without limitation the requirements in Article 8.4 above, in connection with any or all past delays shall not constitute a waiver of, and shall not preclude the University or University's Representative from enforcing, such requirements in connection with any present or future delays.

8.6.2    Design Builder agrees and understands that no oral approval, either express or implied, of any time extension by University or its agents shall be binding upon University unless and until such approval is ratified by execution of a written Change Order.

## ARTICLE 9

## PAYMENTS AND COMPLETION

## 9.1    COST BREAKDOWN

9.1.1    Design Builder shall submit to University's Representative as part of the Contract Documents a breakdown of the initial Contract Sum on the form set out in Cost Breakdown Exhibit.  The total of all line items shall equal the GMAX.  The Cost Breakdown shall initially become the basis for evaluating the Contract Sum proposed by Design Builder and subsequently become a basis for evaluating the Design Builder's Applications for Payment after Acceptance Testing and at Final Completion.  Within 10 days after receipt of the Construction Notice to Proceed for Phase 3, Design Builder shall submit to University's Representative an updated Cost Breakdown of the Contract Sum contained in the Exhibits.

9.1.2    At the time Design Builder requests University's Representative to issue a Certificate of Substantial Completion or Final Completion, Design Builder shall submit an updated cost breakdown itemizing the Actual Cost of Work on the same form set out in Cost Breakdown Exhibit.

## 9.2    PAYMENT AFTER SUBSTANTIAL COMPLETION OF WORK AND UPON COMPLETION OF ACCEPTANCE TESTING OR PROVISIONAL ACCEPTANCE TESTING

9.2.1 If the University exercises its option for Phase 3, University agrees to pay to Design Builder, subject to any adjustments as provided in the Contract Documents (including Article 9.4.3 of the General Conditions), an amount equal to 90% of the Contract Sum less any amounts previously paid, or 95% of

the sum of Actual Cost of Work and Design Builder Fee less any amounts previously paid, whichever is less, upon Design Builder's meeting all of the following conditions:

.1 Design Builder achieves Substantial Completion (as defined in Article 9.7 below); and

.2 Design Builder secures all authorizations and permits necessary for the University to fully operate the Project for its intended purpose (except for authorizations and permits specified in Article 3.6.3); and

3. Design Builder successfully completes Acceptance Testing as determined by issuance of the Performance Certificate in the form contained in the Performance Certificate Exhibit. If Acceptance Testing is not completed within One Hundred Twenty (120) Days after commencement of Acceptance Testing due solely to the failure to receive Conforming Landfill Gas from Renovar Shreveport, LLC (Renovar) or the failure of Enable Midstream Partners (EMP) to accept Product Gas as defined in the Performance Specifications Exhibit, this condition may be met by Design Builder's successful completion of the Provisional Acceptance Testing as defined in the Acceptance Test Procedure Exhibit.

Notwithstanding any dispute over the amount of the payment pursuant to this Article 9.2.1, transfer of Design Builder's title and interest in the Project to the University shall be effective upon Design Builder's receipt of the University's payment and, at the option of University, Design Builder will execute any documents necessary to effectuate the transfer of title prior to receipt of such payment

9.2.2. If the University does not exercise its Options for Phase 3, the University will pay to Design Builder the Contract Sums for Phase 1 and Phase 2 and if the University does not exercise its Option for Phase 2, the University will pay to Design Builder the Contract Sum for Phase 1.

## 9.3    APPLICATION FOR PAYMENT AFTER ACCEPTANCE TESTING OR PROVISIONAL ACCEPTANCE TESTING

9.3.1    Upon issuance of the Performance Certificate following completion of Acceptance Testing or, if applicable, completion of Provisional Acceptance Testing, as required by the Contract Documents, Design Builder shall submit to University's Representative an itemized Application for Payment, for the Actual Cost of the Work, as approved by University's Representative, which has been completed in accordance with the Contract Documents, less any amounts previously paid.    The Application for Payment shall be prepared as follows:

**General Conditions**
**Turnkey Purchase DB:A**

.1    Use the form contained in the Exhibits.

.2    Itemize in accordance with the Cost Breakdown as applicable.

.3    Include such data substantiating Design Builder's right to payment as University's Representative may reasonably require, such as invoices, certified payrolls, daily time and material records.

.4    Itemize retention.

9.3.2    The Application for Payment shall not include requests for payment on account of changes which have not been authorized by Change Orders.

9.3.3    An Application For Payment shall be accompanied by (1) a summary showing payments that will be made to Subcontractors and suppliers covered by such application and conditional lien waivers and releases upon payment after Substantial Completion AND upon final payment  and (2) if required by the University, unconditional waivers and releases of claims, in the form contained in the Exhibits, from each Subcontractor and suppliers listed in the preceding Application For Payment covering sums disbursed pursuant to that preceding Application For Payment.

9.3.4    Design Builder warrants that, upon submittal of an Application for Payment, all Work, for which Certificates For Payment have been previously issued and payment has been received from University, shall be free and clear of all claims, stop notices, security interests, and encumbrances in favor of Design Builder, Subcontractors, or other persons or firms entitled to make claims by reason of having provided labor, services, materials, or equipment relating to the Work.

For any payment made by University, Design Builder shall provide certification that the obligations in this Article 9.3.4 have been met and release and shall defend, indemnify and hold harmless the University against claims of any security interest holder, claimant, privilege or lien holder, or encumbrance.  Design Builder agrees to provide University with evidence satisfactory to University that any such security interests, liens, privileged, and encumbrances have been released, cancelled or terminated.

## 9.4    CERTIFICATE FOR PAYMENT

9.4.1    If Design Builder has submitted an Application for Payment in accordance with Article 9.2.2 or 9.3 above, University's Representative shall, not later than 5 working days after the date of receipt of the

Application For Payment, issue to University, with a copy to Design Builder, a Certificate For Payment for such amount as University's Representative determines to be properly due.

9.4.2   If any such Application For Payment is determined not to be in accordance with Article 9.2.2 or 9.3 above, University will inform Design Builder as soon as practicable, but not later than 5 working days after receipt.   Thereafter, Design Builder shall have 5 working days to revise and resubmit such Application for Payment; otherwise University's Representative may issue a Certificate for Payment in the amount that University's Representative determines to be properly due without regard to such Application for Payment.

9.4.3   Approval of all or any part of an Application for Payment may be withheld, a Certificate for Payment may be withheld, and all or part of a previous Certificate for Payment may be nullified and that amount withheld from a current Certificate for Payment on account of any of the following:

.1   Defective Work not remedied.

.2   Third-party claims against Design Builder or University arising from the acts or omissions of Design Builder or Subcontractors.

.3   Stop notices (if applicable).

.4   Failure of Design Builder to make timely payments due to Subcontractors.

.5   A reasonable doubt that the Work can be completed for the balance of the Contract Sum then unpaid.

.6   Damage to University or Separate Contractor for which Design Builder is responsible.

.7   Reasonable evidence that the Work will not be completed within the Contract Time; and that the unpaid balance of the Contract Sum would not be adequate to cover University's damages for the anticipated delay.

.8   Failure of Design Builder to maintain and update as-built documents.

.9   Failure of Design Builder to submit schedules or their updates as required by the Contract Documents.

---

**General Conditions**
**Turnkey Purchase DB:A**

.10  Failure to provide conditional or unconditional releases from any Subcontractor or supplier, if such waiver(s) have been requested by University's Representative.

.11  Performance of Work by Design Builder without properly processed Shop Drawings.

.12  Any other failure of Design Builder to perform its obligations under the Contract Documents.

9.4.4    Subject to the withholding provisions of Article 9.4.3 of the General Conditions, University will pay Design Builder the amount set forth in the Certificate for Payment no later than 10 days after the issuance of the Certificate For Payment.

9.4.5    Neither University nor University's Representative will have an obligation to pay or to see to the payment of money to a Subcontractor, except as may otherwise be required by law.

9.4.6    Neither a Certificate for Payment nor a progress payment made by University will constitute acceptance of Defective Work.

**9.5     NOT USED**

**9.6     NOT USED**

**9.7     SUBSTANTIAL COMPLETION**

9.7.1    "Substantial Completion" means the stage in the progress of the Construction Work, as determined by University's Representative, when the Construction Work is physically complete in accordance with the Contract Documents except only for completion of minor items which do not impair University's ability to occupy and fully utilize the Construction Work for its intended purpose and that required authorizations or permits to construct and operate the Project have been issued by the state and local authorities having jurisdiction.

9.7.2    When Design Builder gives notice to University's Representative that the Construction Work is substantially complete, unless University's Representative determines that the Construction Work is not sufficiently complete to warrant an inspection to determine Substantial Completion, University's Representative will inspect the Construction Work.  If the University's Representative determines that the Work is not substantially completed the University's Representative will prepare and give to Design Builder a comprehensive list of items to be completed or corrected before establishing Substantial Completion.  Design Builder shall proceed promptly to complete and correct items on the list.  Failure to

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

include an item on such list does not alter the responsibility of Design Builder to complete all Construction Work in accordance with the Contract Documents. Upon notification that the items on the list are completed or corrected, as applicable, the University's Representative will make an inspection to determine whether the Construction Work is substantially complete. Costs for additional inspection by University's Representative shall be deducted from any monies due and payable to Design Builder.

9.7.3    When University's Representative determines that the Construction Work is substantially complete, University's Representative will notify Design Builder who will contact the Building Official and state and local authorities having jurisdiction, as appropriate, and the Fire Marshal, for the purpose of issuing any required authorizations and permits (except for authorizations and permits specified in Article 3.6.3) to construct and operate the Project and arrange for Acceptance Testing as required by the Contract Documents for the purpose of issuing a Performance Certificate prior to Final Completion. After required authorizations or permits to construct and operate the Project have been issued by the state and local authorities having jurisdiction, the University's Representative will prepare a Certificate of Substantial Completion on University's form as contained in the Exhibits, which, when signed by University, shall establish the date of Substantial Completion and the responsibilities of University and Design Builder for security, maintenance, utilities, insurance, and damage to the Construction Work. The University's Representative will prepare and furnish to the Design Builder an industry standard comprehensive "punch list" of items to be completed or corrected prior to Final Completion. Additionally, Design Builder will prepare and furnish to University's Representative the results of Acceptance Testing and the University may request re-testing, as appropriate, or adjustments to be completed prior to Final Completion. After successful completion of Acceptance Testing, the Master Engineer will issue a Performance Certificate as provided herein.

9.7.4    Unless otherwise provided in the Certificate of Substantial Completion, the Guarantee to Repair Period for the Work covered by the Certificate of Substantial Completion, shall commence on the date of Substantial Completion of the Construction Work except that Substantial Completion shall not commence the Guarantee to Repair Period for any equipment or systems that:

   .1    Are not operational (equipment or systems shall not be considered operational if they cannot be used the intended service); or

   .2    Are not accepted by the University.

The Guarantee to Repair Period for equipment or systems which become fully operational and accepted subsequent to Substantial Completion will begin on the date of their written acceptance by University.

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

9.7.5    NOT USED.

**9.8     FINAL COMPLETION AND FINAL PAYMENT**

9.8.1    Upon receipt of notice from Design Builder that the Work is ready for final inspection, University's Representative will conduct the final inspection and review of the Work in accordance with the Contract Documents.  Final Completion shall be when University's Representative determines that the Work is fully completed and operational in accordance with the Contract Documents, including without limitation: satisfaction of all punch list items and performance requirements; that required authorizations or permits (except for authorizations and permits specified in Article 3.6.3) have been issued; that any Fire Marshal permits needed to construct and operate the Project have been issued;; and that a Performance Certificate has been issued by the University, University's Representative or the University's Master Engineer, which shall not be unreasonably withheld.  University will prepare a Notice of Completion within 15 days after Final Completion.   After receipt of the final Application for Payment, if University's Representative determines that Final Completion has occurred, University's Representative will issue the final Certificate for Payment.

9.8.2    If the Design Builder has achieved Final Completion and has submitted a final Application for Payment that meets all the requirements of the Contract Documents and a full accounting of the Actual Cost of the Work to the satisfaction of the University's Representative, the University will make a final payment.  Subject to any adjustments as provided in the Contract Documents (including Article 9.4.3 of the General Conditions), final payment shall be the Contract Sum, less any amounts previously paid.

**9.9 ACCEPTANCE TESTING**

Acceptance Testing shall be performed by the Design Builder as required herein and the Acceptance Test Procedure Exhibit included in the Contract Documents.   The University or their designee may witness the Acceptance Testing.

**9.9.1 PERFORMANCE CERTIFICATE**

In addition to Design Builder's obligation to meet all requirements in the Contract Documents as a condition precedent to Final Payment, performance of the Design Builder's obligations shall not be considered to have been completed the Work until the Performance Certificate has been issued by the University, the University's Representative, or the University's Master Engineer stating the date on which the Design Builder completed his obligations under the Contract.   The University shall issue the Performance Certificate within 28 days after Design Builder has met the requirements for issuance of a

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

Performance Certificate as set forth in Article 1.1.65. If the University fails to issue the Performance Certificate as required above, the Performance Certificate shall be deemed to have been issued on the date 28 days after the date on which it should have been issued.

## 9.9.2 PROCEDURE FOR ACCEPTANCE TESTING

Unless otherwise stated in the Contract Documents:

.1 The Design Builder shall provide all fuel and materials, and shall make the Design Builder and its applicable Subcontractor or supplier's Personnel and Plant available for Acceptance Testing or, if applicable, Provisional Acceptance Testing;

.2 The Design Builder shall provide any other plant, equipment and suitably qualified and experienced staff, as are necessary to carry out the Acceptance Testing or, if applicable, Provisional Acceptance Testing, efficiently; and

.3 If University sends representative(s) to witness the Acceptance Testing, or, if applicable, Provisional Acceptance Testing, the Design Builder shall carry out the Acceptance Testing in the presence of such University's representative(s).

The Acceptance Testing or, if applicable, Provisional Acceptance Testing, shall be carried out as soon as is reasonably practicable after Substantial Completion. The Design Builder shall give to the University 21 days' notice of the date on which the Acceptance Testing or, if applicable, Provisional Acceptance Testing will commence. Unless otherwise agreed, the Acceptance Testing or, if applicable, Provisional Acceptance Testing shall be carried out on the specific day or days determined by the Design Builder and as set forth in the Acceptance Testing Protocol.

The results of the Acceptance Testing or, if applicable, Provisional Acceptance Testing shall be compiled and evaluated by the Design Builder, who shall prepare a detailed report.

## 9.9.3 DELAYED TEST

9.9.3.1 If for any reason the Landfill Gas does not meet the requirements for Conforming Landfill Gas at the commencement of Acceptance Testing, the University shall work diligently with Renovar to obtain Conforming Landfill Gas for a period of Thirty (30) Days after the start of Acceptance Testing. If Acceptance Testing on the Work or any portion of the Work cannot be completed after this 30-Day period, the Parties shall discuss alternative methods to complete Acceptance Testing within Sixty (60) Days

**General Conditions**
**Turnkey Purchase DB:A**

DocuSign Envelope ID: 5E3B18E0-3B43-472F-B433-3726754F0C1A

Project Name: Shreveport Biomethane Facility                          Project No.: PH7006

following the commencement of Acceptance Testing. If Acceptance Testing is not completed within One Hundred Twenty (120) Days after commencement of Acceptance Testing due solely to (1) failure to receive Conforming Landfill Gas from Renovar or (2) failure by EMP to accept the Product Gas as defined in the Performance Specifications Exhibit, the Design Builder will complete the portions of the Acceptance Testing defined as "Provisional Acceptance Testing" in the Acceptance Testing Procedure Exhibit. Any delays arising from the failure to meet the requirement for Conforming Landfill Gas shall be deemed compensable, assuming the other contractual conditions for Compensable Delay are met.

9.9.3.2 The requirement of successfully completing Acceptance Testing or, if applicable, Provisional Acceptance Testing, as a condition of payment under Article 9.2.1 shall be waived, but only to the extent that Acceptance Testing or, if applicable, Provisional Acceptance Testing, cannot be successfully completed because Conforming Landfill Gas was not available and/or EMP would not accept Product Gas for a period exceeding 120 days from the date all other conditions to the commencement of testing have been met.

9.9.3.3 The requirement of successfully completing Acceptance Testing or, if applicable, Provisional Acceptance Testing, as a condition of payment for Final Completion shall be waived, but only to the extent that Acceptance Testing or, if applicable, Provisional Acceptance Testing, cannot be successfully completed because Conforming Landfill Gas was not available and/or EMP would not accept Product Gas for a period exceeding 300 days from the date all other conditions to the commencement of testing have been met.

**9.9.4 RETESTING**

If the Work, or a portion of the Work, fails to pass the Acceptance Testing, then either Party may then require the failed Tests, and the Acceptance Testing on any related work, to be repeated under the same terms and conditions. If and to the extent that this failure and retesting are attributable to defective or incomplete work and cause the University to incur additional costs, the Design Builder shall pay these costs to the University, including the fully burdened labor rate for University employees.

**9.9.5 FAILURE TO PASS ACCEPTANCE TESTING**

.1 If the Project fails to pass Acceptance Testing, Design Builder, at its own cost, shall attempt such repairs, corrections, and modifications as are necessary for the Project to pass Acceptance Testing. Design Builder shall have 180 days after the expiration of the Contract Time to pass Acceptance Testing. If Design Builder has expeditiously, in good faith, attempted such repairs, corrections, and modifications as are necessary for the Project to pass, but has failed to pass, Acceptance Testing during the Correction

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                     Project No.: PH7006

Period, then Design Builder may, but need not, extend the Correction Period for such additional time as is necessary to pass Acceptance Testing, not to exceed an additional 180 days beyond the original Correction Period (the "Extended Correction Period") in order to make such repairs, corrections, and modifications as are necessary for the Project to pass Acceptance Testing.

.2 If during the Correction Period and/or Extended Correction Period the Project can reasonably and lawfully produce Product Gas, Design Builder may elect to operate the Facility at its own cost, while attempting such repairs, corrections and modifications as are necessary for the Project to pass Acceptance Testing.

3.  From the date, pursuant to Article 9.9.5.2, that Design Builder commences operation of the Project to the date Design Builder ceases operation of the Project, net revenue received by University on account of Product Gas sales will be an offset against amounts owed by Design Builder to the University on account of Liquidated Damages.  If the forgoing provision is legally unenforceable, Liquidated Damages shall not apply from the date, pursuant to Article 9.9.5.2, that Design Builder commences operation of the Project to the date Design Builder ceases operation of the Project, and Design Builder shall be liable, during that period of time, for the University's actual damages calculated under applicable legal principles, (calculation of actual damages will include an offset for the net revenues received by the University on account of Product Gas sales).  Whenever University is entitled to actual damages arising from this Authorization, University's actual damages shall include the fully burdened cost of University employees while working on the Project.

.4 If the Project ultimately fails to pass Acceptance Testing, the following shall apply:

.1      If the Project is in a condition such that it can reasonably and lawfully be substantially utilized by the University for its intended purpose, even though it does not fully comply with the requirements of the Contract Documents, then the University shall purchase the Project. In that event, the Contract Sum shall be reduced by the amount of the University's damages calculated under applicable legal principles.

.2      If the Project is not in a condition such that it can reasonably and lawfully be substantially utilized by the University for its intended purpose, then the University may cancel the purchase of the Project, and no payment shall be due to the Design Builder.

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

## ARTICLE 10

## PROTECTION OF PERSONS AND PROPERTY

### 10.1    SAFETY PRECAUTIONS AND PROGRAMS

10.1.1  Design Builder shall be solely responsible for initiating, maintaining, and supervising all safety precautions and programs in connection with the performance of the Contract.

### 10.2    SAFETY OF PERSONS AND PROPERTY

10.2.1  Design Builder shall take adequate precautions for safety of and shall provide adequate protection to prevent damage, injury, or loss to the following:

.1    Employees involved in the Construction Work and other persons who may be affected thereby.

.2    The Construction Work in place and materials and equipment to be incorporated therein, whether in storage on or off the Project site, under care, custody, or control of Design Builder or Subcontractors.

.3    Other property at the Project site and adjoining property.

10.2.2  Design Builder shall erect and maintain, as required by existing conditions and performance of the Work, adequate safeguards for safety and protection, including providing adequate lighting and ventilation, posting danger signs and other warnings against hazards, promulgating safety regulations, and notifying owners and users of adjacent sites and utilities.

10.2.3  When use or storage of explosives, other hazardous materials, equipment, or unusual methods are necessary for execution of the Construction Work, Design Builder shall exercise the utmost care and carry on such activities only under the supervision of properly qualified personnel.

10.2.4  Design Builder shall designate a responsible member of Design Builder's organization at the Project site whose duty shall be the prevention of accidents.  That person shall be the Superintendent, unless otherwise designated by Design Builder in writing to University and University's Representative.

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

10.2.5  Design Builder shall not load, or permit any part of the Construction Work or the Project site to be loaded, so as to endanger the safety of persons or property.

## 10.3    EMERGENCIES

10.3.1  In an emergency affecting the safety of persons or property, Design Builder shall act to prevent or minimize damage, injury, or loss.  Design Builder shall promptly notify University's Representative, which notice may be oral followed by written confirmation, of the occurrence of such an emergency and Design Builder's action.

## ARTICLE 11

## 11.1    DESIGN BUILDER'S INSURANCE

11.1.1  Design Builder shall purchase and maintain, during the performance of Work and the required specified period after Work completion required by the Contract Documents, insurance as required herein and in amounts specified below by this Contract.

11.1.2  The following policies and coverage shall be furnished by Design Builder:

.1   COMMERCIAL FORM GENERAL LIABILITY INSURANCE covering Work done by or on behalf of Design Builder with the following coverages:

- Bodily Injury and Property Damage,
- Personal Injury and Advertising Injury Liability,
- Premises / Operations Liability,
- Products / Completed Operations liability,
- Aggregate limits that apply separately to Work required of Design Builder by the Contract Documents (i.e., per project),
- Explosion, collapse and underground (UCX) exclusion deleted,
- Contractual liability, and
- Broad Form Property Damage.

If the insurance under this article 11.1.2.1 is written on a claims made form, coverage shall survive for a period of not less than the Statute of Repose following termination of this Contract or Notice of Completion, whichever occurs later.  Coverage shall provide for a retroactive date of placement: coinciding with the effective date of this Contract.

**General Conditions**
**Turnkey Purchase DB:A**

.2    BUSINESS AUTOMOBILE LIABILITY INSURANCE – Design Builder shall maintain Business Automobile Liability Insurance on an occurrence form for bodily injury and property damage including coverage for owned, hired, leased, and non-owned automobiles used by or on behalf of Design Builder.  Such coverage shall extend to automobile liability, Code 1 (any auto).

.3    WORKERS' COMPENSATION AND EMPLOYER'S LIABILITY INSURANCE as required by applicable law.  Design Builder shall also require all of its Subcontractors to maintain this insurance coverage. Each of these policies shall contain Alternate Employer and Waiver of Subrogation endorsements in favor of the University.

.4    PROFESSIONAL LIABILITY INSURANCE to insure Design Builder's activities in connection with this Contract and shall obtain, keep in force, and maintain as required herein. However, if the insurance under this Article 11.1.2.4 is written on a claims-made basis, it shall be maintained continuously for a period no less than the Statute of Repose following termination of this Contract or Notice of I Completion, whichever occurs later (or include an extended reporting period for the Statute of Repose following termination of this Contract or Notice of Completion, whichever occurs later).  The insurance shall have a retroactive date of placement prior to or coinciding with the date services are first provided that are governed by the terms of this Contract.

.5    BUILDER'S RISK INSURANCE.  Design Builder shall procure and maintain a builders risk policy for the Project. Coverage form shall be written to protect the interests of  Design Builder and any subcontractors (if any), architects and engineers. Coverage shall include property in transit, on site and off site exposures which will become incorporated into the project. The coverage shall be written to cover 100% of the Project value on an "All Risk" basis at Replacement Cost and Completed Value basis form. The perils of Earthquake, Flood and Wind shall be included in the policy form. The builders risk policy will remain in full force and effect until Notice of Completion by the University.   Design Builder and any subcontractors, architects and engineers shall waive all rights against each other for loss or damage to the extent covered by such builders risk policy, except such rights as they may have to the proceeds of such policy.  If the builders risk policy referred to in this paragraph requires an endorsement to provide for continued coverage where there is a waiver of subrogation, the Design Builder will ensure that the builders risk policy is so endorsed.

Project Name: Shreveport Biomethane Facility                          Project No.: PH7006

.6      CONTRACTOR POLLUTION LIABILITY INSURANCE. Contractor Pollution Liability coverage for bodily injury and property damage and clean-up costs.

Design Builder shall furnish and maintain a Project specific insurance program in accordance with the following:

Insurance shall be (i) issued by companies with a Best rating of A- or better, and a financial classification of VIII or better (or an equivalent rating by Standard & Poor or Moody's) or (ii) guaranteed, under terms consented to by the University (such consent to not be unreasonably withheld), by companies with a Best rating of A- or better, and a financial classification of VIII or better (or an equivalent rating by Standard & Poor or Moody's). Such insurance shall be written for the following (coverage limits may be met by a combination of base and excess coverage):                                                   **Coverage Limit**

11.1.2.1    Commercial    Form    General    Liability Insurance-Limits of Liability

Each Occurrence-Combined Single Limit    **$ 10,000,000**
for Bodily Injury and Property

Products-Completed Operations Aggregate    **$ 15,000,000**
– Per Project

Personal and Advertising Injury    **$ 10,000,000**

General Aggregate- Per Project    **$ 15,000,000**

Products – Completed Operations Coverage shall be maintained continuously from the effective date of this Contract until the expiration of the Statute of Repose following termination of this Contract or Notice of Completion, whichever occurs later.

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                    Project No.:  PH7006

11.1.2.2    Business Automobile Liability Insurance applicable to Owned, Leased, Scheduled, Non-Owned and Hired Automobiles-Limits of Liability

Each Accident-Combined Single Limit for Bodily Injury and Property Damage                    **$ 10,000,000**

If Design Builder or its subcontractors be involved in the hauling or transportation of hazardous waste or materials, such coverage will include endorsements   at least as broad as that provided under the ISO pollution liability – broadened coverage for covered auto endorsement (CA 99 48) and the Motor Carrier Act Endorsement (MCS 90).

11.1.2.4    Professional Liability – Limits of Liability

Each Claim                    **$ 10,000,000**

Aggregate                    **$ 10,000,000**

11.1.2.5    Builders Risk Insurance                    100% of the project value on an "All Risk" basis at Replacement Cost and Completed Value basis form. University shall not be a named insured, additional named insured, additional insured or loss payee on the Builders Risk Policy.

11.1.2.6 Contractor Pollution Liability with limits of $10,000,000 Each Loss / Occurrence and $10,000,000 aggregate.

**General Conditions**
**Turnkey Purchase DB:A**

If such insurance is provided on a Claims-Made basis, policy shall be maintained continuously through the Statute of Repose following termination of this Contract or Notice of Completion, whichever occurs later (or include an Extended Reporting Period for the Statute of Repose following termination of this Contract or Notice of Completion, whichever occurs later) and apply with a retroactive date to reflect the date in which work first commenced on this Project.

11.1.2.7 If necessary to meet the insurance limits required by this Section 11, the limits required can be met by providing primary policies or in combination with umbrella / excess liability policies. Any umbrella/excess coverage shall follow from the primary policies, have drop-down provisions, and shall be at least as broad as the underlying policies.

The insurance required by 11.1.2.1, 11.1.2.2 and 11.2.6 shall provide as follows: Design Builder is named insured and Subcontractor entities and their officers, agents, employees, consultants and Renovar Shreveport LLC, City of Shreveport, and University, University's officers, agents, employees, consultants, University's Representative regardless of whether or not identified in the Contract Documents or to Design Builder in writing, will be included as additional insureds by policy endorsements equivalent to or at least as broad as ISO Form CG 20 10.01 (ongoing operations) in combination with ISO Form CG 20 37 10 01 (completed operations) for and relating to the Work to be performed by Design Builder and Subcontractors. This requirement shall apply to claims, costs, injuries, or damages, but only in proportion to and to the extent such claims, costs, injuries, or damages are caused by or result from the negligent acts or omissions of Design Builder and Subcontractors. This requirement shall not apply to Worker's Compensation and Employer's Liability Insurance or to Professional Liability Insurance.

Policy provisions or endorsements shall note that coverage is primary and not excess over or contributory with any other valid, applicable, and collectible insurance or self-insurance in force for the additional insureds.

Insurance required by Paragraph 11.1.2.3 shall be issued by companies (i) that have a Best rating of A- or better, and a financial classification of VIII or better (or an equivalent rating by Standard & Poor or Moody's); or (ii) that are acceptable to the University. Such insurance shall be written for the following:

**General Conditions**
**Turnkey Purchase DB:A**

DocuSign Envelope ID: 5E3D18E0-3B43-472F-B433-3726754F0C1A

Project Name: Shreveport Biomethane Facility                    Project No.:  PH7006

11.1.2.3    WORKER'S  COMPENSATION  AND EMPLOYER'S LIABILITY –

Worker's Compensation:                    (as required by applicable law).

Employer's Liability:

| | |
|---|---|
| Each Employee | $1,000,000 |
| Each Accident | $1,000,000 |
| Policy Limit | $1,000,000 |

Including Alternate Employer endorsement and a Waiver of Subrogation in favor of University

11.1.3  The insurance limits required under this Article 11 shall not in any way limit the liability of Design Builder.

11.1.4  Certificates of Insurance, as evidence of the insurance required by these Contract Documents and on the form contained in the Exhibits, shall be submitted by Design Builder to University.  The Certificates of Insurance shall provide for no cancellation or modification of coverage without prior written notice to University, in accordance with policy provisions.

11.1.5  In the event Design Builder does not comply with these insurance requirements, University may, after written notice to Design Builder and a reasonable period of not less than 30 days to correct any non-compliance with these insurance requirements, at its option, provide insurance coverage to protect University; and the cost of such insurance shall be paid by Design Builder and may be deducted from the Contract Sum

11.1.6  Design Builder's insurance as required by Article 11.1.2.1 above, shall, by endorsement to the policies and the Certificates of Insurance, include the following:

.1    NOT USED

.2    A Severability of Interest Clause that shall be primary insurance as respects The Regents of the University of California, its officers, agents and employees.  Any insurance or self-insurance maintained by The Regents of the University of California shall be excess of and non-contributory with this insurance. The provision shall state that, "The term 'insured' is hereby used severally and not collectively, but the inclusion herein of more than one insured shall not operate to increase the limits of the insurers' liability."

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                    Project No.:  PH7006

.3   A Cross Liability Clause stating that, "In the event of claims being made under any of the coverages of the policies referred to herein by one or more insureds hereunder for which another insured hereunder may be liable, then the policies shall cover such insureds against whom a claim is made or may be made in the same manner as if separate policies had been issued to each insured hereunder.  Nothing contained herein, however, shall operate to increase the insurers' limits of liability as set forth in the insuring agreements."

.4   University, University's consultants, University's Representative, will not by reason of their inclusion as insureds incur liability to the insurance carriers for payment of premiums for such insurance.

.5   Coverage provided is primary and is not in excess of or contributing with any insurance or self-insurance maintained by University, University's consultants and University's Representative.  This provision, however, shall only apply as per the stipulations of Article 11.1.6.1 above.

.6   The Professional Liability insurance policy shall include Contractual Liability Coverage or endorsements to the insurance policies for Contractual Liability Coverage for liability that would exist in the absence of the contract.

.7   Waiver of Subrogation.  All insurance coverage, with exception to Professional Liability, evidenced herein shall include clauses providing that each insurer shall waive all of its rights of recovery by subrogation against the University together with Additional Insured parties.  Where permitted by law, Design Builder shall require similar written express waivers subrogation and insurance clauses from each of its Subcontractors of every tier.

11.1.7  The form and substance of all insurance policies required to be obtained by Design Builder shall be subject to approval by University.  All policies shall be issued by companies with ratings and financial classifications as specified herein.

11.1.8  Design Builder shall, by mutual agreement with University and at University's cost, furnish any additional insurance as may be required by University.  Design Builder shall provide Certificates of Insurance evidencing such additional insurance.

11.1.9  The Certificate of Insurance shall show (1) all companies affording coverage, and (2) the name of the insured exactly in the manner as shown on the Price Proposal Form. (3) identify all additional insureds

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

as required by the Contract, and (4) specifically reference the additional insured endorsements issued with all applicable policies required by 11.1.2.1, 11.1.2.2. and 11.1.2.6. The name of the insured must be the name under which the entity is licensed by the Design Builders State License Board.

11.1.10 If insurance company refuses to use the Certificate of Insurance form as contained in Exhibits, it must provide a Certificate of Insurance evidencing compliance with this Article and Special Provisions 1 through 3 on the Certificate of Insurance Exhibit by including an endorsement to its form covering Special Provisions 1 through 3 as these provisions appear on the Certificate of Insurance Exhibit.

11.1.11 At the request of University, Design Builder shall submit to University copies of the policies obtained by Design Builder.

**11.2    NOT USED**

**11.3    NOTICE OF CONTRACT AND BOND REQUIREMENT**

11.3.1      Design Builder shall furnish bonds covering the faithful performance of the Contract (Performance Bond) and payment of obligations arising thereunder (Payment Bond) on the forms contained in the Exhibits.

11.3.2      The Payment Bond and Performance Bond shall each be in the amount of █████████

11.3.3      The Payment Bond and Performance Bond shall be in effect on the date the Contract is signed by University.

11.3.4      Design Builder shall promptly furnish such additional security as may be required by University to protect its interests and those interests of persons or firms supplying labor or materials to the Work. Design Builder shall furnish supplemental Payment and Performance Bonds each in the amount of the current Contract Sum at the request of the University.

11.3.5      Surety companies used by Design Builder shall be, on the date the Contract is signed by University, shall be solvent and a legal surety in the State of Louisiana.

11.3.6      The premiums for the Payment Bond and Performance Bond shall be paid by Design Builder.

11.3.7      The Performance and Payment Bonds shall also comply with all requirements of §4812 of the Louisiana Private Works Act (La R.S. 9:4801, et seq.) including but not limited to the following:

**General Conditions**
**Turnkey Purchase DB:A**

DocuSign Envelope ID: EE3D18E0-3B43-4725-B433-2726754E0C1A

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

.1    Immediately upon execution of the Contract and in any event before any Work begins on, or materials are delivered to, the Site, Design Builder shall file a Notice of Contract accompanied by the Performance and Payment Bonds in Caddo parish for the Work to be performed in Caddo parish.

.2    The Notice of Contract shall be on the form contained in the Exhibits and the Performance and Payment Bonds shall be attached to Notice of Contract when it is filed.

.3    Upon Substantial Completion of the Work, as agreed upon with the University, Design Builder shall     file a Notice of Termination of the Work in a form and at the time approved by the University.

.4    Design Builder agrees to complete, execute, and file any additional documents that may be needed as coordinated with University to give effect to the requirements in this Section 11.3.7, to satisfy the requirements of the filings related to, and to show satisfaction of the Notice of Contract under the Louisiana Private Works Act, all without additional compensation.

11.3.8    To ensure compliance with Louisiana's Private Works Act as described in Section 11.3.7, Design Builder shall ensure that an Affidavit of No Work substantially in the form provided in the Exhibits, is completed and filed before Work begins on or materials or delivered to the Site all in accordance with Louisiana R.S.9:4820.

## ARTICLE 12

## UNCOVERING AND CORRECTION OF CONSTRUCTION WORK

## 12.1    UNCOVERING OF WORK

12.1.1   If a portion of the Construction Work is covered contrary to University's Representative's request or direction, or contrary to the requirements of the Contract Documents, it must, if required in writing by University's Representative, be uncovered for University's Representative's observation and be replaced at Design Builder's expense without adjustment of the Contract Time or the Contract Sum.

12.1.2   If a portion of the Construction Work has been covered, which is not required by the Contract Documents to be observed or inspected prior to its being covered and which University's Representative has not specifically requested to observe prior to its being covered, University's Representative may

---

**General Conditions**
**Turnkey Purchase DB:A**

DocuSign Envelope ID: EE3D18E0-3B43-472F-B433-2726754E0C1A

Project Name: Shreveport Biomethane Facility                    Project No.:  PH7006

request to see such Construction Work and it shall be uncovered and replaced by Design Builder.  If such Construction Work is in accordance with the Contract Documents, the costs of uncovering and replacing the Construction Work shall be added to the Contract Sum by Change Order; and if the uncovering and replacing of the Construction Work extends the Contract Time, an appropriate adjustment of the Contract Time shall be made by Change Order.  If such Construction Work is not in accordance with the Contract Documents, Design Builder shall pay such costs and shall not be entitled to an adjustment of the Contract Time or the Contract Sum.

## 12.2    CORRECTION OF DEFECTIVE WORK AND GUARANTEE TO REPAIR PERIOD

This Article 12.2 applies only to Work that is not governed by Article 12.3.

12.2.1  The term "Guarantee to Repair Period" means a period of two (2) years unless a longer period of time is specified, commencing as follows:

.1    For all Construction Work, except Construction Work described as incomplete in the Certificate of Substantial Completion, on the date of Substantial Completion.

.2    NOT USED.

.3    For all Construction Work, described as incomplete in the Certificate of Substantial Completion, on the date of Final Completion.

12.2.2  Design Builder shall (1) correct Defective Work that becomes apparent during the progress of the Work or during the Guarantee to Repair Period, and (2) replace, repair, or restore to University's satisfaction any other parts of the Work and any other real or personal property which is damaged or destroyed as a result of Defective Work or the correction of Defective Work.  Design Builder shall promptly commence such correction, replacement, repair, or restoration upon notice from University's Representative or University, but in no case later than 10 days after receipt of such notice; and Design Builder shall diligently and continuously prosecute such correction to completion. Design Builder shall bear all costs of such correction, replacement, repair, or restoration, and all losses resulting from such Defective Work, including additional testing, inspection, and compensation for University's Representative's services and expenses.  Design Builder shall perform corrective Work at such times that are acceptable to University and in such a manner as to avoid, to the extent practicable, disruption to University's activities.

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

12.2.3  If immediate correction of Defective Work is required for life safety or the protection of property and Design Builder fails to promptly commence such correction of Defective Work, such correction may be performed by University or Separate Contractors and Design Builder shall pay to University all reasonable costs of correcting such Defective Work.  Design Builder shall replace, repair, or restore to University's satisfaction any other parts of the Construction Work and any other real or personal property which is damaged or destroyed as a result of such Defective Work or the correction of such Defective Work.

12.2.4  Design Builder shall remove from the Project site portions of the Construction Work and materials which are not in accordance with the Contract Documents and which are neither corrected by Design Builder nor accepted by University.

12.2.5  If Design Builder fails to commence correction of Defective Work within 10 days after notice from University or University's Representative or fails to diligently prosecute such correction to completion, University may correct the Defective Work in accordance with the General Conditions; and, in addition, University may remove the Defective Work and store salvageable materials and equipment at Design Builder's expense.

12.2.6  If Design Builder fails to pay the costs of such removal and storage as required by above Articles 12.2.4 and 12.2.5 within 10 days after written demand, University may, without prejudice to other remedies, sell such materials at auction or at private sale, or otherwise dispose of such material.  Design Builder shall be entitled to the proceeds of such sale, if any, in excess of the costs and damages for which Design Builder is liable to University, including compensation for University's Representative's services and expenses.  If such proceeds of sale do not cover costs and damages for which Design Builder is liable to University, the Contract Sum shall be reduced by such deficiency.  If there are no remaining payments due Design Builder or the remaining payments are insufficient to cover such deficiency, Design Builder shall promptly pay the difference to University.

12.2.7  Design Builder's liability on the warranties that are subject to this Article 12.2 and Article 3.4 are limited to the remedies set forth in this Article 12.2.  The forgoing limitation of liability shall not apply to third party claims for personal injury, wrongful death, or property damages, including related contribution and indemnity claims by the parties to the Authorization.  For purposes of this Article 12.2.7, employees of the parties are third parties.

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

## 12.3    LIMITED WARRANTIES

The warranties in Articles 3.4.1 and 12.2 and the guarantee in Section 3.15 shall not apply to the following major equipment:

1.  Main compressors and carbon dioxide removal membrane at the landfill gas processing plant.
2.  Booster compressor package at the interconnect gas compression plant.

Design Builder warrants that the equipment described in this Article 12.3 shall be free from defects in workmanship and materials and will conform with the requirements of the Contract Documents, for the durations identified in the individual major equipment warranties.

Design Builder shall deliver to University, as a condition of Substantial Completion, Major Equipment Warranties that are enforceable directly by University.

Design Builder's liability on the warranties that are subject to this Article 12.3 are limited to the cost of repairing or replacing defects in workmanship and materials.

## ARTICLE 13

## TERMINATION OR SUSPENSION OF THE CONTRACT

## 13.1    TERMINATION BY DESIGN BUILDER

13.1.1  Subject to below Article 13.1.2, Design Builder shall have the right to terminate the Contract only upon the occurrence of one of the following:

   .1    Provided that University has not commenced reasonable action to remove any order of a court within the 90-day period, the Work is stopped for 90 consecutive days, through no act or fault of Design Builder, any Subcontractor, or any employee or agent of Design Builder or any Subcontractor, due to an issuance of an order of a court or other public authority having jurisdiction or due to an act of government, such as a declaration of a national emergency making material unavailable.

   .2    University fails to perform any material obligation under the Contract Documents and fails to cure such default within 30 days, or University has not commenced to cure such default within 30 days where such cure will require a reasonable period beyond 30 days and

**General Conditions**
**Turnkey Purchase DB:A**

DocuSign Envelope ID: EE3D18E0-3B43-4725-B433-2726754F0C1A

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

diligently prosecutes the same to completion, after receipt of notice from Design Builder stating the nature of such default(s).

.3  Repeated suspensions by University, other than such suspensions as are agreed to by Design Builder under Article 13.3 below, which constitute in the aggregate more than 20% of the Contract Time.

13.1.2  Upon the occurrence of one of the events listed in Article 13.1.1 above, Design Builder may, upon 10 days additional notice to University and University's Representative, and provided that the condition giving rise to Design Builder's right to terminate is continuing, terminate the Contract.

13.1.3  Upon termination by Design Builder, University will pay to Design Builder the sum determined by Article 13.4.4 of the General Conditions.  Such payment will be the sole and exclusive remedy to which Design Builder is entitled in the event of termination of the Contract by Design Builder pursuant to this Article 13.1; and Design Builder will be entitled to no other compensation or damages and expressly waives the same.

## 13.2    TERMINATION BY UNIVERSITY FOR CAUSE

13.2.1  University will have the right to terminate the Contract for cause at any time after the occurrence of any of the following events:

.1  Design Builder becomes insolvent or files for relief under the bankruptcy laws of the United States.

.2  Design Builder makes a general assignment for the benefit of its creditors or fails to pay its debts as the same become due.

.3  A receiver is appointed to take charge of Design Builder's property.

.4  Design Builder abandons the Work.

13.2.2  Upon the occurrence of any of the following events, University will have the right to terminate the Contract for cause if Design Builder fails to promptly commence to cure such default and diligently prosecute such cure within a reasonable time not to exceed 15 days after notice from University, or within such longer period of time as is reasonably necessary to complete such cure:

**General Conditions**
**Turnkey Purchase DB:A**

.1  Design Builder persistently or repeatedly refuses or fails to supply skilled supervisory personnel, an adequate number of properly skilled workers, proper materials, or necessary equipment to prosecute the Work in accordance with the Contract Documents.

.2  Design Builder fails to make prompt payment of amounts properly due Subcontractors after receiving payment from University.

.3  Design Builder disregards Applicable Code Requirements.

.4  Design Builder persistently or materially fails to execute the Work in accordance with the Contract Documents.

.5  Design Builder is in default of any other material obligation under the Contract Documents.

.6  Design Builder persistently or materially fails to comply with applicable safety requirements.

13.2.3  Upon any of the occurrences referred to in Articles 13.2.1 and 13.2.2 above, University may, at its election and by notice to Design Builder, terminate the Contract and take possession of the Project site and all materials, supplies, equipment, tools, and construction equipment and machinery thereon owned by Design Builder; accept the assignment of any or all of the subcontracts; and then complete the Work by any method University may deem expedient.  If requested by University, Design Builder shall remove any part or all of Design Builder's materials, supplies, equipment, tools, and construction equipment and machinery from the Project site within 7 days of such request; and if Design Builder fails to do so, University may remove or store, and after 90 days sell, any of the same at Design Builder's expense.

13.2.4  If the Contract is terminated by University as provided in this Article 13.2, Design Builder shall not be entitled to receive any further payment until the expiration of 35 days after Final Completion and acceptance of all Work by University.

13.2.5  If the unpaid balance of the Contract Sum exceeds the cost of completing the Work, including all additional costs and expenses made necessary thereby, including costs for University staff time, plus all losses sustained, including any liquidated damages, as provided under the Contract Documents, such excess shall be paid to Design Builder.  Subject to the limitation of liability provisions set out in this Agreement, if such costs, expenses, and losses, exceed the unpaid balance of the Contract Sum, Design Builder shall pay such excess to University.

13.2.6  NOT USED.

## 13.3    SUSPENSION BY UNIVERSITY FOR CONVENIENCE

13.3.1  University may, at any time and from time to time, without cause, order Design Builder, in writing, to suspend, delay, or interrupt the Work in whole or in part for such period of time, up to 90 days, as University may determine, with such period of suspension to be computed from the date of delivery of the written order.  Such order shall be specifically identified as a "Suspension Order" under this Article 13.3. The Work may be stopped for such further period as the parties may agree.  Upon receipt of a Suspension Order, Design Builder shall, at University's expense, comply with its terms and take all reasonable steps to minimize costs allocable to the Work covered by the Suspension Order during the period of Work stoppage.  Within 90 days after the issuance of the Suspension Order, or such extension to that period as is agreed upon by Design Builder and University, University shall either cancel the Suspension Order or delete the Work covered by such Suspension Order by issuing a Change Order.

13.3.2  If a Suspension Order is canceled or expires, Design Builder shall continue with the Work.  A Change Order will be issued to cover any adjustments of the Contract Sum or the Contract Time necessarily caused by such suspension.  Any Claim by Design Builder for an adjustment of the Contract Sum or the Contract Time shall be made within 21 days after the end of the Work suspension.  Design Builder agrees that submission of its claim within said 21 days is an express condition precedent to its right to Arbitrate or Litigate such a claim.

13.3.3  The provisions of this Article 13.3 shall not apply if a Suspension Order is not issued by University.  A Suspension Order shall not be required to stop the Work as permitted or required under any other provision of the Contract Documents.

## 13.4    TERMINATION BY UNIVERSITY FOR CONVENIENCE

13.4.1  University may, at its option, terminate this Contract, in whole or from time to time in part, at any time by giving notice to Design Builder.  Upon such termination, Design Builder agrees to waive any claims for damages, including loss of anticipated profits, on account thereof; and, as the sole right and remedy of Design Builder, University shall pay Design Builder in accordance with Article 13.4.4 below.

13.4.2  Upon receipt of notice of termination under this Article 13.4, Design Builder shall, unless the notice directs otherwise, do the following:

   .1    Immediately discontinue the Work to the extent specified in the notice.

**General Conditions**
**Turnkey Purchase DB:A**

DocuSign Envelope ID: 5E2D18E0-3B43-472F-B433-2726754F0C1A

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

.2    Place no further orders or subcontracts for materials, equipment, services, or facilities, except as may be necessary for completion of such portion of the Work as is not discontinued.

.3    Promptly cancel, on the most favorable terms reasonably possible, all subcontracts to the extent they relate to the performance of the discontinued portion of the Work.

.4    Thereafter, do only such Work as may be necessary to preserve and protect Work already in progress and to protect materials, plants, and equipment on the Project site or in transit thereto.

13.4.3  Upon such termination, the obligations of the Contract shall continue as to portions of the Work already performed and, subject to Design Builder's obligations under Article 13.4.2 above, as to bona fide obligations assumed by Design Builder prior to the date of termination.

13.4.4  Upon such termination, University shall pay to Design Builder the sum of the following:

.1    The amount of the Contract Sum allocable to the portion of the Work properly performed by Design Builder as of the date of termination, less sums previously paid to Design Builder.

.2    Not Used.

.3    Plus any proven losses with respect to materials and equipment directly resulting from such termination.

.4    Plus reasonable demobilization costs.

.5    Plus reasonable costs of preparing a statement of the aforesaid costs, expenses, and losses in connection with such termination.

The above payment shall be the sole and exclusive remedy to which Design Builder is entitled in the event of termination of the Contract by University pursuant to this Article 13.4; and Design Builder will be entitled to no other compensation or damages and expressly waives same.

**General Conditions**
**Turnkey Purchase DB:A**

DocuSign Envelope ID: EE3D18E0-3B43-4725-B433-2726754F0C1A

Project Name: Shreveport Biomethane Facility                                    Project No.: PH7006

## ARTICLE 14

## STATUTORY AND OTHER REQUIREMENTS

### 14.1    NONDISCRIMINATION

14.1.1  For purposes of this Article 14.1, the term Subcontractor shall not include suppliers, manufacturers, or distributors.

14.1.2  NOT USED

14.1.3  Design Builder agrees as follows during the performance of the Work:

.1        Design Builder shall provide equal treatment to, and shall not willfully discriminate against or allow harassment of any employee or applicant for employment on the basis of: race; color; religion; sex; age; ancestry; national origin; sexual orientation; physical or mental disability; veteran's status; medical condition; genetic information (as defined in the Genetic Information Nondiscrimination Act of 2008 and including family medical history); marital status; gender identity, pregnancy, or citizenship (within the limits imposed by law or University's policy) or service in the uniformed services (as defined by the Uniformed Services Employment and Reemployment Rights Act of 1994).  Design Builder will also take affirmative action to ensure that any such employee or applicant for employment is not discriminated against on any of the bases identified above.  Such equal treatment shall apply, but not be limited to the following: employment; upgrade; demotion or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship.  The Design Builder also agrees to post in conspicuous places, available to employees and applicants for employment, notices setting forth the provisions of this nondiscrimination clause.  The Design Builder will, in all solicitations or advertisements for employees placed by or on behalf of the Design Builder, state that qualified applicants will receive consideration for employment without regard to: race; color; religion; sex; age; ancestry; national origin; sexual orientation; physical or mental disability; veteran's status; medical condition (as defined in Section 12926 of the State of California Government Code and including cancer-related medical conditions and or genetic characteristics); genetic information (as defined in the Genetic Information Nondiscrimination Act of 2008 and including family medical history); marital status; gender identity, pregnancy, or citizenship (within the limits imposed by law or University's policy) or service in the uniformed services (as defined by the Uniformed Services Employment and Reemployment Rights Act of 1994).  For purposes of this provision: (1) "Pregnancy" includes pregnancy, childbirth, and medical conditions related to pregnancy and childbirth; and (2) "Service in the uniformed services" includes

General Conditions
Turnkey Purchase DB:A

membership, application for membership, performance of service, application for service, or obligation for service in the uniformed services.

.2      Design Builder shall include the provisions of the foregoing Article 14.1.3.1 in all subcontracts with Subcontractors, so that such provisions will be binding upon each such Subcontractor.

## 14.2    PREVAILING WAGE RATES (APPLICABLE ONLY FOR WORK PERFORMED IN CALIFORNIA)

14.2.1 For purposes of this Article 14.2, the term Subcontractor shall not include suppliers, manufacturers, or distributors.

14.2.2 Solely with regard to Work performed in California, Design Builder shall comply and shall ensure that all Subcontractors comply with prevailing wage law pursuant to the State of California Labor Code, including but not limited to Sections 1770, 1771, 1771.1, 1772, 1773, 1773.1, 1774, and 1775, 1776, 1777.5, and 1777.6 of the State of California Labor Code. Compliance with these sections is required by this Contract. The Work under this Contract is subject to compliance monitoring and enforcement by the State of California Department of Industrial Relations.

14.2.3  The State of California Department of Industrial Relations has ascertained the general prevailing *per diem* wage rates in the locality in which the Construction Work is to be performed for each craft, classification, or type of worker required to perform the Work.  A copy of the general prevailing *per diem* wage rates will be on file at University's principal facility office and will be made available to any interested party upon request.  Design Builder shall post a copy of the general prevailing per diem wage rates as well as job site notices as prescribed by regulation at the job site. By this reference, such schedule is made part of the Contract Documents.  Design Builder shall pay not less than the prevailing wage rates, as specified in the schedule and any amendments thereto, to all workers employed by Design Builder in the execution of the Construction Work.  Design Builder shall cause all subcontracts to include the provision that all Subcontractors shall pay not less than the prevailing rates to all workers employed by such Subcontractors in the execution of the Construction Work.  Design Builder shall forfeit to University, as a penalty, not more than $200 for each calendar day or portion thereof for each worker that is paid less than the prevailing rates as determined by the Director of Industrial Relations for the work or craft in which the worker is employed for any portion of the Work done by Design Builder or any Subcontractor.  The amount of this penalty shall be determined pursuant to applicable law.  Such forfeiture amounts may be deducted from the Contract Sum or sought directly from the surety under its Performance Bond if there are insufficient funds remaining in the Contract Sum.  Design Builder shall also pay to any worker who was paid less than the prevailing wage rate for the work or craft for which the worker was employed for

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

any portion of the Construction Work, for each day, or portion thereof, for which the worker was paid less than the specified prevailing *per diem* wage rate, an amount equal to the difference between the specified prevailing *per diem* wage rate and the amount which was paid to the worker. Review of any civil wage and penalty assessment shall be made pursuant to section 1742 of the California Labor Code.

## 14.3    PAYROLL RECORDS (APPLICABLE ONLY FOR WORK PERFORMED IN CALIFORNIA)

14.3.1 For purposes of this Article 14.3, the term Subcontractor shall not include suppliers, manufacturers, or distributors.

14.3.2 Solely with regard to Work performed in California, Design Builder and all Subcontractors shall keep an accurate payroll record, showing the name, address, social security number, job classification, straight time and overtime hours worked each day and week, and the actual *per diem* wages paid to each journeyworker, apprentice, worker, or other employee employed in connection with the Construction Work. All payroll records shall be certified as being true and correct by Design Builder or Subcontractors keeping such records; and the payroll records shall be available for inspection at all reasonable hours at the principal office of Design Builder on the following basis:

.1    A certified copy of an employee's payroll record shall be made available for inspection or furnished to such employee or the employee's authorized representative on request.

.2    A certified copy of all payroll records shall be made available for inspection upon request to University, the State of California Division of Labor Standards Enforcement, and the Division of Apprenticeship Standards of the State of California Division of Industrial Relations.

.3    A certified copy of all payroll records shall be made available upon request by the public for inspection or copies thereof made; provided, however, that the request by the public shall be made to either University, the Division of Apprenticeship Standards, or the Division of Labor Standards Enforcement.  The public shall not be given access to such records at the principal offices of Design Builder or Subcontractors.  Any copy of the records made available for inspection as copies and furnished upon request to the public or any public agency by University shall be marked or obliterated in such a manner as to prevent disclosure of an individual's name, address, and social security number.  The name and address of Design Builder awarded the Contract or performing the Contract shall not be marked or obliterated.

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                    Project No.:  PH7006

14.3.3  Solely with regard to Work performed in California Design Builder shall file a certified copy of the payroll records with the entity that requested the records within 10 days after receipt of a written request. Design Builder shall inform University of the location of such payroll records for the Project, including the street address, city, and county; and Design Builder shall, within 5 working days, provide notice of change of location of such records.  In the event of noncompliance with the requirements of this Article 14.3 or with the State of California Labor Code Section 1776, Design Builder shall have 10 days in which to comply following receipt of notice specifying in what respects Design Builder must comply.  Should noncompliance still be evident after the 10- day period, Design Builder shall forfeit to University, as a penalty, $100 for each day, or portion thereof, for each worker, until strict compliance is accomplished. Such forfeiture amounts may be deducted from the Contract Sum.

### 14.4   APPRENTICES (APPLICABLE ONLY FOR WORK PERFORMED IN CALIFORNIA)

14.4.1  For purposes of this Article 14.4, the term Subcontractor shall not include suppliers, manufacturers, and distributors.

14.4.2  Solely with regard to Work performed in California only apprentices, as defined in the State of California Labor Code Section 3077, who are in training under apprenticeship standards and written apprentice agreements under Chapter 4, Division 3, of the State of California Labor Code, are eligible to be employed by Design Builder and Subcontractors as apprentices.  The employment and training of each apprentice shall be in accordance with the provisions of the apprenticeship standards and written apprentice agreements under which the apprentice is training and in accordance with prevailing wage law pursuant to the Labor Code, including but not limited to Section 1777.5.  The Design Builder bears responsibility for compliance with this section for all apprenticeable occupations.

14.4.3  Solely with regard to work performed in California, every apprentice shall be paid the standard wage to apprentices, under the regulations of the craft or trade at which the apprentice is employed, and shall be employed only at the Construction Work in the craft or trade to which the apprentice is indentured.

14.4.4  Solely with regard to work performed in California, when Design Builder or Subcontractors employ workers in any apprenticeship craft or trade on the Work, Design Builder or Subcontractors shall 1) send contract award information to the applicable joint apprenticeship committee that can supply apprentices to the site of the public work, and 2) apply to the joint apprenticeship committee, which administers the apprenticeship standards of the craft or trade in the area of the Project site, for a certificate approving Design Builder or Subcontractors under the apprenticeship standards for the employment and training of apprentices in the area of the Project site.  The committee will issue a

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

certificate fixing the number of apprentices or the ratio of apprentices to journeypersons who shall be employed in the craft or trade on the Construction Work. The ratio will not exceed that stipulated in the apprenticeship standards under which the joint apprenticeship committee operates; but in no case shall the ratio be less than 1 hour of apprentice work for every 5 hours of journeyperson work, except as permitted by law. Design Builder or Subcontractors shall, upon the issuance of the approval certificate in each such craft or trade, employ the number of apprentices, or the ratio of apprentices to journeypersons fixed in the certificate issued by the joint apprenticeship committee, or present an exemption certificate issued by the Division of Apprenticeship Standards.

14.4.5  "Apprenticeship craft or trade," as used in this Article 14.4, shall mean a craft or trade determined as an apprenticeship occupation in accordance with rules and regulations prescribed by the Apprenticeship Council.

14.4.6  Solely with regard to work performed in California, if Design Builder or Subcontractors employ journeyworkers or apprentices in any apprenticeship craft or trade in the area of the Project site, and there exists a fund for assisting to allay the cost of the apprenticeship program in the trade or craft, to which fund or funds other contractors in the area of the Project site are contributing, Design Builder and Subcontractors shall contribute to the fund or funds in each craft or trade in which they employ journeyworkers or apprentices on the Construction Work in the same amount or upon the same basis and in the same manner done by the other contractors. Design Builder may include the amount of such contributions in computing its Proposal for the Contract; but if Design Builder fails to do so, it shall not be entitled to any additional compensation therefore from University.

14.4.7  Solely with regard to work performed in California, in the event Design Builder willfully fails to comply with this Article 14.4, it will be considered in violation of the requirements of the Contract.

14.4.8  Nothing contained herein shall be considered or interpreted as prohibiting or preventing the hiring by Design Builder or Subcontractors of journeyworker trainees who may receive on-the-job training to enable them to achieve journeyworker status in any craft or trade under standards other than those set forth for apprentices.

**14.5    NOT USED**

**14.6    NOT USED**

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

## 14.7 OTHER JURISDICTIONS

14.7.1 In addition to complying with requirements of Article 14.1 "NONDISCRIMNATION", Design Builder shall comply and shall ensure that all subcontractors or subconsultants comply with all applicable state and local labor laws and regulations.

## 14.8 PATIENT HEALTH INFORMATION (if applicable)

Design Builder acknowledges that its employees, agents, subcontractors, consultants and others acting on its behalf may come into contact with Patient Health Information ("PHI") while performing work at the Project Site. This contact is most likely rare and brief (e.g. walking through a clinic where patient files may be visible, overhearing conversations between physicians while working or touring a hospital, noticing a relative or acquaintance receiving treatment in a University facility, etc.). Design Builder shall immediately notify University Representative of any such contact. Any and all forms of PHI should not be examined closer, copied, photographed, recorded in any manner, distributed or shared. Design Builder will adopt procedures to ensure that its employees, agents and subcontractors refrain from such activity. If Design Builder, its employees, agents or subcontractors do further examine, copy, photograph, record in any manner, distribute or share this information, Design Builder will report such actions immediately to the University Representative. Design Builder will immediately take all steps necessary to stop any such actions and will ensure that no further violations of this contractual responsibility will occur. Design Builder will report to University Representative within five (5) days after Design Builder gives University Representative notice of the event/action of the steps taken to prevent future occurrences.

## ARTICLE 15

## MISCELLANEOUS PROVISIONS

## 15.1  GOVERNING LAW AND VENUE

15.1.1 This Contract shall be interpreted under the laws of the State of California. The venue for disputes under this Contract shall be the County of Los Angeles in the State of California.

## 15.2  SUCCESSORS AND ASSIGNS

15.2.1 University and Design Builder respectively bind themselves and their successors, permitted assigns, and legal representatives to the other party and to the successors, permitted assigns, and legal representatives of such other party in respect to covenants, agreements, and obligations contained in the

**General Conditions**
**Turnkey Purchase DB:A**

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

Contract Documents. Neither party to the Contract shall assign the Contract, in whole or in part, without prior written consent of the other party. Notwithstanding any such assignment, each of the original contracting parties shall remain legally responsible for all of its obligations under the Contract.

## 15.3    RIGHTS AND REMEDIES

15.3.1  All rights and remedies of either Party under the Contract Documents will be cumulative and in addition to, and not in limitation of, all other rights and remedies.

15.3.2  No action or failure to act by University or University's Representative will constitute a waiver of a right afforded them under the Contract, nor will such action or failure to act constitute approval of or acquiescence in a condition or breach thereunder, except as may be specifically agreed in writing. No waiver by either party or their representatives of any condition, breach, or default will constitute a waiver of any other condition, breach or default; nor will any such waiver constitute a continuing waiver.

15.3.3  No provision contained in the Contract Documents shall create or give to third parties any claim or right of action against University, University's Representative, or Design Builder.

## 15.4    SURVIVAL

15.4.1  The provisions of the Contract which by their nature survive termination of the Contract or Final Completion, including all warranties, indemnities, payment obligations, and University's right to audit Design Builder's books and records, shall remain in full force and effect after Final Completion or any termination of the Contract.

## 15.5    AMENDMENTS

15.5.1  The Agreement may be modified only by a written instrument signed by both parties or as provided in Article 7 of the General Conditions.

## 15.6    SEVERABILITY OF PROVISIONS

15.6.1  If any one or more of the provisions contained in the Contract Documents should be invalid, illegal, or unenforceable in any respect, the validity, legality, and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

**General Conditions**
**Turnkey Purchase DB:A**

## 15.7    UNIVERSITY'S RIGHT TO AUDIT

15.7.1   University and entities and agencies designated by University will have access to and the right to audit and the right to copy at University's cost all of Design Builder's books, records, contracts, correspondence, instructions, drawings, receipts, vouchers, purchase orders, and memoranda relating to the Work.  Design Builder shall preserve all such records and other items during the performance of the Contract and for a period of at least 3 years after Final Completion.

## 15.8    METHODS OF DELIVERY FOR SPECIFIED DOCUMENTS

15.8.1   The following documents must be delivered in a manner specified in Article 15.8.2:

     .1      Design Builder Notices of election to litigate or arbitrate;

     .2      Written demand for a final decision by University's Representative pursuant to Article 4.2.5;

     .3      Design Builder claims pursuant to Article 4.3;

     .4      Design Builder notices of conditions pursuant to Articles 3.10.4, 3.24, or 3.25;

     .5      University's notices of Design Builder's failure to perform and/or correct defective work pursuant to Articles 4.1.6, 12.2 and 13.2.3;

     .6      Notices of termination or suspension pursuant to Article 13.

15.8.2 Delivery methods for documents specified in Article 15.8.1:

     .1      By personal delivery.

     .2      Sent by facsimile copy where receipt is confirmed.

     .3      Sent by Express Mail, or another method of delivery providing for overnight delivery where receipt is confirmed.

     .4      Sent by registered or certified mail, postage prepaid, return receipt requested.

15.8.3    The documents identified in Article 15.8.1 shall only be effective if delivered in the manner specified in Article 15.8.2.  Subject to the forgoing, such documents shall be deemed given and received upon actual receipt in the case of all except registered or certified mail; and in the case of registered or certified mail, on the date shown on the return receipt or the date delivery during normal business hours was attempted. Delivery of the specified documents shall be made at the respective street addresses set forth in the Authorization. Such street addresses may be changed by notice given in accordance with this Article 15.8.

Project Name: Shreveport Biomethane Facility                    Project No.:  PH7006

**15.9 TIME IS OF THE ESSENCE.**

15.9.1 See Authorization, Article 10.6.

**15.10    MUTUAL DUTY TO MITIGATE**

15.10.1 University and Design Builder shall use all reasonable and economically practicable efforts to mitigate delays and damages to the Project and to one another with respect to the Project, regardless of the cause of such delay or damage.

[End]

**General Conditions**
**Turnkey Purchase DB:A**

**Project Name:  Shreveport Biomethane Facility**                    **Project No.:  PH7006**

## EXHIBIT

## SCOPE OF WORK

### GENERAL INFORMATION

This exhibit supplements other Contract Documents in defining the scope of work of the Design Builder.

The Work shall include all design and construction work, labor, material, tools, equipment, excavation, shoring, testing, inspection, commissioning and all necessary general conditions, that may be reasonably inferred from the Contract Documents to provide all Design Work and Construction Work for:

University's Gas Processing Plant, Product Gas Pipeline and Compression Plant and connection to all utilities located in Caddo Parish, Louisiana more fully described as follows:

In addition to the equipment and materials described in this exhibit, the Design Build Contractor shall provide civil, structural, electrical and mechanical services and equipment necessary for the execution of the Design Builder's portion of the work.  An overall Project Site Location map, site areas, and a preliminary process flow diagram for the scope of work can be found in the Exhibits.

### Gas Processing Plant Description

The Gas Processing Plant (GPP) is to be located on property leased from the City of Shreveport landfill on a site previously used for LFG processing.  Most of the previous LFG processing equipment has been removed. The remaining foundations and unneeded equipment will be demolished and removed as part of this scope of work to provide room for the new Gas Processing Plant.

The Gas Processing Plant consists of several stages including moisture removal, sulfur removal and VOC and CO2 removal in a membrane system provided by Air Liquide.

The existing landfill gas gathering system will be connected to a blower to boost the landfill gas pressure to approximately 5 psig prior to the diversion point where it can directed to the existing flare when the GPP is not

Exhibit – Scope of Work
Turnkey Purchase DB:A                         1 of 25

**Project Name:  Shreveport Biomethane Facility**                          **Project No.:  PH7006**

in operation.  The blower discharge flow is cooled by passing through a heat exchanger which is cooled by chilled water from the chiller system. After cooling a separator removes a portion of the water from the gas.

This gas, along with the membrane recycle stream from the 2nd stage membrane, is sent to the compressor aftercooler knockout and then compressed to deliver a pressure of 200 psig to the $CO_2$ removal system, after the compressor aftercooler knockout. This provides some allowance for pressure drop in the Air Liquide heat exchanger. Hot gas from the compressor, before any cooling, is and typically 200-250F, will go direct to the Air Liquide skid and pass through two low pressure drop heat exchangers where a small amount of heat will be taken. Probably less than 50F temp drop max and sometimes nothing, i.e. in hot weather. The gas then passes through the compressor fin-fan aftercooler where the temperature is reduced to near ambient, then in hot weather a cold heat exchanger will trim the temperature to 90F max using chilled water from the chiller system, and in cold weather controlled to a minimum of roughly 50F. After temperature conditioning and liquids knock-out, the landfill gas stream is introduced into the membrane skid for processing.

Within the membrane skid, the feed gas passes through a coalescing filter to remove entrained liquids, primarily water and some compressor oil. Next the gas enters a proprietary pressure swing regenerable adsorption unit where water vapor, VOCs and siloxanes are removed. The nearly clean gas then enters the dual (lead-lag) carbon beds as a polishing step to remove any trace contaminants to extremely low levels. Finally, after exiting the carbon beds, a dust filter removes any carbon dust.

The gas exiting the carbon bed dust filter passes through heat exchanger no. 1 (HX-1) where the temperature is raised to the desired set point and then introduced into the 1st stage membrane elements where the bulk of the $CO_2$ is removed as a low pressure "Permeate1" stream. This "Permeate1" stream is used to regenerate the PSA and after exiting the PSA will then contain about twice the level VOCs found in the feed gas and is sent to a flare or oxidizer unit to destroy the VOCs (typical 98% destruction efficiency per the EPA). The high pressure Residue-1 stream from the first stage passes through HX-2 where the temperature is raised to the desired set point and is introduced into a second membrane stage to produce very low $CO_2$ product gas (which may need to be compressed up to the pipeline pressure). The low pressure Permeate-2 from the second stage is recycled to the suction of the feed compressor to limit hydrocarbon losses.

In addition to the normal operation of the Gas Processing Plant which during regeneration returns gas to the inlet of the Gas Processing Plant for retreatment, provisions for diverting any off-specification gas to the flare disposal are included in this scope by means of a pipe from an automated valve immediately downstream from the Gas Processing Plant

After the Air Liquide system the product gas will pass through an additional polishing vessel to remove any remaining contaminants prior to entering the Product Gas Pipeline.

**Product Gas Pipeline Description**

---

Product Gas is delivered from the Gas Processing Plant (GPP) to the Gas Compression Plant (GCP) by a 3.0-mile long, low-pressure pipeline (UC Pipeline).  The UC Pipeline consists of the re-use of a 2.7 mile section of an existing 10" dia. underground HDPE, SDR11 pipeline that was previously used to transport LFG to a General Motors facility (GM Pipeline).  In addition to the existing section of the GM Pipeline, a 0.3 mile section of new pipeline will be installed underground to extend the UC Pipeline to reach the selected location of the GCP.

The work includes:

• Separation of the existing pipeline at the point of connection of the new section,
• Isolation of the unused portion of the GM Pipeline,
• Fabrication of the new section of pipeline and installing it underground,
• Fabrication and installation of the pipeline transition to above ground inside the Gas Compression Plant and making connections.

The pipeline material of the existing and new sections of the pipeline is high density polyethylene (HDPE) and has a maximum operating pressure of 99 psig.  Product Gas will be delivered to the pipeline at 99 psig or less at the Gas Processing Plant which includes an over pressure protection device. The route of the new 0.3 mile section of the pipeline from the point of connection to the GCP is adjacent to an existing EMP transmission pipeline.

The installation of the new section of pipeline will be accomplished by a combination of directional drilling and trenching as appropriate along the route within the delineated right-of-way.  The final portion of the new pipeline will require crossing the EMP transmission pipeline underground and the transition to above ground piping at the inlet to the GCP.

**Gas Compression Plant Description**

The Gas Compression Plant is located at a previously undeveloped site accessed off of Buncombe Road, east of Simpson Road. An access road to the new site and provision of a new electrical utility connection are included in this scope, both routed generally along an existing unimproved private road.

In order to inject the product gas in to the EMP transmission pipeline, it is necessary to compress the product gas and test it to assure compliance with the EMP gas quality requirements.  The principal components of the gas compression facility are described in the following paragraphs.  The Gas Compression Plant will comprise the booster compressor and ancillary equipment necessary for the process.

Exhibit – Scope of Work
Turnkey Purchase DB:A                           3 of 25

**Project Name:  Shreveport Biomethane Facility**                                           **Project No.:  PH7006**

The Gas Compression Plant system consists essentially of the following system components:

• Product gas inlet filtration,
• Product gas compression,
• Product gas cooling and
• Product gas outlet filtration.
• Connections to the UC Pipeline and the MSA (Design Builder to furnish and install)
• Systems for providing utilities to the EMP metering station.  (Design Builder to furnish and install)
• EMP metering station or meter set assembly (MSA)   (EMP to furnish and install)
• Connection to the existing EMP transmission pipeline.   (EMP to furnish and install)

An inlet particulate filter will be provided upstream of the compressor to remove any contaminants the product gas may have picked up while traveling down the pipeline.  The gas then enters a compressor where it is compressed to up to 350 psig.  The compressor is powered by an electric motor with power provided by a new utility connection to the site from power lines along Buncombe Road or other suitable utility connection point.

A gas-to-air heat exchanger is provided to cool the discharge product gas temperature to between 40°F and 140°F.  A particulate filter is provided downstream of the heat exchanger to remove oil or other contaminants imparted to the product gas stream from the compression and cooling processes.

The compressed, cooled and filtered product gas then enters a Meter Set Assembly (MSA) designed and built by EMP.  The MSA monitors gas quality and quantity.  If the product gas does not meet EMP's gas quality requirements, the MSA will automatically close a valve, stopping the flow of product gas from entering the EMP transmission pipeline   The project will include analyzers and control systems to monitor the quality of the Product Gas at the outlet of the gas processing plant to assure that the gas will meet EMP's requirements and avoid sending Product Gas into the Product Gas pipeline if it does not meet EMP's requirements.

Finally, the Product Gas is delivered from the Compression Plant to the third party gas transmission company, EMP, at the turn over point located at the inlet to the EMP MSA.  EMP requires an inlet pressure of up to 350 psig at the turn over point between the Gas Compression Plant and the MSA.  An over pressure protection device prevents exposing the MSA and existing EMP transmission pipeline to pressure greater than 350 psig.

The Design Builders scope with regard to the MSA is limited to preparing the site location and providing access to the site which is adjacent to the Gas Compression Plant at the point of interconnection with the

**Project Name: Shreveport Biomethane Facility**                    **Project No.: PH7006**

EMP pipeline to which the Product Gas is being injected and providing electrical and compressed air utilities to the boundary of the MSA. Design Builder is not responsible for the design, construction and operation of the MSA or for the modification of the existing EMP transmission pipeline to connect the new piping which will introduce the Product Gas to the transmission pipeline.

**Project Name:  Shreveport Biomethane Facility**                    **Project No.:  PH7006**

## ARTICLE 1

**GENERAL PROVISIONS/REQUIREMENTS**

1.1     UNIVERSITY REVIEW AND APPROVAL

     1.1.1  University Design Approval, see Article 2 of this Exhibit.

     1.1.2  The term "Code Compliance Review" shall mean the review conducted by the state and local authorities having jurisdiction to review the Design Work to determine that it meets all Applicable Code Requirements.

     1.1.3  The term "Scope Compliance Review" shall mean the review by the University's Representative of the Design Work to determine that the requirements of the Contract Documents, other than elements covered by the Code Compliance Review, are met.

     1.1.4  The term "Independent Structural Review" shall mean the review by a structural engineer hired by the University or its Master Engineer to assess the structural safety of the Design Work.

     1.1.5  The term "Independent Cost Review" shall mean the review by the University's Representative of the Design Work to estimate construction cost and overall project cost.

     1.1.6  In accordance with the Design Build Agreement, each Phase is subject to review and approval by University as outlined in this exhibit.  Four separate types of reviews are intended: 1) Scope Compliance Review(s), 2) Code Compliance Review(s), 3) Independent Cost Review and 4) Independent Structural Review.    Once the University has approved the Design Work, any item within such approved Design Work that the Design Builder desires to subsequently change must be identified by Design Builder in the form of a submittal identifying and requesting such change; and shall not be incorporated into the Design Work until written approval is received from the University.

1.2     APPLICABLE CODES, RULES, REGULATIONS, REGULATORY AGENCY APPROVALS, & INDEPENDENT REVIEW(S)

     1.2.1  It is the Design Builder's and its Design Professional's responsibility to design the Project in compliance with applicable requirements of federal and state laws, codes, rules, regulations,

---

Exhibit – Scope of Work
Turnkey Purchase DB:A                    6 of 25

ordinances, and standards, including, but not limited to, those outlined below.  Design Professional shall have copies available of applicable codes and regulations for ready reference.

.1       Americans with Disabilities Act (ADA), Title II, ADAAG.

.2       The Federal Occupational Safety and Health Act and all other Applicable Code Requirements relating to safety.

.3       Regulatory Agencies.   The following agencies must review and approve the appropriate portions of the Design Work:

Louisiana Department of Environmental Quality
Louisiana State Fire Marshal
Louisiana Department of Natural Resources, Pipeline Division
City of Shreveport for Caddo Parish

.4       Codes and Standards referenced in the Criteria Documents.

1.3      REGULATORY APPROVALS AND INDEPENDENT REVIEWS

1.3.1 Design Professional shall be responsible for obtaining review and approval by applicable regulatory agencies as stipulated in this exhibit and the Contract Documents.  Design Builder will coordinate with the University's Representative prior to commencing review and approval with regulatory agencies.

1.3.2 Design Professional shall be responsible for incorporating revisions requested by Independent Reviewer(s).   Design Builder will coordinate with the University's Representative prior to incorporating such revisions.  The University's Representative will direct the Design Builder on how to coordinate with each Independent Reviewer(s).  Meetings may also be required of the Design Builder with Independent Reviewer(s).

1.3.3 Design Builder shall be responsible for obtaining necessary entitlements as described in the General Conditions of the Contract Documents. The Design Builder shall assist the University as it obtains the rights to interconnect with and deliver the anticipated volume of gas to the gas pipeline network.

**Project Name:  Shreveport Biomethane Facility**                        **Project No.:  PH7006**

Design Builder shall also be responsible for satisfying all applicable laws and obtaining any permits or entitlements necessary for the construction and operation of the Project, as described in the General Conditions of the Contract Documents.

1.4     EXAMINATION OF SITES

    1.4.1 Prior to executing the Agreement, Design Builder and Design Builder's Design Professional's shall:

        .1      Visit the Project sites to become familiar with existing site conditions, including the site location and size, utility capacities, and connection options of external utilities.

**Project Name:  Shreveport Biomethane Facility**                    **Project No.:  PH7006**

## ARTICLE 2

**Design Work and the Construction Work shall be segmented or phased with the following phases as a means for the Design Builder to fast track the Project and deliver the Project within the Contract Time:**

**PHASE 1 – DESIGN DEVELOPMENT PHASE**

2.1     GENERAL

2.1.1     Upon University's written Notice to Proceed for Phase 1, Design Professional shall prepare Design Development documents. These documents shall consist of such drawings, outline specifications, and narratives as are needed to establish and describe the size and character of the entire Project, and allow the University to initiate Scope Compliance Review(s).  Design Professional shall incorporate into the Design Development documents architectural, structural, mechanical, and electrical systems, materials, and such other elements and other systems as described in Contract Documents including but not limited to the Performance             Specifications             and             Design             Criteria             Exhibits.

2.1.2     Whereas thirty percent (30%) design level documents were previously completed under a separate authorization assuming a different technology provider, the 30% design shall be revised assuming the current technology provider selected by Design Builder. The revised 30% design elements will be submitted as part of the 50% design submittal outlined in Construction Documents.

2.1.3     The 30% design shall include, at minimum, the following design:

1. Process
2. General
3. Electrical
4. Control

The above design requirements are outlined in detail below:

1. Process Flow Diagram (PFD) to include schematic representation of:
   a. Major equipment

---

Exhibit – Scope of Work
Turnkey Purchase DB:A                    9 of 25

    b.  Process conditions at major process change points. To include:

        i.  Flow (scfm and acfm)

        ii.  Pressure (psig)

        iii.  Temperature (deg F)

        iv.  Fluid stream (Gas & Liquids) constituents

2. Piping & Instrumentation Diagram (P&ID) to include schematic representation of:

    a.  Major equipment

    b.  Valves

    c.  Instrumentation

    d.  Piping Line sizes and materials

3. Facility General Arrangement (GA) to include plan view physical representation of:

    a.  Site boundary (for GPP and GCP)

    b.  Equipment layout

    c.  Area classification designation

4. Electrical Single Line Diagram (SLD) to include schematic representation of:

    a.  Utility interconnect (disconnect)

    b.  Site transformer

    c.  Electrical loads

    d.  Conduit and Conductor sizes

    e.  Metering

5. Demolition Plan to include identification of:

    a.  Foundations and equipment to be demolished

    b.  Existing equipment (e.g. existing flare) to be preserved

    c.  Any buildings to be preserved

6. Typical Major Equipment cut sheets.

7. Project Cost Estimate based on the 30% design.

8. Performance Specification for complete system.

9. List of anticipated permits and/or regulatory requirements and a 30% cost estimate for each.

10. Description of the technical requirements to be met by the owner/customer.

11. Description of the technical requirements to be met by the supplier.

12. Description of the technical requirements to be met by any relevant third parties.

DocuSign Envelope ID: EE3B18E0-3B43-472F-B433-3726754E0C1A

**Project Name:  Shreveport Biomethane Facility**                              **Project No.:  PH7006**

It is understood that the 30% design documents are not final and may be revised prior to issue for construction however the supplier has made every effort to provide as accurate and complete a package as is practical at this stage of the project.

2.1.4    The Design Development and Construction Documents Phases shall also require the procurement of major equipment to maintain the overall project schedule, as further described in the Preliminary Schedule Exhibit. Upon University's written Notice to Proceed with Phase 1, Design Builder shall;

1.   Develop firm price proposals from major equipment suppliers.
2.   Submit to the University the major equipment proposals, technical details and performance data from the suppliers.

University shall review the above submittals according to the Design Build contract documents and after resolution of any issues with the Design Builder, provide a limited notice to proceed with major equipment procurement. Such University limited notice to proceed may occur during the Phase 1 or Phase 2 period.

2.1.5    The Work of this phase is subject to independent reviews, both internal and external.   All comments to the Design Development documents from independent reviews will be addressed and resulting changes to the documents due to comments from independent reviews shall be incorporated in the 50% Design Documents,

2.1.6    Design Development drawings will be produced in CADD utilizing AutoCAD in DWG format. Paper copies will be distributed as the working drawings upon request.  Electronic copies (pdf or equal) shall be permitted at the University's discretion.

2.2    SITE & CIVIL REQUIREMENTS

Civil design shall be in accordance with applicable local and state building codes and requirements.

2.3    STRUCTURAL REQUIREMENTS

Exhibit – Scope of Work
Turnkey Purchase DB:A                         11 of 25

**Project Name:  Shreveport Biomethane Facility**                              **Project No.:  PH7006**

Structural design shall be in accordance with applicable local and state building codes and requirements.

2.4     PLUMBING REQUIREMENTS

Plumbing design shall be in accordance with applicable local and state building codes and requirements.

2.5     MECHANICAL REQUIREMENTS

Mechanical design shall be in accordance with applicable local and state building codes and requirements.

2.6     ELECTRICAL REQUIREMENTS

Electrical design shall be in accordance with applicable local and state building codes and requirements.

2.7     SOILS AND MATERIALS TESTING (Geotechnical)

Soils and materials testing shall be in accordance with applicable local and state building codes and requirements.

## ARTICLE 3

## PHASE 2 – CONSTRUCTION DOCUMENTS PHASE

3.1.    GENERAL

3.1.1    The construction documents phase submittal shall include, at a minimum, all items that are required for the Design Development Phase and those that are enumerated in Phase 1 scope by the University Construction Documents shall show all elements previously shown on the Design Development documents but with greater detail and specificity and any additional necessary elements to meet the requirements in the Contract Documents.

3.1.3    Upon University's written Notice to Proceed for Phase 2, and based on Design Development Phase documents approved in writing by University, and Change Order(s), Design Builder shall prepare for approval by University, Construction Documents consisting of Drawings and Specifications setting forth in detail the requirements for the construction of the project.    The Construction Documents shall describe the quality, configuration, size and relationships of all components to be incorporated into the project.  The Construction Documents shall be consistent with the Contract Documents including but not limited to the Performance Specifications and Design Criteria Exhibits. The fifty percent (50%) and 100 percent (100%) design submittals will include, at minimum, the following tasks.

1.  The preparation and submittal by the Design Builder of the design submittal documents.
2.  The review of said documents by the University or their designee and the preparation of a Letter of Design Review.
3.  The Design Builder's response to the key risk factors in the Letter of Design Review.

3.1.4    After University's written Limited Notice to Proceed under Phase 3 for Major Equipment Procurement, Design Builder shall begin procurement of major equipment identified by Design Builder as having long lead time.  This Major Equipment Procurement task or activity shall be shown on the Contract Preliminary Schedule Exhibit.

3.1.5    The Work of this phase is subject to independent reviews, both internal and external.

3.1.6    Design Professional shall submit to University for Scope Compliance Review and approval at 50% completion and 100% completion of all technical documents of major equipment items identified by Design Builder as having long lead time pursuant to paragraph 3.1.4. Design Professional shall submit construction documents to University for review and approval upon 50% and 100% completion; and Design Professional's determination that the documents are complete and coordinated, Design Professional shall submit Construction Documents for review.    Design Professional shall re-submit the documents for back check by the University for review and to the Building Official, and other applicable agencies after corrections are made to the 100% submittal review.   The Design Professional shall continue to re-submit the documents until written approval from the Building Official and authorities having jurisdiction is obtained for Code Compliance.

3.1.7    Upon 50% and 100% completion of the Construction Documents, Design Professional shall submit for University review and comment three (3) copies each of the Construction Documents, a summary of the calculations, and detailed calculations for the structural engineering design, and other specialized system calculations as required by the Building Official or for independent review. Submission of digital/electronic files shall be allowed at the University's discretion.

3.1.8    The Construction Documents submittals shall either incorporate any changes or corrections required by Building Official or the applicable review agencies as a result of their Code Compliance Review of the 100% completed Construction Documents or be accompanied by a written statement as to why such changes were not incorporated.   Building Official may reject Design Professional's explanation and require Design Professional to make the changes or corrections to the Construction Documents as previously requested by Building Official related to its Code Compliance Review.   The Building Official will be final interpreter of all code requirements, and all such decisions will be final.

3.1.9    Unless directed otherwise in writing by University the Construction Documents Phase shall not be considered 100% complete until all required agency approvals have been received by Design Professional.  Design Professional shall prepare and submit required agency applications as required by University's Representative.

3.1.10  Final Construction Drawings and the Certification page of the specifications submitted to University shall be signed and stamped by the appropriate Design Professionals of Record.

3.1.11  Design Professional shall be responsible for the content of all Construction Documents.  All construction documents prepared or signed by Design Professional of Record shall be complete, coordinated, accurate, and contain directions as will enable a competent contractor to carry them out.

3.1.12  Design Professional shall submit for University review and comment three (3) copies of the final (100%-completed) Construction Documents. Submission of digital/electronic files shall be allowed at the University's discretion.

3.1.13  When reviews by the University and Building Official are complete, and review agency required changes or corrections have been incorporated by Design Professional, the 100%-completed Construction Documents will be deemed to be final and ready for University to issue Construction Notice to Proceed.  Design Professional shall provide to University one (1) set of Drawings in CADD, AutoCAD DWG format, three (3) sets of prints, and the complete set of the Specifications in PDF format, of the final (100% back checked and corrected) set of Construction Documents.  The Specifications shall be provided in both hard copy form and on computer disk.

3.2     50% COMPLETED SUBMITTAL REQUIREMENT

3.2.1    The 50% complete design submittal of Construction Documents is intended to display progress toward completion of the final project documents and confirm the basic scope and technical approach between the University and Design Builder. The document package includes a re-submittal of all the documents that were previously submitted in the 30% package with any changes or additions clouded or otherwise highlighted.  The 50% Complete Construction Documents shall include drawings and specifications as follows:

1. Process
2. General
3. Mechanical plans, schedules, and details
4. Plumbing plans and details
5. Civil plans and details
6. Structural plans and details
7. Electrical plans, panel schedules, and details
8. Control system plans, schedules, and details
9. Security plans and details
10. Specifications, including a comprehensive set of specification sections including but not limited to:
    a. Quality Control requirements by the Design Builder, meeting identified industry standard quality control measures used in the construction and erection of the components of the Facility.

Exhibit – Scope of Work
Turnkey Purchase DB:A                    15 of 25

DocuSign Envelope ID: EE3D18E0-3B43-4725-B423-272675AE0C1A

Project Name: **Shreveport Biomethane Facility**                   Project No.: **PH7006**

       b.   Commissioning of all systems including but limited to the Gas Processing Plant and the Gas Compression Plant.

       c.   Safety Requirements during construction and startup of facility.

       d.   Temporary Utilities and Temporary Facilities that may be required during construction.

       e.   Other items not cover in Article 4 of this Scope of Work Exhibit

In addition, the 50% design submittal package shall include but not be limited to:

1. Equipment supplier information
   a. Equipment List showing quantity, size/rating, manufacturer, other pertinent information.
   b. Weights and Dimensions of equipment. Certified vendor drawings where applicable.
   c. Installation requirements including foundation loads for site location and conditions.
   d. Electrical Equipment, Valves, Instrumentation and Analyzer makes, models, sizes/ratings and cut sheets if different than what was submitted with the 30% submittal.

2. Control system information
   a. Sequence of Operation narrative
   b. Point matrix including all monitoring and control points
   c. Control hardware manufacturer and series.
   d. Interconnection requirements for off-site communication (phone, internet, etc.)
   e. Operator station hardware and software information.

3. Surveillance system information
   a. Camera location plan
   b. Camera hardware manufacturer and series
   c. Digital Video Recorder (DVR) manufacturer and series
   d. Interconnection requirements for off-site communication (phone, internet, etc.)
   e. Operator station hardware and software information.

4. Construction Phase schedule for supply, construction, installation, through start up, testing and final acceptance updated to 50% design level.

5. Change order log showing all scope or design revisions since NTP for Phase 1.

**Project Name:  Shreveport Biomethane Facility**                    **Project No.:  PH7006**

6.  HAZOP support documentation.

It is understood that the submitted documents are not final and may be revised prior to issue for construction however the supplier has made every effort to provide as accurate and complete a package as is practical at this stage of the project.

3.3      100% COMPLETED SUBMITTAL REQUIREMENTS

3.3.1      The 100% design submittal is intended to be the final project documents issued for construction. The document package includes a re-submittal of all the documents that were previously submitted in the 50% package with all clouding and change highlighting removed.  In addition to the updated 50% documents the 100% design submittal package shall include but not be limited to the following:

1.  All drawings Issued for Construction with the appropriate stamp by the Engineer of Record registered in the State of Louisiana.

2.  All specifications issued for Construction in current CSI format including

    a.  Division 1 specifications (including but not limited to specifications relating to quality control, inspection, testing, startup and commissioning)

    b.  Upper division specifications

3.  Warranty documentation.

4.  Installation, construction, start up and commissioning subcontractor information including.
    a.  List of contractors with contact information
    b.  Site safety plan
    c.  Safety data for all contractors including OSHA Incident Rate for most recent 3 years.

5.  HazOp certification that all issues are addressed in the 100 percent design

---

Exhibit – Scope of Work
Turnkey Purchase DB:A                    17 of 25

3.3.2    All drawings, specifications, and other documents enumerated in Paragraph 3.2 for inclusion in the 50% completed submittals shall be further developed by Design Professional in sufficient detail as to be deemed 100% complete and buildable.   Prior to submitting the 100% construction documents, Design Professional and Design Professional's consultants shall have thoroughly checked, coordinated, and revised all documents to bring them to 100% completed level.   General Conditions items shall not be included on Drawings or Schedules.   Notes must coordinate with, and conform to the written Contract Documents. Products and materials specified on the drawings must be identical to the products and materials required in the written Contract Documents Specifications.    In addition to the documents enumerated for the 50% completed submittal, Design Professional shall submit the items listed below for the 100% completed submittal.  The Design Builder acknowledges that the following submittals associated the phase above must be submitted to the University, and that the University must review and approve submittals prior to Design Builder commencing Construction Work for the applicable phase:

1.    Civil Drawings.  Drawings shall detail site grading, compaction requirements, and erosion prevention and control methods.

2.    Structural Drawings.   Drawings shall detail concrete foundations for equipment and the anchorage of all fixed equipment in accordance with the International Building Codes. Structural drawings shall be accompanied by computations stamped and signed by a Structural Engineer licensed in the State of Louisiana. The computations shall be sufficiently complete as to establish that the structure will resist the loads and forces prescribed by applicable law.   Safe bearing pressures on soils from Geotech studies and the ultimate strengths of concrete shall be provided in computations and noted on the drawings.  Where unusual conditions occur, any additional data that are pertinent to the work shall be submitted.

3.    Mechanical  Equipment  Drawings.    Mechanical  equipment  drawings  shall  indicate components of the mechanical system, mechanical support systems and connection requirements between equipment.  A sufficient level of detail shall be provided to illustrate connections, routings, and other items in complex areas.

4.    Electrical Drawings.  Electrical drawings shall indicate all components of the electrical system in place and connected to the sources of services.  A sufficient level of detail shall be provided to illustrate connections, routings, and other items in complex areas.  All wiring shall

be final-sized.  Detailed methods for fastening equipment to the structure to resist seismic forces shall be indicated.  At minimum, provide the following:

.a          Feeder and conduit sizes and a schedule of feeder breakers or switches.

.b          Locations of light fixtures, receptacles, switches, power outlets, and all circuits.

.c          Other systems as required.

5.       Soils and Materials Testing.  Design Professional shall include, with the 100% completed submittal, a list of requirements for special testing and inspections, such as soils and materials testing, welding inspections, and dewatering requirements, included in the Quality Control Plan.  The Building Official has the authority as part of the Code Compliance Review to require additional testing based on his final code requirements and interpretation.

6.       Cost Breakdown form shown in the exhibits with all proposed schedule of value description information, for University review.

7.       Quality Control Plan.  As specified in the General Requirements Exhibits.  No Construction Notice to Proceed will be issued until the Quality Control Plan has been reviewed and approved by the University.  The Design Builder shall prepare the Quality Control Plan to provide reasonable time for University to review and accommodate for subsequent revisions required of the Design Builder, as not to impact the Contract Time.  Revisions required by the University may include, but not limited to, additional testing by either University or Design Builder.

8.       Design Builder shall provide all other testing and inspection.

The corrected 100% and University approved back check drawings and specifications shall be submitted in both reproducible, paper hard copy form and electronic format utilizing Microsoft Office applications (Word, Excel, etc.) and AutoCAD Release 2010 DWG format.

**Project Name:  Shreveport Biomethane Facility**                    **Project No.:  PH7006**

### ARTICLE 4

**PHASE 3 - CONSTRUCTION AND PROVEOUT PHASE**

4.1     GENERAL

4.1.1 The Design Builder shall provide all materials, equipment, labor, and services required by the Contract Documents to construct the Work and perform Acceptance Testing of the constructed Work for the Contract Sum and within the Contract Time during Phase 3.

4.1.2     The construction phase commences with the Notice to Proceed issued by the University and continues until the point of Final Completion.  The construction phase is comprised of the following summary tasks.

      a.   Construction Notice to Proceed

      b.   Landfill gas collection and control system (GCCS) Expansion construction (by others).

      c.   Product Gas Transmission Pipeline construction.

      d.   Gas Processing Plant construction.

      e.   Gas Compression Plant construction.

      f.   Start up and commissioning of all above systems (GCCS by others).

      g.   Substantial Completion.

      h.   Acceptance Testing.

      i.   Determination and delivery of critical spares pursuant to the Critical Spares Exhibit within an allowance of $300,000.

      j.   Final Completion.

Exhibit – Scope of Work
Turnkey Purchase DB:A                    20 of 25

**Project Name:  Shreveport Biomethane Facility**                      **Project No.:  PH7006**

4.1.3    Final Documentation Submittal

The Final document submittal is intended to be the as built project documents issued for record after construction is complete and prior to Final Completion of the project.  Only changes to the 100% issued for construction documents need be submitted along with the following:

1.  Record Drawings for all shop fabricated components.
    a.    Structural steel bases, frames and supports
    b.    Piping
    c.    Enclosures, housings and panels
    d.    Electrical equipment

2.  As Built Drawings showing any and all modifications or deviations made during supply, construction, and installation through start up and testing.    Refer also to section "Record Documents"

3.  Operations & Maintenance Manuals

4.  Warranty documentation

5.  All vendor or supplier documentation received on site by Design Builder or their sub-contractors, if not previously submitted. This includes but is not limited to the documents necessary for initiation or verification of warranties, service contracts or other manufacturer services as well as Operation and Maintenance manuals, calibration certificates, installation guides or other information not previously submitted for components delivered to the site.


4.2     PROJECT STAFFING


4.2.1    Design Builder shall provide the following staff, up to the maximums shown below, during the construction work of Phase 3:

**Project Name:  Shreveport Biomethane Facility**                                                    **Project No.:  PH7006**

| Job Position | Time | Location |
|---|---|---|
| Superintendent | Full time | Field Office/Project Site |
| Project Engineer | Full time | Field Office/Project Site/Design Office |
| Scheduler | 10% | Design Office |
| Estimator | 10% | Design Office |
| Project Manager | 25% | Design Office |

4.2.2   Design Builder shall provide University with copies of resumes for each project staff person for review.  If personnel are changed during construction, Design Builder shall notify University and Design Builder shall arrange and pay for the cost of any transition in staffing.

4.3   SCHEDULES

4.3.1   Design Builder shall maintain a construction phase schedule that includes the contract milestones shown on the Preliminary Schedule in the Exhibits.

4.3.2   Design Builder shall update the construction schedule at least monthly and submit the schedule update to the University for review.

4.3.3   Design Builder shall hold a weekly status call/meeting with the University when Design Builder or subs are working onsite.

4.4   TEMPORARY UTILITIES

4.4.1   Design Builder shall provide all utilities needed to complete the construction Work, commissioning, startup and Acceptance Testing including but not limited to:

1.   Temporary power
2.   Temporary domestic water

4.5 TEMPORARY FACILITIES

4.5.1     Design Builder shall provide a temporary construction trailer (at least 10' x40') at the project site for use by Design Builder's project staff and a University representative.

4.4.1     Design Builder shall provide for use by staff the following facilities: sink for hand washing, portable toilets, and emergency eye wash station and emergency shower, and other facilities (as may be required by applicable laws and regulations).

4.4.2     Design Builder shall provide at least one vehicle for use by Design Builder's project staff at the project site. Project staff may also use this vehicle for offsite transportation.

4.4.3     Design Builder shall provide any temporary fencing or temporary enclosures/buildings that may be required for the construction of the project.

4.6     QUALITY CONTROL TESTING AND INSPECTION

Testing and inspection shall follow the approved Quality Control Plan and the Specifications.

4.6.1     The Design Builder shall:

.1     Participate in punch list inspections for Beneficial Occupancy, Substantial Completion and Final Completion.

.2     Assist University's Representative in reviewing test and inspection results.

.3     Not authorize deviations from the Contract Documents including the Exhibits and Specifications.

.4     Assure the Construction Work is in compliance with the Quality Control Plan and Specifications.

.5     Acceptance Testing of the Work as specified in Acceptance Test Exhibit to the satisfaction of the University shall occur within 60 days following Substantial Completion.

6.     Facilitate inspections by the University representative as requested.

4.7     COMMISSIONING

4.7.1     Design Builder shall coordinate the startup and commissioning of major equipment items including functional testing and performance testing in accordance with the Construction Documents.

**Project Name:  Shreveport Biomethane Facility**                                **Project No.:  PH7006**

4.7.2    Commissioning and initial startup of major equipment shall precede Substantial Completion and shall occur prior to Acceptance Testing.

4.8    ACCEPTANCE TESTING

Acceptance of the Work shall be subject to Acceptance Testing of the completed work by University or its representatives in addition to requirements for final inspection as required in Article 9 of the General Conditions and the Acceptance Testing Protocol in the Contract Documents.

4.8.1.   The Design Builder shall:

Perform Acceptance Testing and any tests after completion, including any re-testing, required by the Contract Documents including the Exhibits and Specifications.

4.9    RECORD DOCUMENTS

4.9.1    Any revisions or changes that have been made during construction shall be incorporated in the Record Documents.   During construction, University's Representative shall have reviewed all revisions and changes and shall have approved the set of drawings and specifications maintained by Design Builder prior to Design Professional's preparation of the final Record Documents.   Design Professional shall provide reproducible Record Documents to University in all the following formats: (1) paper hardcopy (2) electronic format utilizing Microsoft Office applications (Word, Excel, etc.) and AutoCAD Release 2010 DWG format.

4.9.2    Plumbing and mechanical drawings shall include the following items:

.1      Revisions of each schedule in the original Contract Documents reflecting the actual equipment installed (by manufacturer's name and model number) and all other revisions.

10      GUARANTEE TO REPAIR PERIOD INSPECTIONS

Design Builder shall review the work no sooner than 11 months and no later than 23 months after Performance Certificate, as applicable and shall submit written recommendations to University for the correction of any deficiencies.   Design Builder may be accompanied by University and Design

Exhibit -- Scope of Work
Turnkey Purchase DB:A                          24 of 25

DocuSign Envelope ID: 5E3B18E0-3B43-472F-B433-3726754F0C1A

**Project Name: Shreveport Biomethane Facility**   **Project No.: PH7006**

Professional(s) during these inspections. Dates for inspections shall be as mutually agreed by the parties. See also 12.2 of the General Conditions.

Project Name: Shreveport Biomethane Facility                                    Project No:   PH7006

# EXHIBIT

## ACCEPTANCE TEST PROCEDURE

### Purpose

The purpose of the acceptance test procedure is to describe the actions to be taken to confirm compliance with the requirements set forth in the Performance Specification Exhibit.

### Test Scope, Schedule and Duration

The testing will be performed on the gas processing portions of the Facility including the following systems; Gas Processing Plant (GPP), the Gas Compression Plant (GCP) and the Product Gas Pipeline interconnecting the GPP and GCP.  The interconnection to the third party Enable Mid-Stream Partners (EMP) pipeline, including EMP's Meter Station (MS) is scheduled to be completed and commissioned by EMP prior to Acceptance Testing of the GCP, Product Gas pipeline and GPP, as are modifications to the landfill gas collection and control system (GCCS).

The Acceptance Testing shall begin after Substantial Completion.   Acceptance Testing will be performed in accordance with Article 9 of the General Conditions and this Exhibit, and in compliance with the other applicable requirements of the Contract Documents.

Prior to Acceptance Testing, the portion of the Facility to be tested shall have been operated for seven (7) days under stable conditions within its operating range.  The Design Builder may, at its discretion, start, stop, or otherwise adjust operation of the Facility or portion thereof during the seven (7) days preceding the commencement of Acceptance Testing.  These activities shall not be deemed a breach of the requirement to operate seven days under stable conditions.  The duration of the acceptance test shall be two (2) consecutive weeks.

The Acceptance Testing period of two (2) consecutive weeks shall be restarted in the event that a total of 16 hours or more occur where (i) the facility experiences an outage where production and delivery of Product Gas to the EMP turnover point stops and/or (ii) any of the Performance Specification criteria are not met.

In addition, the Acceptance Testing period of two (2) consecutive weeks shall also be restarted if four (4) outages occur where the production and delivery of Product Gas to the EMP turnover point stops.

### General Test Requirements

General.  The GPP, Product Gas Pipeline and GCP systems and components shall be tested to verify that system and components meet the Performance Specifications and the requirements set forth in the Construction Documents and this Exhibit.

System Testing.  Acceptance Testing of the GPP, the Product Gas Pipeline, and the GCP will be performed at the sites where these systems are installed and at the then current flow rate of Conforming Landfill Gas.

Exhibit – Acceptance Test Procedures
Turnkey Purchase DB:A                              1 of 6

Subcomponent Testing.  The sub-system components of the GPP which have a capacity less than or equal to the then current flow rate of Conforming Landfill Gas shall be functionally tested at their full rated capacity for a forty-eight (48) hour portion of the test period with the available Conforming Landfill Gas. The conditions in place at the time of the execution of this document indicate that the GPP compressors are arranged and sized in a manner to allow full design flow rate testing at the expected available Conforming Landfill Gas flow rate of approximately 1,300 to 1500 standard cubic feet per minute (scfm).

## Data Collection

Data collection locations are shown on the Process Drawing Exhibit and described below.  The incoming Landfill Gas introduced into the GPP will be documented with the data collected as follows:

- Gas flow rate, pressure and temperature: Continuously measured at the Point of LFG Delivery, location A, shown on the Process Drawing.  Data to be recorded continuously in the Facility SCADA.
- Composition (CH4/CO2/O2): Continuously measured at location A, shown on the Process Drawing.  Data to be recorded continuously in the Facility SCADA.
- Trace Composition (H2S): Measured at location A by drawing three (3) bag samples each three (3) days apart during the test period.  Short term testing will also be performed using Draeger-Tubes® or equal, which provide instant readings.
- N2: Calculated from measured data as the balance of gases after other specified gases (CH4/CO2/O2 and H2S) are measured.

The Landfill Gas flow to the existing Flare data will be collected as follows:

- Gas flow rate: Continuously measured at the inlet to the Flare, location F, shown on the Process Drawing.  Data to be recorded continuously in the facility SCADA.

The Waste Gas from the GPP, abated in the Thermal Oxidizer (TOX), will be documented with the data collected as follows:

- Gas flow, pressure and temperature: Continuously measured at location B, prior to the waste gas thermal oxidizer.  Data to be recorded continuously in the Facility SCADA.
- Composition (CH4): Continuously measured at location B with gas analyzer.  Data to be recorded continuously in the Facility SCADA.

The TOX supplemental fuel Landfill gas and stack emissions data will be collected as follows:

- Gas Flow: Continuously measured at location C, prior to the inlet to the TOX.  Data to be recorded continuously in the Facility SCADA.
- Stack emissions measured between day ten (10) and day fourteen (14) for comparison to permit limits in accordance with the air permit requirements.

The Product Gas produced by the GPP will be documented with the data collected as follows:

- Gas flow, pressure and temperature: Continuously measured at location D, at the outlet of the GPP.  Data to be recorded continuously in the Facility SCADA.

DocuSign Envelope ID: EE3D18E0-3B43-4725-B433-2F2676AF0C1A

Project Name: Shreveport Biomethane Facility                     Project No:   PH7006

- Composition (CH4/CO2/O2): Continuously measured at location D with gas analyzer.  Data to be recorded continuously in the Facility SCADA.
- Higher heating value: Calculated from the CH4 content measured at location D as detailed above. Calculated value to be recorded continuously in the Facility SCADA.
- Trace composition (H2S): Measured at location D by drawing three (3) bag samples each three (3) days during the test period. Short term testing will also be performed using Draeger-Tubes® or equal, which provide instant readings.
- Water dew point: Measured at location D by drawing three (3) bag samples each three (3) days during the test period.
- N2:  Calculated from measured data as the balance of gases after other specified gases (CH4/CO2/O2 and H2S) are measured.

The Product Gas Pipeline test consists of flow through the pipeline during the GPP and GCP testing. The Product Gas Pipeline does not include any instrumentation within the constructed scope.  The GPP and GCP pressure and flow data (listed above and below) will be used to determine the pressure loss in the Product Gas Pipeline which will be compared to the design pressure loss of fifteen (15) pounds per square inch, gauge (psig).  The pressure loss in the Product Gas Pipeline will be measured for information purposes only and is not a required performance parameter for successful Acceptance Testing.  Failure to meet the design pressure loss will not be a basis for failure of the Acceptance Test.

The Gas Compression Plant performance data will be collected as follows:

- Gas Flow, Pressure and Temperature:  Continuously measured at location E, at the outlet of the GCP, prior to the point of ownership transfer at the inlet to the EMP MS.  Data to be recorded continuously in the Facility SCADA.
- Data on gas composition, quality and volume will also be provided by EMP from their MS SCADA.  The EMP data is provided for comparison to the data collected at locations D and E, as applicable.  If there is a conflict between the EMP data and the data collected at location E, Design Builder will work with EMP to determine which data source is correct including as necessary third party testing.
- Power: Continuously measured by two (2) Facility power meters, one at GCP and another at GPP, recorded in the Facility SCADA.

**Data Interpretation**

Continuously measured data shall demonstrate that the performance requirements as set forth in the Performance Specification exhibit are met for the entire fourteen (14) day test period.  Compliance with specific requirements are described below:

- Compliance with the gas methane recovery requirement will be verified by calculation, as described in the Performance Specifications, using the above measurements of methane (CH4) concentrations and flows over the fourteen (14) day test period with respect to the incoming Conforming Landfill Gas to be processed at location A, Product Gas at location D, and Waste Gas at location B.

- Compliance with the Product Gas specification requirements for methane, carbon dioxide, oxygen, sulfur, water and trace compounds, as set forth in the Performance Specifications Exhibit will be determined by reviewing the continuously recorded output of the analyzers and the lab

sample results from the bag samples drawn, and with EMP provided Product Gas quality and
quantity data.

- Compliance with Product Gas pressure requirements will be determined by reviewing the
  continuously recorded output from pressure sensors at locations D and E.

- Compliance with the higher heating value requirement as defined in the Performance
  Specifications will be verified through calculation using the data collected from the Product Gas
  composition analyzer location D and EMP.  The Product Gas heating value calculation is the
  average percentage of methane in the Product Gas times the higher heating value of methane
  (1,012 btu/scf).

- Compliance with the energy consumption requirement as defined in the Performance
  Specifications will be verified with the energy use data from the two utility power meter
  measurements at the GPP and GCP over the fourteen (14) day period.

**Contingencies**

The test shall be run over fourteen (14) consecutive days.  In the event the test must be stopped due to
issues outside the control of Design Builder, the test will be continued at the earliest convenient time with
full credit being given for the test duration up to the point of stoppage and said stoppage shall not be
counted as one of the four allowed outages per the Acceptance Test exhibit.  Pursuant to the Contract
Documents, issues outside the control of Design Builder include, but are not limited to, Force Majeure,
volume flow rate of Landfill Gas less than the minimum rate in the Performance Specification, Landfill Gas
not meeting the requirements of Conforming Landfill Gas, non-availability of the EMP pipeline and
adverse weather.

In the event that the Performance Test occurs before EMP has authorized Product Gas to be injected in
to their distribution system, the Product Gas may be sent to the existing Flare for destruction by a pipe
run from Location D in Process Diagram to the existing Flare or the TOX.  In this event the GCP testing
may be done separately from the GPP testing as described in the Provisional Acceptance Testing section
below.

**Provisional Acceptance Testing Requirements**

The term "Provisional Acceptance Testing" shall mean testing performed in the event that the GPP is not
receiving Conforming Landfill Gas, and/or the EMP pipeline is not able to accept Product Gas.  The
Provisional Acceptance Test report issued after completion of testing shall detail the procedures followed,
the actual Landfill or Test Gas used, as well as the achieved performance and shall explain any
requirements of the Performance Specification that could not be met or tested due to the provisional
nature of the testing.

1. Pursuant to the General Conditions, if Acceptance Testing is not completed within one hundred
   twenty (120) Days after commencement of Acceptance Testing due solely to the fact that Landfill
   Gas does not meet the requirements for Conforming Landfill Gas, Design Builder shall perform
   Provisional Acceptance Testing of the GPP, Product Gas Pipeline and GCP that includes all
   steps of the Acceptance Testing which are not prevented by the Landfill Gas not meeting all
   requirements of Conforming Landfill Gas as follows:

   a.  Gas Processing Plant Provisional testing with non-conforming landfill gas.

DocuSign Envelope ID: EE3D18E0-3B43-4725-B423-2726764F0C1A

Project Name: Shreveport Biomethane Facility                    Project No: PH7006

 

i. All steps outlined above in the Acceptance Testing section to determine Methane Gas Recovery from available, non-conforming Landfill Gas or test gas with specifications mutually agreed by the parties but including at least fifty (50) % methane and forty (40) % carbon dioxide ("Test Gas") to supplement or replace the non-conforming landfill gas.

ii. All steps outlined above in the Acceptance Testing section to determine H2S removal from the available Landfill Gas.

iii. All steps outlined above in the Acceptance Testing section to determine water removal from available Landfill Gas.

iv. All steps outlined above in the Acceptance Testing section to determine VOC removal from available Landfill Gas.

b. Product Gas Pipeline and Gas Compression Plant Provisional Testing with non-conforming landfill gas.

i. The gas produced by the GPP during Provisional testing in 1.a may be in conformance with the requirements of Product Gas or may not, depending on the deficiencies in the available non-conforming LFG. If the gas produced by the GPP is not in conformance with the requirements of Product Gas, the Product Gas pipeline and GCP can be tested with this produced gas. In the event that the gas produced meets the requirements of Product Gas, it will be injected into the EMP pipeline allowing testing of the EMP facility (by others) as described above in the Acceptance Testing. In the event that the gas produced does not meet the Product gas requirements, provisions will be made to divert the gas to the existing flare before it enters the Product Gas pipeline or otherwise dispose of the non-conforming produced gas.

ii. In the event that the GPP testing does not proceed or produces gas that cannot be safely or responsibly injected into the Product Gas Pipeline and GCP these portions of the facility may be tested using compressed air of mutually agreed upon specifications.

iii. In the event that Test Gas is needed for acceptance testing of the GPP, Product Gas pipeline GCP, the duration of the testing for those portions of the Facility shall be shortened to seven (7) days or as agreed to between the parties.

2. Pursuant to the General Conditions, if Acceptance Testing is not completed within one hundred twenty (120) Days after commencement of Acceptance Testing due solely to EMP failing to accept Product Gas, Design Builder shall perform Provisional Acceptance Testing including all steps of the Acceptance Testing which are not prevented by EMP not accepting Product Gas including, but not limited to the following:

a. All steps outlined in this Exhibit for Acceptance Testing of the Gas Processing Plant.

b. All steps outlined in this Exhibit to test the Product Gas Pipeline and GCP using Product Gas. The Provisional testing would be arranged to dispose of the Product Gas, if available, after the GCP by use of a temporary flare, or compressed air if no Product Gas is available and vent the compressed gas to air, or other suitable means. The duration of this testing for those portions of the Facility shall be shortened to twenty-four (24) hours or as agreed to between the parties.

3. The above does not limit the responsibility of Design Builder to complete those portions of the Acceptance Testing that were not completed during Provisional Testing prior to Final Completion if the Conforming Landfill Gas or EMP pipeline becomes available.

4. All costs associated with Provisional Acceptance Testing or repetition of Acceptance Testing that are added to the original project scope due to lack of Conforming Landfill Gas or inability to inject Product Gas into the EMP pipeline due to actions outside of the Design Builder's control shall be compensable as a change order in accordance with the Turnkey Purchase General Conditions. The following potential costs are not included in the contract scope of work for the Acceptance Testing:

   a. Rental of temporary flare and temporary modifications to the facility to allow for disposal of Product Gas.
   b. Purchase, transport, permitting, unloading, injection and disposal of Test Gas, Natural Gas or other gases used to complete any portion of the Provisional Acceptance Testing.
   c. Re-mobilization, travel, labor and material expenses of Design Builder, suppliers and sub-contractors required to complete the Provisional Testing.
   d. Re-mobilization, travel, labor and material expenses of Design Builder, suppliers and sub-contractors required to repeat all or part of the Acceptance Testing after the Provisional testing is completed and the GCCS begins producing Conforming Landfill Gas or after EMP issues are resolved to allow for injection into the EMP pipeline prior to Final Completion as stated above in item 3.
   e. Labor expenses shall include, but not be limited to project management, site supervision, laborers, engineers, and designers.

5. In the event that is it is required, as described in sections 1 and 2 above, completion of Provisional Acceptance Testing shall replace the requirements for Acceptance Testing in the Contract Document sections relating to issuance of the Performance Certificate.

6. In the event that Provisional Acceptance Testing cannot be completed due to actions or lack of action by parties outside of the Design Builder's responsibility or control for a period of one hundred twenty (120) days from the date of the start of the initial Acceptance Testing, then Provisional Acceptance Testing and Substantial Completion shall be considered to be completed by the Design Builder as long as all other provisions of Substantial Completion in the Contract Documents are satisfied.

7. In the event that the Acceptance Testing cannot be completed due to actions or lack of action by parties outside of the Design Builders responsibility or control for a period of one hundred eighty (180) days from Substantial Completion, then Final Completion shall be considered to be completed by the Design Builder as long as all other provisions of Final Completion in the Contract Documents are satisfied. Costs of the Acceptance Testing during this period shall be compensable per section 2 above.

8. Design Builder and Owner both shall make good faith efforts to endeavor to successfully complete Acceptance Testing and Provisional Acceptance Testing.

Project Name: Shreveport Biomethane Facility                    Project No.:   PH7006

## EXHIBIT

### **AFFIDAVIT OF NO WORK**

STATE OF LOUISIANA,
PARISH OF CADDO.

           I, the undersigned individual ("Affiant"), being first duly sworn, on oath did depose and state in the presence of the undersigned Notary Public duly commissioned and qualified in and for the state and parish aforesaid that:

           Being either a Louisiana registered or certified engineer or surveyor, licensed architect, or building inspector employed by the city or parish or a lending institution chartered under federal or state law, as more specifically identified under the Professional Capacity blank below, I hereby certify that I have personally inspected the property described below (the "Property") on the date and time listed below and observed that as of that time and date no work had commenced nor materials placed on the Property.   This certificate is given pursuant to La. R.S. 9:4808 and La. R.S. 9:4820.

**PROPERTY DESCRIPTION:**

### **[INSERT LEGAL DESCRIPTION]**

        Geo. Number _____

_____
**Affiant's Typed Name**

_____
**Professional Capacity**

_____
**Date of Inspection**

_____ .m. Central Standard Time
**Time of Inspection**

                                _____
                                  -- **Affiant Signature**

          SWORN TO AND SUBSCRIBED before me, Notary, this _____ day of _____,
2016.

Project Name: Shreveport Biomethane Facility                    Project No.:   PH7006

_____   _____

NOTARY PUBLIC in and for
Caddo Parish, Louisiana.
Bar Roll/Notary number _____
My commission is for life.



## UNIVERSITY OF CALIFORNIA

## SHREVEPORT BIOMETHANE PROJECT

### PURCHASE ORDER TERMS AND CONDITIONS OF SALES BETWEEN SCS (BUYER) AND ALAS (SELLER)

The items described in the purchase order (referred to separately and collectively as the "Equipment") are hereby offered for sale at prices to be established by Air Liquide Advanced Separations (**ALAS**), a Division of Air Liquide Advanced Technologies U.S. LLC, 305 Water Street, Newport, Delaware, 19804, USA ("Seller"). This offer and its acceptance by any "Buyer" shall be governed by all of the terms and conditions stated herein. Buyer's order for any Equipment described in its document, when communicated to Seller, verbally or in writing, shall constitute acceptance of this offer. All descriptions, quotations, proposals, offers, acknowledgements, acceptances and sales of Seller's products are subject to and shall be governed exclusively by the terms and conditions stated herein. Buyer's acceptance of any offer to sell is limited to the terms and conditions stated herein. Any terms or conditions proposed by Buyer in any Buyer document that are in addition to, or inconsistent with, the terms or conditions stated herein are hereby objected to. No such additional, different or inconsistent terms or conditions shall become part of the contract between Buyer and Seller unless expressly accepted in writing in advance by Seller. Seller's acceptance of any offer to purchase  by Buyer is expressly conditional upon Buyer's assent to all the terms and conditions stated herein, including any terms or conditions stated herein that are in addition to, or inconsistent with, those contained in Buyer's offer. Acceptance of Seller's Equipment shall in all events constitute such assent.

1. **PAYMENT.**

All payments to Seller shall be made at the locations indicated on Seller's invoice. All invoices shall be payable net cash by Buyer within thirty (30) days of the date of the invoice, unless

1

**ALAS, a division of Air Liquide Advanced Technologies U.S. LLC**
**305 Water Street • Newport, DE 19804 • USA - Phone (302) 225-1100 - FAX (302) 225-0412**
**Email: info.medal@airliquide.com • Website: www.medal.com**

Page 172



otherwise expressly stated in Seller's applicable commercial proposal (the "Commercial Proposal"). Buyer shall also pay all taxes, except Seller's income tax. Seller may also collect from Buyer on any delinquent balance a charge at a rate of one percent 1.0%  per month or, if less, the maximum rate permitted by law. Payments 60 days past due will result in Buyer being put on credit hold. The Buyer will only be released from credit hold when all outstanding payments are satisfied.

## 2.  DELIVERY AND INSTALLATION.

Unless otherwise expressly stated in the Commercial Proposal, the Equipment shall be delivered FCA Workshop or ALAS, Newport, DE (INCOTERMS 2000) at Buyer's expense and Buyer shall be deemed to have accepted the Equipment on the day of such delivery. Transport shall be at Buyer's expense, including but not limited to obtaining transportation and other applicable permits, licenses and authorizations. If the Equipment is of the kind that requires installation, Buyer shall be responsible, at Buyer's expense, for site preparation (if any) and installation of the Equipment (including securing all applicable permits) unless otherwise agreed in writing by Seller.

## 3.  USE, MAINTENANCE AND ALTERATIONS.

Buyer shall not make any material alterations or additions to the Equipment or replace any material part of the Equipment without the prior written authorization of Seller. In the event that Buyer makes any material alteration or addition, or replaces any material part with components which are not identical to the original components without Seller's prior authorization in writing, or materially uses or operates the Equipment other than in the manner specified in the applicable Seller's operating manual (the "Operating Manual"), any warranty with respect to the Equipment shall not apply to the extent impacted by such actions of Buyer.

## 4.  RISK OF LOSS AND INSURANCE.

Risk of loss and title to the Equipment or any part thereof shall pass to Buyer upon delivery of the Equipment to carrier EX Works Newport, Delaware (INCOTERMS 2000). Prior to receipt by Seller of full payment of the  price, Buyer, at its own expense, and for the benefit of Seller,

2

ALAS, a division of Air Liquide Advanced Technologies U.S. LLC
305 Water Street • Newport, DE 19804 • USA - Phone (302) 225-1100 - FAX (302) 225-0412
Email: info.medal@airliquide.com • Website: www.medal.com

Page 173

DocuSign Envelope ID: EE2D18E0-3B43-472F-B433-2726764F0C1A

**AIR LIQUIDE**
ADVANCED BUSINESS & TECHNOLOGIES

shall insure the Equipment from the date of shipment to Buyer against all risk of loss or damage from any cause, including but not limited to fire and theft, for not less than the price. Seller shall be specified as a loss payee to the extent of its interest in the Equipment and Buyer shall furnish to Seller prior to delivery, a certificate evidencing such insurance coverage.

**5. INDEMNITY.**

Buyer agrees to defend, indemnify and hold Seller and its employees and affiliates harmless from and against any and all claims (including, but not limited to, all costs, expenses, suits, damages, liabilities, losses, fines, penalties and reasonable attorneys' fees and court costs) which may directly or indirectly arise in connection with the  negligent act, error or omission, or breach of this Agreement by Buyer or a party for which Buyer is responsible relating to   the Equipment after its delivery.

Seller agrees to defend, indemnify and hold Buyer and its Client and their officers, employees, agents, affiliates, successor and assigns harmless from and against any and all claims (including, but not limited to, all costs, expenses, suits, damages, liabilities, losses, fines, penalties and reasonable attorneys' fees and court costs) which may directly or indirectly arise in connection with (1) The  negligent act, error or omission, or breach of this Agreement by Seller or a party for which Seller is responsible, and (2) Any claim of patent, trademark or other intellectual property infringement of any nature whatsoever arising out of or relating to the Equipment or Seller's performance of this Agreement, unless such claim arises due to the modification of the equipment by Buyer or Buyer's representatives wherein such modification causes the infringement.

If there is any injury (including death), loss or damage to the person or property of any third party (including employees of either party), then, subject to any limitations set forth in this Agreement, each party agrees to indemnify the other party to the extent of the indemnifying party's negligence.

ALAS, a division of Air Liquide Advanced Technologies U.S. LLC
305 Water Street • Newport, DE 19804 • USA - Phone (302) 225-1100 - FAX (302) 225-0412
Email: info.medal@airliquide.com • Website: www.medal.com



## 6.  WARRANTIES, HAZARDS AND LIMITATION ON LIABILITY.

### 6.1 Limited Warranty.

Subject to any and all limitations contained in this Agreement (including but not limited to this Section 6), Seller provides  only the Mechanical Warranty set forth in Subsection 6.5 below (including services) and the Startup Performance Warranty set forth in Subsection 6.6 (collectively "Warranty"). Goods that are provided by Seller as a repair or replacement during the applicable warranty period and not as a general consumable (wear and tear limited life) of the Good are  warranted against defects in material and workmanship for the remainder of the applicable warranty period or (90) days from the date of shipment of such Good, whichever is longer.

The warranties provided by Seller under this Agreement may be enforced directly by Buyer and/or the University of California (the "University"). Seller shall execute such documents as reasonably required to evidence the right of the University to directly enforce the warranty rights provided by Seller under this Agreement.  Buyer and the University shall coordinate warranty enforcement such that Seller will not incur duplicate or simultaneous claims from more than one party.

Buyer's sole remedy, and Seller's sole liability, for breaches of the Warranty is as set forth herein. The Warranty period shall be as provided in the Mechanical Warranty and the Startup Performance Warranty. Seller is not liable for any claim made after the expiration of the applicable Warranty period. All warranties provided by Seller either in the Commercial Proposal or this Section 6 are void to the extent the Equipment is operated improperly by Buyer, including but not limited to:

(i)     pollution of the site with contaminants;

(ii)    improper maintenance or improper storage;

**ALAS, a division of Air Liquide Advanced Technologies U.S. LLC**
**305 Water Street • Newport, DE 19804 • USA - Phone (302) 225-1100 - FAX (302) 225-0412**
**Email: info.medal@airliquide.com • Website: www.medal.com**



(iii) operation of the Equipment above specified feed gas temperature limits;

(iv) operating the Equipment such that the membrane inlet pressure is above maximum design pressure;

(v) failure to follow system installation guidelines;

(vi) improper handling of the Equipment;

(vii) any attempt to materially modify the Equipment (or any part thereof);

(viii) failure to upgrade the Equipment (or any part thereof) at Seller's sole cost and expense within six months following Seller's notification of a problem/corrective action; or

(ix) failure to operate the Equipment according to instructions in the Operating Manual.


Further, Buyer must:

(i) provide a complete written description of the problem; and

(ii) provide a copy of operation and maintenance documents relevant to the warranty claim matter.

The limited warranty set forth above does not extend to repair or replacements resulting from normal wear and tear, including consumables such as filter elements, adsorbents, fuses and depleting sensor elements. All removal, installation and shipping costs for warranty claim transactions will be borne by the Buyer with Seller paying for the shipment costs of any replacement parts.

**SELLER MAKES NO OTHER WARRANTIES OF ANY KIND, EXPRESSED OR IMPLIED, INCLUDING BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.**

5

**ALAS, a division of Air Liquide Advanced Technologies U.S. LLC**
**305 Water Street • Newport, DE 19804 • USA - Phone (302) 225-1100 - FAX (302) 225-0412**
**Email: info.medal@airliquide.com • Website: www.medal.com**

Page 176



**6.2 Hazards.**

Buyer acknowledges that there are hazards associated with the use of the Equipment and the gases produced from the Equipment. Buyer shall be responsible for training its employees, customers and all others exposed to such hazards in the proper uses of the Equipment and for taking all appropriate actions to warn and protect such individuals. Buyer acknowledges its understanding that the gases produced by the Equipment are classified by the U.S. Occupational Safety and Health Administration ("OSHA") as hazardous chemicals and that the OSHA regulations require Buyer to develop and implement a written chemical hazard communications program for its employees regarding all hazardous chemicals. Buyer acknowledges that Supplier has supplied (or will supply) Buyer with certain Material Safety Data Sheets ("MSDSs") relating to the gases produced by the Equipment, and that more MSDSs are available from Seller on request. Buyer understands that the Equipment must not be used without consulting the MSDSs, and will ensure that all employees, customers and others who may be exposed to the gases produced by the Equipment receive and refer to the MSDSs.

**6.3 Damage limitations.**

SELLER SHALL NOT BE LIABLE FOR INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES. SELLER'S SOLE LIABILITY AND BUYER'S SOLE REMEDY FOR ANY DAMAGES, INCLUDING BUT NOT LIMITED TO ANY DAMAGES RESULTING FROM OR OCCURRING TO EQUIPMENT MANUFACTURED BY SELLER, SERVICES PROVIDED BY SELLER OR SELLER'S FAILURE TO DELIVER SUCH EQUIPMENT OR SERVICES, SHALL BE LIMITED TO, AT SELLER'S OPTION, REPAIR OR REPLACEMENT OF THE EQUIPMENT AT ISSUE OR REPERFORMANCE OF THE SERVICES AT ISSUE.

IN NO EVENT SHALL SELLER'S TOTAL CUMULATIVE LIABILITY FOR ALL CLAIMS

6

**ALAS, a division of Air Liquide Advanced Technologies U.S. LLC**
**305 Water Street • Newport, DE 19804 • USA - Phone (302) 225-1100 - FAX (302) 225-0412**
**Email: info.medal@airliquide.com • Website: www.medal.com**

Page 177



FOR DIRECT DAMAGES EVER EXCEED FIFTY PERCENT (50%) OF THE PURCHASE PRICE OF THE EQUIPMENT IN QUESTION (EXCLUDING CLAIMS FOR BREACHES OF THE MECHANICAL WARRANTY AND/OR EXCLUDING CLAIMS RELATING TO SERVICES SUCH AS BUT NOT LIMITED TO BREACHES OF THE SERVICES WARRANTY SET FORTH IN SECTION 11.5 BELOW) ), AND IN NO EVENT SHALL SELLER'S TOTAL CUMULATIVE LIABILITY FOR ALL CLAIMS ON A COMBINED BASIS FOR BREACHES OF THE MECHANICAL WARRANTY OR FOR CLAIMS RELATING TO SERVICES, INCLUDING WITHOUT IMITATION BREACHES OF THE SERVICES WARRANTY SET FORTH IN SECTION 11.5 BELOW, EVER EXCEED THE PURCHASE PRICE OF THE EQUIPMENT IN QUESTION..

BUYER MUST NOTIFY SELLER OF ANY CLAIM WITHIN THIRTY (30) DAYS OF THE DATE THE BUYER ACTUALLY KNOWS (OR REASONABLY SHOULD HAVE KNOWN) OF AN EVENT GIVING RISE TO SUCH CLAIM OR SUCH CLAIM IS WAIVED.

THE LIMITATIONS CONTAINED IN THIS SUBSECTION 6.3 SHALL APPLY REGARDLESS OF WHETHER THE CLAIM FOR DAMAGES IS BASED ON BREACH OF CONTRACT, BREACH OF WARRANTY, TORT OR OTHERWISE, AND SHALL APPLY EVEN WHERE SUCH DAMAGES ARE CAUSED, IN WHOLE OR IN PART, BY THE NEGLIGENCE, OR ACTS AND OMISSIONS OF THE PARTY CLAIMING DAMAGES OR THE PARTY FROM WHOM DAMAGES ARE SOUGHT.

AS USED IN THIS SECTION, THE TERM "BUYER" AND "SELLER" SHALL INCLUDE NOT ONLY THE PARTY TO THIS AGREEMENT BUT ALSO ALL OF ITS AFFILIATES. THE PROVISIONS GOVERNING DAMAGE LIMITATIONS AND INDEMNITY SET FORTH IN THIS AGREEMENT SHALL SURVIVE EXPIRATION, TERMINATION, OR CANCELLATION OF THIS AGREEMENT.

7

**ALAS, a division of Air Liquide Advanced Technologies U.S. LLC**
**305 Water Street • Newport, DE 19804 • USA - Phone (302) 225-1100 - FAX (302) 225-0412**
**Email: info.medal@airliquide.com • Website: www.medal.com**

Page 178



**6.4 Compliance with laws.**

Buyer and Seller shall comply with all laws, ordinances and regulations relating to the Equipment including any applicable licensing, permitting and registration obligations and environmental laws. The parties agree to comply with all applicable U.S. export control laws, rules and regulations. Without limiting the foregoing, the parties agree that they will not transfer any export controlled item, data or services, to include transfer to foreign persons employed by or associated with, or under contract to a party or a party's subcontractors or suppliers, without the authority of an export license, agreement or applicable exemption or exception.

**6.5 Mechanical Warranty.**

Subject to any and all limitations contained in this Agreement (including but not limited to this Section 6), ALAS warrants all equipment provided by it or any of its subcontractors to be free of defects in workmanship and materials and against mechanical failure for a period of two (2) years from the start-up or thirty (30) months from skid shipment, whichever occurs first. Subject to any and all limitations contained in this contained in this Agreement (including but not limited to this Section 6), ALAS also warrants that all work performed by it or any of its subcontractors shall be performed in a good and workmanlike manner, with such warranty running for a period of one (1) year from the performance of the work in question.

Component warranties can be pursued with ALAS or directly with the supplier. ALAS will provide a replacement component upon request, ex-works ALAS. Customer must return the faulty component to ALAS as soon as possible so that ALAS can obtain warranty coverage with the component manufacturer. Warranty coverage excludes damage due to improper operation and for the other exclusions set forth herein.

8

**ALAS, a division of Air Liquide Advanced Technologies U.S. LLC**
**305 Water Street • Newport, DE 19804 • USA - Phone (302) 225-1100 - FAX (302) 225-0412**
**Email: info.medal@airliquide.com • Website: www.medal.com**

Page 179

DocuSign Envelope ID: EE8D18E0-3B43-472F-B433-272676450C1A



**AIR LIQUIDE**

ADVANCED BUSINESS & TECHNOLOGIES

### 6.6 Startup Performance Warranty

The feed gas composition, pressure and temperatures must be proven to be as described in the Technical Proposal. Given these conditions and subject to any and all limitations contained in the Commercial Proposal and the PO Terms and Conditions, the system will produce product gas as detailed in the Commercial Proposal. Hydrocarbon recovery will be no less than 95% during the Performance Test Run.

For Customer's acceptance of the system, a performance test run shall be performed by the Customer under supervision of ALAS. Performance Test Run shall be performed for 14 (fourteen) consecutive days (or as agreed by both parties) with stabilized conditions of the system based on performance figures in the Technical Proposal. Upon satisfactory performance test results, an acceptance certificate will be signed by both parties indicating satisfactory performance with or without conditions. If during the acceptance performance test run the guaranteed performances cannot be reached, both parties shall make a bilateral document with actual performances recorded.

The startup performance warranty is subject to ALAS being present at startup, design conditions being met, proper installation and operation of the system.

No performance warranty is offered beyond startup. The Startup Performance warranty automatically terminates upon successful start-up of the system (as described above).

### 7. PROPRIETARY INFORMATION AND CONFIDENTIALITY.

Buyer hereby acknowledges Seller's representation that the technology related to the Equipment constitutes proprietary information belonging exclusively to Seller (the "Proprietary Information"). Buyer hereby covenants that it shall maintain the Proprietary Information in confidence and shall not disclose, or permit any of its employees or agents to disclose, any Proprietary Information to any person, except to Buyer's and the University's employees, officers, directors, agents or representatives who are directly involved in the purchase or use

9

ALAS, a division of Air Liquide Advanced Technologies U.S. LLC
305 Water Street • Newport, DE 19804 • USA - Phone (302) 225-1100 - FAX (302) 225-0412
Email: info.medal@airliquide.com • Website: www.medal.com

Page 180

**AIR LIQUIDE**
ADVANCED BUSINESS & TECHNOLOGIES

of the Equipment and who agree to be bound by the provisions of this Section 7 in the same manner as Buyer, without the prior written consent of Seller. Buyer shall be liable for any breach by any of Buyer's employees, officers, directors, agents or representatives of any of the provisions of this Section 7.

Proprietary Information shall not include information which (i) at the time of disclosure, is available to the general public; or ii) at a later date, becomes available to the general public, through no fault of the receiving party, and then only after such later date; or (iii) the receiving party can demonstrate was in its possession before receipt; (iv) is disclosed to receiving party without restriction on disclosure by a disclosing party who had lawful right to disclose such information: or (v) is required to be disclosed by law.

## 8. RESALE.

If Buyer resells any of the Equipment, Buyer agrees to require the purchaser of the Equipment to be bound by Sections 3, 5, 6, 7 and 8 of this Agreement. Except for University, any such purchaser, however, shall not be considered a third-party beneficiary of this Agreement.

## 9. EXCUSE OF PERFORMANCE.

Seller shall not be liable for any failure or delay in the performance of any of its obligations hereunder caused by circumstances beyond the reasonable control of Seller.

## 10. MISCELLANEOUS.

### 10.1 Assignment.

Each party must receive the other party's prior written consent to assign this Agreement. This Agreement shall be binding on, and inure to the benefit of, the parties and their respective successors and permitted assigns.

### 10.2 Applicable Laws and Severability.

10

ALAS, a division of Air Liquide Advanced Technologies U.S. LLC
305 Water Street • Newport, DE 19804 • USA - Phone (302) 225-1100 - FAX (302) 225-0412
Email: info.medal@airliquide.com • Website: www.medal.com

Page 181

**AIR LIQUIDE**
ADVANCED BUSINESS & TECHNOLOGIES

The Agreement shall be interpreted under the laws of the State of Louisiana. The venue for disputes under this Agreement shall be Shreveport, Louisiana.

### 10.3 Entire agreement.

This Agreement, together with the Commercial Proposal _____dated_____( the " Commercial Proposal") and Seller's applicable Technical Proposal CM-14-01, Rev 4, dated _____( the "Technical Proposal") , constitutes the entire agreement between the parties with respect to the subject matter hereof and any reference to the term "Agreement" shall also include the Commercial proposal and the Technical Proposal. No provision of any Buyer purchase order or other Buyer document shall alter or add to this Agreement. Any modifications of this Agreement must be in writing, signed by both parties and dated. The waiver by either party of any of its rights under this Agreement shall not be construed as constituting a precedent.

### 10.4 Notices.

All notices given in connection with this Agreement must be in writing and sent to the party's place of business addresses indicated on the first page of this Agreement (or on the face of this Purchase Order) or any substitute address that the Party may provide to the other by notice hereunder. In the case of Seller, such notice shall be sent to the attention of the Director, Marketing. Notice shall be considered to be given on the date it is sent by prepaid express mail.

### 10.5 Mediation.

Prior to filing a lawsuit, except to prevent the running of any applicable statute of limitations, all claims and disputes regarding this Agreement or the Equipment shall be submitted to non-binding mediation. If the parties cannot agree to a mediator, one will be selected pursuant to American Arbitration Association rules. The mediation shall take place in Shreveport, Louisiana.

ALAS, a division of Air Liquide Advanced Technologies U.S. LLC
305 Water Street • Newport, DE 19804 • USA - Phone (302) 225-1100 - FAX (302) 225-0412
Email: info.medal@airliquide.com • Website: www.medal.com

DocuSign Envelope ID: 5E3B18E0-3B43-472F-B433-2726754F0C1A

**AIR LIQUIDE**
ADVANCED BUSINESS & TECHNOLOGIES

### 10.6 Miscellaneous.

Each party represents that such party is contractually free to enter into this Agreement and to perform hereunder and shall indemnify and defend Seller against all damages Seller may suffer if Buyer's representation is not correct. The captions, titles, and headings used in this Agreement are intended for convenience only and shall not be used for purposes of construction or interpretation.

## 11. FIELD SERVICES.

In addition to the provisions of Sections 6.3 and Section 10 above, the following terms and conditions shall apply only to any Equipment start-up and/or field supervision assistance services ("Services") performed by or on behalf of Seller (if any):

### 11.1 Fees and Expenses.

Buyer agrees to pay Seller, within 30 days of receipt of Seller's invoice, the following charges for the Services, except as modified by the Commercial Proposal which shall take precedence: (a) (i) Seller's per diem charge specified in the Commercial Proposal per 8-hour man-day, Monday through Friday; (ii) one and a half (1.5) times the pro-rata per diem rate for each hour in excess of 8 hours; and (iii) two (2) times the per diem rate for weekends and holidays, as the case may be, for each Seller technical advisor for each whole or part of a calendar day from the date of departure from Seller's home office up to and including the date of return to Seller's home office ; and (b) an amount equal to Seller's other actual and reasonable direct expenses, such as travel, living and communication expenses, incurred in connection with such Services.

Standby Time, defined herein as time up to 8 hours per day, during which Seller's representative, during the course of his or her assignment, is available to work but is not working because of circumstances beyond the reasonable control of Seller, including but not limited to weather conditions, but excluding his or her own sickness or injury, shall be billed at the rates above. Daily travel time to and from lodging, as well

12

ALAS, a division of Air Liquide Advanced Technologies U.S. LLC
305 Water Street • Newport, DE 19804 • USA - Phone (302) 225-1100 - FAX (302) 225-0412
Email: info.medal@airliquide.com • Website: www.medal.com

Page 183

**AIR LIQUIDE**
ADVANCED BUSINESS & TECHNOLOGIES

as time for meals, will be included and billed as part of the workday. Air travel shall be at Coach or Economy Class level of service. The per diem charge may be subject to adjustment by Seller.

The per diem charge does not include any taxes which may now or hereafter be applicable to, or be imposed upon, the Services. Buyer shall pay all such taxes, except Seller's income tax. Buyer agrees to pay or reimburse Seller any such taxes which Seller is required to pay or collect or which are required to be withheld by Buyer.

If Buyer's account is not paid in full by the above-referenced payment day, Seller may, at Seller's option, exercise any one or more of the following (in addition to any other remedies available to Buyer):

(a) require Buyer, as a condition of continuing to receive Services, to prepay for Services plus a specified part of the past due amounts as specified by Seller; (b) collect from Buyer on any delinquent balance a charge at the rate of one percent (1.0%) per month or, if less, the maximum rate permitted by law; (c) cease providing any or all of the Services; and/or (d) terminate this Agreement.

**11.2 Nondisclosure and Restriction on Use.**

Seller and Buyer shall respect the confidentiality of each other's commercial or technical data disclosed to each other during the performance of the Services. Seller's technical data shall only be used for the detailed design, procurement, construction, operation and maintenance of the facilities for which the Services are furnished. Materials marked "Confidential" will be kept confidential by Buyer. Buyer and /or University shall have the right to copy any Services materials provided by or on behalf of Seller, but only as necessary for the direct conduct of Buyer's and/or University's business for which they are provided and provided that all " Confidential" markings are maintained on any such copies.

13

**ALAS, a division of Air Liquide Advanced Technologies U.S. LLC**
**305 Water Street • Newport, DE 19804 • USA - Phone (302) 225-1100 - FAX (302) 225-0412**
**Email: info.medal@airliquide.com • Website: www.medal.com**

Page 184

**AIR LIQUIDE**
ADVANCED BUSINESS & TECHNOLOGIES

### 11.3 Responsibilities of Buyer.

Buyer will at all times remain solely responsible for the facilities for which the Services are furnished. Buyer has the sole responsibility for accepting or rejecting Seller's recommendations. Buyer will give Seller access to the facilities where the Services are to be performed by Seller and otherwise cooperate with Seller, as reasonable and appropriate, in connection with the supply of Services under this Agreement. . Seller's personnel shall abide by and be responsible for complying with all health and safety requirements as well as facilities access rules at the site where services are performed. Seller shall indemnify, defend and hold harmless Buyer, the University and the site owner against claims by or on behalf of Seller's personnel.  Buyer agrees to provide a written copy of such health and safety requirements and site access rules to Seller.

### 11.4 Excuse of Performance.

Seller shall not be liable for failure to perform if prevented by circumstances beyond its reasonable control including but not limited to, breakdown, or malfunction of any equipment utilized by Seller in providing the Services.

### 11.5 Services Warranty.

SELLER WARRANTS THAT THE SERVICES WILL BE PERFORMED IN A GOOD AND WORKMANLIKE MANNER. SELLER MAKES NO OTHER WARRANTY OF ANY KIND EXCEPT AS EXPRESSLY PROVIDED HEREIN IN THIS AGREEMENT SELLER EXPRESSLY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR PARTICULAR PURPOSE.

14

**ALAS, a division of Air Liquide Advanced Technologies U.S. LLC**
**305 Water Street • Newport, DE 19804 • USA - Phone (302) 225-1100 - FAX (302) 225-0412**
**Email: info.medal@airliquide.com • Website: www.medal.com**

Page 185

Project Name: Shreveport Biomethane Facility                Project No.: PH7006

## EXHIBIT

## APPLICATION FOR PAYMENT AFTER ACCEPTANCE TESTING

TO UNIVERSITY:
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,
AND UNIVERSITY'S REPRESENTATIVE:

FROM DESIGN BUILDER:
    ADDRESS:        3900 Kilroy Airport Way, Suite 100, Long Beach, CA 90806
    PROJECT NAME:    Shreveport Biomethane Facility
    PROJECT NUMBER: PH7006
    CONTRACT DATE:
    APPLICATION DATE:

Application is made for payment under the Contract as shown below and in Schedule 1 attached hereto:

1. ACTUAL COST OF WORK (Column E, Schedule 1) 

2. CONTRACT SUM 

3. PAYMENT AFTER ACCEPTANCE TESTING* 

    (* Article 9.2.1 of the General Conditions states that payment will be:

    95% of Actual Cost of Work or 90% of the Contract Sum, whichever is less)

4. TOTAL AMOUNT PREVIOUSLY PAID

5. CURRENT PAYMENT DUE (Line 3 less Line 4)    $

    The undersigned Design Builder hereby represents and warrants to University that all Work, for which Certificates For Payment have previously been issued and payment received from University, to the extent of such payments is free and clear of all claims, stop notices, security interests, and encumbrances in favor of Design Builder, any Subcontractor, and any other persons or firms entitled to make claims by reason of having provided labor, materials, or equipment related to the Work.

    The following Schedules are attached and incorporated herein, and made a part of this Application For Payment:

        Schedule 1 Cost Breakdown
        Schedule 2 List of Subcontractors
        Schedule 3 Declaration of Releases of Claims

DocuSign Envelope ID: EE3D18E0-3B43-472F-B433-2726754F0C1A

Project Name: Shreveport Biomethane Facility                 Project No.: PH7006

Design Builder

By: _____
                                    (Name)

      _____
                                    (Title)

Project Name:  Shreveport Biomethane Facility                    Project No.: PH7006

DECLARATION

I, _____ hereby declare that I am the
_____ of Design Builder submitting this Application For Payment; that I am duly authorized to execute and deliver this Application For Payment on behalf of Design Builder; and that all information set forth in this Application For Payment and all Schedules attached hereto are true, accurate, and complete as of its date.

I declare, under penalty of perjury, that the foregoing is true and correct and that this declaration was subscribed at _____, _____, State of _____ on , 20___.


_____
(Signature)

_____
(Print Name)


PROJECT NAME: _____
PROJECT NUMBER:

APPLICATION DATE: _____

PERIOD TO: _____

CONTRACT DATE: _____

DESIGN BUILDER: _____

SCHEDULE 1
TO
APPLICATION FOR PAYMENT
COST BREAKDOWN

| A ITEM NO. | B DESCRIPTION OF WORK ACTIVITY OR OTHER ITEM | C SCHEDULED VALUE | D % COMPLETE TO DATE | E ACUTAL COST OF WORK COMPLETED TO DATE (C x D) |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
| Subtotal |  |  |  | $ |
| Design Builder Fee |  |  |  | $ |
| Total Actual Cost of Work (including Design Builder's Fee) |  |  |  | $ |

*Notes –Work of Phase 1 and Phase 2 shall be entered as a separate schedule of value items per General Conditions Article 9.

Exhibit  - App for Payment After Acceptance Testing
Turnkey DB:A                              4 of 9

PROJECT NAME:

DESIGN BUILDER:

PROJECT NUMBER:

APPLICATION NUMBER:

Exhibit  - App for Payment After Acceptance Testing
Turnkey DB:A                                       5 of 9

(Design Builder)

By: _____  __

(Name)

_____

(Title)

Date: _____  _

NOTE:
Notary acknowledgment for Design Builder and Escrow Agent must be attached.

Exhibit  - App for Payment After Acceptance Testing
Turnkey DB:A                               6 of 9

PROJECT NAME:

DESIGN BUILDER:

PROJECT NUMBER:

APPLICATION NUMBER:

SCHEDULE 2
TO
**APPLICATION FOR PAYMENT**

**LIST OF SUBCONTRACTORS**

Subcontractors listed below are all Subcontractors furnishing labor, services, or materials for the period referred to in the Application For Payment referenced above, of which this Schedule 3 is a part:

| Name of Subcontractor | Subcontracted Work Activity | Date Work Activity Completed |
|---|---|---|

Exhibit  - App for Payment After Acceptance Testing
Turnkey DB:A                                    7 of 9

(Design Builder)

By: _____
                    (Name)

_____
                    (Title)

Date: _____

PROJECT NAME:

DESIGN BUILDER:

PROJECT NUMBER:

APPLICATION NUMBER:

SCHEDULE 3
TO
**APPLICATION FOR PAYMENT**

**DECLARATION OF RELEASE OF CLAIMS**

Design Builder hereby certifies that attached hereto are releases and waivers of claims and stop notices from all Subcontractors furnishing labor, services, or materials covered by the Certificate For Payment dated _____, 20____, except those listed below:

(Name of Design Builder)

By: _____
(Name)

_____
(Title)

Date: _____

Exhibit  - App for Payment After Acceptance Testing
Turnkey DB:A                                        9 of 9

Project Name:  Shreveport Biomethane Facility                    Project No:  PH7006

EXHIBIT

## APPLICATION FOR PAYMENT AT FINAL COMPLETION

TO THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,
AND UNIVERSITY'S REPRESENTATIVE:

FROM DESIGN BUILDER:
    ADDRESS:          3900 Kilroy Airport Way, Suite 100, Long Beach, CA 90806
    PROJECT NAME:   Shreveport Biomethane Facility
    PROJECT NUMBER: PH7006
    CONTRACT DATE:   {Insert Date}
    APPLICATION DATE: {Insert Date}

Application is made for payment under the Contract as shown below and in Schedule 1 attached hereto:

  1. ACTUAL COST OF WORK 

  2. CONTRACT SUM (as defined in the Authorization) 

  3. GMAX (including any Change Orders) 

  4. TOTAL COST SAVINGS (Line 3 less Line 2 not to exceed 10% of GMAX) 

  5. COST SAVINGS (25% of Line 4) 

  6. AMOUNT EARNED AT FINAL COMPLETION* 

  (* Article 9.8.2 of the General Conditions states final payment shall be the Contract Sum less any
amounts previously paid.)

  7. AMOUNT PREVIOUSLY PAID AFTER ACCEPTANCE TESTING

  8. CURRENT PAYMENT DUE (Line 7 less Line 6)

The undersigned Design Builder hereby represents and warrants to University that all Work, for which Certificates For Payment have previously been issued and payment received from University, to the extent of such payment is free and clear of all claims, stop notices, security interests, and encumbrances in favor of Design Builder, any Subcontractor, and any other persons or firms entitled to make claims by reason of having provided labor, materials, or equipment related to the Work.

The following Schedules are attached and incorporated herein, and made a part of this Application For Payment:

Exhibit  - App. for Payment upon Final Completion
Turnkey DB:A                              1 of 9

Project Name:  Shreveport Biomethane Facility                     Project No:  PH7006

       Schedule 1 Cost Breakdown
       Schedule 2 List of Subcontractors
       Schedule 3 Declaration of Releases of Claims

Design Builder

By:  _____
                    (Name)

         _____
                    (Title)

Project Name: Shreveport Biomethane Facility          Project No: PH7006

## DECLARATION

I, _____ hereby declare that I am the
_____ of Design Builder submitting this Application For Payment; that I am duly authorized to execute and deliver this Application For Payment on behalf of Design Builder; and that all information set forth in this Application For Payment and all Schedules attached hereto are true, accurate, and complete as of its date.

I declare, under penalty of perjury, that the foregoing is true and correct and that this declaration was subscribed at _____, _____, State of _____on , 20___.


_____
(Signature)

_____
(Print Name)


PROJECT NAME: _____
PROJECT NUMBER: _____

APPLICATION DATE: _____

FACILITY: _____

CONTRACT DATE: _____

DESIGN BUILDER: _____


Exhibit  - App. for Payment upon Final Completion
Turnkey DB:A                    3 of 9

Project Name:  Shreveport Biomethane Facility        Project No:  PH7006

SCHEDULE 1
TO
**APPLICATION FOR PAYMENT**
COST BREAKDOWN

| A | B | C | D | E |
|---|---|---|---|---|
| | DESCRIPTION OF WORK ACTIVITY OR | | | ACUTAL COST OF WORK COMPLETED TO DATE |
| ITEM NO. | OTHER ITEM | SCHEDULED VALUE | % COMPLETE TO DATE | (C x D) |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| Subtotal | | | | $ |
| Design Builder Fee | | | | $ |
| Total Actual Cost of Work (including Design Builder's Fee) | | | | $ |

*Notes –Work of Phase 1 and Phase 2 shall be entered as a separate schedule of value items per General Conditions Article 9.

PROJECT NAME:

Exhibit  - App. for Payment upon Final Completion
Turnkey DB:A           4 of 9

Project Name:  Shreveport Biomethane Facility                    Project No:  PH7006

DESIGN BUILDER:

PROJECT NUMBER:

APPLICATION NUMBER:

Exhibit  - App. for Payment upon Final Completion
Turnkey DB:A                             5 of 9

Project Name:  Shreveport Biomethane Facility                    Project No:  PH7006


                    (Design Builder)

By:
_____
                    (Name)

                    _____
                    (Title)

Date:  _____


NOTE:
Notary acknowledgment for Design Builder and Escrow Agent must be attached.

Project Name:  Shreveport Biomethane Facility                    Project No:  PH7006

PROJECT NAME:

DESIGN BUILDER:

PROJECT NUMBER:

APPLICATION NUMBER:


SCHEDULE 2
TO
<u>APPLICATION FOR PAYMENT</u>


<u>LIST OF SUBCONTRACTORS</u>

Subcontractors listed below are all Subcontractors furnishing labor, services, or materials for the period referred to in the Application For Payment referenced above, of which this Schedule 3 is a part:


| Name of Subcontractor | Subcontracted Work Activity | Date Work Activity Completed |
|---|---|---|
| | | |


Exhibit  - App. for Payment upon Final Completion
Turnkey DB:A                                      7 of 9

Project Name:  Shreveport Biomethane Facility                    Project No:  PH7006


                (Design Builder)


By: _____
                (Name)


        _____
                (Title)

Date: _____

Project Name:  Shreveport Biomethane Facility                    Project No:  PH7006

PROJECT NAME:

DESIGN BUILDER:

PROJECT NUMBER:

APPLICATION NUMBER:

SCHEDULE 3
TO
<u>APPLICATION FOR PAYMENT</u>

<u>DECLARATION OF RELEASE OF CLAIMS</u>

Design Builder hereby certifies that attached hereto are releases and waivers of claims and stop notices from all Subcontractors furnishing labor, services, or materials covered by the Certificate For Payment dated _____, 20_____, except those listed below:

(Name of Design Builder)

By: _____
                    (Name)

_____
                    (Title)

Date: _____

Exhibit  - App. for Payment upon Final Completion
Turnkey DB:A                                    9 of 9

Project Name:  Shreveport Biomethane Facility                          Project No.: PH7006

## Exhibit

## Assumptions & Qualifications

The Design Builder states the following assumptions and qualifications as part of the Contract
Documents. In the event that the Design Builder encounters conditions which vary from the stated
Assumptions and Qualifications herein, Design Builder shall be entitled to a Change Order for additional
costs and or delays, subject to the provisions of the Contract Documents.

1. The condition of existing pipeline from the landfill to the point of connection is acceptable to be
   used as part of the UC Pipeline in that;
   a. No significant restrictions or reductions in the cross sectional open area exist.
   b. No damage or degradation has occurred that would prevent the use for the intended
      purpose.
   c. Size, wall thickness and material as marked on the exposed portion of the pipeline and
      stated on the pressure testing documents provided by the owner is accurate and
      consistent throughout the entire length to be put into service.  Specifically the following
      information is assumed to be valid for this existing pipeline:

      i. Nominal size/dimension ratio = 10 inch / SDR11
      ii. Outside diameter = 10.75 inch
      iii. Minimum wall thickness = 0.977 inch
      iv. Material = PE3408
      v. Meeting the applicable requirements of ASTM F714, AWWA C906 and NSF
      vi. Maximum allowable working pressure = 99psig

2. The existing foundations from the previous gas processing facility at the Woolworth Road
   Landfill lease area shall be demolished by the Design/Builder as required to construct the
   facility.  It is assumed that the foundations from the previous gas procession facility at the
   Woolworth Road landfill lease area that are to be demolished are less than or equal to 24 inches
   in depth.

3. The underground conduits and piping existing are of the number and size shown by the existing
   stub ups at the site.  There are no significant conduits, pipes or other manmade objects that
   have been buried without leaving an exposed portion above ground.

Exhibit  - Assumptions and Qualifications
Turnkey DB:A                              1 of 2

Project Name:  Shreveport Biomethane Facility                                    Project No.: PH7006

4. There are no significant underground structures, pipes, conduits or other manmade objects present at the proposed Gas Compression Plant (GCP) location or along the proposed route of the new portion of the UC Pipeline.

5. There are no significant underground structures, pipes, conduits or other manmade objects present along the proposed route of the road to be constructed between Buncombe Road and the GCP.

6. Sound level of less than or equal to 80dBA at the property line of the landfill and at closest point on Buncombe Road to the GCP is acceptable.

7. The soil at the location for the GCP, Enable Midstream Partners (EMP) metering station (MS) and the access road is similar to that found at the Gas Processing Plant (GPP) location and has equal to or better conditions for construction as evaluated in the Geotechnical Engineering Evaluation for the GPP site provided in the University Furnished Information. The subsurface soils at all sites identified for construction in this project are of good bearing quality and suitable for support of the equipment anticipated.

8. The existing landfill gas flare owned by Renovar (Flare) is sufficiently structurally sound to allow for relocation by lifting with an overhead crane or similar normal construction rigging methods.

9. The tie in point for the return of condensate to the landfill condensate management system will be within 50 feet of the existing landfill gas inlet sump at the GPP site. The condensate liquid pressure required at this tie in point shall be less than or equal to 5 psig.

10. The condition of the EMP Gas Transmission line N (Line N) which must be crossed with the UC Pipeline at the Gas Compression Plant is suitable to be crossed with excavation only and no secondary support, modification or other measures are required to install the UC Pipeline under or over Line N.

11. Temporary access to the Line N right of way in the area of the connection point between the existing and new portions of the UC Pipeline will be allowed during construction.

12. The existing flare at the GPP site may be relocated by Design Builder for reuse at the GPP site and its capacity is limited to 3,000 scfm. The existing buildings at the GPP site will be removed by Design Builder during construction activities. The condition of existing buildings at the GPP site is unknown.

Exhibit  - Assumptions and Qualifications
Turnkey DB:A                                    2 of 2

Project Name:  Shreveport Biomethane Facility                              Project No.: PH7006

13. The Work will not be subject to Louisiana State and local sales and use taxes and Owner is responsible for obtaining an exemption from Louisiana state and local sales and use tax for the Work. Design Builder agrees to provide reasonable assistance to Owner or Owners consultants with regard to obtaining Louisiana state and local sales and use tax exemption for the Work and other federal, state or local program that is enacted and would allow for a reduction, rebate, or exemption of Taxes (including Louisiana state or local sales and use tax on the Work).

**Project Number: PH7006**



# CERTIFICATE OF LIABILITY INSURANCE
(for non-UCIP Construction Projects and Consultant/Design Contracts)

| DATE (MM/DD/YYYY) |
|---|
|   |

THIS CERTIFICATE **IS** ISSUED AS A MATTER OF INFORMATION **ONLY AND** CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES **NOT** AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL **INSURED**, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| | PHONE (A/C, No, Ext): | | FAX (A/C, No): |
| | E-MAIL ADDRESS: | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : | | |
| INSURED | INSURER B : | | |
| | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

| COVERAGES | CERTIFICATE NUMBER: | REVISION NUMBER: |
|---|---|---|

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED  NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS |
|---|---|---|---|---|---|---|---|
| | **GENERAL LIABILITY** <br> ☐ COMMERCIAL GENERAL LIABILITY <br> ☐ CLAIMS-MADE ☐ OCCUR <br> GEN'L AGGREGATE LIMIT APPLIES PER: <br> ☐ POLICY ☐ PRO-JECT ☐ LOC | | | | | | |
| | **AUTOMOBILE LIABILITY** <br> ☐ ANY AUTO <br> ☐ ALL OWNED AUTOS ☐ SCHEDULED AUTOS <br> ☐ HIRED AUTOS ☐ NON-OWNED AUTOS | | | | | | |
| | ☐ UMBRELLA LIAB ☐ OCCUR <br> ☐ EXCESS LIAB ☐ CLAIMS-MADE <br> ☐ DED ☐ RETENTION $ | | | | | | |
| | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** <br> ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? Y/N <br> (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | N/A | | | | | ☐ WC STATU-TORY LIMITS ☐ OTH-ER |
| | **PROFESSIONAL LIABILITY** <br> ☐ OCCUR <br> ☐ CLAIMS-MADE | | | | | | |

Special Provisions:
1.  Renovar Shreveport LLC, City of Shreveport, and The Regents of the University of California, The University of California, University, and each of their Representatives, consultants, officers, agents, and employees, , are included as additional insureds on the general liability policy as required by contract and pursuant to additional insured endorsement CG2010 (11/85) or a combination of both CG 2010 (10/01 or 07/04) and CG 2037 (10/01 or 07/04) but only in connection with ___(name of project)___.
2.  The General Liability coverage contains a Severability of Interest provision and shall be primary insurance as respects The Regents of the University of California, its officers, agents and employees.  Any insurance or self-insurance maintained by The Regents of the University of California shall be excess of and non-contributory with this insurance.

**CERTIFICATE HOLDER: The Regents of the University of California**

| Forward to:  {Office, Room Number or Mail Stop} <br> University of California, {Facility} <br> {Street Address} <br> {City, State, Zip} | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. <br> AUTHORIZED REPRESENTATIVE |
|---|---|

© 1988-2010 ACORD CORPORATION. All rights reserved. ACORD 25 (2010/05) The ACORD name and logo are registered marks of ACORD

Project Name: Shreveport Biomethane Facility                                           Project No.: PH7006

## EXHIBIT

## CERTIFICATE OF SUBSTANTIAL COMPLETION

Project Name: _____

Design Builder: _____

Project Number: _____

Date of Issuance: _____

The Construction Work has been reviewed and the date of Substantial Completion is hereby established as of the date of issuance above.

A Certificate of Occupancy has been issued by the University's Building Official, or other authority having jurisdiction, {NAME} on {MONTH} {DAY}, {YEAR}.

In accordance with GC 9.7.3, a list of items to be completed or corrected is included herein. The failure to include any items on such list does not alter the responsibility of Design Builder to complete all of the Work in accordance with the Contract Documents.

In accordance with the Contract Documents, Design Builder is notified as follows:

1. Without limitation of Design Builder's obligation to fully complete the Work within the Contract Time, Design Builder shall complete or correct the Construction Work on the list of items attached hereto within {NUMBER} daysfrom the date of Substantial Completion.
2. University will be responsible {INSERT "NONE" OR STATE ANY UNIVERSITY RESPONSIBILITIES AFTER SUBSTANTIAL COMPLETION: security, maintenance, utilities (e.g. water, sewer, electrical, gas, etc.}
3. Design Builder shall be responsible for all Contract requirements except items or responsibilities of University set forth in Paragraph 2 above.
4. List of items to be completed or corrected by Design Builder: {INSERT "SEE ATTACHED LIST" OR IDENTIFY ITEMS TO BE COMPLETED/CORRECTED}

### UNIVERSITY'S REPRESENTATIVE:

_____

(Name of Firm)

_____

(Signature)

_____

(Typed or Printed Name)

_____

(Title)

_____

(Date)

### UNIVERSITY: THE REGENTS OF THE UNIVERSITY OF CALIFORNIA

_____

(Signature)

_____

(Typed or Printed Name)

Exhibit  -  Certificate of Substantial Completion
Turnkey DB:A                                        1 of 2

Project Name: Shreveport Biomethane Facility                                    Project No.: PH7006

_____   _____   _____

(Title)

_____   _____   _____

(Date)

cc: Office of Risk Management

.

Project Name:  Shreveport Biomethane Facility                                    Project No.:  PH7006

**Exhibit**

**CHANGE ORDER**

University of California Facility:

CHANGE ORDER NO. _____ ___                     Reference Field Order No.:

Project Name:

Project Number: ____ _____ _____          Contract Date: .

To Design Builder:

Address:

DESCRIPTION OF CHANGE:

| Adjustment of Contract Sum and GMAX: | Adjustment of Contract Time: | |
|---|---|---|
| Original Contract Sum: _____ ____ | Original Contract Time: | (Days) |
| Original GMAX: | | |
| Prior Adjustments: _____ _____ | Prior Adjustments: | (Days) |
| Contract Sum Prior to this Change: _____ _____ | Contract Time Prior to this Change: | (Days) |
| GMAX  Prior to this Change: _____ _____ | | |
| Adjustment for this Change: _____ _____ | Adjustment for this Change: | (Days) |
| Revised Contract Sum: _____ _____ | Revised Contract Time: | (Days) |
| Revised GMAX: _____ _____ | | |

_____
Exhibit – Change Order
Turnkey Purchase DB:A                          1 of 3

Project Name:  Shreveport Biomethane Facility                    Project No.: PH7006

| Adjustment of Contract Sum (Phase 1 Work): | | Adjustment of Contract Time (Phase 1): | |
|---|---|---|---|
| Original Option Sum: | ____ _____ | Original Option Time: | (Days) |
| Prior Adjustments: | _____ _____ | Prior Adjustments: | (Days) |
| Option Sum Prior to this Change: | _____ _____ | Option Time Prior to this Change: | (Days) |
| Adjustment for this Change: | _ _____ ___ | Adjustment for this Change: | (Days) |
| Revised Option Sum: | _____ ___ | Revised Option Time: | (Days) |

**Adjustment of Contract Sum (Phase 1 and 2 Work):**            Adjustment   of   Contract Time (Phases 1 and 2):

| Original Option Sum: | ___ _____ | Original Option Time: | (Days) |
|---|---|---|---|
| Prior Adjustments: | ____ _____ | Prior Adjustments: | (Days) |
| Option Sum Prior to this Change: | _____ _____ | Option Time Prior to this Change: | (Days) |
| Adjustment for this Change: | _ _____ ____ | Adjustment for this Change: | (Days) |
| Revised Option Sum: | _____ | Revised Option Time: | (Days) |

Design Builder waives any claim for further adjustments of the Contract Sum and the Contract Time related to the above described change in the Work.

**Recommended:**                                                      **Accepted:**

By: _____ ___                          By:_____ _____

(Signature of University's Representative)                      (Design Builder Signature)


_____ _____                           _____ _____ _____

(Printed Name)                                        Printed    Design    Builder

Name)

Date: _____ _____ _____                Date: ____ _____ _____


**Reviewed and Recommended**

By: _____ ___

(Signature of University's
Designated Administrator)


_____ _____

(Printed Name)

Date: ____ _____ _____

Exhibit – Change Order
Turnkey Purchase DB:A                      2 of 3

Project Name:  Shreveport Biomethane Facility                                    Project No.:  PH7006

**Funds Sufficient:**

By: _____

    (Signature from University's
    Accounting Office)

_____

          (Printed Name)

Date: _____

**Approved:**

UNIVERSITY:  THE REGENTS OF THE UNIVERSITY OF CALIFORNIA

_____

          (Printed Name)

By: _____

        (Signature)

_____

        (Title)

Date: _____

Project Name:  Shreveport Biomethane Facility                                    Project No.:  PH7006

EXHIBIT

COST BREAKDOWN

| Item | COST |
|------|------|
| **Major Equipment** | |
| LFG Moisture Separators/Blower/Cooler | ▮ |
| SulfaTreat Vessel | ▮ |
| Refrigeration Equipment/Moisture Separator | ▮ |
| LFG Compressor/Aftercooler | ▮ |
| Heat Exchanger/Moisture Separator | ▮ |
| Membrane Skid (Air Liquide) | ▮ |
| Activated Carbon Polishing Vessel | ▮ |
| Product Gas Compressor | ▮ |
| Waste Gas Thermal Oxidizer | ▮ |
| Other Equipment/Aftercooler/Scrubbers | ▮ |
| Water Well installation | ▮ |
| **Major Equipment Subtotal** | ▮ |
| **Civil/Structural** | |
| Grading/Site Preparation/Excavation, both sites | ▮ |
| Paving/Ground Cover | ▮ |
| Fence | ▮ |
| Concrete | ▮ |
| Office/Storage Trailers | ▮ |
| Pipe Racks/Steel | ▮ |
| **Civil & Structural Subtotal** | ▮ |
| **Mechanical** | |
| Piping/Valves/Insulation | ▮ |
| Rigging/Equipment Installation | ▮ |
| **Mechanical Subtotal** | ▮ |
| **Electrical/Instrumentation** | |
| Switchgear/MCCs | ▮ |
| Transformers | ▮ |
| Power + Control Wiring/Lighting/Installation | ▮ |
| SCADA | ▮ |
| **Electrical & Instrumentation Subtotal** | ▮ |

Exhibit – Cost Breakdown
Turnkey Purchase DB:A                                    2 of 1

Project Name:  Shreveport Biomethane Facility                                          Project No.:  PH7006

| Item | COST |
|---|---|
| **Labor** | |
| SCS Labor | ▉ |
| Subcontract Engineering | ▉ |
| **Design/Build Labor Subtotal** | ▉ |
| **Other** | |
| Site Expenses, travel, lodging, training, etc. | ▉ |
| Security Systems | ▉ |
| Permits, fees | ▉ |
| Utility Interconnects for Electricity | ▉ |
| Pipeline and Road Construction to GCP | ▉ |
| Critical Spares | ▉ |
| **Other Subtotal** | ▉ |
| | |
| **Subtotal Phase 1 & 2 non Labor** | ▉ |
| *Mark Up Phase 1& 2 non Labor* | ▉ |
| **Subtotal Phase 3** | ▉ |
| *Mark Up Phase 3* | ▉ |
| **Subtotal DB Labor, all phases** | ▉ |
| *Mark Up DB Labor, all phases* | ▉ |
| **Total w/out Mark Ups** | ▉ |
| *Total Mark Ups* | ▉ |
| **Total w/Mark Ups, w/out Contingency** | ▉ |
| Contingency | ▉ |
| **Design/Build Total** | ▉ |
| **Bonds** | ▉ |
| **Insurance** | ▉ |
| **Interest** | ▉ |
| **GMAX** | ▉ |
| **Phase 1 Contract Sum** | ▉ |
| **Phase 1 and 2 Contract Sum** | ▉ |

Exhibit – Cost Breakdown
Turnkey Purchase DB:A                         2 of 2

Project Name:  Shreveport Biomethane Facility                    Project No:  PH7006

## EXHIBIT

## COST PROPOSAL


Date: _____          Change Request No.: _____

Project Name: _____

Facility: _____

Contract Date: _____

**Scope of Change:**




Instructions:

1. Complete this form by providing: (a) all information required above, (b) the amount and justification based upon the Contract Schedule for any proposed adjustments of Contract Time, (c) the proposed adjustment of the Contract Sum, (d) the attached "Cost Proposal Summary", and (e) the attached form titled, "Supporting Documentation for the Cost Proposal Summary".

2. Attach the form titled "Supporting Documentation for the Cost Proposal Summary" for Design Builder and each Subcontractor involved in the Extra Work. Each such form shall be completed and signed by Design Builder or Subcontractor actually performing the Work activity identified on the form.  Attach supporting data to each such form to substantiate the individually listed costs.  The costs provided on these forms shall be used to substantiate Additional Costs shown on the Cost Proposal Summary.

3. The Design Builder Fee shall be computed on the Cost of Extra Work of Design Builder and each Subcontractor involved in the Extra Work; and shall not constitute full compensation for all costs and expenses related to the subject change and not listed in the "Supporting Documentation of the Cost Proposal Summary", including overhead and profit.

4. Refer to Article 7 of the General Conditions for the method of computing the Design Builder Fee.



Adjustment to the Contract Time (include justification based upon the Contract Schedule): _____   ____

_____   _____   _____   _____   _____   _____   ____
                                                                                              (Days)
Refer to Article 8 of the General Conditions.



**Adjustment of the Contract Sum (Total Additional Cost from Cost Proposal Summary):** $_____   ____

Refer to Article 7 of General Conditions


Exhibit – Cost Proposal
Turnkey Purchase DB:A                      1 of 6

Project Name:  Shreveport Biomethane Facility                                    Project No:  PH7006

| Phases 1 and 2 Work | | (1) Design Builder | (2) Subs | (4) Total |
|---|---|---|---|---|
| ACTUAL COSTS | 1.  Straight Time Wages/Salaries - Labor | {e.g. 10.00} | | {e.g. ▮▮▮} |
| | 2.  Fringe Benefits and Payroll Taxes - Labor | {e.g. 3.05} | | {e.g. ▮▮} |
| | 3.  Overtime Wages/Salaries - Labor | | | |
| | 4.  Fringe Benefits and Payroll Taxes - Overtime | | | |
| | 5.  Tests | | | |
| | 6.  Materials, Equipment, Consumables and Services | | | |
| | 7.  Sales Taxes | | | |
| | 8.  Rental Equipment Charges | | | |
| | 9.  Utilities | | | |
| | 10.  Revisions to Construction Documents | | | |
| | 11.  Royalties | | | |
| | 12.  Permits | | | |
| | 13.  Insurance premiums and Bond costs | | | |
| | 14.  Field Office expenses | | | |
| | 15.  Interest on capital borrowed | | | {e.g. ▮▮} |
| | 16.  **Subtotal of Actual Costs  (Sum of lines 1-15)** | | | {e.g. ▮▮} |
| DESIGN BUILDER FEE | 17. Line 16 less line 15. | | | {e.g. ▮▮ } |
| | 18. Subcontractor (____% of lines 1-4; col. 2 and [    ]%of lines 5-13) | | | |
| | 19.. Design Builder▮▮▮ of sum of lines 1 to 4 only)▮▮▮ of lines 5-14, cols 1 and 2. | {e.g. ▮▮} | | {e.g. ▮▮} |
| | 20. Design Builder Fee (Sum of lines 18-19) | {e.g. ▮▮} | | {e. ▮▮} |

Project Name:  Shreveport Biomethane Facility

Project No:  PH7006

| TOTAL | 21. **ADDITIONAL COST** (Sum of lines 16 & 20; col. 4) | | | {e.g. ███ |
|---|---|---|---|---|

| **Phase 3 Work** | | (1)<br><br><br>Design Builder | (2)<br><br>Subs | (4)<br><br>Total |
|---|---|---|---|---|
| ACTUAL<br><br><br><br>COSTS | 1.  Straight Time Wages/Salaries - Labor | | | |
| | 2.  Fringe Benefits and Payroll Taxes - Labor | | | |
| | 3.  Overtime Wages/Salaries - Labor | | | |
| | 4.  Fringe Benefits and Payroll Taxes - Overtime | | | |
| | 5.  Tests | | | |
| | 6.  Materials,Equipment, Consumables and Services | | | |
| | 7.  Sales Taxes | | | |
| | 8.  Rental Equipment Charges | | | |
| | 9.  Utilities | | | |
| | 10. Revisions to Construction Documents | | | |
| | 11. Royalties | | | |
| | 12. Permits | | | |
| | 13. Insurance premiums | | | |
| | 14. Field Office expenses | | | |
| | 15. Interest on capital borrowed | | | |
| | 16. **Subtotal of Actual Costs  (Sum of lines 1-15)** | | | |
| DESIGN BUILDER | 17. Line 16 less line 15. | | | |
| | 18. Subcontractor  (____ % of lines 1-4; col. 2 and [     ]%of lines 5-13) | | | |

Exhibit – Cost Proposal
Turnkey Purchase DB:A

DocuSign Envelope ID: EE3D18E0-3B43-4725-B423-873675450C1A

Project Name: Shreveport Biomethane Facility                    Project No: PH7006

| FEE | 19. Design Builder (___ % of sum of lines 1 to 4 only) and ___ % of lines 5-14, cols 1 and 2. | | | |
|-----|------------------------------------------------------------------|--|--|--|
| | 20. Design Builder Fee (Sum of lines 18-191) | | | |
| TOTAL | 21. **ADDITIONAL COST** (Sum of lines 16 & 20; col. 4) | | | |

Notes:(1) Additional Costs are from line 16 of the attached forms titled, "Supporting Documentation For the Cost Proposal Summary" for Design Builder and each Subcontractor involved in the Extra Work.

(2) Round down all Additional Costs of 50¢ or less to the nearest dollar. Round up all Additional Costs of 51¢ or more to the nearest dollar.

DocuSign Envelope ID: 5E3B18E0-3B43-472F-B433-3726754F0C1A

Project Name:  Shreveport Biomethane Facility                                      Project No:  PH7006

### SUPPORTING DOCUMENTATION FOR THE COST PROPOSAL SUMMARY

Design Builder/Subcontractor Name: _____
Change Order Request No.: _____
Project Name: _____
Work Activity: _____
Project No.: _____

### University of California {FACILITY NAME}

| COST ITEM | | COST [1] |
|---|---|---|
| ACTUAL COSTS | 1.  Straight Time Wages/Salaries -- Labor | |
| | 2.  Fringe Benefits and Payroll Taxes -- Labor: _____ % of line 1 | |
| | 3.  Overtime Wages/Salaries - Labor (Attach University Representative's written authorization) | |
| | 4.  Fringe Benefits and Payroll Taxes -- Overtime: _____ % of line 3 | |
| | 5.  Tests | |
| | 5.  Materials and Consumable items | |
| | 6.  Sales Taxes: _____ % of line 5 | |
| | 7.  Rental Charges (attach U.S. Army Corps of Engineers' Schedule) | |
| | 5.  Tests | |
| | 6.  Materials and Consumable Items | |
| | 7.  Sales Taxes | |
| | 8.  Rental Equipment Charges | |
| | 9. Utilities | |
| | 10. Revisions to Construction Documents | |
| | 11.  Royalties | |
| | 12.  Permits | |
| | 13. Insurance premiums | |
| | 14. Interest on capital employed or borrowed | |
| | 15. Field Office expenses | |
| | | |
| | 16. Total Direct Expense -- sum of lines 1-15 | |
| Subcontractor Markup | 19, _____% markup on direct labor expenses and ___% on all other expenses. | |

(Company Name)

Project Name:  Shreveport Biomethane Facility                                    Project No:  PH7006

(Signature) [2]

_____

(Title)

_____

(Date)

_____

(Design Builder's Company Name)

_____

(Signature) [3]

_____

(Title)

_____

(Date)


Notes:   (1) Round down all costs of 50¢ or less to the nearest dollar.  Round up all costs of 51¢ or more to the nearest dollar.
         (2) This form shall be prepared and signed by Design Builder or Subcontractor actually performing the Work activity
             indicated above.
         (3) If this form is signed by a Subcontractor, it shall be reviewed and signed by Design Builder certifying the accuracy of
             the information.

Project Name: Shreveport Biomethane Facility                                                    Project No.:  PH7006

Woolworth Road Landfill                                         Critical Spares Exhibit

| Item | System | Critical spare parts not included in spares for warranty period | Consequence in case of failure | Lead Time | Estimated Cost | Comments from suppliers (*SCSE comments*) |
|---|---|---|---|---|---|---|
| 1 | GPP | **Gas Processing Plant Compressors** | | | | |
| 1.1 | GPP | compressor block | loss of approx. 50% nominal capacity | 20 weeks | ▮0 | Most repairs can be made on site in less time. Historically reliable. |
| 1.2 | GPP | electric motor, 800 hp | loss of approx. 50% nominal capacity | 16 weeks | ▮ | may not be required in the first years |
| 2 | GPP | **Oil & Gas Coolers** | | | | |
| 2.1 | GPP | Oil Cooler motor, 7.5HP | loss of approx. 50% nominal capacity | 2 weeks | ▮ | short lead time |
| 2.2 | GPP | Gas After Cooler Motor, 7.5HP | loss of approx. 50% nominal capacity | 2 weeks | ▮ | short lead time |
| 3 | GPP | **Auxiliaries** | | | | |
| 3.1 | GPP | electrical heater, separator tank | loss of approx. 100% nominal capacity | 4 weeks | ▮ | Compressors cannot be restarted if cold. |
| 3.2 | GPP | Bypass Valve Actuator | loss of 100% nominal capacity | 2 weeks | ▮0 | short lead time |
| 3.3 | GPP | MCC parts (main breaker, contactor etc.) | loss of 100% nominal capacity | 12 weeks | ▮ | Most repairs can be made on site in less time. Historically reliable. |
| 4.2 | GPP | Instrumentation | loss of approx. 100% nominal capacity | 2 weeks | ▮ | short lead time |
| 3.4 | GPP | Contols, PLC parts | loss of 0...100% nominal capacity | 2 weeks | ▮ | short lead time |
| 4 | GPP | **CO2 Removal System** | | | | |
| 4.1 | GPP | Valves & Actuators | loss of approx. 100% nominal capacity | 2 weeks | ▮ | short lead time |
| 4.2 | GPP | Instrumentation | loss of approx. 100% nominal capacity | 2 weeks | ▮ | short lead time |
| 4.3 | | Controls | loss of approx. 100% nominal capacity | 2 weeks | ▮ | short lead time |
| 4.4 | GCP | **Gas Compression Plant** | | | | |
| 5 | GCP | Bare Compressor | loss of 100% nominal capacity | 8 weeks | ▮ | Most repairs can be made on site in less time. Historically reliable. |
| 5.1 | GCP | Electric Motor, 300HP | loss of 100% nominal capacity | 14 weeks | ▮ | Historically reliable if no issues in 1st year. |
| 5.2 | GCP | Oil Cooler motor, 7.5HP | loss of approx. 50% nominal capacity | 2 weeks | ▮ | short lead time |
| 5.3 | GCP | Gas After Cooler Motor, 7.5HP | loss of approx. 50% nominal capacity | 2 weeks | ▮ | short lead time |
| 5.4 | GCP | **GCP Auxiliaries** | | | | |
| 5.5 | GPP | electrical heater, separator tank | loss of approx. 100% nominal capacity | 4 weeks | ▮ | Compressors cannot be restarted if cold. |
| 5.6 | GCP | Bypass Valve Actuator | loss of 100% nominal capacity | 2 weeks | ▮ | short lead time |
| 5.7 | GPP | MCC parts (main breaker, contactor etc.) | loss of 10...100% nominal capacity | 3 weeks | ▮ | short lead time |
| 5.8 | GPP | Air Compressor Spares | loss of 10...100% nominal capacity | 2 weeks | ▮ | short lead time |
| | | | | total, estimated | ▮ | |

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

## EXHIBIT
## DESIGN BUILDER CLAIM CERTIFICATION

Pursuant to Article 4.3.3 of the General Conditions, I certify as follows:

1.   The Claim to which this certification is attached is made in good faith.

2.   Amounts claimed for costs, expenses and damages incurred by Design Builder are accurate and complete.  Supporting data for amounts incurred by Design Builder is accurate and complete. Any such supporting data, including any such new amounts, submitted after the execution of this certification, will be accurate and complete.

3.  To the best of my knowledge and belief, amounts claimed, and supporting data submitted by Design Builder on behalf of any and all subcontractors or suppliers, of all tiers, or any person or entity under Design Builder, are accurate and complete.  Design Builder will not submit, after the date of execution of this certification, any such supporting data, including any such new amounts that, to the best of my knowledge and belief, is not accurate and complete.

4.   The amount requested accurately reflects the adjustment of the Contract Sum for which the Design Builder believes the University is liable.

5.   Attached hereto is a certification that has been executed by each Subcontractor claiming not less than 5% of the total monetary amount sought by the claim to which this certification is attached.

6.   I am duly authorized to certify the Claim on behalf of the Design Builder.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed at:
_____(Name of City if within a City, otherwise Name of County), in the
State of _____, on _____.
                  (State)                              (Date)


_____
           (Signature)

_____
           (Print Name)

_____
      (Name of Design Builder)

Project Name: Shreveport Biomethane Facility                                    Project No. PH7006

EXHIBIT

Design Criteria

Safety:

The design of the Facility is to consider health and safety as the utmost priorities and provide reasonable design provisions for the safety of the operators, staff and public throughout the design, construction, installation, commissioning, operation and maintenance of the Facility.

Location:

The two sites comprising the major portions of the facility and the pipeline connecting them are located in Caddo Parish, Louisiana as further detailed in the contract documents. The Gas Processing Plant (GPP) site is located on City of Shreveport's (the "City") Woolworth Road Landfill and shall be designed to avoid any interference with landfill safety, regulatory compliance or operations in any way. The GPP is accessed via the entry and private roads of the Woolworth Road Landfill. Access to the GPP site is subject to the City safety and operations rules including but not limited to speed limits, parking and right of way. Cooperation with landfill operations is required during construction, operation and maintenance.

The Gas Compression Plant (GCP) is accessed from a public road and is within 1,900 feet of occupied homes. There is a potential that private lands closer to the GCP site may be developed and occupied during the 20 year design life of the project. The design shall minimize impacts to the public by compliance with the permit requirements and other prudent measures and good engineering practice.

The pipeline to be constructed underground is adjacent to an existing Enable Midstream Partners (EMP) underground transmission line and associated right of way. The design shall comply with EMP requirements and the provisions of the easements, permits, codes, regulations and standards associated with the location.

Performance:

Technical design parameters for the Facility, including power consumption and capacity, are also addressed in the Performance Specification document. In the event of a conflict between these Design Criteria and the Performance Specifications, the Performance Specifications shall govern.

Code Requirements:

Facility shall meet all applicable code requirements including but not limited to the codes and standards listed below. These codes and standards shall be referred to hereinafter by basic designation only and form a part of the contract documents. In the absence of reference to a specific issue, it shall be understood that the publication shall be of latest edition in effect at the time of construction permit

Exhibit – Design Criteria
Turnkey Purchase DB:A                        1 of 7

Project Name:  Shreveport Biomethane Facility                                    Project No.  PH7006

issuance.  In the event of conflict between the referenced codes and standards and the contract documents, the more stringent shall govern.

Air Movement and Control Association, Inc. (AMCA)

American Bearing Manufacturers Association (ABMA)

American Gear Manufacturers Association (AGMA)

American Institute of Steel Construction (AISC)

American Iron and Steel Institute (AISI)

American National Standards Institute (ANSI)

American Petroleum Institute (API)

American Society for Testing and Materials (ASTM)

American Society of Civil Engineers (ASCE)

American Society of Heating, Refrigerating and Air Conditioning Engineers (ASHRAE)

American Society of Mechanical Engineers (ASME) including but not limited to the following:

     ASME B31.3 Process Piping

     ASME Boiler and Pressure Vessels Codes

     ASME Power Test Codes

Compressed Air and Gas Institute (CAGI)

Industrial Risk Insurers and applicable insurance agencies

Institute of Electrical and Electronics Engineers (IEEE)

Instrument Society of America (ISA)

International Conference of Building Officials (ICBO)

Louisiana State Uniform Construction Code incorporating but not limited to:

     2012 International Building Code (IBC), (excluding Chapters 1, 11, 27, and 29);

     2012 International Mechanical Code (IMC);

     2013 Louisiana State Plumbing Code (LSPC) (effective Feb. 20, 2013);

Exhibit – Design Criteria
Turnkey Purchase DB:A                                    2 of 7

Project Name:  Shreveport Biomethane Facility                        Project No.  PH7006

    2012 International Fuel Gas Code (IFGC);

    2011 National Electric Code (NEC).

    2012 National Fire Code, NFPA 101 Life Safety Code

National Association of Corrosion Engineers (NACE)

National Electric Manufacturers Association (NEMA)

National Fire Protection Association (NFPA)

Steel Structures Painting Council (SSPC)

Tubular Exchanger Manufacturers Association (TEMA)

U.S. Department of Labor - Occupational Safety and Health Administration (OSHA)

### Site Conditions and Loading:

Facility shall be designed to withstand the environmental and site determinant conditions such as (but not limited to) geotechnical, seismic, temperature, humidity, storm water runoff, wind and other weather conditions for the Facility locations near Shreveport, Louisiana, based on applicable codes and good engineering practice.  The Facility shall be designed for all applicable loading conditions and load combinations.  The construction documents, when issued for construction, shall state all the design loads and loading conditions to which the Facility has been designed to comply.

### Plant Capacity:

Facility shall be designed for, and be capable of, receiving at least 2,646 scfm (dry) of conforming landfill gas received from the landfill and processing that portion of the landfill gas that is not used as supplemental fuel for the waste gas combustion.  The portion of the landfill gas processed will recover from the landfill gas at least the specified percentage of methane and produce pipeline grade quality gas meeting the gas quality requirements of EMP as detailed in the Performance Specification Exhibit.  Facility shall also be designed for, and be capable of, being turned down to and processing of a low of 900 scf per minute (dry) while recovering from  the landfill gas the specified percentage of methane and producing pipeline grade quality gas meeting the gas quality requirements of  EMP.   Additionally, at both min and max volumes of product gas, Facility should be capable of delivering Product Gas to the inlet of the EMP metering system between 345 psi and 350 psi while meeting the gas quality requirements of EMP.  The EMP gas transmission pipeline is normally operated at between 220 and 230 psig but not in excess of 250psig.

The Facility shall be designed for initial operation at approximately 50 percent of the maximum design flow stated in the preceding paragraph with gradual increase in flow to 100 percent design over 8 to 10

Project Name:  Shreveport Biomethane Facility                    Project No.  PH7006

years.  This criteria does not govern over the minimum flow (turndown) requirements expressed in the
Performance Specification Exhibit.

Project Name:  Shreveport Biomethane Facility                                    Project No.  PH7006

## Power Consumption:

When operating at full design capacity, Facility will be designed to provide a total power consumption, including both sites, of 2,300 kW while producing product gas meeting the requirements for injection in the EMP pipeline.

The Facility shall be designed for initial operation at 50 percent of maximum design flow with gradual increase in design flow to 100 percent design over 8 to 10 years.  The design shall incorporate appropriate measures to provide efficient power consumption at all flows.  Such measures shall be clearly identified in the design submittal documents.

## Utilities:

Electrical service shall be provided as required to serve the Gas Processing Plant at the main Project site and a separate electrical service to the Gas Compression Plant at the interconnection point with EMP's gas transmission line.

Industrial water service or other means shall be provided as required to serve the Gas Processing Plant.

Points of connection for utilities shall be shown on the drawings.

## Durability:

Facility shall be designed to minimize corrosion in the Shreveport, LA environment including rain and continuous long term exposure to the elements.

All process piping and connections shall have corrosion resistance to the process gases to which they are exposed, including but not limited to H2S where applicable.

All control equipment including but not limited to VFDs shall be enclosed in weather proof and conditioned space at a temperature not to exceed the manufacturer's recommendations.

## Accessibility:

Each building, structure, or equipment item shall comply with codes and manufacturers' recommendations regarding clearance for maintenance operations.

Each control, or access panel shall have not have obstructions or piping within the clearance distances prescribed by manufacturers or as required by applicable code.

## System Reliability:

Gas treatment process and gas compression shall be designed for maximum system reliability with a minimum system availability of 95% using a strategy combining component redundancy and having spare parts on hand.  Every critical component such as pumps, compressors, and fan units shall have spare replacement parts on-hand to assure system reliability.  Additionally, pumps, compressors and fan

Exhibit – Design Criteria
Turnkey Purchase DB:A                              5 of 7

Project Name: Shreveport Biomethane Facility                          Project No. PH7006

units, as the case may be, over 350 hp in size shall be designed with multiple units working in parallel with at least partial redundancy to provide sufficient reserve capacity to maintain a 50% gas production level in the event of the need for maintenance, repair or replacement of any single unit.  Each pump, compressor or fan unit shall fully isolatable for shut-down and removal of the unit without shutdown of the system.  Critical valves including valves used to divert flow to the flare both upstream and immediately downstream from the Gas Processing Plant shall be fully isolatable.  Where applicable, redundant pumps and compressors shall use a rotation strategy to assure even wear and extended life of all units.

Process Control System:

Facility shall be capable of automatic operation. Facility shall have a centralized monitoring and control station for operation of gas processing plant and interlocks with and monitoring of the gas compression station.  Facility will include monitoring and control points to initiate and stop the flare operation as needed.  Operator shall be able to view the status of the system and component alarms, and all monitoring points from the single monitoring and control station.  Operator shall be able to monitor the relevant points and to control equipment of the gas processing plant and gas compression station from the centralized monitoring and control station.

Process Control System shall send signals or be accessible by the University for University to monitor all points but not control the gas production process.

Metering:

Facility shall have installed gas flow meters that measure continuously at all key process points including but not limited to the inlet and outlet of the gas processing plant. The existing flare inlet flow meter will be used to monitor flow to the flare.

Facility shall have instruments including but not limited to gas quality analyzers to measure the relevant gas constituents on a continuous basis at the inlet and outlet of the gas processing plant.

UC-owned gas analyzers shall be installed at the outlet of the Gas Processing Plant.  If off-specification Product Gas is detected by the gas analyzer, gas plant operation will be suspended, and/or product gas will be diverted to the flare, until such time that the Product Gas can again be made compliant. Metering and measurements of the flow, quality and composition of Landfill Gas, Product Gas and, Waste gas shall be as more fully described on the Acceptance Test Procedure Exhibit.

All metering and measurement instruments are to be designed with appropriate all weather enclosures.

Media:

H2S removal and VOC removal processes and vessels shall be designed so that activated carbon or other adsorption media can be replaced at a frequency of not less than 6 months.  Pressure Swing Adsorption

Exhibit – Design Criteria
Turnkey Purchase DB:A                          6 of 7

Project Name:  Shreveport Biomethane Facility                    Project No.  PH7006

process and vessels shall be designed so that carbon molecular sieve is completely regenerated at each cycle and requires limited periodic media replacement pursuant to the Technical Description Exhibit.

### Security:

1.  Facilities shall have a perimeter security fence and gate(s) a minimum of 8 feet in total height and designed to resist intrusion.

2. Facility shall have closed circuit surveillance system capable of automatically detecting motion and recording with a sufficient number of fixed high-definition cameras with daytime and low light capability to cover all areas of facility, and digital recording device for recording of each channel and remote backup for long-term storage of video.  Recorded video and live video will be remotely accessible via a web interface.

### Operator's Facilities:

Facility will have sufficient interior floor and wall space for use by 2 operators including space for the monitoring and control station for the process control station and the security monitoring equipment as well as Operation & Maintenance Manuals and copies of the as-built record documents.

Facility shall also have sufficient interior floor space for desk and chairs as well as a minimum of 10 SF of counter space.

Facility shall also have access to sufficient sanitary facilities for an 8-hour shift at the GPP including a microwave, refrigerator, sink and toilet.  Sanitary facilities shall be available nearby to satisfy code requirements.

Facility shall also have desktop computer for internet access in addition to computer system for monitoring and control and computer system for surveillance system.

**Project Name: Shreveport Biomethane Facility**     **Project No.: PH7006**

## LIST OF DRAWINGS

1. Cover Sheet
2. Sheet Index
3. Project Site Plan
4. Gas Treatment Plant Site Plan
5. Gas Compression Site Plan (1 of 2)
6. Gas Compression Site Plan (2 of 2)
7. Process Diagram

DocuSign Envelope ID: EE3D18E0-3B43-472F-B433-2726754F0C1A

# THE UNIVERSITY OF CALIFORNIA
# WOOLWORTH ROAD LANDFILL
# BIOMETHANE PROGRAM
# SHREVEPORT, LOUISIANA



**CONTACT LIST**

OWNER
UNIVERSITY OF CALIFORNIA
OFFICE OF PRESIDENT
1111 BROADWAY, SUITE 1450
OAKLAND, CA 94607
CONTACT: NICK BALISTRERI
PH: (510) 987-0951

DESIGN ENGINEER
STEARNS, CONRAD AND SCHMIDT
CONSULTING ENGINEERS, INC.
DBA SCS ENERGY
3900 KILROY AIRPORT WAY, SUITE 100
LONG BEACH, CA 90806
CONTACT: TED WHEELER, P.E.
PH: (562) 426-9544

SCS ENERGY

| CLIENT | SHEET TITLE | NO. | REVISION | DATE | PROJECT DATE: 01-29-16 |
| UNIVERSITY OF CALIFORNIA OFFICE OF PRESIDENT 1111 FRANKLIN ST., SIXTH FLOOR OAKLAND, CA 94607 | COVER SHEET | | CONTRACT DOCUMENTS | 01-29-16 | SCALE: AS SHOWN |
| | PROJECT TITLE WOOLWORTH ROAD LANDFILL UC BIOMETHANE PROGRAM | | | | DRAWING NO. of |

DocuSign Envelope ID: EE3D18E0-3B43-472F-B433-272G7B4F0C1A



# THE UNIVERSITY OF CALIFORNIA
# WOOLWORTH ROAD LANDFILL
# BIOMETHANE PROGRAM
# SHREVEPORT, LOUISIANA

| CONTRACT DOCUMENTS | | REV. # | DATE |
|---|---|---|---|
| | COVER SHEET | A | 01-29-16 |
| | SHEET INDEX | B | 02-16-16 |
| G-100 | PROJECT SITE PLAN | A | 01-29-16 |
| G-110 | GAS PROCESSING PLANT GENERAL ARRANGEMENT PLAN | B | 02-16-16 |
| G-120 | GAS COMPRESSION PLANT SITE PLAN 1 OF 2 | A | 01-29-16 |
| G-121 | GAS COMPRESSION PLANT SITE PLAN 2 OF 2 | A | 01-29-16 |
| | PROCESS DIAGRAM EXHIBIT | | |

**SCS ENERGY**

| CLIENT | SHEET TITLE | | NO. | REVISION | DATE | PROJECT DATE |
|---|---|---|---|---|---|---|
| UNIVERSITY OF CALIFORNIA OFFICE OF PRESIDENT 1111 FRANKLIN ST., SIXTH FLOOR OAKLAND, CA 94607 | SHEET INDEX | | A | CONTRACT DOCUMENTS | 01-29-16 | 01-29-16 |
| | | | A | CONTRACT DOCUMENTS | 02-16-16 | SCALE AS SHOWN |
| | PROJECT TITLE | | | | | DRAWING NO |
| | WOOLWORTH ROAD LANDFILL UC BIOMETHANE PROGRAM | | | | | o1 |





LEASING AREA COORDINATES

| POINT NUMBER | NORTHING | EASTING |
|---|---|---|
| 1 | 614857.2632 | 1559843.0865 |
| 2 | 614857.8937 | 1559862.3500 |
| 3 | 614798.4488 | 1559895.5627 |
| 4 | 614781.5602 | 1560440.5970 |
| 5 | 614754.7409 | 1560439.4937 |
| 6 | 614745.1345 | 1560358.4355 |
| 7 | 614753.1134 | 1560003.0563 |
| 8 | 614748.4361 | 1559995.2224 |
| 9 | 614750.7814 | 1559849.2189 |
| 10 | 614765.5931 | 1559839.4076 |

ITEM# EXISTING EQUIPMENT

| | |
|---|---|
| 1 | INLET SUMP (#2') |
| 3 | FLARE SKID (EXISTING) |
| 9 | BUILDING (EXISTING– REMOVE) |

LEGEND

———————— LEASE BOUNDARY

– – – – – – – EXISTING CONCRETE

NOTES:

1.  LEASING AREA 26968 SQ FT OR 0.619 ACRES

2.  NORTHING AND EASTING COORDINATES BASED ON NAD27

3.  ALL EXISTING FOUNDATIONS OR STRUCTURES WHICH INTERFERE WITH CONSTRUCTION OF THE NEW FACILITY WILL BE REMOVED BY DESIGN/BUILDER

4.  EQUIPMENT AND ARRANGEMENT SHOWN IS PRELIMINARY AND NOT A DEFINITION OR LIMITATION OF PROJECT SCOPE OF SUPPLY.

PRELIMINARY NOT FOR CONSTRUCTION

EXHIBIT-SITE PLAN
GAS PROCESSING PLANT

SCS ENERGY

CLIENT
UNIVERSITY OF CALIFORNIA
OFFICE OF PRESIDENT
1111 FRANKLIN ST., SIXTH FLOOR
OAKLAND, CA 94607

SHEET TITLE
GAS PROCESSING PLANT
SITE PLAN

PROJECT TITLE
WOOLWORTH ROAD LANDFILL
UC BIOMETHANE PROGRAM

SCALE: AS SHOWN

DRAWING NO.
G-110

DocuSign Envelope ID: EE3D18E0-3843-472F-B433-272675AF0C1A







**PROCESS DIAGRAM**
**EXHIBIT**

Project Name: Shreveport Biomethane Facility                                    Project No.: PH7006

## FIELD ORDER

University of California Facility: _____

FIELD ORDER NO. _____

Project Name: _____

Project Number: _____     Contract Date: _____

To Design Builder: _____

Address: _____

_____

DESCRIPTION OF CHANGE:

Estimated Adjustment                              Estimated Adjustment
of Contract Sum: _____            of Contract Time: _____

_____
Name of University's Representative
(typed or printed)

By: _____
            (Signature)

_____
            (Title)

Date: _____

_____

**Exhibit – Field Order**
**Turnkey Purchase DB:A**                          **2 of 2**

Project Name: Shreveport Biomethane Facility                                    Project No.: PH7006


University's Designated Administrator                    Design Builder's Name
(typed or printed)                                       (typed or printed)


_____                                  _____
(Signature)                                              (Signature)


_____                                  _____
(Title)                                                  (Title)

Date: _____                                    Date: _____

Note:   If the Work described above constitutes a change, this Field Order will be superseded by a Change
        Order that will include the scope of the change in the Work and any actual adjustments of the
        Contract Sum and the Contract Time.

**Exhibit – Field Order**
**Turnkey Purchase DB:A**                    **2 of 2**

DocuSign Envelope ID: EE3D1BF0-3B43-4725-B423-2726754F0C1A

Project Name:  Shreveport Biomethane Facility                    Project No.  PH7006

## EXHIBIT

## FINAL PAYMENT RELEASE OF LIEN

**KNOW ALL MEN BY THESE PRESENTS, THAT**

**WHEREAS**, (1)_____ ("Contractor"), having its principal offices at (2)_____, and The Regents of the University of California (referenced herein as "Owner") have heretofore entered into a certain contract or agreement (the "Contract") dated (3)_____ relating to the furnishing of materials, labor and/or equipment for construction or services of (4)_____ (description of the "Contract Work") in connection with the Project (as defined in the Contract) located at 5)_____.

**NOW, THEREFORE** upon actual receipt by Contractor of payment from Owner in the sum of (11)_____ dollars ($_____), which sum shall represent payment in full and final payment due to Contractor under and pursuant to the above-referenced Contract resulting in a total Contract price of (10)_____ Dollars ($_____), Contractor does hereby:

1. Certify to Owner that all persons, firms, associations, corporation, or other entities furnishing labor, materials, equipment, supplies or services to Contractor with respect to the Contract have been paid in full as of Release Date, including any and all applicable federal, state, and local sales, use, excise or similar taxes or import duties, licenses and royalties, and

2. Remise, release, waive, relinquish and forever quitclaim unto Owner, its direct and indirect subsidiaries and affiliates, including its limited liability companies and limited and general partners, and their respective successors and assigns, any and all manner of liens, claims or demands whatsoever which against Owner, Contractor ever had, now has, or which it or its successors or assigns hereafter can, shall or may have upon any portion of the lands of Owner or the buildings or improvements thereon, for labor, material, equipment or services furnished under the Contract, and

Exhibit – Final Payment Conditional Release of Lien
Turnkey Purchase DB:A                    1 of 4

Project Name: Shreveport Biomethane Facility        Project No. PH7006

     3. Not Used

     4. Agree to indemnify and hold harmless Owner, its direct and indirect subsidiaries and affiliates, including its limited liability companies and limited and general partners, and their respective successors and assigns, against all loss, cost, damage or expense (including but not limited to attorneys' fees) by reason of any and all manner of liens, claims or demands which anyone may have for labor performed, for material, equipment or services furnished under the Contract.

     **IN WITNESS WHEREOF**, Contractor has duly caused these presents to be signed and attested by its duly authorized owner, partner or officer (and, if a corporation, its corporate seal to be hereunto affixed) on the _____ day of _____, 20____ ("Release Date").

Project Name:  Shreveport Biomethane Facility                    Project No.  PH7006

**WITNESSES:**                              **CONTRACTOR**


_____  ___  _____                    _____  _____  ___


Print Name:_____  _____  _              Print Name:_____  _____

                                          Title:_____  _____


_____  ___  _____


Print Name:_____  _____  ____


        **THUS, DONE AND SUBSCRIBED** before me, Notary, as of the date set forth above.



_____  _____  _____

Notary Public in and for


My Commission expires_____  _____  .



NOTARY PUBLIC SEAL



Exhibit – Final Payment Conditional Release of Lien
Turnkey Purchase DB:A                    3 of 4

Project Name:  Shreveport Biomethane Facility                    Project No.  PH7006

**NOTE:  THIS DOCUMENT MUST BE SIGNED BY AN AUTHORIZED OFFICER OF THE CONTRACTOR AND THE SIGNATURE MUST BE WITNESSED AND NOTARIZED.**

Project Name: Shreveport Biomethane Facility                     Project No.: PH7006

## Exhibit

## Letter of Design Review

{Date}


{Design Builder Name}
{Design Builder Address}


The University of California has completed its design review of
{phase or portion of phase as listed in the Preliminary Schedule Exhibit} phase
for the {Project Name} Project. Since the review is now complete, you should
proceed with your selection of Subcontractors for this scope, if you have not
already done so.

Per the General Conditions, you must provide the University's Representative
with an updated "Expanded List of Subcontractors" within thirty calendar days
from the date of this letter. Failure to identify Subcontractors will represent a
commitment to perform the applicable work with your own forces.

Should you have any questions related to this letter, please direct them to the
University's Representative, {Name}.

Sincerely,



{University Contract Administrator}

Exhibit – Letter of Design Review
Turnkey Purchase DB:A                     1 of 1

Project Name: Shreveport Biomethane Project                                                                    Project No.: PH7006

## EXPANDED LIST OF SUBCONTRACTORS
*(to be submitted as soon as each subcontractor is selected – see General Conditions)*

Provide in the spaces below:
(a)  Phase of work, (as defined in exhibits),
(b)  The portion of the work which will be done by each subcontractor, the Design Builder shall list only one subcontractor for each such portion,
(c)  The name of each subcontractor who will perform work or labor or render service to the Design Builder in or about the construction of the work or improvement, or a subcontractor licensed by the state of California who, under subcontract to the Design Builder, specifically fabricates and installs a portion of the work or improvement according to detailed drawings contained in the plans and specifications, in an amount in excess of 1/2 of 1 percent of the Design Builder's total bid,
(d)  Type of license,
(e)  Verified license number,
(f)  Location of the place of business (full street address, city, state and zip code).

| Phase (a) | Portion of the Work Activity (b) | Subcontractor Information | | | | |
|---|---|---|---|---|---|---|
| | | Full Name (c) | Type of License (d) | Verified License No. (e) | Street Address (f) | City, State, Zip Code (f) |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

(Note:  Add additional pages if required.)

Exhibit – List of Subcontractors
Turnkey Purchase DB:A                                                  1 of 1

Project Name: Shreveport Biomethane Facility                          Project No: PH7006

WHEN RECORDED, MAIL TO:

_____ ____ ____ _____

_____ ____ ____ _____

_____ ____ ____ _____

Exhibit

## NOTICE {OF COMPLETION}

NOTICE IS HEREBY GIVEN that on the _____ day of _____, 20__, the Work on the {Insert Project Name} Project was completed. The name of the owner is THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, hereinafter referred to as "The Regents." The address of The Regents is University of California, Office of the President, 1111 Franklin St. 6th Floor, Oakland, California, 94607-5200. The Regents is the owner in fee simple of the real property commonly known as: {Building name, if any}, {Building number i.e. CAAN}, {Names of streets abutting project, if any, and street address, if any}, {Facility name e.g. campus, laboratory, etc.}, {City in which project is located}, {County in which project is located} and of all improvements and buildings thereon including the above-named Project. The name of the original Contractor is: {Insert name of original Contractor}.

THE REGENTS OF THE UNIVERSITY OF CALIFORNIA:

By: _____

I, _____, say that I am the _____ of the {Facility} of the University of California, and as such, make this verification on behalf of The Regents, a corporation; and that I have read the above Notice of Completion and know the contents thereof and that the facts

Exhibit – Notice of Completion
Turnkey Purchase DB:A                          1 of 7

Project Name: Shreveport Biomethane Facility                                    Project No: PH7006

stated therein are true. I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____, 20 , at _____.

_____

(Signature)

*(Note: See attached optional Notary Acknowledgment)*

Exhibit – Notice of Completion
Turnkey Purchase DB:A                          2 of 7

Project Name: Shreveport Biomethane Facility                    Project No: PH7006

*Note: California Civil Code section 9208 provides that a Notice of Completion in the form required by Civil Code secs. 8100-8118, 8182 "shall be accepted by the recorder for recording and is deemed duly recorded without acknowledgment." Nevertheless, clerks in the county recorder's office may be unused to accepting any document without an acknowledgment, so it may be easier to have the document acknowledged, even though unnecessary.*

STATE OF CALIFORNIA   )

COUNTY OF _____ )

On _____, before me, _____, Notary Public, personally appeared _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity on behalf of the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

IN WITNESS WHEREOF, my hand and official seal.

_____

Signature

My Commission expires: _____

Exhibit – Notice of Completion
Turnkey Purchase DB:A                    3 of 7

DocuSign Envelope ID: EE3B18E0-3B43-472F-B433-3726754E0C1A

Project Name: Shreveport Biomethane Facility                    Project No: PH7006

## NOTICE OF COMPLETION, UNIVERSITY IS LESSEE

WHEN RECORDED, MAIL TO:

_____

_____

_____

## NOTICE OF COMPLETION

NOTICE IS HEREBY GIVEN that on the _____ day of _____, 20\_\_, the Work on the {Insert Project Name} Project was completed. The name of the lessee is THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, hereinafter referred to as "The Regents." The address of The Regents is University of California, Office of the President, 1111 Franklin St. 6th Floor, Oakland, California, 94607-5200. The Regents has the following interest in the real property upon which the above-named Work of improvement has been constructed:  {e.g pursuant to a lease with e.g. State of California}.  The location of the work of improvement is commonly known as: {Building name, if any}, {Building number i.e. CAAN}, {Names of streets abutting project, if any, and street address, if any}, {Facility name e.g. campus, laboratory, etc.}, {City in which project is

Project Name: Shreveport Biomethane Facility                              Project No: PH7006

located}, {County in which project is located}. The name of the original Contractor is: {Insert name of original Contractor}.

The name and address of all other persons and entities who hold an ownership interest in the real property are: {Insert name(s) and address(es) e.g., State of California}.

THE REGENTS OF THE UNIVERSITY OF CALIFORNIA:

By: _____

I, _____, say that I am the _____ of the University of California {insert Facility} for the leased space at {insert address of the leased space} and as such, make this verification on behalf of The Regents, a corporation; and that I have read the above Notice of Completion and know the contents thereof and that the facts stated therein are true. I declare under penalty of perjury that the foregoing is true and correct. Executed on _____, 20 , at _____.

_____

(Signature)

*(Note: See attached optional Notary Acknowledgment)*

Project Name: Shreveport Biomethane Facility                    Project No: PH7006

*Note: California Civil Code section 9208 provides that a Notice of Completion in the form required by Civil Code secs. 8100-8118, 8182 "shall be accepted by the recorder for recording and is deemed duly recorded without acknowledgment." Nevertheless, clerks in the county recorder's office may be unused to accepting any document without an acknowledgment, so it may be easier to have the document acknowledged, even though unnecessary.*

STATE OF CALIFORNIA   )

COUNTY OF _____ )

On _____, before me, _____, Notary Public, personally appeared _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity on behalf of the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

IN WITNESS WHEREOF, my hand and official seal.

_____

Signature

My Commission expires: _____

Project Name: Shreveport Biomethane Facility                    Project No: PH7006

## NOTICE OF COMPLETION, UNIVERSITY OWNS LAND BUT NOT IMPROVEMENTS

(Note:  This situation is rare.  Consult the Office of General Counsel for guidance.)

Exhibit – Notice of Completion
Turnkey Purchase DB:A                    7 of 7

**EXHIBIT**

**NOTICE OF CONTRACT**

**(La. R.S. 9:4801, *et seq.*)**

STATE OF LOUISIANA

PARISH OF CADDO

This Notice of Contract is signed and filed under the provisions of Louisiana Revised Statute 9:4801, *et seq.*

1.      The parties to the contract are:

|  |  |
|---|---|
| Owner: | The Regents of the University of California |

| | |
|---|---|
| Contractor: | Stearns, Conrad, and Schmidt Consulting Engineers, Inc. |

2.      The legal descriptions of the immovable property upon which the work is to be performed and the name of the project are:

**Name of Property A**:

[Site of Gas Processing Plant]

**Legal Description A**:

[Insert Legal Description of Gas Processing Plant]

**Name of Property B**:

[Site of Gas Compression Plant]

DocuSign Envelope ID: EE3D18E0-3B43-472F-B433-2726754F0C1A

Project Name:  Shreveport Biomethane Facility                    Project No:  PH7006

Legal Description B:

[Insert Legal Description of Gas Compression Plant and Right-of-Way]

Name of Property C:

[New Section of UC Pipeline]

Legal Description C:

[Insert Legal Description of UC Pipeline Right-of-way]

3.      The price of the work is:

[Total cost here]

4.      The payment of the price is to be made:

[In what increments]

5.      The work to be done, in general terms, is:

Construct a _____ facility including _____

Dated _____, 20__, at _____, Louisiana.

Exhibit – Notice of Contract
Turnkey Purchase DB:A                    2 of 4

DocuSign Envelope ID: EE3D18E0-3B43-472F-B433-2726754F0C1A

Project Name:  Shreveport Biomethane Facility                Project No:  PH7006

WITNESSES:                                    OWNER:

                                              The Regents of the University of
                                              California

_____              **By:**_____

_____              Its:  _____

┌─────────────────────────────────────────────┐
│ A notary public or other officer completing this │
│ certificate verifies only the identity of the individual │
│ who signed the document to which this certificate │
│ is attached, and not the truthfulness, accuracy, or │
│ validity of that document. │
└─────────────────────────────────────────────┘

STATE OF CALIFORNIA
COUNTY OF  _____

Subscribed  and  sworn  to  (or  affirmed)  before  me  on  this  _____  day  of
_____,  20__,  by  _____  _____
_____, proved to me on the basis of
satisfactory evidence to be the person who appeared before me.

_____
NOTARY PUBLIC in and for
_____ County, State of California

WITNESSES:                                    CONTRACTOR:

                                              Stearns,   Conrad,   and   Schmidt
                                              Consulting Engineers, Inc.

_____              By:_____

_____              Its: _____

Exhibit – Notice of Contract
Turnkey Purchase DB:A                    3of 4

DocuSign Envelope ID: EE3D18E0-3B43-472F-B433-2726754F0C1A

STATE OF LOUISIANA

PARISH OF _____

On  this  _____day  of  _____,  20__,  before  me  appeared,
_____, to me personally known, who, being by
me duly sworn did say that it is the _____ of
Stearns, Conrad, and Schmidt Consulting Engineers, Inc.  and that the instrument
was signed and sealed in behalf of the corporation by authority of its directors and
it has acknowledged the instrument to be the free act and deed of the corporation.


_____

NOTARY PUBLIC in and for

_____Parish, State of Louisiana


EXHIBIT A

LEGAL DESCRIPTION


# [ATTACH BONDS]

**Project Name:  Shreveport Biomethane Facility**                    **Project No.:  PH7006**

EXHIBIT

**{IF APPLICABLE, INSERT "LIMITED"} NOTICE TO PROCEED – PHASE {PHASE NUMBER}**

University of California

Facility: _____

Office: _____

Address: _____

_____          _____
(Design Builder's Name)                                    (Date)

_____
(Address)

_____          _____          _____
(City)                                    (State)          (Zip)

Project Number:_____

Project Name: _____

Office: _____

This letter will serve as your notice to proceed for Phase {PHASE NUMBER OR THE DESCRIBED PORTION THEREOF}.

Work on this Phase shall commence on _____, 20_____, and be fully completed within the Contract Time

of _____ days thereafter.

**{INSERT THE FOLLOWING FOR PHASE 1 ONLY:}**

We look forward to working with you and feel certain that this will be a successful Project.

**{{IF UNIVERSITY EXERCISES ITS OPTION(S), INSERT THE FOLLOWING FOR PHASES 2 AND 3:}**

We look forward to working with you on this Phase of the Project.

Very truly yours,

_____
(University's Representative)

Exhibit – Notice to Proceed
Turnkey Purchase DB:A                    1 of 1

## EXHIBIT

### PAYMENT AFTER ACCEPTANCE TESTING LIEN RELEASE

### KNOW ALL MEN BY THESE PRESENTS, THAT

**WHEREAS**, (1)_____ ("Contractor"), having its principal offices at (2)_____, and [**INSERT PROPER LEGAL NAME FOR UNIVERISTY OF CA CONTRACTING ENTITY**]_____ ( referred to as "Owner"), entered into that certain contract or agreement (the "Contract") dated (3)_____ relating to the furnishing of materials, labor and/or equipment for construction or services of (4)_____(description of the "Contract Work") in connection with the Project (as defined in the Contract) located at (5)_____.

**NOW, THEREFORE** upon actual receipt by Contractor of payment from Owner in the sum of **(6)**_____

_____ dollars ($_____ ),

which sum represents the full amount of **(7)**_____. dollars ($_____ ) due Contractor as of (8)_____ , 20___, ("Release Date") less and except retention in the amount of **(9)**_____ dollars ($_____)

(if applicable) still being withheld by Owner all under and pursuant to the Contract, this document shall become effective to release *pro tanto* any mechanic's lien, stop notice or bond right that Contractor has on the Project as of the Release Date.  Contractor does hereby and thereby:

1. Certify to Owner that all persons, firms, associations, corporation, or other entities furnishing labor, materials, equipment, supplies or services to Contractor with respect to the Contract have been paid in full as of Release Date, including any and all applicable federal, state, and local sales, use, excise or similar taxes or import duties, licenses and royalties, or will be paid within the prompt payment laws after receipt of the Owner's payment, except the following (**none, unless noted**):

(attach additional page, if necessary, and so note)

and

2.   Certify to Owner that all persons, firms, associations, corporations, or other entities furnishing financing to or on behalf of Contractor with respect to the Contract, which burdens in whole or in part Owner's interest in the Contract, any portion of the lands of Owner or the buildings, equipment, fixtures, or improvements thereon, or any personal or intangible property of Owner, whether as a purchase money security interest, secured indebtedness, mortgage, or otherwise, have been paid as of Release Date in accordance with any financing and security agreements, or will be paid promptly, fully, and in accordance with any financing and security agreements after receipt of the Owner's payment; and

3.   Release and waive any and all manner of liens, whatsoever which Contractor, its successors or assigns may have upon any portion of the lands of Owner or the buildings, equipment, fixtures, or improvements thereon, or any personal or intangible property of Owner, for labor, material, equipment or services furnished under the Contract, as of Release Date, and

4.   Further remise, release and forever discharge Owner, its direct and indirect subsidiaries and affiliates, including its limited liability companies, and their respective successors and assigns, of and from any and all manner of claims, demands, and causes of action whatsoever against Owner which Contractor, its successors or assigns may have for, upon or by reason of any matter, cause or thing whatsoever arising under or out of the Contract, as of Release Date, except the following **(none, unless noted)**:

(attach additional page, if necessary, and so note)

and

5.   Agree to indemnify, defend, and hold harmless Owner, its direct and indirect subsidiaries and affiliates, including its limited liability companies, and their respective successors and assigns, against all loss, cost, damage or expense accrued as of Release Date (including, without limitation, any attorneys' fees), **except as specifically noted below** by reason of a) any and all manner of liens, claims or demands which anyone may have for labor performed, or for materials, equipment or services furnished under the Contract; or b) any and all manner of security interests, encumbrances, or mortgages burdening the lands, buildings, equipment, fixtures, or improvements thereon, or any personal or intangible property of Owner for financing provided to or on behalf of Contractor for the Project, including without limitation, any security interests under the Uniform Commercial Code ("UCC") adopted by Louisiana or Louisiana Civil Code Articles 3278 *et seq.* or other applicable state's commercial code or laws; and

6.  Agree to provide to Owner within 15 days of the Release Date in a form satisfactory to Owner, proof of the *pro tanto* or total (as the case may be) cancellation, termination and release of security interests, encumbrances, mortgages, or other secured interests burdening the lands, buildings, equipment, fixtures, or improvements thereon, or any personal or intangible property of Owner for financing provided to or on behalf of Contractor for the Project, including, without limitation, evidence of a termination of any fixture, equipment, or other security interests filed under the UCC, the Louisiana Civil Code Articles 3278 *et seq.,* or other applicable state's commercial laws.

**IN WITNESS WHEREOF**, Contractor has duly caused these presents to be signed and attested by its duly authorized owner, partner or officer (and, if a corporation, its corporate seal to be hereunto affixed) on the ____ day of _____, 20___.

**WITNESSES:**                              **CONTRACTOR**

_____                    _____

Print Name:_____                 Print Name:_____

                                           Title:_____

_____

Print Name:_____

**THUS, DONE AND SUBSCRIBED** before me, Notary, as of the date set forth above.

Notary Public in and for

My Commission expires_____.

NOTARY PUBLIC SEAL

**NOTE:  THIS DOCUMENT MUST BE SIGNED BY AN AUTHORIZED OFFICER OF THE CONTRACTOR AND THE SIGNATURE MUST BE WITNESSED AND NOTARIZED.**

Project Name:  Shreveport Biomethane Facility                    Project No.:  PH7006

## EXHIBIT

### PAYMENT BOND

CONTRACTOR:                              SURETY:
*(Name, legal status and address)*        *(Name, legal status and address)*

_____                  _____

_____                  _____


OWNER:
*(Name, legal status and address)*

_____

_____


CONSTRUCTION CONTRACT
Date: _____
Amount: $_____
Description:
*(name and location)*

_____

_____


BOND
Date: _____  *(Not earlier than the Construction Contract Date)*
Amount: $_____


§1       The Contractor and Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner to pay for labor, materials and equipment furnished for use in the performance of the Construction Contract, which is incorporated herein by reference, subject to the following terms.

§2       If the Contractor promptly makes payment of all sums due to Claimants, and defends , indemnifies and holds harmless the Owner for claims, demands, liens or suits by an person or entity seeking payment for labor, materials or equipment furnished for use in the performance  of the Construction Contract, then the Surety and the Contractor shall have no obligation under this Bond.

§3       If there is no Owner Default under the Construction Contract, the Surety's obligation to the Owner under this Bond shall arise after the Owner has promptly notified the Contractor and the Surety (at the address described in Section 13) of claims, demands, liens or suits against the Owner or the Owner's property by any person or entity seeking payment for labor, materials or equipment furnished for use in the performance of the Construction Contract and tendered defense of such claims, demands, liens or suits to the Contractor and the Surety.

§4       When the Owner has satisfied the conditions in Section 3, the Surety shall promptly and at the Surety's expense defend, indemnify and hold harmless the Owner against a duly tendered claim, demand, lien or suit.

Exhibit – Payment Bond (AIA-A312)
Turnkey Purchase DB:A                          1 of 4

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

§5      The Surety's obligations to a Claimant under this Bond shall arise after the following:

§5.1 Claimants, who do not have a direct contract with the Contactor,

        .1 have furnished a written notice of non-payment to the Contractor and Owner, stating with
substantial accuracy the amount claimed and the name of the party to whom the materials were, or
equipment was, furnished or supplied or for whom the labor was done or performed, within ninety (90)
days after having last performed labor or last furnished materials or equipment included in the Claim; and

        .2 have sent a Claim to the Surety (at the address described in Section 13) and a copy thereof to
the Owner.

§5.2 Claimants, who are employed or have a direct contract with the Contractor, have sent a Claim to the
Surety (at the address described in Section 13) and a copy thereof to the Owner."

§6      If a notice of non-payment required by Section 5.1.1 is given by the Owner to the  Contractor,
that is sufficient to satisfy a Claimant's obligation to furnish a written notice of non-payment under
Section 5.1.1.

§7      When a Claimant has satisfied the conditions of Sections 5.1 and 5.2, whichever is applicable, the
Surety shall promptly and at the Surety's expense take the following actions:

§7.1    Send an answer to the Claimant, with a copy to the Owner, within sixty (60) days after receipt of
the Claim, stating the amounts that are undisputed and the basis for challenging any amounts that are
disputed; and

§7.2    Pay or arrange for payment of any undisputed amounts.

§7.3    The Surety's failure to discharge its obligations under Section 7.1 or Section 7.2 shall not be
deemed to constitute a waiver of defenses the Surety or Contractor may have or acquire as to a Claim,
except as to undisputed amounts for which the Surety and Claimant have reached agreement. If,
however, the Surety fails to discharge its obligations under Section 7.1 or Section 7.2, the Surety shall
indemnify the Claimant for the reasonable attorney's fees the Claimant incurs thereafter to recover any
sums found to be due and owing to the Claimant.

§8      The Surety's total obligation shall not exceed the amount of this Bond, plus the amount of the
reasonable attorney's fees provided under Section 7.3, and the amount of this Bond shall be credited for
any payments made in good faith by the Surety.

§9      Amounts owed by the Owner to the Contractor under the Construction Contract shall be used for
the performance of the Construction Contract and to satisfy claims, if any, under any construction
performance bond. By the Contractor furnishing and the Owner accepting this Bond, they agree that all
funds earned by the Contractor in the performance for the Construction Contract are dedicated to satisfy
the obligations of the Contractor and  Surety under this Bond, subject to the Owner's priority to use the
funds for the completion of the work.

Exhibit – Payment Bond (AIA-A312)
Turnkey Purchase DB:A                        2 of 4

Project Name: Shreveport Biomethane Facility                                            Project No.: PH7006

§10     The Owner shall not be liable for the payment of any costs or expenses of any Claimant under this Bond, and shall have under this Bond no obligation to make payments to, or give notice on behalf of, Claimants or otherwise have any obligations to Claimants under this Bond.

§11     The Surety hereby waives notice of any change, including changes in time, to the Construction Contract or to related subcontracts, purchase orders and other obligations.

§12     The choice of law, venue and jurisdiction provisions of the Construction Contract are incorporated herein by reference.

§13     Notice and Claims to Surety, the Owner or the Contractor shall be mailed or delivered to the address shown on the page on which their signature appears. Actual receipt of notice of Claims, however accomplished, shall be sufficient compliance as of the date received.

§14     When this Bond has been furnished to comply with statutory or other legal requirement in the location where construction was to be performed, any provision in this Bond conflicting with said statutory or legal requirement shall be deemed deleted herefrom and provisions conforming to such statutory and other legal requirement shall be deemed incorporated herein. When so finished, the intent is that this Bond shall be construed as a statutory bond and not as a common law bond.

§15     Upon request by any person or entity appearing to be potential beneficiary of this Bond, the Contractor and Owner shall promptly furnish a copy of this Bond or shall permit a copy to be made.

§16     Definitions

§16.1   Claim. A written statement by the Claimant including at a minimum:

        .1      the name of the Claimant;

        .2      the name of the person for whom the labor done, or materials or equipment furnished;

        .3      a copy of the agreement or purchase order pursuant to which labor, material, or equipment was furnished for use in the performance of the Construction Contract;

        .4      a brief description of the labor, materials, or equipment furnished;

        .5      the date on which the Claimant last performed labor or last furnished materials or equipment for use in the performance of the Construction Contract;

        .6      the total amount of the previous payments received by the Claimant; and

        .7      the total amount due and unpaid to the Claimant for labor, materials or equipment furnished as of the date of the Claim.

 §16.2  Claimant. An individual or entity having a direct contract with the Contractor or with a subcontractor of the Contractor to furnish labor, materials or equipment for use in the performance of the Construction Contract. The term Claimant also includes any individual or entity that has rightfully asserted a claim under an applicable mechanic's lien or similar statute again the real property upon which the Project is located. The intent of this Bond shall be to include without limitation in the terms "labor,

Exhibit – Payment Bond (AIA-A312)
Turnkey Purchase DB:A                        3 of 4

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

materials or equipment" that part of water, gas, power, light, heat, oil, gasoline, telephone service or
rental equipment used in the Construction Contract, architectural and engineering services required for the
performance of the work of the Contractor and the Contractor's subcontractors, and all other items for
which a mechanic's lien may be asserted in the jurisdiction where the labor, materials or equipment were
furnished.

§16.3    Construction Contract. The agreement between the Owner and the Contractor identified on the
cover page, including all Contract Documents and changes made to the agreement and the Contract
Documents.

§16.4    Owner Default. Owner's material breach of contract, which has not been remedied or waived,
including a material breach of the obligation to pay the Contractor as required under the Construction
Contract or other material breach of Contract.

§16.5    Contract Documents. All the documents that comprise the agreement between the Owner and
Contractor.

§17      If this Bond is issued for an agreement between the Contractor and subcontractor, the term
Contractor in this Bond shall be deemed to be Subcontractor and the term Owner shall be deemed to be
Contractor.

§18      Modifications to this bond are as follows:

§18.1    The term Contractor shall have the same meaning as Design Builder and the term Owner shall
have the same meaning as University.

**CONTRACTOR AS PRINCIPAL**                    **SURETY**
Company:              *(Corporate Seal)*        Company:              *(Corporate Seal)*

Signature: _____             Signature: _____
Name & Title: _____             Name & Title: _____
Address: _____             Address: _____
_____             _____

Project Name:  Shreveport Biomethane Facility                    Project No.: PH7006

## EXHIBIT

## PERFORMANCE BOND

CONTRACTOR:                                SURETY:
*(Name, legal status and address)*         *(Name, legal status and address)*

_____                  _____
_____                  _____

OWNER:
*(Name, legal status and address)*

_____
_____

CONSTRUCTION CONTRACT
Date: _____
Amount: $_____
Description:
*(name and location)*

_____
_____

BOND
Date: _____  *(Not earlier than the Construction Contract Date)*
Amount: $_____

§1      The Contractor and Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner for the performance of the Construction Contract, which is incorporated herein by reference.

§2      If the Contractor performs the Construction Contract, the Surety and the Contractor shall have no obligation under this Bond.

§3      If there is no  Owner Default under the Construction Contract, the Surety's obligation under this Bond shall arise after:

§3.1      The Owner has issued a formal notice to the Contractor in accordance with the notice provisions of the Construction Contract of Owner's intent to invoke its Contractor-default termination rights under the applicable provisions of the Construction Contract and has simultaneously notified the Surety by telephone (if Surety has provided a telephone number on page 1), or via overnight commercial carrier to the address set forth for Surety on page 1, of Owner's intent and provided a copy of such written notification to Surety.

§3.2 The Owner has provided Contractor with the required notice under the Construction Contract of its intent to invoke its Contractor-default termination rights under the applicable provisions of the Construction Contract, and the opportunity to cure period set forth in the Construction Contract, if any,

has expired without Contractor having cured the basis of the notice of intent to terminate the Construction Contract, in whole or in part due to the Contractor default.; and

§3.3 The Owner has agreed to pay the Balance of the Contract Price in accordance with the terms of the Construction Contract to the Surety or to a contractor selected to perform the Construction Contract.

§4     Failure on the part of the Owner to comply with the notice requirement in Section 3.1 shall not constitute a failure to comply with a condition precedent to the Surety's obligations, or release the Surety from its obligations, except to the extent the Surety demonstrates actual prejudice.

§5     When the Owner has satisfied the conditions in Section 3, the Surety shall promptly and at the Surety's expense take one of the following actions:

§5.1   Arrange for the Contractor, with the consent of the Owner, to perform and complete the Construction Contract;

§5.2   Undertake to perform and complete the Construction Contract itself, through its agents or independent contractors;

§5.3   Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract, arrange for a contact to be prepared for execution by the Owner and a contractor selected with the Owner's concurrence, to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Construction Contract, any pay to the Owner the amount of damages as described in Section 7 in excess of the Balance of the Contract Price incurred by the Owner as a result of the Contractor Default; or

§5.4   Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances:

     .1     After investigation, determine the amount for which it may be liable to the Owner and, as soon as practicable after the amount is determined, make payment to the Owner; or

     .2     Deny liability in whole or in part and notify the Owner, citing the reasons for denial.

§6     If the Surety does not proceed as provided in Section 5 with reasonable promptness, the Surety shall be deemed to be in default on this Bond seven days after receipt of an additional written notice from the Owner to the Surety demanding that the Surety perform its obligations under this Bond, and the Owner shall be entitled to enforce any remedy available to Owner.  If the Surety proceeds as provided in Section 5.4, and the Owner refuses the payment or the Surety has denied liability, in whole or in part, without further notice the Owner shall be entitled to enforce any remedy available to the Owner.

§7     If the Surety elects to act under Section 5.1, 5.2 or 5.3, then the responsibilities of the Surety to the Owner shall not be greater than those of the Contractor under the Construction Contract, and the responsibilities of the Owner to the Surety shall not be greater than those of the Owner under the Construction Contract.  Subject to the commitment by the Owner to pay the Balance of the Contract Price, the Surety is obligated, without duplication, for:

Exhibit – Performance Bond (AIA-A312)
Turnkey Purchase DB:A                       2 of 4

Project Name:  Shreveport Biomethane Facility                          Project No.:  PH7006

§7.1    The responsibilities of the Contractor for correction of defective work and completion of the Construction Contract;

§7.2    Additional legal, design professional and delay costs resulting from the Contractor's Default, and resulting from the actions or failure to act of the Surety under Section 5; and

§7.3    Liquidated Damages, or if no liquidated damages are specified in the Construction Contract, actual damages caused by delayed performance or non-performance of the Contractor.

§8      If the Surety elects to act under Section 5.1, 5.3 or 5.4, the Surety's liability is limited to the amount of this Bond.

§9      No right of action shall accrue under this Bond to any person or entity other than the Owner or its heirs, executors, administrators, successors and assigns.

§10     The Surety shall not be liable to the Owner or others for obligations of the Contractor that are unrelated to the Construction Contract, and the Balance of the Contract Price shall not be reduced or set off on account of any such unrelated obligations.

§11     The choice of law, venue and jurisdiction provisions of the Construction Contract are incorporated herein by reference.

§12     Notice to the Surety, the Owner or the Contractor shall be mailed or delivered to the address shown on the page on which their signature appears.

§13     When this Bond has been furnished to comply with statutory or other legal requirement in the location where construction was to be performed, any provision in this Bond conflicting with said statutory or legal requirement shall be deemed deleted herefrom and provisions conforming to such statutory and other legal requirement shall be deemed incorporated herein.  When so finished, the intent is that this Bond shall be construed as a statutory bond and not as a common law bond.

§14     Definitions

§14.1   Balance of the Contract Price.  The total amount payable by the Owner to the Contractor under the Construction Contract after all proper adjustments have been made, including allowance to the Contractor of any amounts received or to be received by the Owner in settlement of insurance or other claims for damages to which the Contractor is entitled, reduced by all valid and proper payments made to or on behalf of the Contractor under the Construction Contract.   Notwithstanding the provisions of Section 9 or of this Section 14.1, in addition to amounts previously paid to Contractor or to others for Contractor's benefit, Owner shall be entitled to withhold from the Balance of the Contract Price any and all such other amounts for which Contractor is liable or responsible for to Owner under the Construction Contract.

§14.2   Construction Contract.  The agreement between the Owner and the Contractor identified on the cover page, including all Contract Documents and changes made to the agreement and the Contract Documents.

Exhibit -- Performance Bond (AIA-A312)
Turnkey Purchase DB:A                        3 of 4

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

§14.3   Contractor Default. Failure of the Contractor, which has not been remedied or waived, to perform or otherwise to comply with a term of the Construction Contract.

§14.4   Owner Default.  Owner's material breach of contract, which has not been remedied or waived, including a material breach of the obligation to pay the Contractor as required under the Construction Contract or other material breach of Contract.

§14.4   Contract Documents. All the documents that comprise the agreement between the Owner and Contractor.

§15     If this Bond is issued for an agreement between the Contractor and subcontractor, the term Contractor in this Bond shall be deemed to be Subcontractor and the term Owner shall be deemed to be Contractor.

§16     Modifications to this bond are as follows:

§16.1   The term Contractor shall have the same meaning as Design Builder and the term Owner shall have the same meaning as University.

**CONTRACTOR AS PRINCIPAL**                    **SURETY**
Company:              *(Corporate Seal)*        Company:              *(Corporate Seal)*

Signature: _____            Signature: _____
Name & Title: _____            Name & Title: _____
Address: _____            Address: _____
_____               _____

Project Name:  Shreveport Biomethane Facility                          Project No.:  PH7006

Exhibit

## PERFORMANCE CERTIFICATE


Design Builder hereby represents that the Construction Work is physically complete in accordance with the Contract Documents as evidenced by the issuance of a Certificate of Substantial Completion and Design Builder further represents that the Construction Work meets the Performance Specifications as set forth in the Performance Specifications Exhibit as evidenced by the successful completion of the Acceptance Testing, including any re-testing, in accordance with the requirements as set forth in Acceptance Test Procedures Exhibit which was conducted by Design Builder on the following dates and times:        _____  _____

Design Builder represents that it agrees that the Work shall not be considered complete and the performance of Design Builder's obligations set forth in the Contract Documents shall be not be considered complete until the Work has been  completed in accordance with the Contract Documents.


. . . . . . . . . . . . . . . . . . . . . . . . .          . . . . . . . . . . . . . . . . . . . . . . . .          . . . . . . . . . . . .
*Signature:*                                              *Name:*                                      *Date:*

**Design Builder**




It is hereby certified that Design Builder is considered to have completed all obligations under Article 9.9 "Acceptance Testing" of the General Conditions.

Certified by:


. . . . . . . . . . . . . . . . . . . . . . . . .          . . . . . . . . . . . . . . . . . . . . . . . .          . . . . . . . . . . . .
*Signature:*                                              *Name:*                                      *Date:*
**Master Engineer**

Issued by:


. . . . . . . . . . . . . . . . . . . . . . . . .          . . . . . . . . . . . . . . . . . . . . . . . .          . . . . . . . . . . . .
*Signature:*                                              *Name:*                                      *Date:*
**University's Representative**

Exhibit - Performance Certificate
Turnkey Purchase DB:A                          1 of 1

**Project Name:  Shreveport Biomethane Facility**                    **Project No.:  PH7006**

EXHIBIT

PERFORMANCE SPECIFICATIONS

<u>**Index of Performance Specifications**</u>

1.  Abbreviations used in this exhibit

2.  Gas Processing Plant (GPP) Design Capacity

3.  Waste Gas Combustion

4.  Gas Processing Plant, Conforming Gas Composition at LFG Inlet

5.  Product Gas Specifications at Outlet of Gas Processing Plant (GPP)

6.  UC Pipeline Specification for new 0.3 Mile Section

7.  Product Gas Specifications at Outlet of Gas Compression Plant (GCP)

8.  General System Specifications

**Project Name: Shreveport Biomethane Facility**          **Project No.: PH7006**

| | |
|---|---|
| BTU | British thermal unit |
| CFC | Chlorinated Fluorocarbon |
| deg. F | degrees Fahrenheit |
| gr/100scf | grains per one hundred standard cubic feet |
| inches w.c. | inches water column |
| lb/mmscf | pounds per million standard cubic feet |
| m3 | cubic meter |
| mg | milligram |
| ppmv | parts per million by volume |
| psia | pounds per square inch, absolute |
| psig | pounds per square inch, gauge |
| scf | standard cubic feet |
| scfm | standard cubic feet per minute |
| scf/year | Standard cubic feet per year |
| VOC | volatile organic compounds |
| VOSiC | volatile organic silicon compounds |

**Project Name:  Shreveport Biomethane Facility**                                      **Project No.:  PH7006**

## 2.   Gas Processing Plant (GPP) Capacity

| (from Landfill Gas Collection and Control System) | | | |
|---|---|---|---|
| Parameter | Condition | Limit | Units |
| Maximum Flow from LF, dry | equal to | 2,646 | scfm, dry |
| Maximum Flow from LF, wet | equal to | 2,874 | scfm, wet |
| Minimum Flow from LF, dry | equal to | 900 | scfm, dry |
| Static Pressure Provided | Minimum | -60.9 | inches, w.c. |
| Turndown of Static Pressure Provided | Greater than or equal to | 0 | Inches., w.c. |
| Pressure Control tolerance | Maximum | +/-2.8 | inches, w.c. |
| LFG Inlet Temperature | Design | 80 to 110 | degrees, F |
| Stated flow above is for Conforming LFG at the inlet to the GPP from the Landfill.  LFG for Thermal Oxidizer fuel is not processed by the GPP. | | | |
| (at inlet to methane recovery section of the GPP-- Location A in Process Diagram) | | | |
| Maximum Flow to GPP, dry | equal to | 2,434 | scfm, dry |
| Maximum Flow to GPP, wet | equal to | 2,644 | scfm, wet |
| Minimum Flow to GPP, dry | equal to | 828 | scfm, dry |
| LFG Inlet to GPP is saturated at 100 deg. F at Normal Composition (below). | | | |
| Reference standard conditions are 14.73 psia and 60 degrees F throughout this document. | | | |

## 3.   Waste Gas Combustion (TOX)

| (at inlet of TOX - Location B in Process Diagram) | | | | | |
|---|---|---|---|---|---|
| Parameter | Condition | | Limit | Units | |
| Waste Gas Maximum Flow, wet | equal to | | 1,166 | scfm, wet | |
| Waste Gas Minimum Flow, wet | equal to | | 233 | scfm, wet | |
| LFG Supplementary Fuel at maximum Waste Gas Flowrate | equal to | | 212 | scfm, wet | |
| Static Pressure Provided at TOX inlet | greater than or equal to | | 20 | inches w.c. | |
| Waste Gas Composition, Design | CH4, % | CO2, % | O2, % | N2, % | H2O, % |
| | 5.97 | 92.7 | 0.16 | 0.34 | 0.8225 |

**Project Name:  Shreveport Biomethane Facility**                    **Project No.:  PH7006**

#### 4.  Gas Processing Plant, Conforming Gas Composition at LFG Inlet

| (at inlet to the GPP– Location A in Process Diagram) | | | | |
|---|---|---|---|---|
| | CH$_4$, % | CO$_2$, % | O$_2$, % | N$_2$, % |
| Normal | 55 | 43.5 | 0.1 | 1.4 |
| Max | 59 | 48.5 | 0.2 | 1.6 |
| Min | 50 | 39.5 | 0 | 0 |
| Max. / Min. concentrations for each component are stated as simultaneous only in the "Normal" case.  GPP shall be **designed to process any possible** combination within the **ranges provided.** | | | | |
| Trace Constituents | VOC (ppm) | Sulfur as H2S, gr/100scf (ppm) | VOSC (as Silicon), mg Si/m3 | CFC, ppm |
| Normal | 820 | 3.3  (50) | 50 | 70 |
| Max | 1000 | 6.6  (100) | 100 | 100 |
| LFG Inlet Temperature | | greater than or equal | 80 | degrees, F |
| LFG Inlet Temperature | | less than or equal | 110 | degrees, F |

#### 5.  Product Gas Specifications at Outlet of Gas Processing Plant (GPP)

| (at inlet to Product Gas Pipeline – Location D in Process Diagram) | | | |
|---|---|---|---|
| Parameter | Condition | Limit | Units |
| Pressure | greater than | 95 | psig |
| Pressure | less than | 99.9 | psig |
| Temperature | greater than | 40 | F |
| Temperature | less than | 120 | F |
| Higher Heating Value | greater than | 975 | BTU/scf |
| Higher Heating Value | less than | 1100 | BTU/scf |
| Hydrocarbon Dew Point | less than | 20 | F |
| Methane | greater than | 96.5 | percent |
| Carbon Dioxide | less than | 2 | percent |
| Nitrogen | less than | 3 | percent |
| Oxygen | less than | 0.2 | percent |
| Water Vapor | less than | 7 | lb/mmscf |
| Hydrogen Sulfide | less than | 0.25  (3.8) | grains/100scf (ppm) |
| Total Sulfur | less than | 5 | grains/100scf |
| Total VOSiC | less than | 0.4 | mg Si/m$^3$ |

Product Gas shall be commercially free of objectionable odors, dust, impurities or other solid, gaseous or liquid matter.

Product Gas shall not contain any toxic, hazardous or deleterious materials or substances, or any materials potentially harmful to persons or the environment, other than those stated above.

**Project Name: Shreveport Biomethane Facility**                **Project No.: PH7006**

Notwithstanding the limits listed above, Product Gas shall meet the gas quality requirements (except pressure) detailed in Enable Gas Transmission LLC, FERC Gas tariff, Ninth Revised Volume No. 1, effective August 16, 2013 ( " EGT GAS Quality Requirements") . Design Builder is not responsible for changes in EGT Gas Quality Requirements

### 6.  UC Pipeline Performance Specification (new section of 10" dia HDPE pipeline)

| Parameter | Condition | Limit | Units |
|---|---|---|---|
| Maximum Flow | equal to | 1,320 | scfm, dry |
| Maximum allowable operating pressure | equal to | 99 | psig |
| Gas composition in the UC Pipeline will match the Product Gas specification below. | | | |

### 7.  Product Gas Specification at Outlet of Gas Compression Plant (GCP)

| (at inlet to Enable Metering Station -- Location E in Process Diagram) | | | |
|---|---|---|---|
| All specifications for quality, composition and temperature are the same as for the outlet of the Gas Processing Plant with the following exceptions and added requirements: | | | |
| Parameter | Condition | Limit | Units |
| Maximum Pressure | less than or equal to | 350 | psig |
| Minimum Pressure | greater than | existing pressure in the EMP line or as required by EMP at the interconnect | psig |
| Pressure Turndown | Greater than or equal | 200 | psig |
| Product Gas Flow specified here in is based on at LFG inlet methane concentration of 55% CH4 and 95% Methane Recovery. | | | |
| Product Gas Flow at LFG inlet flow of 2434 scfm into the GPP | greater than or equal | 1,320 | scfm, dry |
| Product Gas Flow at Minimum LFG inlet flow of 828 scfm into the GPP | greater than or equal | 440 | scfm, dry |

**Project Name:  Shreveport Biomethane Facility**                    **Project No.: PH7006**

### 8.   General System Specifications

| Applicable to entire system including Gas Processing Plant and Gas Compression Plant. | | | |
|---|---|---|---|
| In addition to the above quality, composition and process specifications the provided system shall be designed to meet the following requirements. | | | |
| Parameter | Condition | Value | Units |
| Methane Recovery | greater than or equal to | 93 | percent |
| Turndown based on inlet LFG Flow | greater than or equal to | 3:01 | ratio |
| Air Emissions | less than or equal to | applicable air permit levels | N/A |
| Power Consumption, GPP at full design gas flow conditions | Average less than or equal to | 2010 | KW |
| Power Consumption, GCP at full design gas flow conditions | Average less than or equal to | 290 | KW |

The Gas Processing Plant (GPP) methane recovery rate will be determined by recording of methane concentrations in three gas streams.  The methane recovery is calculated on the basis of a methane mass balance according to the following equation:

$$R = \frac{(c_{RG} - c_{TG}) \times c_{PG}}{(c_{PG} - c_{TG}) \times c_{RG}}$$

Where:

        R     = GPP methane recovery

        $c_{RG}$ = methane concentration, raw gas (Conforming Landfill gas)

        $c_{TG}$ = methane concentration, tailgas (Waste gas to combustion)

        $c_{PG}$ = methane concentration, Product gas

Methane recovered in the Product Gas will be measured at the outlet of the Gas Processing Plant.  Methane in the Conforming Landfill Gas will be measured at the inlet to the Gas Processing Plant.  Methane in the waste gas (tail gas) will be measured at the outlet of the CO2 removal system, prior to the Waste Gas Combustion.

Design Builder is not responsible for changes in applicable air permit levels.

DocuSign Envelope ID: EE3D18E0-3B43-472F-B433-2726754F0C1A



| Preliminary Schedule Exhibit | | Project: UCOP - Biomethane Program - Landfill Sources - Woolworth Road | Project No.: PH7006 |
|---|---|---|---|

| Name | Duration |
|---|---|
| Woolworth Road High BTU Project | 24.59 mons |
| Contract Development | 1.36 mons |
| Phase 1 - Design Development | 2.5 mons |
| Phase 2 - Construction Documents | 11.05 mons |
| Phase 3 Limited - Major Equipment Procurement | 14.77 mons |
| Phase 3 - Construction | 8.64 mons |
| Substantial Completion | 1.18 mons |
| Acceptance Test | 2.77 mons |
| Final Completion | 3.77 mons |
| Gas Transmission (EMP) Work | 7.82 mons |
| Gas Owner (Renovar) Work | 3.95 mons |
| Land Owner Work | 0.68 mons |

Filename: Exhibit-Preliminary Schedule 03 03 2016

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

## EXHIBIT

## SUBCONTRACTOR CLAIM CERTIFICATION

Pursuant to Article 4.3.3 of the General Conditions, I certify as follows:

1.  The portion of the Claim made on behalf of the Subcontractor to which this certification is attached is made in good faith.

2.  Amounts claimed for costs, expenses and damages incurred by the Subcontractor are accurate and complete.  Supporting data for amounts incurred by the Subcontractor is accurate and complete.  Any such supporting data, including any such new amounts, submitted to Design Builder after the execution of this certification, will be accurate and complete.

3.  To the best of my knowledge and belief, amounts claimed, and supporting data submitted to Design Builder by the Subcontractor on behalf of any and all subcontractors or suppliers to Subcontractor, of all tiers, or any person or entity under Subcontractor, are accurate and complete.  Subcontractor will not submit, after the date of execution of this certification, any such supporting data, including any such new amounts that, to the best of my knowledge and belief, is not accurate and complete.

4.  The amount requested accurately reflects the amount for which the Subcontractor believes the University is liable to Design Builder.

5.  I am duly authorized to certify the Claim on behalf of the Subcontractor.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed at:

_____(Name of City if within a City, otherwise Name of County), in the
State of _____, on _____.
        (State)          (Date)


_____
       (Signature)


_____
       (Print Name)


_____
    (Name of Subcontractor)

Project Name:  Shreveport Biomethane Facility                                    Project No:  PH7006

# EXHIBIT

## FINAL UNCONDITIONAL PAYMENT RELEASE OF LIENS/SECURITY INTERESTS

### KNOW ALL MEN BY THESE PRESENTS, THAT

WHEREAS, (1)_____ ("Contractor"), having its principal offices at (2)_____, and _____ ( "Owner") have heretofore entered into a certain contract or agreement (the "Contract") dated (3)_____ relating to the furnishing of materials, labor and/or equipment for construction or services of (4)_____ (description of the "Contract Work") in connection with the Project (as defined in the Contract) located at 5)_____.

NOW, THEREFORE Contractor acknowledges the receipt and sufficiency of  payment from Owner in the sum of  (11)_____ _____ dollars  ($_____ ),  which sum constitutes payment in full and final payment due to Contractor under and pursuant to the above-referenced Contract resulting in a total Contract price of (10)_____ Dollars ($_____), and, accordingly, Contractor does hereby:

1. Certify to Owner that all persons, firms, associations, corporation, or other entities furnishing labor, materials, equipment, supplies or services to Contractor with respect to the Contract have been paid in full as of Release Date, including any and all applicable federal, state, and local sales, use, excise or similar taxes or import duties, licenses and royalties, and

2.   Certify to Owner that as of the Release Date, all persons, firms, associations, corporations, or other entities furnishing financing to or on behalf of Contractor with respect to the Contract, which burdens in whole or in part Owner's interest in the Contract, any portion of the lands of Owner or the buildings, equipment, fixtures, or improvements thereon, or any personal or intangible property of Owner, whether as a purchase money security interest, secured indebtedness, mortgage, or otherwise, have been paid in full  and in accordance with any financing and security agreements; and

3. Remise, release, waive, relinquish and forever quitclaim unto Owner, its direct and indirect subsidiaries and affiliates, including its limited liability companies and limited and general partners, and their respective successors and assigns, any and all manner of liens, privileges, including without limitation mechanics liens addressed in Louisiana Revised Statutes 9:4801 *et seq*. and Louisiana Civil Code articles 2772 *et seq*., claims or demands whatsoever which against Owner, Contractor ever had, now has, or which it or its successors or assigns hereafter can, shall or may have upon any portion of the lands of Owner or the buildings or improvements thereon, for labor, material, equipment or services furnished under the Contract, and

Project Name:  Shreveport Biomethane Facility                    Project No:  PH7006

4. Further remise, release and forever discharge Owner, its direct and indirect subsidiaries and affiliates, including its limited liability companies and limited and general partners, and their respective successors and assigns, of and from any and all manner of liens, privileges, including without limitation mechanic's liens address in Louisiana Revised Statutes 9:4801 *et seq*. and Louisiana Civil Code articles 2772 *et seq*., and of and from claims related to non-payment for labor performed, for material, equipment or services furnished,   which Contractor ever had, now has, or which it or its successors or assigns hereafter can, shall or may have for, upon or by reason of any matter, cause or thing whatsoever arising under or out of the Contract, and

5.  Agree to indemnify, defend, and hold harmless Owner, its officers, directors, employees, agents, representatives, direct and indirect subsidiaries and affiliates, including its limited liability companies and limited and general partners, and their respective successors and assigns, against all loss, cost, damage or expense (including but not limited to attorneys' fees) arising out of or occurring in connection with a) any and all manner of liens, privileges, including without limitation mechanics liens addressed in Louisiana Revised Statutes 9:4801 *et seq*. and Louisiana Civil Code articles 2772 *et seq*., claims or demands which anyone may have or assert for labor performed, for material, equipment or services furnished, ; or b) any and all manner of security interests, encumbrances, or mortgages burdening the lands, buildings, equipment, fixtures, or improvements thereon, or any personal or intangible property of Owner for financing provided to or on behalf of Contractor for the Project, including without limitation, any security interests under the Uniform Commercial Code ("UCC") adopted by Louisiana or Louisiana Civil Code Articles 3278 *et seq*. or other applicable state's commercial code or laws

6.  Agree to provide to Owner within 15 days of the Release Date in a form satisfactory to Owner, proof of the total cancellation, termination and release of any and all security interests, encumbrances, mortgages, or other secured interests burdening the lands, buildings, equipment, fixtures, or improvements thereon, or any personal or intangible property of Owner for financing provided to or on behalf of Contractor for the Project, including, without limitation, evidence of a termination of any fixture, equipment, or other security interests filed under the UCC, the Louisiana Civil Code Articles 3278 *et seq.,* or other applicable state's commercial laws.

**IN WITNESS WHEREOF**, Contractor has duly caused these presents to be signed and attested by its duly authorized owner, partner or officer on the _____ day of _____, 20____ ("Release Date").

**WITNESSES:**                              **CONTRACTOR**

_____              _____

Print Name:_____              Print Name:_____

                                           Title:_____

_____

Print Name:_____

Exhibit – Unconditional Final Payment Release of Lien
Turnkey Purchase DB:A                       2 of 3

Project Name:  Shreveport Biomethane Facility                    Project No:  PH7006

**THUS, DONE AND SUBSCRIBED** before me, Notary, as of the date set forth above.

_____

Notary Public in and for

My Commission expires_____.

NOTARY PUBLIC SEAL

**NOTE:  THIS DOCUMENT MUST BE SIGNED BY AN AUTHORIZED OFFICER OF THE CONTRACTOR AND THE SIGNATURE MUST BE WITNESSED AND NOTARIZED.**

**Project Name: Shreveport Biomethane Facility**　　　　　　　　　　**Project No.: PH7006**

## EXHIBIT
### UNVERSITY FURNISHED INFORMATION

The following information is made available for the convenience of Design Builder and is not a part of the Contract. The information is provided subject to the provisions of Article 3 of the General Conditions.

1. Geotechnical Report for site of Gas Processing Plant prepared by Ardaman & Associates Inc. dated May 20, 2015.
2. Environmental Site Assessment Phase 1 report for site of Gas Processing Plant prepared by Sphere3 Environmental dated May 27, 2015
3. Environmental Site Assessment Phase 1 report for site of Gas Compression Plant prepared by Sphere3 Environmental dated May 27, 2015
4. Ecological Assessment for the Woolworth Road Landfill Biomethane Project, prepared by Sphere3 Environmental dated May 28, 2015.
5. Pipeline Right of Way Grant Filed Copy prepared by Amwar Consulting Group dated November 15 and 20, 2015
6. Surface Site and Access Road Servitude Grant Filed Copy prepared by Amwar Consulting Group dated November 15 and 20, 2015.
7. Project Site Description prepared by NTB Associates and accompanying metes and bounds legal description dated December 23, 2014.
8. Grant of pipeline easement from Baker Forest LP dated June 28, 2002.
9. Grant of pipeline easement from Joseph Blake and Vetta Blake dated July 10, 2002.
10. Grant of pipeline easement from Martin Timber Company dated August 20, 2002.
11. As built Pipeline alignment drawing of pipeline easement prepared by Renovar Shreveport LLC, dated July 21, 2005.

**Exhibit**

**Compressor Manufacturer's Warranty**

**(Section 24, below)**

### GENERAL PROVISIONS OF PURCHASE ORDER

**1. ACCEPTANCE** – This "Purchase Order" represents the entire contract between "Seller" and SCS Engineers, hereinafter referred to as "Buyer", notwithstanding any failure to sign and return the acknowledgement copy of this Purchase Order or Seller's use of any other acknowledgement form not signed by Buyer. It is expressly understood and agreed that Seller, by commencing work hereunder, accepts this Purchase Order as a binding contract and agrees to all of the terms and conditions hereof. No change, modification, revision, or addition to this Purchase Order shall be valid and binding on either party hereto unless in writing and signed by an authorized representative of the other party.

**2. ASSIGNMENT** – This Purchase Order shall not be assignable by either party hereto, voluntary or involuntarily, nor shall Seller subcontract or otherwise delegate its duties to any other party for the furnishing of any of the completed or substantially completed Equipment or work covered by this Purchase Order, without Buyer's prior written consent, which shall not be unreasonably withheld.  Any such attempted assignment or delegation shall be void and ineffective.

**3. BUYER'S PROPERTY** – All property used by Seller but owned, furnished, or charged to or paid for by Buyer, including, but not limited to, materials, tools, dies, jigs, patterns, fixtures, equipment, and any replacement thereof, shall be the property of Buyer, subject to removal and inspection by Buyer at any time, at the cost or expense of Buyer.  Buyer shall identify and mark as its property any such property and shall maintain adequate insurance for its own protection.  While such property is in Seller's possession and control, Seller shall assume all liability for and maintain such property, and remove or return the same to Buyer in the same state of repair as when delivered to Seller, reasonable wear and tear excepted; provided, however, that Seller shall not be responsible for and assumes no risk in the event of loss or damage to such property by fire, water, burglary, theft, civil disorder or any accident beyond the reasonable control of Seller.

**4. CHANGES** – Buyer shall have the right at any time to make changes in the drawings, designs, specifications, quantities, delivery schedules, methods of shipment or packaging, and place of inspection, and point of delivery of any Equipment or work covered by this Purchase Order, provided

however, such changes must be agreed to by Supplier, provided that such agreement shall not be unreasonably withheld.  No change shall be effective unless authorized in writing by Buyer.  If such changes result in a

delay or an increase or decrease in expense to Seller, Seller shall notify Buyer promptly and an equitable adjustment shall be promptly negotiated; Seller shall proceed diligently to perform the work or supply the Equipment contracted for under this Purchase Order, as so changed, immediately following agreement by the parties regarding such equitable adjustment. In addition, Seller may at any time, with approval of Buyer, make such changes in design and construction of Equipment as Seller deems appropriate, and Seller may furnish substitutes for materials that are either not obtainable because of priorities or regulations established by a governmental authority or not available.

**5. COMPLIANCE WITH LAWS** – Seller shall comply with all federal, state, and local laws, executive orders, and regulations in place at the time of order shipment applicable to Seller with respect to the manufacture and delivery of the Equipment the subject of this Purchase Order or start-up services related to such Equipment for which liability may accrue to Buyer for violation thereof.   Subject to Section 19 herein,  Seller hereby agrees to defend, indemnify and hold Buyer harmless from any and all  costs, damages penalties, and fines, and expenses  including reasonable attorneys' fees (if Seller fails to provide a defense) suffered or occasioned by Buyer through any failure of Seller to comply with any such law, regulations, or order.

**6. EQUAL EMPLOYMENT OPPORTUNITY** – Seller hereby agrees to comply with the provisions set forth in Paragraphs (1) through (7) of Section 202 of Executive Order 11246, as amended, and the same shall be deemed incorporated herein by reference.   Seller further agrees that it will not discriminate on the basis of race, creed, color, age, sex, or national origin.

**7. HEALTH AND SAFETY** – Notwithstanding anything in this Purchase Order to the contrary, Seller warrants that the Equipment  and  services contracted for under this Purchase Order meet the applicable requirements of the Occupational Health and Safety Act, but Seller does not warrant that any such Equipment meet any state or local equivalent thereof. The Equipment described herein is provided only with the safety devices and features shown in the applicable specifications. Should Buyer

2

require any additional devices or features, they should be specifically identified, and Seller will amend this quotation accordingly.

**8. DELIVERY** – Time shall be considered of the essence in the performance of this Purchase Order by Seller and Seller shall comply with agreed delivery dates set forth in Exhibit B, provided that Buyer issues a purchase order by the date set out in Exhibit B.  For each day of delay in meeting the delivery dates set out in Exhibit B, Seller shall pay to Buyer liquidated damages in the amount shown on Exhibit B per day, up to the maximum amount shown on Exhibit B, the parties having negotiated and agreed that this amount is a reasonable estimate of the damage suffered by Buyer as a result of Seller's delay in delivery of the Equipment.

**9. DRAWINGS, SPECIFICATIONS, AND TECHNICAL INFORMATION** – Any information that Seller may disclose to Buyer with respect to the design, manufacture, sale or use of the of the Equipment covered by this Purchase Order shall be deemed to have been disclosed as part of the consideration for this Purchase Order, and may be freely provided to the Owner and other project parties for use on this project, but shall otherwise be held in confidence and not shared or disclosed to any other party.

**10. INSPECTION AND ACCEPTANCE** – , Within fifteen (15) days after delivery to the site, all Equipment will be subject to  preliminary inspection for obvious defects, notwithstanding any prior payment or inspection prior to shipment.  Final acceptance of the Equipment will occur on the date that the Equipment has passed all acceptance tests or two hundred forty (240) days after shipment by Seller from its facility or Seller arranged storage, whichever is later, unless delay in passing acceptance testing is due to causes for which Seller is responsible in which case, the period during which the Equipment may be rejected shall be extended on a day for day basis, whichever occurs first. Equipment may be rejected up to Final Acceptance. .

**11.  LEGAL CONSTRUCTION** – This Purchase Order shall be construed under and shall be subject to the laws of the State in which the project is located..

**12. LIENS** – All Equipment shall be delivered hereunder, and all property to be returned to Buyer shall be kept, at all times, free and clear of any and all liens and encumbrances whatsoever, provided full

3

payment has been received by Seller from Buyer for Equipment covered by this Purchase Order.

**13. PACKING, SHIPPING, AND INSURANCE** – No charges will be allowed by Buyer for boxing or wrapping other than those specified in this Purchase Order. Seller shall pack or otherwise prepare all Equipment for shipment to meet carrier's requirements and Seller shall use commercially reasonable efforts to safeguard the Equipment against damage from weather and transportation. Risk of loss shall transfer to Buyer as provided in Section 22 herein. Seller will prepay for freight and insurance and bill Buyer for the cost thereof. Seller shall not ship Equipment prior to the agreed upon delivery date without prior written approval of Buyer. Buyer shall not be responsible for handling or storage costs of Equipment prior to the shipment date specified in this purchase order. If the shipment of the Equipment covered by this Purchase Order is delayed by Buyer for any reason, Seller reserves the right to ship the Equipment to a storage facility in Seller's sole discretion and Buyer agrees to pay for any and all storage costs and other additional expenses resulting therefrom. Seller will contact Buyer, which will provide the necessary shipping information, including the third party to ship to for storage, if necessary. Interest may be charged at legal rates.

**14. PATENT PROTECTION** – Provided Buyer shall have made all payments then due hereunder and shall

have given Seller prompt notice in writing of any alleged infringement (including any processes and papers served upon Buyer), and subject to Section19, to the extent that the Equipment covered by this Purchase Order are manufactured pursuant to designs not originated by Buyer, Seller shall indemnify and hold Buyer, its representatives, and Owner harmless from and against any expense, claims, cost, loss, damage, or liability for infringement or alleged infringement of any valid United States patents, copyright or other intellectual property right with respect to such Equipment and their process of manufacture, and Seller hereby agrees at its own expense to defend any action in which such infringement is alleged with respect to the manufacture, sale or use of such Equipment delivered hereunder, provided Seller's indemnity as to use shall not apply to any infringement arising out of use, in combination with other equipment, where such infringement would not have occurred in the normal use for which the Equipment was designed. In the event such Equipment is held to infringe upon a U.S. patent, copyright or other intellectual property right in such suit, and the use of such Equipment is

4

enjoined, or in the case of a compromise or settlement by Seller, Seller shall have the right, at its option and expense, to procure for Buyer, its representatives and Owner the right to continue using such Equipment, or replace them with non-infringing equipment, or modify same to become non-infringing. Buyer agrees to indemnify and save Seller harmless from all expenses and damages resulting from any claim, suit or proceeding for alleged infringement of any patent or copyright based in whole or in part upon the manufacture, sale or use of any Equipment or any part thereof, in combination or assembly with machinery or apparatus not furnished under this agreement. Notwithstanding the foregoing, Seller shall not be responsible for any compromise or settlement made without its written consent which shall not be unreasonably withheld, or for infringement of any process patents within which the Equipment sold hereunder may be used.  In addition to the foregoing the liability of Seller for direct infringement, subject to Section 19, Seller shall be liable for the direct damages of Buyer, its representatives and Owner resulting from such infringement.   Seller's indemnity and defense obligations hereunder are contingent upon Buyer's prompt notification to Seller of any claims and Buyer's reasonable cooperation with Seller and permission for Seller to control the defense, settlement or compromise of any such allegation of infringement.  If the terms of a settlement or compromise would materially impact the Buyer or Owner, the terms of any settlement or compromise must be approved by Buyer and the approval shall not be unreasonably withheld.

**15. PAYMENT** – Invoices will be paid according to the following terms:
Invoices will be paid according to discount terms, or, if no discount is offered, within forty-five (45) days after receipt and acceptance of the items or completion and acceptance of the work.  Discount periods will be computed from either the date of delivery of the items ordered, plus three days' allowance for inspection, or the date of receipt of correct invoices prepared in accordance with the terms of Buyer's order, whichever date is later.

Payment Schedule – Engineered Equipment
    25% with placement of purchase order
    30% upon receipt of complete drawing submittal package
    30% upon receipt of major vendor equipment identified in proposal
    5% upon shipment or notification of readiness to ship
    10% upon successful passing acceptance testing or 240 days from shipment, as extended by

5

Section 10, whichever occurs first

Payment Schedule – Commissioning and Start-up Services

    100% net forty-five (45) days after completion and acceptance of the work

Payment Schedule – Spare Parts and Consumables

    100% net forty-five (45) days from receipt and acceptance of the items.

**16. TAXES** – Federal, state, and local taxes of any nature shall be paid by Buyer in addition to the prices quoted or invoiced. All such taxes shall be separately invoiced or separately identified on any invoice. In the event Seller is required to pay any such tax, fee or charge, Buyer shall reimburse Seller therefore; or in lieu of such payment, Buyer shall provide Seller at the time the Purchase Order is submitted with an exemption certificate or other document acceptable to the authority imposing the same. Should Seller, in its sole discretion, determine that the exemption document provided by Buyer does not clearly meet the requirements of the authority imposing a tax, Buyer hereby agrees to pay such tax in full.

**17. TERMINATION** –  (a) Buyer may terminate this Purchase Order for cause if Seller: (1) subject to Sections 8, 18 and 26, fails to deliver the Equipment by the agreed upon delivery date, (2) fails to observe or comply with any material terms or conditions in this Purchase Order, (3) becomes insolvent or any bankruptcy or insolvency proceedings are commenced by or against Seller, (4) has a receiver or trustee is appointed to Seller, or (5) makes an assignment for the benefit of creditors.  Notwithstanding the foregoing, Buyer shall provide written notice to Seller that Buyer plans to terminate this Purchase Order for any of the conditions in this Section 17(a) and Seller shall be given a thirty (30) day opportunity to cure such default prior to the effectiveness of any

termination. Seller may terminate this Purchase Order for cause if Buyer: (i) fails to make timely payment as set forth in Section 15, (ii) becomes insolvent or any bankruptcy or insolvency proceedings are commenced by or against Buyer, (iii) has a receiver or trustee is appointed to Buyer, (iv) makes an assignment for the benefit of creditors. Notwithstanding the foregoing, Seller shall provide written notice to Buyer that Seller plans to terminate

6

this Purchase Order for any of the conditions in this Section 17(a) and Buyer shall be given a ten (10) day opportunity to cure such default prior to the effectiveness of any termination in the event of (i), and thirty (30) day opportunity to cure such default prior to the effectiveness of any termination in the event of (ii)-(iv). If the order is terminated for breach pursuant to this section, Buyer will pay Seller for work completed up to the date of termination, including amounts to cover non-refundable component purchases made by Seller and a reasonable profit thereon, and Seller will deliver to Buyer all work completed and any non-refundable component purchases. If progress payments have been made, such payments will be reconciled with actual work completed and non-refundable component purchases. Seller will provide reasonable assistance to Buyer in disposing of work completed and non-refundable component parts.

**18. SUSPENSION OF WORK** – Buyer may order Seller in writing once prior to delivery of Equipment to suspend, delay, or interrupt all or any part of the work for a period not to exceed one hundred twenty (120) consecutive days. An adjustment shall be made for any increase in cost of Seller's performance of the Purchase Order (excluding profit) necessarily caused thereby. An adjustment shall also be made in the delivery or performance dates and any other contractual provisions affected thereby. However, no adjustment shall be made for any suspension, delay, or interruption to the extent that performance would have been so suspended, delayed, or interrupted pursuant to Section 26.

**19. LIMITATION OF LIABILITY** - Seller's liability with respect to breaches of warranty shall be handled as provided in Section 24 hereof. In the event Buyer properly rejects the Equipment and services hereunder and they are not repaired or replaced in accordance with Section 24 hereof, then Buyer may cover by purchasing replacement Equipment or services and charge Seller for the cost thereof.

With respect to all breaches of this Purchase Order or indemnification obligations hereunder, Seller's total liability shall in no event exceed the amount paid to Seller under this Agreement, the amount of insurance proceeds or ███████████████████████ whichever is greater.

7

**20.  INDEMNIFICATION** –  Unless otherwise excluded pursuant to Section 19, to the fullest extent permitted by law and subject to the limitations set forth in Section 19, Seller shall indemnify, defend and hold Buyer, its successor, officers, directors, assigns and the project owner harmless from and against any third party suits, liabilities, losses, damages, claims, causes of action, proceedings of any kind and expenses  including reasonable attorney's fees, if Seller fails to provide a defense, to the extent caused by any act or omission of Seller, its agents, employees or subcontractors with respect to any work performed, Equipment sold or services provided pursuant to this Purchase Order.  Seller's foregoing obligations shall be conditioned upon Buyer promptly notifying Seller of any claim or suit involving Buyer in which such claims are alleged, and that Buyer reasonably cooperates with Seller and permits Seller to control the defense, settlement or compromise of any such allegation.  If the terms of a settlement or compromise would materially impact the Seller or Owner, the terms of any settlement must be approved by Buyer and or its representatives or Owner, and such approval shall not be unreasonably withheld.  In consideration of the foregoing indemnification Buyer agrees to pay Seller One Hundred Dollars ($100) for all rights contained herein.

**21.  INSURANCE** - Seller shall maintain insurance coverage, limits and endorsements in accordance with Exhibit C hereof.

**22.  TITLE, RISK OF LOSS AND RETURNS -** The shipping terms for all Equipment sold hereunder are D.A.P project site, exclusive of carrier fees and insurance, which shall be prepaid and billed by Seller to Buyer at cost.  Legal title to the Goods shall continuously transfer from Seller to Buyer as fabrication occurs.  Risk of loss for damage and responsibility shall pass from Seller to Buyer upon unloading at the site.   Seller reserves the right to make delivery in installments, unless otherwise expressly stipulated herein; all such installments to be separately invoiced and paid for when due per invoice, without regard to subsequent deliveries and any deliveries not in dispute shall be paid for regardless of other controversies relating to other delivered or undelivered merchandise. Delay in delivery of any installment shall not relieve Buyer of its obligations to accept remaining deliveries. Method and route of shipment shall be at the discretion of Seller unless Buyer shall specify otherwise; any additional expense of the method or route of shipment specified by Buyer shall be borne entirely by Buyer.

Claims for shortages or other errors in delivery must be made in writing to Seller within fifteen (15) days

8

after receipt of shipment.

**23.  WAIVER OF TERMS AND CONDITIONS** – The failure of either party, in any one or more instances, to insist upon performance of any of the terms or conditions of this Purchase Order, or to exercise any right or privilege contained in this Purchase Order, or the waiver of any breach of the terms or conditions of this Purchase Order, shall not be construed as thereafter waiving any such terms, conditions, or privileges, and the same shall continue and remain in force and effect as if no waiver had occurred.

**24.  WARRANTIES** –  Subject to Section 19, Seller represents and warrants to Buyer and Owner that services shall be performed in a workman like manner and free of defects and Equipment provided by Seller shall meet the Performance Specifications set forth in Exhibit A and is free from defects in design, workmanship and materials, in accordance with applicable law and fit for the purpose intended, for a period of two years from the date of start up or thirty (30) months from the date of shipment, whichever occurs first.

If within such periods any such services and/ or Equipment fail to conform with the above representation and warranty, such services and/or Equipment shall be promptly repaired by Seller at the project site or replaced at Seller's option, subject to Buyer's reasonable consent Except for Seller's indemnification obligations under Section 20, such repair or replacement shall be Seller's sole obligation for breach of this representation and warranty and Buyer's exclusive remedy hereunder and shall be conditioned upon Buyer providing Seller written notice of any alleged defect within thirty (30) days after its discovery.

Goods or services repaired or replaced pursuant to this warranty shall be warranted for the unexpired portion of the applicable warranty, or one year, whichever is greater.  IF THE GOODS ARE FOR A GAS COMPRESSION APPLICATION, THIS WARRANTY DOES NOT APPLY IF THE GOODS ARE OPERATED IN CONJUNCTION WITH A GAS WITH AN $H_2S$ LEVEL CONSISTENTLY ABOVE  100 PPM, UNLESS SELLER HAS BEEN INFORMED OF THE POSSIBILITY OF OPERATING THE EQUIPMENT IN CONJUNCTION WITH GAS WITH AN H2S LEVELS ABOVE 100 PPM.

If Seller fails to respond to notice of a warranty defect within one (1) day and begin warranty repairs within five (5) days, reasonable expenses incurred by Buyer in repairing or replacing any defective

9

services and/or Equipment shall be reimbursed by Seller. This warranty is only applicable to Equipment properly maintained and used according to Seller's instructions. This warranty does not apply to ordinary wear and tear, or damage caused by misuse, overloading, neglect, improper operation, accident or alteration. To the extent that Buyer or its agents has supplied specifications, information, representation of operating conditions or other data to Seller in the selection or design of the Equipment and the preparation of Seller's quotation, and in the event that actual operating conditions or other conditions materially differ from those represented by Buyer, a reasonable adjustment will be made in the performance specifications, which are covered by this warranty and any warranties or other provisions contained herein which are affected by such conditions shall be adjusted accordingly. THE WARRANTY CONTAINED IN THIS SECTION 24 IS EXCLUSIVE AND IN LIEU OF ALL OTHER REPRESENTATIONS, AND WARRANTIES (EXCEPT OF TITLE), EXPRESS OR IMPLIED, AND SELLER EXPRESSLY DISCLAIMS AND EXCLUDES ANY IMPLIED WARRANTY OF MERCHANTABILITY. The warranties set out herein may be freely transferred by Buyer to the project Owner.

Seller agrees that the warranty shall be transferrable to Owner, and enforceable by Buyer and/or Owner.

**25. GOVERNMENT CONTRACT** – This Purchase Order shall be subject to any government clauses and provisions, agreed to by Buyer and which are set out in the prime contract between Buyer and the Project Owner, a copy of which is available to Seller.

**26. INDEPENDENT CONTRACTOR** – All work to be performed by Seller hereunder shall be performed as an independent contractor and not as an employee or agent of Buyer, and entirely at the risk of Seller.

**27. EVENTS BEYOND CONTROL OF PARTIES** – Neither party shall be liable to the other hereunder for any delay or failure of performance due to fire, earthquake, flood, explosion, accident, terrorism, dispute with or inability to secure workmen, lack of material, lack of facilities, act of God, voluntary or involuntary compliance with any valid or invalid law, order, regulation, request or recommendation of any governmental agency or authority, lack of transportation facilities, act of the other party or any

10

other cause beyond its control and without its fault or negligence, provided, however, that when Seller has reason to believe that its performance hereunder as scheduled will thereby be affected, written notice setting forth the cause thereof and the anticipated delay shall be given promptly to Buyer.

11

| Change Order Log |
|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA |

Project Name:  Shreveport Biomethane Facility

CO Log Date:  6/14/2017

Project No.  PH7006

Design Builder: Stearns, Conrad and Schmidt Consulting Engineers, Inc.

| Change Order Request | Change Order | Topic | CO Request Date | CO Date | Contract Amount Change | Contract Time Change, days | Task |
|---|---|---|---|---|---|---|---|
| 1 | 1 | Contract Language: Documents, Bonds | | 4/7/2016 | None | None | |
| 2 | 2 | Odorizer Deduct | 9/21/2016 | 12/6/2016 | ■ | None | 3 |
| 3 | 3 | Liquid Storage Addition | 10/6/2016 | 12/6/2016 | ■ | 7 | 3 |
| 4 | 4 | Phone Line Addition | 10/31/2016 | 12/6/2016 | ■ | None | 3 |
| 5 | denied | Paved Entry Addition | 11/7/2016 | na | ■ | 4 | not approved |
| 6 | 6 | Contract Language: Expenses, Process Description | 11/8/2016 | 12/6/2016 | None | None | 2 |
| 7 | 7 | Change TOX Performance | 1/30/2017 | 2/23/2017 | ■ | 15 | 2 |

Total Changes, Requested  ■  26

Total Changes, Approved  ■  22

# UNIVERSITY OF CALIFORNIA – DOCUMENT TRACKING SYSTEM
# OFFICE OF CHIEF OPERATING OFFICER
# ACTION TRANSMITTAL SLIP (ATS)

## DEPARTMENT INITIATED ACTION

**[√] FOR YOUR SIGNATURE**

**BACKGROUND AND CONSULTATION**  **DATE:**  **July 5, 2016**

Rachael Nava's signature is requested on the enclosed:

"Change Order No. 1 to Authorization for the Shreveport Biomethane Facility (Project No. PH7006)"

Phase 1 of the Project is nearly complete and SCS Energy will soon begin Phase 2.   This Change Order No. 1 was prepared by UCOP Energy & Sustainability to address certain necessary changes to the contract provisions as requested by the parties.

This is a <u>no-cost</u> change order.   No additional funding is required.

**COORDINATED WITH**          **COORDINATING DEPARTMENT ENDORSEMENT**

<u>Jerome Ripley</u>          Assistant Director, Contract Services,
                  UCSF FAS Financial Service Center

DRAFTED OR PREPARED BY:  <u>Kenyon Potter</u>          PHONE: <u>7-3865</u>

SUPERVISOR APPROVAL: <u>Nick Balistreri</u>          PHONE: <u>7-0951</u>

APPROVED BY AVP : <u>David Phillips</u>          DATE:    <u>7/5/2016</u>

Comments:

Project Name:  Shreveport Biomethane Facility                          Project No.:  PH7006

## CHANGE ORDER

University of California Facility:  University of California, Office of the President

CHANGE ORDER NO.:  ___1___                    Reference Field Order No.:      N/A

Project Name:  **Shreveport Biomethane Facility**

Project Number: __PH7006_____                    Contract Date: __April 7, 2016__

To Design Builder:  Stearns, Conrad and Schmidt Consulting Engineers, Inc. dba SCS Energy

Address:  3900 Kilroy Airport Way, Suite 100, Long Beach, California, 90806

DESCRIPTION OF CHANGE:

Article 3, "Contract Documents" of the Authorization is revised as follows:
1. In the first paragraph, the term "Contract Documents" is revised to replace the words "…Drawings, Drawings…" with "…Drawings, Specifications,…".

2. The final paragraph is revised by adding the Exhibit "Affidavit of No Work" to the list of exhibits that are made a part of the Contract.

Article 4, "Contract Sum", of the Authorization is revised as follows:
In the second paragraph, the existing amount "$161,000.00" is replaced with revised amount "$173,000.00".

Article 11.3.2 of the General Conditions, is revised to read:  "The Payment Bond and Performance Bond shall each be in the amount of the Guaranteed Maximum Price."

All other provisions of the Contract remain unchanged.

**Adjustment of Contract Sum and GMAX**:        **Adjustment of Contract Time**:
No change in Contract Sum or GMAX.              No change in the Contract Time.

Design Builder waives any claim for further adjustments of the Contract Sum and the Contract Time related to the above described change in the Work.

**Recommended**:                              **Accepted**:

UNIVERSITY OF CALIFORNIA                      SCS ENERGY

By: _____*Mck Balistreri*_____                By: _____*Steven Hamilton*_____
   (Signature of University's Representative)     (Design Builder Signature)

_____Nicholas Balistreri_____                 _____Steve Hamilton_____
        (Printed Name)                            (Printed Design Builder Name)

Date: __7/6/2016__                            Date: __7/6/2016__

Exhibit – Change Order                                          Change Order No. 1
Turnkey Purchase                    1 of 2

DocuSign Envelope ID: 56C15816-960C-4076-92CE-D418EE993FC3
Case 2:19-cv-01134-JAK-JC Document 1-3 Filed 11/09/18 Page 297 of 377 Page ID #:337

Project Name: Shreveport Biomethane Facility                    Project No.: PH7006

**Reviewed and Recommended**

By: *David Phillips*
(Signature)

David Phillips
(Printed Name)

Associate Vice President
(Title)

Date: 7/11/2016

**Funds Sufficient:**

By: N/A
(Signature from University's
Accounting Office)

(Printed Name)

Date:

**Approved:**

UNIVERSITY: THE REGENTS OF THE UNIVERSITY OF CALIFORNIA

By: *Rachael Nava*
(Signature)

Rachael Nava
(Printed Name)

Chief Operating Officer
(Title)

Date: 7/11/2016

Project Name:  Shreveport Biomethane Facility                                    Project No.:  PH7006

## CHANGE ORDER

University of California Facility:

CHANGE ORDER NO.: ___2___                    Reference Field Order No.:      N/A

Project Name:  Shreveport Biomethane Facility

Project Number: PH7006                        Contract Date:  April 7, 2016

To Design Builder:  Stearns, Conrad and Schmidt Consulting Engineers, Inc. dba SCS Energy

Address:  3900 Kilroy Airport Way, Suite 100, Long Beach, California, 90806

DESCRIPTION OF CHANGE:

As requested by the University the system for adding odorant to the biomethane produced at the Gas
Processing Plant is no longer to be included in the scope of work. This change requires reduction in
equipment purchase amounts, construction sub-contractor costs and SCS Energy engineering, design and
project management costs.  There are also cost additions in order to make the changes to the drawings,
schedule and other project documents to delete the odorant injection system.

The net change is a reduction of the original Contract Amount with no change in Contract Time.

Adjustment of Contract Sum and GMAX:                    Adjustment of Contract Time:

Reduction in Contract Sum or GMAX by: ~~$17,351.00~~              None.

$17,016.00

Design Builder waives any claim for further adjustments of the Contract Sum and the Contract Time related to
the above described change in the Work.

Recommended:                                             Accepted:

By: _____                          By: _____
     (Signature of University's Representative)              (Design Builder Signature)

_____Nicholas Balistreri_____                  Ted Wheeler
          (Printed Name)                                Printed    Design    Builder
Name)

Date: ___11/8/16_____                       Date:    12/6/2016_____

Reviewed and Recommended
By: _____

Exhibit – Change Order
Turnkey Purchase DB:A                    1 of 2

Project Name:  Shreveport Biomethane Facility                        Project No.:  PH7006

(Signature of University's
Designated Administrator)

___ David Phillips _____ ___
(Printed Name)

Date:  __11/21/16_____ ___

**Funds Sufficient:**

By:  ___N/A_____ ___
(Signature from University's
Accounting Office)

_____ ___
(Printed Name)

Date:  _____ _____ ___

**Approved:**

UNIVERSITY:  THE REGENTS OF THE UNIVERSITY OF CALIFORNIA

___ Rachael Nava _____ ___
(Printed Name)

By:  _____Rachael Nava_____
(Signature)

___ Chief Operating Officer ___ ___
(Title)

Date:  __11/22/16_____

Project Name:  Shreveport Biomethane Facility                                    Project No:  PH7006

## EXHIBIT

## COST PROPOSAL

Date:  **September 26, 2016**          Change Request No.:  2

Project Name:  **Shreveport Biomethane Facility**

Facility:  **Shreveport Biomethane Facility**

Contract Date: **April 7, 2016**

### Scope of Change:

As requested by the University the system for adding odorant to the biomethane produced at the Gas Processing Plant is no longer to be included in the scope of work. This change requires reduction in equipment purchase amounts, construction sub-contractor costs and SCS Energy engineering, design and project management costs. There are also cost additions in order to make the changes to the drawings, schedule and other project documents to delete the odorant injection system.

The net change is a reduction of the original Contract Amount with no change in Contract Time.

### Instructions:

1.  Complete this form by providing: (a) all information required above, (b) the amount and justification based upon the Contract Schedule for any proposed adjustments of Contract Time, (c) the proposed adjustment of the Contract Sum, (d) the attached "Cost Proposal Summary", and (e) the attached form titled, "Supporting Documentation for the Cost Proposal Summary".

2.  Attach the form titled "Supporting Documentation for the Cost Proposal Summary" for Design Builder and each Subcontractor involved in the Extra Work. Each such form shall be completed and signed by Design Builder or Subcontractor actually performing the Work activity identified on the form. Attach supporting data to each such form to substantiate the individually listed costs. The costs provided on these forms shall be used to substantiate Additional Costs shown on the Cost Proposal Summary.

3.  The Design Builder Fee shall be computed on the Cost of Extra Work of Design Builder and each Subcontractor involved in the Extra Work; and shall not constitute full compensation for all costs and expenses related to the subject change and not listed in the "Supporting Documentation of the Cost Proposal Summary", including overhead and profit.

4.  Refer to Article 7 of the General Conditions for the method of computing the Design Builder Fee.

### Adjustment to the Contract Time (include justification based upon the Contract Schedule):

None

(Days)

Refer to Article 8 of the General Conditions.

### Adjustment of the Contract Sum (Total Additional Cost from Cost Proposal Summary):  Reduction of $17,016

Refer to Article 7 of General Conditions

Exhibit – Cost Proposal
Turnkey Purchase DB:A                     1 of 5

Project Name: Shreveport Biomethane Facility                    Project No: PH7006

| | Phases 1 and 2 Work (CO amount is less than $50,000) | -1 Design Builder | -2 Subs | -4 Total |
|---|---|---|---|---|
| ACTUAL COSTS | 1. Straight Time Wages/Salaries - Labor | (624) | | (624) |
| | 2. Fringe Benefits and Payroll Taxes - Labor | (275) | | (275) |
| | 3. Overtime Wages/Salaries - Labor | | | - |
| | 4. Fringe Benefits and Payroll Taxes - Overtime | | | - |
| | 5. Tests | | | - |
| | 6. Materials, Equipment, Consumables and Services | | | - |
| | 7. Sales Taxes | | | - |
| | 8. Rental Equipment Charges | | | - |
| | 9. Utilities | | | - |
| | 10. Revisions to Construction Documents | | | - |
| | 11. Royalties | | | - |
| | 12. Permits | | | - |
| | 13. Insurance premiums and Bond costs | | | - |
| | 14. Field Office expenses | | | - |
| | 15. Interest on capital borrowed | (118) | | (118) |
| | 16. Subtotal of Actual Costs (Sum of lines 1-15) | (1,017) | - | (1,017) |
| DESIGN BUILDERFEE | 17. Line 16 less line 15. | (899) | - | (899) |
| | 18. Subcontractor (_% of lines 1-4; col. 2 and [ ]%of lines 5-13) | | - | - |
| | 19.. Design Builder (118.5% of sum of lines 1 to 4 only) and 10.0% of lines 5-14, cols 1 and 2. | (1,065) | | (1,065) |
| | 20. Design Builder Fee (Sum of lines 18-19) | (1,065) | - | (1,065) |
| TOTAL | 21. ADDITIONAL COST (Sum of lines 16 & 20; col. 4) | | | (2,082) |

| | Phase 3 Work (CO amount is less than $50,000) | (1) Design Builder | (2) Subs | (4) Total |
|---|---|---|---|---|
| ACTUAL COSTS | 1. Straight Time Wages/Salaries - Labor | (52) | | (52) |
| | 2. Fringe Benefits and Payroll Taxes - Labor | (14) | | (14) |
| | 3. Overtime Wages/Salaries - Labor | - | | - |
| | 4. Fringe Benefits and Payroll Taxes - Overtime | - | | - |
| | 5. Tests | - | | - |
| | 6. Materials,Equipment, Consumables and Services | (10,032) | (2,500) | (12,532) |
| | 7. Sales Taxes | - | | - |
| | 8. Rental Equipment Charges | - | | - |
| | 9. Utilities | - | | - |
| | 10. Revisions to Construction Documents | - | | - |
| | 11. Royalties | - | | - |
| | 12. Permits | - | | - |
| | 13. Insurance premiums | - | | - |
| | 14. Field Office expenses | - | | - |
| | 15. Interest on capital borrowed | (634) | | (634) |
| | 16. **Subtotal of Actual Costs (Sum of lines 1-15)** | (10,732) | | (13,232) |
| DESIGN BUILDER FEE | 17. Line 16 less line 15. | | | |
| | 18. Subcontractor (10.8% of lines 1-4; col. 2 and 10.8% of lines 5-13) | | (270) | (270) |
| | 19. Design Builder (118.5% of sum of lines 1 to 4 only) and 10.8% of lines 5- 14, cols 1 and 2. | (1,432) | | (1,432) |
| | 20. Design Builder Fee (Sum of lines 18-19) | (1,432) | (270) | (1,702) |
| TOTAL | 21. **ADDITIONAL COST** (Sum of lines 16 & 20; col. 4) | | | (14,934) |

Notes: (1) Additional Costs are from line 16 of the attached forms titled, "Supporting Documentation For the Cost Proposal Summary" for Design Builder and each Subcontractor involved in the Extra Work.

(2) Round down all Additional Costs of 50¢ or less to the nearest dollar. Round up all Additional Costs of 51¢ or more to the nearest dollar.

Exhibit – Cost Proposal
Turnkey Purchase DB:A

3 of 5

Project Name:  Shreveport Biomethane Facility                    Project No:  PH7006

### SUPPORTING DOCUMENTATION FOR THE COST PROPOSAL SUMMARY

Design Builder/Subcontractor Name:  Stearns, Conrad, and Schmidt, Consulting Engineers, Inc.
Change Order Request No.: _2_
Project Name: **Shreveport Biomethane Facility**
Work Activity: _Deduction of Odorization System_
Project No.: _PH7006_

| COST ITEM | | | COST (1) |
|---|---|---|---|
| ACTUAL COSTS | 1.  Straight Time Wages/Salaries -- Labor | | (676) |
| | 2.  Fringe Benefits and Payroll Taxes -- Labor: _%_ of line 1 | | (289) |
| | 3.  Overtime Wages/Salaries - Labor (Attach University Representative's written authorization) | | - |
| | 4.  Fringe Benefits and Payroll Taxes -- Overtime: _%_ of line 3 | | - |
| | 5.  Tests | | - |
| | 6.  Materials and Consumable items | | (12,532) |
| | 7.  Sales Taxes: _%_ of line 5 | | - |
| | 8.  Rental Charges (attach U.S. Army Corps of Engineers' Schedule) | | - |
| | 9.  Utilities | | - |
| | 10.  Revisions to Construction Documents | | - |
| | 11.  Royalties | | - |
| | 12.  Permits | | - |
| | 13.  Insurance premiums and Bond costs | | - |
| | 14.  Field Office expenses | | - |
| | 15.  Interest on capital borrowed | | (752) |
| | 16. **Subtotal of Actual Costs (Sum of lines 1-15)** | | (14,249) |
| | 17.  Line 16 less line 15. | | (13,497) |
| DESIGN BUILDER | 18.  Subcontractor | | (270) |
| FEE | 19.  Design Builder | | (2,497) |
| | 20.  Design Builder Fee  (Sum of lines 18-19) | | (2,767) |
| TOTAL | 21. **ADDITIONAL COST (Deduct for reduction in scope)** (Sum of lines 16 & 20) | | (17,016) |

Project Name: Shreveport Biomethane Facility        Project No: PH7006

Stearns, Conrad, and Schmidt, Consulting Engineers, Inc.
(Company Name)

(Signature) [2]

Project Manager
(Title)

September 21, 2016
(Date)

Same: Stearns, Conrad, and Schmidt, Consulting Engineers, Inc.
(Design Builder's Company Name)

(Signature) [3]

(Title)

(Date)

Notes: (1) Round down all costs of 50¢ or less to the nearest dollar. Round up all costs of 51¢ or more to the nearest dollar.
(2) This form shall be prepared and signed by Design Builder or Subcontractor actually performing the Work activity indicated above.
(3) If this form is signed by a Subcontractor, it shall be reviewed and signed by Design Builder certifying the accuracy of the information.

Project Name:  Shreveport Biomethane Facility                    Project No.:  PH7006

## CHANGE ORDER

University of California Facility:

CHANGE ORDER NO.: __3__                Reference Field Order No.:     N/A

Project Name:  Shreveport Biomethane Facility

Project Number:  PH7006                Contract Date:  _April 7, 2016_

To Design Builder:  Stearns, Conrad and Schmidt Consulting Engineers, Inc. dba SCS Energy

Address:  3900 Kilroy Airport Way, Suite 100, Long Beach, California, 90806

DESCRIPTION OF CHANGE:

Liquid Storage Tank Addition
As requested by the University the addition of a liquid storage tank to the biomethane produced at the Gas
Processing Plant is to be included in the scope of work. This change requires an increase in equipment
purchase amounts, construction sub-contractor costs and SCS Energy engineering, design and project
management costs. The following summary outlines the additional tasks for the scope of work.

1. Add Underground Storage Tank System (UST) to PID, PFD, Mechanical, General,
   Structural, Electrical and Control Drawings;
2. Add UST System to engineering documents: Equip. List, Instrument Lists, etc.;
3. PM / PE check drawings;
4. Add UST Leak/Level signals to PLC and SCADA;
5. Confirm Permit requirements;
6. Add UST to project documentation, O&M Manuals, As built drawings, etc.;
7. Purchasing, Accounting, for added UST;
8. Project and Engineering Management for UST, submittals, transmittals, bid review, etc.;
9. Excavate for UST, install deadmen, tank, risers, manway, straps, backfill, compact;
10. Install Leak/Level instrumentation panels, wiring, conduit, in tank devices, and
11. Additional construction management to inspect installation, test controls, etc.

The net change is an increase of the original Contract Amount with an increase in the Contract Time.

Adjustment of Contract Sum and GMAX:                Adjustment of Contract Time:

Increase in Contract Sum or GMAX by: $43,239.00                add seven (7) days

Design Builder waives any claim for further adjustments of the Contract Sum and the Contract Time related to
the above described change in the Work.

Recommended:                                    Accepted:

By: _____                    By: _____

Exhibit – Change Order
Turnkey Purchase DB:A                    1 of 2

Project Name:  Shreveport Biomethane Facility

Project No.:  PH7006

(Signature of University's Representative)

_____
Nicholas Balistreri
(Printed Name)
Name)

Date: _____ 11/8/16 _____

Reviewed and Recommended
By: _____
(Signature of University's
Designated Administrator)

_____
David Phillips
(Printed Name)

Date: _____ 11/21/16 _____

**Funds Sufficient:**

By: _____ N/A _____
(Signature from University's
Accounting Office)

_____
(Printed Name)

Date: _____

**Approved:**

UNIVERSITY:  THE REGENTS OF THE UNIVERSITY OF CALIFORNIA

_____
Rachael Nava
(Printed Name)

By: _____
(Signature)

_____
Chief Operating Officer
(Title)

Date: _____ 11/22/16 _____

(Design Builder Signature)

_____
Printed     Design     Builder

Date: _____ 12/6/2016 _____

Project Name: Shreveport Biomethane Facility          Project No: PH7006

## EXHIBIT

## COST PROPOSAL

Date: October 6, 2016       Change Request No.: 3

Project Name: Shreveport **Biomethane** Facility

Facility: Shreveport Biomethane Facility

Contract Date: April 7, 2016

### Scope of Change:

### Liquid Storage Tank Addition

As requested by the University the addition of a liquid storage tank at the Gas Processing Plant is to be included in the scope of work. This change requires an increase in equipment purchase amounts, construction sub-contractor costs, and SCS Energy engineering, design and project management costs. The following summary outlines the additional tasks for the scope of work.

1. Add Underground Storage Tank System (UST) to PID, PFD, Mechanical, General, Structural, Electrical and Control Drawings;
2. Add UST System to engineering documents: Equip. List, Instrument Lists, etc.;
3. PM / PE check drawings;
4. Add UST Leak/Level signals to PLC and SCADA;
5. Confirm Permit requirements;
6. Add UST to project documentation, O&M Manuals, As built drawings, etc.;
7. Purchasing, Accounting, for added UST;
8. Project and Engineering Management for UST, submittals, transmittals, bid review, etc.;
9. Excavate for UST, install deadmen, tank, risers, manway, straps, backfill, compact;
10. Install Leak/Level instrumentation panels, wiring, conduit, in tank devices, and
11. Additional construction management to inspect installation, test controls, etc.

The net change is an increase of the original Contract Amount with no change in Contract Time.

Instructions:

1. Complete this form by providing: (a) all information required above, (b) the amount and justification based upon the Contract Schedule for any proposed adjustments of Contract Time, (c) the proposed adjustment of the Contract Sum, (d) the attached "Cost Proposal Summary", and (e) the attached form titled, "Supporting Documentation for the Cost Proposal Summary".

2. Attach the form titled "Supporting Documentation for the Cost Proposal Summary" for Design Builder and each Subcontractor involved in the Extra Work. Each such form shall be completed and signed by Design Builder or Subcontractor actually performing the Work activity identified on the form. Attach supporting data to each such form to substantiate the individually listed costs. The costs provided on these forms shall be used to substantiate Additional Costs shown on the Cost Proposal Summary.

3. The Design Builder Fee shall be computed on the Cost of Extra Work of Design Builder and each Subcontractor involved in the Extra Work; and shall not constitute full compensation for all costs and expenses related to the subject change and not listed in the "Supporting Documentation of the Cost Proposal Summary", including overhead and profit.

Exhibit – Cost Proposal
Turnkey Purchase DB:A        1 of 6

4.  Refer to Article 7 of the General Conditions for the method of computing the Design Builder Fee.

Adjustment to the Contract Time (include justification based upon the Contract Schedule):

Add Seven (7)<br>(Days)

Refer to Article 8 of the General Conditions.

**Adjustment of the Contract Sum (Total Additional Cost from Cost Proposal Summary):  Increase of $43,239**

Refer to Article 7 of General Conditions

DocuSign Envelope ID: EE3D18E0-3B43-472F-B433-2726754F0C1A

Project Name:  Shreveport Biomethane Facility                    Project No:  PH7006

| | | (1) | (2) | (4) |
|---|---|---|---|---|
| | Phases 1 and 2 Work (CO amount is less than $50,000) | Design Builder | Subs | Total |
| ACTUAL COSTS | 1.  Straight Time Wages/Salaries - Labor | 1,112 | | 1,112 |
| | 2.  Fringe Benefits and Payroll Taxes - Labor | 490 | | 490 |
| | 3.  Overtime Wages/Salaries - Labor | | | - |
| | 4.  Fringe Benefits and Payroll Taxes - Overtime | | | - |
| | 5.  Tests | | | - |
| | 6.  Materials, Equipment, Consumables and Services | | 6,900 | 6,900 |
| | 7.  Sales Taxes | | | - |
| | 8.  Rental Equipment Charges | | | - |
| | 9.  Utilities | | | - |
| | 10.  Revisions to Construction Documents | | | - |
| | 11.  Royalties | | | - |
| | 12.  Permits | | | - |
| | 13.  Insurance premiums and Bond costs | | | - |
| | 14.  Field Office expenses | | | - |
| | 15.  Interest on capital borrowed | 210 | | 210 |
| | 16. Subtotal of Actual Costs  (Sum of lines 1-15) | 1,812 | 6,900 | 8,712 |
| DESIGN BUILDERFEE | 17. Line 16 less line 15. | 1,602 | 6,900 | 8,502 |
| | 18. Subcontractor  (10.8% of lines 1-4; col. 2 and 10.8% of lines 5-13) | | 745 | 745 |
| | 19. Design Builder (118.5% of sum of lines 1 to 4 only) and 10.0% of lines 5-14, cols 1 and 2. | 2,588 | | 2,588 |
| | 20. Design Builder Fee (Sum of lines 18-19) | 2,588 | 745 | 3,333 |
| TOTAL | 21. ADDITIONAL COST (Sum of lines 16 & 20; col. 4) | | | 12,045 |

Exhibit – Cost Proposal
Turnkey Purchase DB:A                    3 of 6

| | Phase 3 Work (CO amount is less than $50,000) | (1) Design Builder | (2) Subs | (4) Total |
|---|---|---|---|---|
| **ACTUAL**<br><br><br>**COSTS** | 1. Straight Time Wages/Salaries - Labor | 210 | | 210 |
| | 2. Fringe Benefits and Payroll Taxes - Labor | 54 | | 54 |
| | 3. Overtime Wages/Salaries - Labor | - | | - |
| | 4. Fringe Benefits and Payroll Taxes - Overtime | - | | - |
| | 5. Tests | - | | - |
| | 6. Materials ,Equipment, Consumables and Services | | 23,868 | 23,868 |
| | 7. Sales Taxes | - | | - |
| | 8. Rental Equipment Charges | - | | - |
| | 9. Utilities | - | | - |
| | 10. Revisions to Construction Documents | - | | - |
| | 11. Royalties | - | | - |
| | 12. Permits | 200 | | 200 |
| | 13. Insurance premiums | - | | - |
| | 14. Field Office expenses | - | | - |
| | 15. Interest on capital borrowed | 1,372 | | 1,372 |
| | 16. **Subtotal of Actual Costs (Sum of lines 1-15)** | 1,836 | 23,868 | 25,704 |
| **DESIGN BUILDER**<br><br>**FEE** | 17. Line 16 less line 15. | 464 | 23,868 | 24,332 |
| | 18. Subcontractor (10.8% of lines 1-4; col. 2 and 10.8% of lines 5-13) | | 2,578 | 2,578 |
| | 19. Design Builder (118.5% of sum of lines 1 to 4 only) and 10.8% of lines 5- 14, cols 1 and 2. | 2,912 | | 2,912 |
| | 20. Design Builder Fee  (Sum of lines 18-19) | 2,912 | 2,578 | 5,490 |
| **TOTAL** | 21. **ADDITIONAL COST**<br>(Sum of lines 16 & 20; col. 4) | | | 31,194 |

Notes:
(1) Additional Costs are from line 16 of the attached forms titled, "Supporting Documentation For the Cost Proposal Summary" for Design Builder and each Subcontractor involved in the Extra Work.

(2) Round down all Additional Costs of 50¢ or less to the nearest dollar. Round up all Additional Costs of 51¢ or more to the nearest dollar.

Project Name: Shreveport Biomethane Facility        Project No: PH7006

## SUPPORTING DOCUMENTATION FOR THE COST PROPOSAL SUMMARY

Design Builder/Subcontractor Name: Stearns, Conrad, and Schmidt, Consulting Engineers, Inc.
Change Order Request No.: 2
Project Name: Shreveport Biomethane Facility
Work Activity: Addition of Liquid Storage System at Gas Compression Plant
Project No.: PH7006

| COST ITEM | | COST (1) |
|---|---|---|
| ACTUAL COSTS | 1. Straight Time Wages/Salaries -- Labor | 1,322 |
| | 2. Fringe Benefits and Payroll Taxes -- Labor: % of line 1 | 544 |
| | 3. Overtime Wages/Salaries - Labor (Attach University Representative's written authorization) | - |
| | 4. Fringe Benefits and Payroll Taxes -- Overtime: % of line 3 | - |
| | 5. Tests | - |
| | 6. Materials and Consumable items | 30,768 |
| | 7. Sales Taxes: % of line 5 | - |
| | 8. Rental Charges (attach U.S. Army Corps of Engineers' Schedule) | - |
| | 9. Utilities | - |
| | 10. Revisions to Construction Documents | - |
| | 11. Royalties | - |
| | 12. Permits | 200 |
| | 13. Insurance premiums and Bond costs | - |
| | 14. Field Office expenses | - |
| | 15. Interest on capital borrowed | 1,582 |
| | 16. Subtotal of Actual Costs (Sum of lines 1-15) | 34,416 |
| | 17. Line 16 less line 15. | 32,834 |
| DESIGN BUILDER | 18. Subcontractor | 3,323 |
| FEE | 19. Design Builder | 5,500 |
| | 20. Design Builder Fee (Sum of lines 18-19) | 8,823 |
| TOTAL | 21. ADDITIONAL COST (Sum of lines 16 & 20) | 43,239 |

DocuSign Envelope ID: EE3D18E0-3B43-472F-B433-2726754F0C1A

Project Name:  Shreveport Biomethane Facility        Project No:  PH7006

<u>                    Stearns, Conrad, and Schmidt, Consulting Engineers, Inc.                    </u>
(**Company** Name)

<u>                                                                                      </u>
(Signature) [2]

<u>     Project Manager                                                                   </u>
(Title)

<u>     September 21, 2016                                                                 </u>
(Date)

<u>     Same:   Stearns, Conrad, and Schmidt, Consulting Engineers, Inc.                   </u>
(Design Builder's Company Name)

<u>                                                                                      </u>
(Signature) [3]

<u>                                                                                      </u>
(Title)

<u>                                                                                      </u>
(Date)

Notes:   (1) Round down all costs of 50¢ or less to the nearest dollar.  Round up all costs of 51¢ or more to the nearest dollar.
         (2) This form shall be prepared and signed by Design Builder or Subcontractor actually performing the Work activity indicated above.
         (3) If this form is signed by a Subcontractor, it shall be reviewed and signed by Design Builder certifying the accuracy of the information.

Exhibit – Cost Proposal
Turnkey Purchase DB:A                    6 of 6

Project Name: Shreveport Biomethane Facility

Project No.: PH7006

## CHANGE ORDER

University of California Facility:

CHANGE ORDER NO.: ___4___

Reference Field Order No.: N/A

Project Name: Shreveport Biomethane Facility

Project Number: PH7006

Contract Date: April 7, 2016

To Design Builder: Stearns, Conrad and Schmidt Consulting Engineers, Inc. dba SCS Energy

Address: 3900 Kilroy Airport Way, Suite 100, Long Beach, California, 90806

DESCRIPTION OF CHANGE:

Phone Service Addition
As requested by the University the addition of phone service at the Gas Processing Plant is to be included in the scope of work. This change requires an increase in construction sub-contractor costs and SCS Energy engineering, design and project management costs. The following summary outlines the additional tasks for the scope of work.

1. Add Phone line to General/Structural/Civil Dwgs as needed
2. Add Phone System to engineering documents: Equip. List, site layout, etc.
3. PM / PE check drawing revisions
4. Add Phone line conduit to EMP turnover point
5. Contract with AT&T to install new service
6. Add phone to project documentation, As builts, etc.
7. Purchasing, Accounting, for added phone service
8. Project and Engineering Management for Phone, submittals, transmittals, bid review, etc.
9. Coordinate Phone install with AT&T, utility (PHEC) and construction subcontractors

The net change is an increase of the original Contract Amount with no change in Contract Time.

Adjustment of Contract Sum and GMAX:

Adjustment of Contract Time:

Increase in Contract Sum or GMAX by: $6,929.00

None.

Design Builder waives any claim for further adjustments of the Contract Sum and the Contract Time related to the above described change in the Work.

Recommended:

Accepted:

By: _____
(Signature of University's Representative)

By: _____
(Design Builder Signature)

Exhibit – Change Order
Turnkey Purchase DB:A                    1 of 2

Project Name: Shreveport Biomethane Facility

Project No.: PH7006

| Nicholas Balistreri |
| (Printed Name) |

Name)

Date: ___11/ 83/ 16___

Ted Wheeler

| | | |
| --- | --- | --- |
| Printed | Design | Builder |

Date: ___12/6/2106___

**Reviewed and Recommended**

By: _____
   (Signature of University's
   Designated Administrator)

| David Phillips |
| (Printed Name) |

Date: ___11/21/16___

**Funds Sufficient:**

By: ___N/A___
   (Signature from University's
   Accounting Office)

_____
   (Printed Name)

Date: _____

**Approved:**

UNIVERSITY: THE REGENTS OF THE UNIVERSITY OF CALIFORNIA

| Rachael Nava |
| (Printed Name) |

By: _____
   (Signature)

| Chief Operating Officer |
| (Title) |

Date: ___11/22/16___

Exhibit – Change Order
Turnkey Purchase DB:A                    2 of 2

Project Name: Shreveport Biomethane Facility                    Project No: PH7006

## EXHIBIT

## COST PROPOSAL

Date: __October 31, 2016__          Change Request No.: _4_

Project Name: __Shreveport Biomethane Facility__

Facility: __Shreveport Biomethane Facility__

Contract Date: _April 7, 2016_

### Scope of Change:

### Phone Service Addition

As requested by the University the addition of **phone service** at the Gas Processing Plant is to be included in the scope of work. This change requires an increase in construction sub-contractor costs and SCS Energy engineering, design and project management costs. The following summary outlines the additional tasks for the scope of work.

1.  Add Phone line to General/Structural/Civil Dwgs as needed
2.  Add Phone System to engineering documents: Equip. List, site layout, etc.
3.  PM / PE check drawing revisions.
4.  Add Phone line conduit to EMP turnover point
5.  Contract with AT&T to install new service
6.  Add phone to project documentation, As builts, etc.
7.  Purchasing, Accounting, for added phone service
8.  Project and Engineering Management for Phone, submittals, transmittals, bid review, etc.
9.  Coordinate Phone install with AT&T, utility (PHEC) and construction subcontractors

The net change is an increase of the original Contract Amount with no change in Contract Time.

### Instructions:

1.  Complete this form by providing: (a) all information required above, (b) the amount and justification based upon the Contract Schedule for any proposed adjustments of Contract Time, (c) the proposed adjustment of the Contract Sum, (d) the attached "Cost Proposal Summary", and (e) the attached form titled, "Supporting Documentation for the Cost Proposal Summary".
2.  Attach the form titled "Supporting Documentation for the Cost Proposal Summary" for Design Builder and each Subcontractor involved in the Extra Work. Each such form shall be completed and signed by Design Builder or Subcontractor actually performing the Work activity identified on the form. Attach supporting data to each such form to substantiate the individually listed costs. The costs provided on these forms shall be used to substantiate Additional Costs shown on the Cost Proposal Summary.
3.  The Design Builder Fee shall be computed on the Cost of Extra Work of Design Builder and each Subcontractor involved in the Extra Work; and shall not constitute full compensation for all costs and expenses related to the subject change and not listed in the "Supporting Documentation of the Cost Proposal Summary", including overhead and profit.
4.  Refer to Article 7 of the General Conditions for the method of computing the Design Builder Fee.

Adjustment to the Contract Time (include justification based upon the Contract Schedule):

None

Refer to Article 8 of the General Conditions.
Adjustment of the Contract Sum (Total Additional Cost from Cost Proposal Summary):    Increase of $6,929
Refer to Article 7 of General Conditions

Exhibit -- Cost Proposal
Turnkey Purchase DB:A                    1 of 5

Project Name: Shreveport Biomethane Facility                    Project No: PH7006

| | | (1) | (2) | (4) |
|---|---|---|---|---|
| | **Phases 1 and 2 Work**<br>(CO amount is less than $50,000) | Design Builder | Subs | Total |
| ACTUAL<br><br><br><br><br><br><br><br><br>COSTS | 1. Straight Time Wages/Salaries - Labor | 1,436 | | 1,436 |
| | 2. Fringe Benefits and Payroll Taxes - Labor | 633 | | 633 |
| | 3. Overtime Wages/Salaries - Labor | | | - |
| | 4. Fringe Benefits and Payroll Taxes - Overtime | | | - |
| | 5. Tests | | | - |
| | 6. Materials,Equipment, Consumables and Services | | 500 | 500 |
| | 7. Sales Taxes | | | - |
| | 8. Rental Equipment Charges | | | - |
| | 9. Utilities | | | - |
| | 10. Revisions to Construction Documents | | | - |
| | 11. Royalties | | | - |
| | 12. Permits | | | - |
| | 13. Insurance premiums and Bond costs | | | - |
| | 14. Field Office expenses | | | - |
| | 15. Interest on capital borrowed | 271 | | 271 |
| | 16. **Subtotal of Actual Costs  (Sum of lines 1-15)** | 2,340 | 500 | 2,840 |
| DESIGN BUILDER FEE | 17. Line 16 less line 15. | 2,069 | 500 | 2,569 |
| | 18. Subcontractor  (10.8% of lines 1-4; col. 2 and 10.8% of lines 5-13) | | 54 | 54 |
| | 19.. Design Builder (118.5% of sum of lines 1 to 4 only) and 10.0% of lines 5-14, cols 1 and 2. | 2,502 | | 2,502 |
| | 20. Design Builder Fee (Sum of lines 18-19) | 2,502 | 54 | 2,556 |
| TOTAL | 21. **ADDITIONAL COST**<br>(Sum of lines 16 & 20; col. 4) | | | 5,396 |

|  | | (1) | (2) | (4) |
|---|---|---|---|---|
|  | **Phase 3 Work**<br>(CO amount is less than $50,000) | Design Builder | Subs | Total |
| **ACTUAL**<br><br>**COSTS** | 1. Straight Time Wages/Salaries - Labor | 419 |  | 419 |
|  | 2. Fringe Benefits and Payroll Taxes - Labor | 108 |  | 108 |
|  | 3. Overtime Wages/Salaries - Labor | - |  | - |
|  | 4. Fringe Benefits and Payroll Taxes - Overtime | - |  | - |
|  | 5. Tests | - |  | - |
|  | 6. Materials,Equipment, Consumables and Services |  | 300 | 300 |
|  | 7. Sales Taxes | - |  | - |
|  | 8. Rental Equipment Charges | - |  | - |
|  | 9. Utilities | - |  | - |
|  | 10. Revisions to Construction Documents | - |  | - |
|  | 11. Royalties | - |  | - |
|  | 12. Permits | 200 |  | 200 |
|  | 13. Insurance premiums | - |  | - |
|  | 14. Field Office expenses | - |  | - |
|  | 15. Interest on capital borrowed | 17 |  | 17 |
|  | 16. **Subtotal of Actual Costs  (Sum of lines 1-15)** | 744 | 300 | 1,044 |
| **DESIGN BUILDER**<br><br>**FEE** | 17. Line 16 less line 15. | 727 | 300 | 1,027 |
|  | 18. Subcontractor  (10.8% of lines 1-4; col. 2 and 10.8% of lines 5-13) |  | 32 | 32 |
|  | 19. Design Builder (118.5% of sum of lines 1 to 4 only) and 10.8% of lines 5- 14, cols 1 and 2. | 678 |  | 678 |
|  | 20. Design Builder Fee  (Sum of lines 18-19) | 678 | 32 | 710 |
| **TOTAL** | 21. **ADDITIONAL COST**<br>(Sum of lines 16 & 20; col. 4) |  |  | 1,754 |

Notes:
(1) Additional Costs are from line 16 of the attached forms titled, "Supporting Documentation For the Cost Proposal Summary" for Design Builder and each Subcontractor involved in the Extra Work.

(2) Round down all Additional Costs of 50¢ or less to the nearest dollar. Round up all Additional Costs of 51¢ or more to the nearest dollar.

Exhibit – Cost Proposal
Turnkey Purchase DB:A                    3 of 5

Project Name:  Shreveport Biomethane Facility                                        Project No:  PH7006

SUPPORTING DOCUMENTATION FOR THE COST PROPOSAL SUMMARY

Design Builder/Subcontractor Name:  Stearns, Conrad, and Schmidt, Consulting Engineers, Inc.
Change Order Request No.: 4
Project  Name: **Shreveport Biomethane Facility**
Work Activity: **Addition of Phone Service at Gas Compression Plant**
Project No.: **PH7006**

| COST ITEM | | COST (1) |
|---|---|---|
| ACTUAL COSTS | 1.  Straight Time Wages/Salaries -- Labor | 1,855 |
| | 2.  Fringe Benefits and Payroll Taxes -- Labor:_% of line 1 | 741 |
| | 3.  Overtime Wages/Salaries - Labor (Attach University Representative's written authorization) | - |
| | 4.  Fringe Benefits and Payroll Taxes -- Overtime:_% of line 3 | - |
| | 5.  Tests | - |
| | 6.  Materials and Consumable items | 800 |
| | 7.  Sales Taxes:_% of line 5 | - |
| | 8.  Rental Charges (attach U.S. Army Corps of Engineers' Schedule) | - |
| | 9.  Utilities | - |
| | 10.  Revisions to **Construction** Documents | - |
| | 11.  Royalties | - |
| | 12.  Permits | - |
| | 13.  Insurance premiums and Bond costs | - |
| | 14.  Field Office expenses | - |
| | 15.  Interest on capital borrowed | 288 |
| | 16. **Subtotal of Actual Costs  (Sum of lines 1-15)** | 3,684 |
| | 17. Line 16 less line 15. | 3,396 |
| DESIGN BUILDER | 18. Subcontractor | 86 |
| FEE | 19. Design Builder | 3,159 |
| | 20. Design Builder Fee  (Sum of lines 18-19) | 3,245 |
| TOTAL | 21. **ADDITIONAL COST** | 6,929 |
| | (Sum of lines 16 & 20) | |

Project Name:  Shreveport Biomethane Facility        Project No:  PH7006

| Stearns, Conrad, and Schmidt, Consulting Engineers, Inc. |
|---|
| (Company Name) |

(Signature) [2]

Project Manager
(Title)

September 21, 2016
(Date)

Same:  Stearns, Conrad, and Schmidt, Consulting Engineers, Inc.
(Design Builder's Company Name)

(Signature) [3]

(Title)

(Date)

Notes:   (1) Round down all costs of 50¢ or less to the nearest dollar.  Round up all costs of 51¢ or more to the nearest dollar.
         (2) This form shall be prepared and signed by Design Builder or Subcontractor actually performing the Work activity
             indicated above.
         (3) If this form is signed by a Subcontractor, it shall be reviewed and signed by Design Builder certifying the accuracy of
             the information.

Exhibit – Cost Proposal
Turnkey Purchase DB:A                        5 of 5

Project Name: Shreveport Biomethane Facility          Project No.: PH7006

## CHANGE ORDER

University of California Facility:

CHANGE ORDER NO.: ___6___         Reference Field Order No.:    N/A

Project Name: Shreveport Biomethane Facility

Project Number: PH7006         Contract Date: __April 7, 2016__

To Design Builder: Stearns, Conrad and Schmidt Consulting Engineers, Inc. dba SCS Energy

Address: 3900 Kilroy Airport Way, Suite 100, Long Beach, California, 90806

DESCRIPTION OF CHANGE:

Contract Language revision to clarify expense reimbursable items and the process description.

1. Revise General Conditions section 1.1.60.2 with 1.1.60.2.1 describing Construction Phase non-reimbursable items and 1.1.60.2.2 describing items that are non-reimbursable in all phases as shown on the attached.
2. Revise Scope of Work exhibit "Gas Processing Plant Description" to reflect the final design configuration and correct previous mention of water cooling, as shown on the attached.

The net change is an increase of the original Contract Amount with no change in Contract Time.

See two attachments for changes to contract documents, described above.

**Adjustment of Contract Sum and GMAX:**        **Adjustment of Contract Time:**

Increase in Contract Sum or GMAX by:   None         None

Design Builder waives any claim for further adjustments of the Contract Sum and the Contract Time related to the above described change in the Work.

**Recommended:**                  **Accepted:**

By:                         By:

(Signature of University's Representative)     (Design Builder Signature)

___Nicholas Balistreri___          Ted Wheeler
      (Printed Name)             Printed   Design   Builder
Name)

Date: ___11/17/16___           Date:   12/6/2016

**Reviewed and Recommended**

Exhibit – Change Order
Turnkey Purchase DB:A         1 of 2

Project Name:  Shreveport Biomethane Facility                    Project No.:  PH7006

By: _____
    (Signature of University's
    Designated Administrator)

_____ David Phillips _____ _____
              (Printed Name)

Date: _____

**Funds Sufficient:**

By: _____ N/A _____ _____
    (Signature from University's
    Accounting Office)

_____ _____
              (Printed Name)

Date: _____ _____ _____

**Approved:**

UNIVERSITY:  THE REGENTS OF THE UNIVERSITY OF CALIFORNIA

_____ Rachael Nava _____ _____
              (Printed Name)

By: _____
              (Signature)

_____ Chief Operating Officer _____ _____
              (Title)

Date: _____

Exhibit – Change Order
Turnkey Purchase DB:A                    2 of 2

Page 323

Project Name: **Shreveport Biomethane Facility**                    Project No.: **PH7006**

### EXHIBIT

### SCOPE OF WORK

**GENERAL INFORMATION**

This exhibit supplements other Contract Documents in defining the scope of work of the Design Builder.

The Work shall include all design and construction work, labor, material, tools, equipment, excavation, shoring, testing, inspection, commissioning and all necessary general conditions, that may be reasonably inferred from the Contract Documents to provide all Design Work and Construction Work for:

University's Gas Processing Plant, Product Gas Pipeline and Compression Plant and connection to all utilities located in Caddo Parish, Louisiana more fully described as follows:

In addition to the equipment and materials described in this exhibit, the Design Build Contractor shall provide civil, structural, electrical and mechanical services and equipment necessary for the execution of the Design Builder's portion of the work. An overall Project Site Location map, site areas, and a preliminary process flow diagram for the scope of work can be found in the Exhibits.

**Gas Processing Plant Description**

The Gas Processing Plant (GPP) is to be located on property leased from the City of Shreveport landfill on a site previously used for LFG processing. Most of the previous LFG processing equipment has been removed. The remaining foundations and unneeded equipment will be demolished and removed as part of this scope of work to provide room for the new Gas Processing Plant.

The Gas Processing Plant consists of several stages including moisture removal, sulfur removal and VOC and CO2 removal in a membrane system provided by Air Liquide.

The existing landfill gas gathering system will be connected to a blower to boost the landfill gas pressure to approximately 5 psig prior to the diversion point where it can directed to the existing flare when the GPP is not

**Project Name:  Shreveport Biomethane Facility**                                      **Project No.:  PH7006**

in operation. The blower discharge flow is cooled by passing through a heat exchanger which is cooled by ambient air~~chilled water from the chiller system~~. After cooling a separator removes a portion of the water from the gas.

This gas, along with the membrane recycle stream from the 2nd stage membrane, is sent to the compressor ~~aftercooler knockout~~ and ~~then~~ compressed to deliver a pressure of 200 psig to the CO2 removal system~~, after the compressor aftercooler knockout~~. This provides some allowance for pressure drop in the Air Liquide heat exchanger. Hot gas from the compressor, before any cooling, is and typically 200-250F, will go direct to the Air Liquide skid and pass through a~~two~~ low pressure drop heat exchangers where a small amount of heat will be taken. Probably less than 50F temp drop max and sometimes nothing, i.e. in hot weather. The gas then passes through the compressor fin-fan aftercooler where the temperature is reduced to ~~near~~ about ten degrees above ambient~~.~~ ~~then i~~In hot weather a cold heat exchanger will then trim the temperature to 90F max using ~~chilled water from~~ the **high pressure circuit of the** chiller system, and in cold weather controlled to a minimum of roughly 50F. After temperature conditioning and liquids knock-out, the landfill gas stream is introduced into the membrane skid for processing.

Within the membrane skid, the feed gas passes through a coalescing filter to remove entrained liquids, primarily water and some compressor oil. Next the gas enters a proprietary pressure swing regenerable adsorption unit where water vapor, VOCs and siloxanes are removed. The nearly clean gas then enters the dual (lead-lag) carbon beds as a polishing step to remove any trace contaminants to extremely low levels. Finally, after exiting the carbon beds, a dust filter removes any carbon dust.

The gas exiting the carbon bed dust filter passes through heat exchanger no. 1 (HX-1) where the temperature is raised to the desired set point and then introduced into the 1st stage membrane elements where the bulk of the CO2 is removed as a low pressure "Permeate1" stream. This "Permeate1" stream is used to regenerate the PSA and after exiting the PSA will then contain about twice the level VOCs found in the feed gas and is sent to a flare or oxidizer unit to destroy the VOCs (typical 98% destruction efficiency per the EPA). The high pressure Residue-1 stream from the first stage passes ~~through HX-2 where the temperature is raised to the desired set point and is introduced~~ into a second membrane stage to produce very low CO2 product gas (which may need to be compressed up to the pipeline pressure). The low pressure Permeate-2 from the second stage is recycled to the suction of the feed compressor to limit hydrocarbon losses.

In addition to the normal operation of the Gas Processing Plant which during regeneration returns gas to the inlet of the Gas Processing Plant for retreatment, provisions for diverting any off-specification gas to the flare disposal are included in this scope by means of a pipe from an automated valve immediately downstream from the Gas Processing Plant

After the Air Liquide system the product gas will pass through an additional polishing vessel to remove any remaining contaminants prior to entering the Product Gas Pipeline.

1.1.60

.2   Notwithstanding the provisions in 1.1.60.1, the following costs are considered nonreimbursable and are to be included in the Design Builder Fee along with any and all nonreimbursable general and administrative costs, overhead, and profit.

.1   During the Construction Phase, which shall be deemed to start on the date that the University issues a Notice to Proceed for the complete Construction Phase Scope of Work, Design Builder's Phase 3 ~~labor~~ Ccosts of:

.1   ~~Labor costs of~~ Superintendent(s); Assistant Superintendent(s); Project Manager(s); Scheduler(s); and Estimator(s). However, Design Builder's costs for Project Engineering, is reimbursable for services rendered up to the maximum number of hours defined in the Contract Documents. Project Engineering consists of reviewing subcontractor submittals, responding to requests for information and change orders, updating drawings, performing field quality assurance of materials and equipment, preparing reports under section 3.12 and 3.13, or otherwise providing similar services which are not duplicative of service rendered by subcontractors.

~~.2   Cost of executive officer salaries and travel expenses of executive officers not directly engaged in the performance of the Work.~~

.2~~3~~   Costs of employee bonus, deferred compensation, and profit sharing plans.

~~.4   Negligence.~~

~~.5   Indemnification Amounts~~

.3~~6~~   Warranty and Punch List Work.

~~.7   Business licenses~~

~~.8   Design Builder's small tools; Computer and data processing personnel and equipment; Office expenses including staff, materials and supplies, telephone, facsimile, copier equipment; Federal, state, or local business income and franchise taxes;~~

~~.9   Design Builder Overhead and Profit (including without limitation all overhead including home office overhead and field office overhead.)~~

~~.10   Costs and expenses of any kind or item not specifically and expressly included in paragraph 1.1.60.1.~~


.2   During all Phases:

.1.~~2~~ Unless directly engaged in the performance of the Work, the Ccost of executive officer salaries and travel expenses of executive officers ~~not directly engaged in the performance of the Work~~.

.2~~4~~ Negligence.

.3~~5~~ Indemnification Amounts.

.4   Business licenses.

.5   Computer and data processing personnel and equipment;

.6   Federal, state, or local business income and franchise taxes;

.7   Design Builder's small tools; Office expenses including office staff except as expressly provided in section 1.1.60.1 above , materials and supplies, telephone, facsimile, copier equipment;

~~.7   Design Builder's small tools; Office expenses including staff not directly involved in the performance of the Work, materials and supplies, telephone, facsimile, copier equipment;~~

.8   Design Builder Overhead and Profit (including without limitation all overhead including home office overhead and field office overhead.)

.9   Costs and expenses of any kind or item not specifically and expressly included in paragraph 1.1.60.1.

Project Name: Shreveport Biomethane Facility                        Project No: PH7006

## EXHIBIT

## COST PROPOSAL

Date: **January 27, 2017**          Change Request No.: 7

Project Name: Shreveport Biomethane Facility

Facility: Shreveport **Biomethane** Facility

Contract Date: April 7, 2016

**Scope of Change:**

**Change Thermal Oxidizer Supplier and Performance**

The waste gas Thermal Oxidizer is to be changed in order to increase the overall Gas Processing Plant performance. This change requires an increase in equipment purchase amounts, engineering and construction sub-contractor costs, and SCS Energy engineering, design and project management costs. The following summary outlines the additional tasks for the scope of work.

1. Revise documents related to the Thermal Oxidizer performance including to PID, PFD, Mechanical, General, Structural, Electrical and Control Drawings;
2. Revise Thermal Oxidizer related engineering documents: Equip. List, Instrument Lists, etc.;
3. PM / PE check drawings and documents;
4. Install electrical equipment for added blower motor (starter, wiring, conduit)
5. Additional commissioning of blower motor, revised Thermal Oxidizer design from new supplier.
6. Construction management for added blower/motor.

The net change is an increase of the original Contract Amount and an increase in the Contract Time.

Instructions:

1. Complete this form by providing: (a) all information required above, (b) the amount and justification based upon the Contract Schedule for any proposed adjustments of Contract Time, (c) the proposed adjustment of the Contract Sum, (d) the attached "Cost Proposal Summary", and (e) the attached form titled, "Supporting Documentation for the Cost Proposal Summary".

2. Attach the form titled "Supporting Documentation for the Cost Proposal Summary" for Design Builder and each Subcontractor involved in the Extra Work. Each such form shall be completed and signed by Design Builder or Subcontractor actually performing the Work activity identified on the form. Attach supporting data to each such form to substantiate the individually listed costs. The costs provided on these forms shall be used to substantiate Additional Costs shown on the Cost Proposal Summary.

3. The Design Builder Fee shall be computed on the Cost of Extra Work of Design Builder and each Subcontractor involved in the Extra Work; and shall not constitute full compensation for all costs and expenses related to the subject change and not listed in the "Supporting Documentation of the Cost Proposal Summary", including overhead and profit.

4. Refer to Article 7 of the General Conditions for the method of computing the Design Builder Fee.

**Adjustment to the Contract Time (include justification based upon the Contract Schedule):  15 (Days)**
Refer to Article 8 of the General Conditions

**Adjustment of the Contract Sum (Total Additional Cost from Cost Proposal Summary):  Increase of $293,648**

Refer to Article 7 of General Conditions

Exhibit – Cost Proposal
Turnkey Purchase DB:A            1 of 6

Project Name:  Shreveport Biomethane Facility         Project No:  PH7006

| | | (1) | (2) | (4) |
|---|---|---|---|---|
| | **Phases 1 and 2 Work**<br>(CO amount is less than $50,000) | Design Builder | Subs | Total |
| | 1.  Straight Time Wages/Salaries - Labor | 2,670 | | 2,670 |
| | 2.  Fringe Benefits and Payroll Taxes - Labor | 1,176 | | 1,176 |
| | 3.  Overtime Wages/Salaries - Labor | | | – |
| | 4.  Fringe Benefits and Payroll Taxes - Overtime | | | - |
| | 5.  Tests | | | - |
| | 6.  Materials,Equipment, Consumables and Services | | 3,100 | 3,100 |
| | 7.  Sales Taxes | | | – |
| ACTUAL | 8.  Rental Equipment Charges | | | - |
| | 9.  Utilities | | | - |
| | 10.  Revisions to Construction Documents | | | - |
| | 11.  Royalties | | | - |
| COSTS | 12.  Permits | | | - |
| | 13.  Insurance premiums and Bond costs | | | - |
| | 14.  Field Office expenses | | | - |
| | 15.  Interest on capital borrowed | 503 | | 503 |
| | 16. **Subtotal of Actual Costs  (Sum of lines 1-15)** | 4,349 | 3,100 | 7,449 |
| DESIGN BUILDE RFEE | 17. Line 16 less line 15. | 3,846 | 3,100 | 6,946 |
| | 18. Subcontractor  (10.8% of lines 1-4; col. 2 and 10.8% of lines 5-13) | | 335 | 335 |
| | 19.. Design Builder (118.5% of sum of lines 1 to 4 only) and 10.0% of lines 5-14, cols 1 and 2. | 4,868 | | 4,868 |
| | 20. Design Builder Fee (Sum of lines 18-19) | 4,868 | 335 | 5,203 |
| TOTAL | 21. **ADDITIONAL COST**<br>(Sum of lines 16 & 20; col. 4) | | | 12,652 |

| Phase 3 Work (CO amount is less than $50,000) | (1) Design Builder | (2) Subs | (4) Total |
|---|---|---|---|
| ACTUAL COSTS | 1. Straight Time Wages/Salaries - Labor | 1,048 | | 1,048 |
| | 2. Fringe Benefits and Payroll Taxes - Labor | 271 | | 271 |
| | 3. Overtime Wages/Salaries - Labor | - | | - |
| | 4. Fringe Benefits and Payroll Taxes - Overtime | - | | - |
| | 5. Tests | - | | - |
| | 6. Materials, Equipment, Consumables and Services | | 218,220 | 218,220 |
| | 7. Sales Taxes | - | | - |
| | 8. Rental Equipment Charges | - | | - |
| | 9. Utilities | - | | - |
| | 10. Revisions to Construction Documents | - | | - |
| | 11. Royalties | - | | - |
| | 12. Permits | - | | - |
| | 13. Insurance premiums | - | | - |
| | 14. Field Office expenses | - | | - |
| | 15. Interest on capital borrowed | 12,758 | | 12,758 |
| | 16. Subtotal of Actual Costs (Sum of lines 1-15) | 14,077 | 218,220 | 232,297 |
| DESIGN BUILDER FEE | 17. Line 16 less line 15. | 1,319 | 218,220 | 219,539 |
| | 18. Subcontractor (10.8% of lines 1-4; col. 2 and 10.8% of lines 5-13) | | 23,568 | 23,568 |
| | 19. Design Builder (118.5% of sum of lines 1 to 4 only) and 10.8% of lines 5-14, cols 1 and 2. | 25,131 | | 25,131 |
| | 20. Design Builder Fee (Sum of lines 18-19) | 25,131 | 23,568 | 48,699 |
| TOTAL | 21. ADDITIONAL COST (Sum of lines 16 & 20; col. 4) | | | 280,996 |

Notes:
(1) Additional Costs are from line 16 of the attached forms titled, "Supporting Documentation For the Cost Proposal Summary" for Design Builder and each Subcontractor involved in the Extra Work.

(2) Round down all Additional Costs of 50¢ or less to the nearest dollar. Round up all Additional Costs of 51¢ or more to the nearest dollar.

Project Name:  Shreveport Biomethane Facility                     Project No:  PH7006

## SUPPORTING DOCUMENTATION FOR THE COST PROPOSAL SUMMARY

Design Builder/Subcontractor Name:  Stearns, Conrad, and Schmidt, Consulting Engineers, Inc.

Change Order Request No.:  7

Project Name:  **Shreveport Biomethane Facility**

Work Activity:  **Change of Thermal Oxidizer Supplier and Performance**

Project No.:  PH7006

| COST ITEM | | COST (1) |
|---|---|---|
| ACTUAL COSTS | 1.  Straight Time Wages/Salaries -- Labor | 3,718 |
| | 2.  Fringe Benefits and Payroll Taxes -- Labor: % of line 1 | 1,447 |
| | 3.  Overtime Wages/Salaries - Labor (Attach University Representative's written authorization) | - |
| | 4.  Fringe Benefits and Payroll Taxes -- Overtime: % of line 3 | - |
| | 5.  Tests | - |
| | 6.  Materials and Consumable items | 221,320 |
| | 7.  Sales Taxes: % of line 5 | - |
| | 8.  Rental Charges (attach U.S. Army Corps of Engineers' Schedule) | - |
| | 9.  Utilities | - |
| | 10.  Revisions to Construction Documents | - |
| | 11.  Royalties | - |
| | 12.  Permits | - |
| | 13.  Insurance premiums and Bond costs | - |
| | 14.  Field Office expenses | - |
| | 15.  Interest on capital borrowed | 13,261 |
| | 16.  **Subtotal of Actual Costs  (Sum of lines 1-15)** | 239,746 |
| DESIGN BUILDER FEE | 17.  Line 16 less line 15. | 226,485 |
| | 18.  Subcontractor | 23,903 |
| | 19.  Design Builder | 29,999 |
| | 20.  Design Builder Fee  (Sum of lines 18-19) | 53,902 |
| TOTAL | 21.  **ADDITIONAL COST** (Sum of lines 16 & 20) | 293,648 |

Project Name:  Shreveport Biomethane Facility          Project No:  PH7006

Stearns, Conrad, and Schmidt, Consulting **Engineers,** Inc.
(Company Name)

Ted Wheeler                    (Signature) [2]

Project Manager
(Title)

February 22, 2017
(Date)

Same:  Stearns, Conrad, and Schmidt, Consulting Engineers, Inc.
(Design Builder's Company Name)

(Signature) [3]

(Title)

(Date)

Notes:  (1) Round down all costs of 50¢ or less to the nearest dollar.  Round up all costs of 51¢ or more to the nearest dollar.
        (2) This form shall be prepared and signed by Design Builder or Subcontractor actually performing the Work activity
            indicated above.
        (3) If this form is signed by a Subcontractor, it shall be reviewed and signed by Design Builder certifying the accuracy of
            the information.

| SCS ENERGY | | | 6/16/2017 | Rev. | F | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| UC WOOLWORTH ROAD LANDFILL, BIOMETHANE PROGRAM (06214001.07) | | | | | | Approximate Weights & Dimensions See vendor drawings for final information. | | | | | |
| Mechanical Equipment List | | | | | | | | | | | |
| Tag No. | Description | Manufacturer | Model /Size / Rating | P&ID No. | GFP dwg G119 ref. no. | Weight, lb | Ht, in | Width, in | Length, in | Dia, in | Notes |
| OP-006 | EXISTING OPEN FLARE, TO BE RELOCATED | LFG Specialties/CBI | 1557-H2 Utility Flare Package | P-200 | 15 | 18,000 | 387.6 | 96 | 408 | | Stack lowers for moving Ht.=123in |
| ME-001 | FLAME ARRESTOR | Enardo or equal | 16" Series 7-O | P-200 | | 250 | | | 30 | 24 | piping component |
| ME-002 | LANDFILL GAS BLOWER SYSTEM | VILTER/Gardner Denver | 150HP x 2 each Centrifugal Blowers, Suction/Discharge Separators | P-200 | 2 | 30,000 | 153 | 120 | 219 | | |
| ME-003 | H2S REMOVAL VESSEL (FOR FUTURE) | M.L. Smith Jr. or equal | 10ft diameter x 15ft, SS304, 20,000 lb. carbon media | P-200 | | NA | | | | | Future, not to be installed now |
| HX-004 | BLOWER AFTERCOOLER | VILTER/SRC | 20HP x 2 fans Air cooled gas cooler | P-200 | 3 | 16,300 | 204 | 97 | 324 | | |
| ANZ-005 | LANDFILL GAS ANALYZER | Siemens or equal | Ultramat 23 or equal tbd | P-200 | | 750 | 72 | 36 | 36 | | |
| ME-101 | CHILLER SYSTEM | VILTER | 150HP, Dual Circuit R134A, VSM-361 Flooded Single Screw | P-201 | 4 | 42,500 | 144 | 140 | 294 | | |
| HX-102 | CHILLER CONDENSER | VILTER/SRC | 15HP x 2 fans Air cooled refrigerant cooler | P-201 | 5 | 10,400 | 190 | 90 | 261 | | |
| CMP-201A | MAIN COMPRESSOR - A | VILTER | 800HP VSG-2101 Flooded Single Screw | P-202 | 9 | 25,100 | 119 | 97 | 201 | | |
| CMP-201B | MAIN COMPRESSOR - B | VILTER | 800HP VSG-2101 Flooded Single Screw | P-202 | 9 | 25,100 | 119 | 97 | 201 | | |
| HX-202A | COMPRESSOR OIL COOLER - A | VILTER/SRC | 15HP fan, Air Cooled Oil Cooler | P-202 | 13 | 4,700 | 190 | 84 | 122 | | |
| HX-202B | COMPRESSOR OIL COOLER - B | VILTER/SRC | 15HP fan, Air Cooled Oil Cooler | P-202 | 13 | 4,700 | 190 | 84 | 122 | | |
| ME-301 | AIR LIQUIDE SKID | AIR LIQUIDE | Biogas Separation, PSA/Carbon/2 stage Membrane | P-203 | 7 | 64,000 | 168 | 136 | 396 | | Load with ___ lb media |
| V-303 | CARBON POLISHING VESSEL | M.L. Smith Jr. | 72" Dia x 156" CS, 10,000lb Activated Carbon media | P-203 | 17 | 7,608 | 20 | | | 72 | Load with 10,000 lb media, install Platforms |
| V-304 | SILICA POLISHING VESSEL | M.L. Smith Jr. | 72" Dia x 156" CS, 7,500lb Silica gel media | P-203 | 18 | 7,608 | 20 | | | 72 | Load with 7,500 lb media, install Platforms |
| ANZ-305 | PRODUCT GAS ANALYZER | Siemens or equal | Ultramat 23 or equal tbd | P-203 | | 750 | 72 | 36 | 36 | | |
| FLT-306 | PARTICULATE FILTER | Shawndra | P20-0202-RF-030, 99% at >10 micron | P-203 | | 650 | 50 | | | 16 | Piping component |
| HX-401 | MAIN HIGH PRESSURE AFTERCOOLER | VILTER | 10HP x 2 fan Air Cooled Gas Cooler | P-204 | 6 | 7,900 | 190 | 89 | 191 | | |
| V-502 | PSA BLOWDOWN BUFFER VESSEL | AIR LIQUIDE/Global | 102in. Dia x 384in CS | P-205 | 8 | 23,555 | | | 295 | 120 | |
| V-503A | ACTIVATED CARBON VESSEL - ACT 1 | AIR LIQUIDE/Schmidt | 84in Dia x 144in CS, Activated Carbon media | P-205 | 16 | 11,000 | 214 | | | 84 | Load with 13,644 lb media, install platforms |
| V-503B | ACTIVATED CARBON VESSEL - ACT 2 | AIR LIQUIDE/Schmidt | 84in Dia x 144in CS, Activated Carbon media | P-205 | 16 | 11,000 | 214 | | | 84 | Load with 13,644 lb media, install platforms |
| ME-504 | PROPANE SYSTEM | Amerigas or equal | 250gal | P-205 | | 500 | 94 | | | 32 | |
| ME-505 | THERMAL OXIDIZER | Catalytic Products | 15HP blower, Quadrant RRV 6000 | P-205 | 19 | 31,250 | 308 | 172 | 370 | | Stack Ht., assembled dimensions |
| ANZ-506 | WASTE GAS ANALYZER | Siemens or equal | Ultramat 23 or equal tbd | P-205 | | 750 | 72 | 36 | 36 | | |
| CMP-601 | GFP PLANT AIR COMPRESSOR PACKAGE | FS Curtis | 15HP, 58 CFM free air, 125psig, -40°F dewpoint | P-206 | 20 | 1,000 | 67 | 26 | 61 | | |
| S-701 | OIL/WATER SEPARATOR | Hausner | 500 gal SOW | P-207 | 24 | 6,000 | 50 | 48 | 91 | | Underground install |
| S-702 | AUTO SUMP WITH AUTO PUMP | Real Environmental | AutoSump 7000-I-24-DC | P-207 | 1 | 2,800 | 242 | | | 36 | Underground install |
| FLT-703 | VENT FILTER | Odorhog | OHOG-MUSHCAP 4" | P-207 | | 30 | 12 | | | 4 | piping component |
| CMP-802 | GCP PLANT AIR COMPRESSOR PACKAGE | FS Curtis | 10HP, 42 CFM free air, 125psig, -40°F dewpoint | P-208 | GCP | 950 | 67 | 26 | 61 | | |
| ME-801 | SALES GAS COMPRESSOR SYSTEM | VILTER | 300HP VSG-301 Flooded Single Screw | P-208 | GCP | 27,500 | 146 | 149 | 233 | | |
| ME-803 | CONDENSATE STORAGE TANK | Highland Tank | UST 550 gal Double Wall CS Epoxy Lined, Polyurethane Coated | P-208 | GCP | 6,600 | 72 | | | 48 | Underground Tank=2000 , 2 weights=2300/ea. |

| REVISION | Description of Rev | Date of Rev |
|---|---|---|
| C | Removed Odorization | 3/22/2017 |
| D | Added equipment details | 6/14/2017 |
| E | Added equipment weights, dims. | 6/15/2017 |
| F | Rev. ME-803 weights, V-503A/B media | 6/16/2017 |

Notes
1. See also Electrical Equipment List and complete Drawings for pipe racks and other lifts.
2. Items on P-208 are located at GCP on Buncombe Rd.

Construction Scope Breakdown                                                                    **SCS ENERGY**

Date: August, 2017

Project No.: 06214001.07

Subject:    UC Biomethane Project – Issued for Construction
            UC Construction Scope Breakdown

Please refer to the drawings, prime contract and other contract documents provided for an overview of the project. The project in general consists of two sites with a pipeline connecting them. The Gas Processing Plant (GPP) site is at the City of Shreveport Landfill which has its entrance at 10580 Woolworth Road, Keithville, LA 71047.  The smaller, green field site is the Gas Compression Plant (GCP) site at 7899 Buncombe Road, Shreveport, LA 74107.  The pipeline extension terminates at the GCP.

All Service Orders shall be firm fixed price with labor rates provided for use in the event of change orders for additional work. SCS may self-perform some portions of the project.

Construction Service Orders shall be provided as appropriate to the contracted scope of work, as organized below with the scope items identified by the following numbers.

**GPP**

1. Demo & Rough Grade
2. Structural – concrete
3. Structural – Steel pipe rack and misc. pipe supports, fab and install
4. Mechanical Underground HDPE
5. Relocation of existing flare
6. Mechanical and piping above grade
7. Electrical

**GCP**

8. Clear & Rough Grade
9. Structural – concrete &  Construct Road
10. Mechanical Underground HDPE & condensate tank
11. Mechanical and piping above grade
12. Electrical

**Pipeline (predominantly in the GCP drawing set)**

13. Fab and install HDPE pipeline

**Both sites:**

14. SCS Rigging and Setting equipment

Scope 01
Demolition and Grading for Construction at GPP                          SCS ENERGY

Date: June 16, 2017

Project No.: 06214001.07

Subject:   UC Biomethane Project – Issued for Construction
           Demolition and Grading for Construction at GPP

Please refer to the Service order, SCS drawings, prime contract and other contract documents
provided for an overview of the project requirements.  This scope of services includes the
demolition work and grading at the Gas Production Plant (GPP) site at the City of Shreveport
landfill (entrance at 10580 Woolworth Rd, Keithville, LA 71047).

# 1    BASE SCOPE OF SERVICES

With SCS Energy acting as the general contractor, the Demolition and Grading sub-contractor
(Contractor) will provide the following scope of services.

1. Verify location of existing live electrical power utilities including meters, conduits and
   wiring providing power to the existing open flare and landfill pumps.

2. Provide all services and material necessary for demolition of the existing concrete
   foundations, conduits, structural steel and other existing objects as indicated in the
   drawings and contract documents.

3. All work to be performed in accordance with project documents, applicable code, and
   good industry practice.

4. Clean-up and haul off of all debris generated by the Contractor **including demolished
   existing materials.**

5. Coordination of required work, inspections and testing with the work of other sub-
   contractors, electric utility and the overall project efforts.

# 2    WORK BY OTHERS

1. Utility power relocations.
2. Electrical
3. Controls
4. Pre-fabricated buildings

Scope 01
Demolition and Grading for Construction at GPP                    **SCS ENERGY**

## 3   COMMERCIAL

Contractor will provide the scope of services described herein for the lump-sum amount including.

1. Scope as defined herein and in the drawings and contract documents.
2. Freight costs for contractor supplied material to job site.  Contractor to provide freight bills supporting freight costs.

## 4   CLARIFICATIONS

1. **Sales and use taxes are to be paid by Contractor as applicable and billed to SCS in excess of the agreed upon lump sum contract.  The project qualifies for a state sales tax reduction but is not tax exempt.**
2. Non-prevailing wages are included.
3. Permit costs are excluded.
4. Subject to provisions of the prime contract between SCS and University of California.
5. **Based on normal working hours of 5 days/week, 10 hours per day.**
6. No cutting, patching, or painting other than penetrations to/from the modular control/electrical room buildings at each site as indicated on the drawings and contract documents.
7. Based on standard shipping for all material.
8. Utility charges, if incurred, by others.
9. **Dumpsters for trash, not construction debris, are to be provided by others.**

## 5   DOCUMENTS

The following documents are part of the contract by reference.

1. Terms and Conditions for Service Order for Construction Services.

2. UC / SCS Agreement documents for UC project PH7006 (Prime Contract) and change orders.

3. UC prime contract flowdowns – Construction.

4. SCS complete drawing package

5. SCS Electrical Equipment List

6. SCS Mechanical Equipment List

Scope 01

Demolition and Grading for Construction at GPP          `SCS ENERGY`

## 6    GENERAL ISSUES

1. The SCS service order including all exhibits and attachments shall be the governing contract document between Contractor and SCS.

2. Contractor shall comply with all SCS safety requirements as well as Parish, State and Federal safety requirements and good practice.

3. Contractor shall provide **updates to** their most recent three years of TRIR and EMR safety performance **every 6 months or in the event of serious injury or loss of life on any projects they are working on**. Upon request, Contractor shall provide records documenting the submitted TRIR and EMR performance.

4. All Contractor personnel on site shall:

    a. Sign-in and sign-out on the Personnel Log maintained by the SCS Site Superintendent/Construction Manager or their designee.

    b. Participate in daily tailgate safety meetings.

    c. Promptly report any injury to their supervisor.

    d. Be empowered to stop work by anyone on the site if they feel an unsafe condition exists.

    e. Cooperate with the Landfill owner and Operator as well as other contractors to minimize any disruption of the landfill operations.

5. Contractor shall keep their equipment, storage, and work areas clean and safe at all times. Contractor shall clean-up their work areas prior to leaving the facility at the end of each day and as required throughout the day.

6. **The project sites are smoking free areas. This includes all forms of tobacco, smoke, as well as e-cigarettes (vapor cigarettes).** There is a zero-tolerance policy in effect. No warnings will be given. Any person found to be using prohibited substances will be immediately escorted from the site and will be banned from working on the project, no exceptions. Please make sure all of your employees and subcontractors are aware of and abide by this requirement.

## 7    SCHEDULE

The current project schedule is attached. It is agreed and understood that it is the goal of the project team to complete the project according to the schedule or sooner. Contractor shall make reasonable efforts to meet this goal.

---

Scope 01
Demolition and Grading for Construction at GPP                    SCS ENERGY

# 8    INVOICING

Contractor shall submit invoices no more frequently than on a monthly basis in accordance with
the Terms and Conditions of the Service Order.

Progress payment invoices shall include:

1. Copies of red-lined drawings showing as-built condition as of the invoice date.

2. Conditional waiver and release of lien and right to claim against the payment bond upon
   progress payment on completed form appropriate to the project location/jurisdiction.

The final payment invoice shall include:

1. Red-lined drawings showing the final as-built condition of the facility.

2. O&M literature where available from the manufacturer for all material and equipment
   supplied by Contractor.

3. Conditional waiver and release of lien and right to claim against the payment bond upon
   final payment on completed form appropriate to the project location/jurisdiction.

4

Date: August 30, 2017

Project No.: 06214001.07

Subject:    UC Biomethane Project – Issued for Construction
            Structural Construction at GPP site

Please refer to the drawings, prime contract and other contract documents provided for an overview of the project.  This scope of services includes the structural concrete work at the Gas Processing Plant (GPP) site at the City of Shreveport Landfill which has its entrance at 10580 Woolworth Road, Keithville, LA 71047.


# 1    BASE SCOPE OF SERVICES

With SCS Energy acting as the general contractor, the structural sub-contractor (Contractor) will provide the following scope of services.

1.  Provide all services and material necessary for complete and functional structural concrete foundation system shown on the drawings and contract documents.

2.  Potholing as required to locate any underground interferences.

3.  Excavation of site as required to construct the structural concrete foundations indicated on the drawings and contract documents.

4.  Trenching for installation of piping and conduit within the sites. Conduit, ground grid and Piping installation by others.

5.  Backfill and compaction of conduit and piping trenches.

6.  Prepare site for foundation construction including Formwork and Reinforcement

7.  Placement of rebar, concrete and proper provisions for curing.

8.  Stripping of forms and clean up

9.  Backfill, preparation for and placement and crushed aggregate base or other paving as shown on the drawings.

10. Quality assurance tasks in cooperation with testing sub-contractor.

11. Repair of defects

12. Documentation of field changes with as built mark ups of drawings as needed.

Scope 02
RFP for Structural Construction at GPP                                        **SCS ENERGY**

13. All work to be performed in accordance with project documents, applicable code, and good industry practice.

**14.** Clean-up of all debris generated by the Contractor **including demolished existing materials.**

15. Coordination of required work, inspections and testing with the work of other sub-contractors and the overall project efforts.

## 2   WORK BY OTHERS

1. Materials testing and special inspections
2. HDPE pipeline extension between existing Renovar pipeline and GCP
3. Electrical
4. Controls
5. Pre-fabricated buildings

## 3   COMMERCIAL

Contractor will provide the scope of services described herein for the lump-sum amount including.

1. Scope as defined herein and in the drawings and contract documents.
2. Freight costs for contractor supplied material to job site.  Contractor to provide freight bills supporting freight costs.

## 4   CLARIFICATIONS

**1.** **Sales and use taxes are to be paid by Contractor as applicable and billed to SCS in excess of the agreed upon lump sum contract.  The project qualifies for a state sales tax reduction but is not tax exempt.**
2. Non-prevailing wages are included.
3. Permit costs are excluded.
4. Subject to provisions of the prime contract between SCS and University of California.
**5. Based on normal working hours of 5 days/week, 10 hours per day.**
6. Based on standard shipping for all material.
7. Utility charges, if incurred, by others.
**8. Dumpsters for trash, not construction debris, are to be provided by others.**

## 5   DOCUMENTS

The following documents are part of the contract by reference.

Scope 02
RFP for Structural Construction at GPP                                    SCS ENERGY

1. Terms and Conditions for Service Order for Construction Services.

2. UC / SCS Agreement documents for UC project PH7006 (Prime Contract) and change orders

3. UC prime contract flowdowns – Construction.

4. SCS drawing package

5. SCS Electrical Equipment List

6. SCS Mechanical Equipment List

# 6    GENERAL ISSUES

1. The SCS service order including all exhibits and attachments shall be the governing contract document between Contractor and SCS.

2. Contractor shall comply with all SCS safety requirements as well as Parish, State and Federal safety requirements and good practice.

3. Contractor shall provide **updates to** their most recent three years of TRIR and EMR safety performance **every 6 months or in the event of serious injury or loss of life on any projects they are working on**. Upon request, Contractor shall provide records documenting the submitted TRIR and EMR performance.

4. All Contractor personnel on site shall:

   a. Sign-in and sign-out on the Personnel Log maintained by the SCS Site Superintendent/Construction Manager or their designee.

   b. Participate in daily tailgate safety meetings.

   c. Promptly report any injury to their supervisor.

   d. Be empowered to stop work by anyone on the site if they feel an unsafe condition exists.

   e. Cooperate with the Landfill owner and Operator as well as other contractors to minimize any disruption of the landfill operations.

5. Contractor shall keep their equipment, storage, and work areas clean and safe at all times. Contractor shall clean-up their work areas prior to leaving the facility at the end of each day and as required throughout the day.

6. **The project sites are smoking free areas. This includes all forms of tobacco, smoke, as well as e-cigarettes (vapor cigarettes).** There is a zero-tolerance policy in effect. No

---

3

warnings will be given.  Any person found to be using prohibited substances will be immediately escorted from the site and will be banned from working on the project, no exceptions. Please make sure all of your employees and subcontractors are aware of and abide by this requirement.

# 7    SCHEDULE

The current project schedule is attached.  It is agreed and understood that it is the goal of the project team to complete the project according to the schedule or sooner.  Contractor shall make reasonable efforts to meet this goal.

# 8    INVOICING

Contractor shall submit invoices no more frequently than on a monthly basis in accordance with the Terms and Conditions of the Service Order.

Progress payment invoices shall include:

1.  Copies of red-lined drawings showing as-built condition as of the invoice date.

2.  Conditional waiver and release of lien and right to claim against the payment bond upon progress payment on completed form appropriate to the project location/jurisdiction.

The final payment invoice shall include:

1.  Red-lined drawings showing the final as-built condition of the facility.

2.  O&M literature where available from the manufacturer for all material and equipment supplied by Contractor.

3.  Conditional waiver and release of lien and right to claim against the payment bond upon final payment on completed form appropriate to the project location/jurisdiction.

Scope 03
RFP Structural Steel Fabrication and Installation                    SCS ENERGY

Date: August 30, 2017

Project No.: 06214001.07

Subject:    UC Biomethane Project – Request for Proposal
            Structural Steel Fabrication and Installation at GPP

Please refer to the drawings, prime contract and other contract documents provided for an overview of the project.  This scope of services includes the fabrication of the structural steel pipe rack and other pipe supports and miscellaneous steel fabrications for the GPP and GCP sites.

**The scope in general is to also** provide a proposal for delivery and field installation of these steel fabrications at the GPP site if their capabilities include such construction work.  The small pipe supports at the GCP will be installed by the mechanical piping contractor.

# 1    BASE SCOPE OF SERVICES

With SCS Energy acting as the general contractor, the Structural Steel sub-contractor (Contractor) **shall** provide the following scope of services.

1.  Fabricate all required steel pipe racks, pipe supports, instrument supports and miscellaneous steel fabrications for both sites included in the project.

2.  Verify location of pipe support foundations (Owner furnished).

3.  Provide all services and material necessary for complete and functional pipe rack and pipe support systems shown on the drawings and contract documents.

4.  All work to be performed in accordance with project documents, applicable code, and good industry practice.

5.  Surface protection touch up as needed, paint or galvanized per contract drawings and documents.

6.  Clean-up of all foreign objects and debris generated by the Contractor **including demolished existing materials.**

7.  Coordination of required work, inspections and testing with the work of other sub-contractors and the overall project efforts.

Scope 03
RFP Structural Steel Fabrication and Installation                    `SCS ENERGY`

## 2   WORK BY OTHERS

1. Electrical
2. Controls
3. Pre-fabricated buildings
4. Fencing and gates

## 3   COMMERCIAL

Contractor will provide the scope of services described herein for the lump-sum amount including.

1. Scope as defined herein and in the drawings and contract documents.
2. Freight costs for contractor supplied material to job site. Contractor to provide freight bills supporting freight costs.

## 4   CLARIFICATIONS

1. **Sales and use taxes are to be paid by Contractor as applicable and billed to SCS in excess of the agreed upon lump sum contract. The project qualifies for a state sales tax reduction but is not tax exempt.**
2. Non-prevailing wages are included.
3. Permit costs are excluded.
4. Subject to provisions of the prime contract between SCS and University of California.
5. **Based on normal working hours of 5 days/week, 10 hours per day.**
6. No cutting, patching, or painting other than penetrations to/from the modular control/electrical room buildings at each site as indicated on the drawings and contract documents.
7. Based on standard shipping for all material.
8. Utility charges, if incurred, by others.
9. **Dumpsters for trash, not construction debris, are to be provided by others.**

## 5   DOCUMENTS

The following documents are part of the contract by reference.

1. Terms and Conditions for Service Order for Construction Services.

2. UC / SCS Agreement documents for UC project PH7006 (Prime Contract) and change orders

3. UC prime contract flowdowns – Construction.

4. SCS drawing package

Page 345

Scope 03
RFP Structural Steel Fabrication and Installation                     **SCS ENERGY**

## 6    GENERAL ISSUES

1.  The SCS service order including all exhibits and attachments shall be the governing contract document between Contractor and SCS.

2.  Contractor shall comply with all SCS safety requirements as well as Parish, State and Federal safety requirements and good practice.

3.  Contractor shall provide their most recent three years of TRIR and EMR safety performance with their proposals.  Upon request, Contractor shall provide records documenting the submitted TRIR and EMR performance.

4.  All Contractor personnel on site shall:

    a.  Sign-in and sign-out on the Personnel Log maintained by the SCS Site Superintendent/Construction Manager or their designee.

    b.  Participate in daily tailgate safety meetings.

    c.  Promptly report any injury to their supervisor.

    d.  Be empowered to stop work by anyone on the site if they feel an unsafe condition exists.

    e.  Cooperate with the Landfill owner and Operator as well as other contractors to minimize any disruption of the landfill operations.

5.  Contractor shall keep their equipment, storage, and work areas clean and safe at all times. Contractor shall clean-up their work areas prior to leaving the facility at the end of each day and as required throughout the day.

6.  **The project sites are smoking free areas.  This includes all forms of tobacco, smoke, as well as e-cigarettes (vapor cigarettes).**  There is a zero-tolerance policy in effect.  No warnings will be given.  Any person found to be using prohibited substances will be immediately escorted from the site and will be banned from working on the project, no exceptions. Please make sure all of your employees and subcontractors are aware of and abide by this requirement.

## 7    SCHEDULE

The current project schedule is attached.  It is agreed and understood that it is the goal of the project team to complete the project according to the schedule or sooner.  Contractor shall make reasonable efforts to meet this goal.

Scope 03
RFP Structural Steel Fabrication and Installation                  SCS ENERGY

# 8    INVOICING

Contractor shall submit invoices no more frequently than on a monthly basis in accordance with the Terms and Conditions of the Service Order.

Progress payment invoices shall include:

1. Copies of red-lined drawings showing as-built condition as of the invoice date.

2. Conditional waiver and release of lien and right to claim against the payment bond upon progress payment on completed form appropriate to the project location/jurisdiction.

The final payment invoice shall include:

1. Red-lined drawings showing the final as-built condition of the facility.

2. O&M literature where available from the manufacturer for all material and equipment supplied by Contractor.

3. Conditional waiver and release of lien and right to claim against the payment bond upon final payment on completed form appropriate to the project location/jurisdiction.

Scope o4
Mechanical Underground Piping Construction at GPP                    **SCS ENERGY**

Date: August 30, 2017

Project No.: 06214001.07

Subject:   UC Biomethane Project – Issued for Construction
           Mechanical Underground Piping Construction at GPP

Please refer to the drawings, prime contract and other contract documents provided for an overview of the project. This scope of services includes the mechanical underground HDPE piping and underground vessels and associated work at the Gas Processing Plant (GPP) site.

# 1    BASE SCOPE OF SERVICES

With SCS Energy acting as the general contractor, the mechanical underground sub-contractor (Contractor) will provide the following scope of services.

1. Verify locations of relevant Mechanical equipment (Owner and Contractor furnished).

2. Install underground HDPE sump (Owner furnished) including poured concrete footing and all associated underground piping (Contractor furnished) at GPP.

3. Install underground pre-cast concrete Oil Water Separator (Owner furnished) at GPP.

4. Install all instrumentation associated with this scope (Owner furnished) per manufacturer's instructions.

5. Provide all services and material necessary for complete and functional underground HDPE piping systems at the GPP as indicated on the drawings and contract documents, with the exception of the pipeline between the existing line and the GCP site (UCOP Pipeline). The UCOP Pipeline installation is covered by a separate scope of work and contract.

6. Provide and install all piping, fittings, insulation, pipe supports, gaskets and other mechanical components for the following underground HDPE services at the GPP site.
   a. Portions of the gas systems including Landfill Gas (LFG), Product Gas, Waste Gas and located.
   b. Condensate.
   c. Water
   d. Plant Air

7. Pressure testing of all installed pipe per ASME 31.3 unless noted otherwise.

Scope o4
Mechanical Underground Piping Construction at GPP ███ SCS ENERGY ███

8. All work to be performed in accordance with project documents, applicable code, and good industry practice.

9. Clean-up of all foreign objects and debris generated by the Contractor **including demolished existing materials.**

10. Coordination of required work, inspections and testing with the work of other sub-contractors and the overall project efforts.

11. Provision of as built drawing mark ups for this scope of work.

## 2   WORK BY OTHERS

1. HDPE pipeline extension between existing Renovar pipeline and GCP (UCOP Pipeline).
2. Electrical
3. Controls
4. Pre-fabricated buildings

## 3   OWNER SUPPLIED EQUIPMENT

SCS will supply all mechanical equipment indicated on the Mechanical Equipment List for final installation and piping by the Contractor.  SCS will supply the following for installation and connection by the Contractor:

1. Valves
2. Instrumentation
3. Loose shipped vendor components as indicated on the contract and vendor drawings.

## 4   COMMERCIAL

Contractor will provide the scope of services described herein for the lump-sum amount including.

1. Scope as defined herein and in the drawings and contract documents.
2. Freight costs for contractor supplied material to job site.  Contractor to provide freight bills supporting freight costs.

## 5   CLARIFICATIONS

1. **Sales and use taxes are to be paid by Contractor as applicable and billed to SCS in excess of the agreed upon lump sum contract.  The project qualifies for a state sales tax reduction but is not tax exempt.**
2. Non-prevailing wages are included.
3. Permit costs are excluded.

Scope o4
Mechanical Underground Piping Construction at GPP                    **SCS ENERGY**

4. Subject to provisions of the prime contract between SCS and University of California.
5. **Based on normal working hours of 5 days/week, 10 hours per day.**
6. Based on standard shipping for all material.
7. Utility charges, if incurred, by others.
8. **Dumpsters for trash, not construction debris, are to be provided by others.**

# 6   DOCUMENTS

The following documents are part of the contract by reference.

1. Terms and Conditions for Service Order for Construction Services.

2. UC / SCS Agreement documents for UC project PH7006 (Prime Contract) and change orders

3. UC prime contract flowdowns – Construction.

4. SCS drawing package

5. SCS Electrical Equipment List

6. SCS Mechanical Equipment List

# 7   GENERAL ISSUES

1. The SCS service order including all exhibits and attachments shall be the governing contract document between Contractor and SCS.

2. Contractor shall comply with all SCS safety requirements as well as Parish, State and Federal safety requirements and good practice.

3. Contractor shall provide **updates to** their most recent three years of TRIR and EMR safety performance **every 6 months or in the event of serious injury or loss of life on any projects they are working on**.  Upon request, Contractor shall provide records documenting the submitted TRIR and EMR performance.

4. All Contractor personnel on site shall:

   a. Sign-in and sign-out on the Personnel Log maintained by the SCS Site Superintendent/Construction Manager or their designee.

   b. Participate in daily tailgate safety meetings.

   c. Promptly report any injury to their supervisor.

**SCS ENERGY**

    d.  Be empowered to stop work by anyone on the site if they feel an unsafe condition exists.

    e.  Cooperate with the Landfill owner and Operator as well as other contractors to minimize any disruption of the landfill operations.

5.  Contractor shall keep their equipment, storage, and work areas clean and safe at all times. Contractor shall clean-up their work areas prior to leaving the facility at the end of each day and as required throughout the day.

6.  **The project sites are smoking free areas.  This includes all forms of tobacco, smoke, as well as e-cigarettes (vapor cigarettes).** There is a zero-tolerance policy in effect.  No warnings will be given.  Any person found to be using prohibited substances will be immediately escorted from the site and will be banned from working on the project, no exceptions. Please make sure all of your employees and subcontractors are aware of and abide by this requirement.

# 8   SCHEDULE

The current project schedule is attached.  It is agreed and understood that it is the goal of the project team to complete the project according to the schedule or sooner.  Contractor shall make reasonable efforts to meet this goal.

# 9   INVOICING

Contractor shall submit invoices no more frequently than on a monthly basis in accordance with the Terms and Conditions of the Service Order.

Progress payment invoices shall include:

1.  Copies of red-lined drawings showing as-built condition as of the invoice date.

2.  Conditional waiver and release of lien and right to claim against the payment bond upon progress payment on completed form appropriate to the project location/jurisdiction.

The final payment invoice shall include:

1.  Red-lined drawings showing the final as-built condition of the facility.

2.  O&M literature where available from the manufacturer for all material and equipment supplied by Contractor.

3.  Conditional waiver and release of lien and right to claim against the payment bond upon final payment on completed form appropriate to the project location/jurisdiction.

Date: June 16, 2017

Project No.: 06214001.07

Subject:    UC Biomethane Project – Request for Proposal
            Relocation of Existing Flare and Air Compressor at the GPP site

Please refer to the drawings, prime contract and other contract documents provided for an
overview of the project.  This scope of services includes the relocation of the existing flare and
air compressor at the Gas Production Plant (GPP) site at the City of Shreveport landfill (entrance
at 10580 Woolworth Rd, Keithville, LA 71407)

# 1    BASE SCOPE OF SERVICES

With SCS Energy acting as the general contractor, the sub-contractor (Contractor) will provide
the following scope of services.

1.  Verify locations all relevant equipment, electrical power supply and foundations (Owner
    and Contractor furnished).

2.  Coordinate work with SCS Construction Manager, City of Shreveport Landfill operations
    and flare owner (Renovar) prior to and during operations.

3.  Provide all services and material necessary for relocation of the existing equipment to
    provide functional systems in the new locations as indicated on the drawings and contract
    documents.

4.  Provide and install all piping, fittings, insulation, pipe supports, gaskets and other
    mechanical components as required to disconnect at the existing locations and reconnect
    at the new locations the following services.

    a.  Landfill Gas
    b.  Condensate
    c.  Compressed Air

5.  Provide crane, operator, rigging accessories as needed.

6.  Provide electrician as needed for disconnection of equipment from existing power feed
    and reconnection at the new locations.

7.  All work to be performed in accordance with project documents, applicable code, and
    good industry practice.

8.  Clean-up of all debris generated by the Contractor.

1

9. Coordination of required work, inspections and testing with the work of other sub-contractors and the overall project efforts.

# 2   WORK BY OTHERS

1. Civil
2. Concrete

# 3   COMMERCIAL

Contractor will provide the scope of services described herein for the lump-sum amount including.

1. Scope as defined herein and in the drawings and contract documents.
2. Freight costs for contractor supplied material to job site.  Contractor to provide freight bills supporting freight costs.

# 4   CLARIFICATIONS

1. Sales taxes are to be included.
2. Non-prevailing wages are included.
3. Permit costs are excluded.
4. Subject to provisions of the prime contract between SCS and University of California.
5. Based on normal working hours.
6. Based on standard shipping for all material.
7. Utility charges, if incurred, by others.
8. Dumpsters are to be provided by others.

# 5   DOCUMENTS

The following documents are part of the contract by reference.

1. Terms and Conditions for Service Order for Construction Services.

2. UC / SCS Agreement documents for UC project PH7006 (Prime Contract) and change orders

3. UC prime contract flowdowns – Construction.

4. SCS drawing package

5. SCS Electrical Equipment List

6. SCS Mechanical Equipment List

## 6   GENERAL ISSUES

1.  The SCS service order including all exhibits and attachments shall be the governing contract document between Contractor and SCS.

2.  Contractor shall comply with all SCS safety requirements as well as Parish, State and Federal safety requirements and good practice.

3.  Contractor shall provide their most recent three years of TRIR and EMR safety performance with their proposals.  Upon request, Contractor shall provide records documenting the submitted TRIR and EMR performance.

4.  All Contractor personnel on site shall:

    a.  Sign-in and sign-out on the Personnel Log maintained by the SCS Site Superintendent/Construction Manager or their designee.

    b.  Participate in daily tailgate safety meetings.

    c.  Promptly report any injury to their supervisor.

    d.  Be empowered to stop work by anyone on the site if they feel an unsafe condition exists.

    e.  Cooperate with the Landfill owner and Operator as well as other contractors to minimize any disruption of the landfill operations.

5.  Contractor shall keep their equipment, storage, and work areas clean and safe at all times. Contractor shall clean-up their work areas prior to leaving the facility at the end of each day and as required throughout the day.

6.  The project sites are tobacco free areas.  This includes all forms of tobacco, smoke and smokeless, as well as e-cigarettes (vapor cigarettes). There is a zero-tolerance policy in effect.  No warnings will be given.  Any person found to be using prohibited substances will be immediately escorted from the site and will be banned from working on the project, no exceptions. Please make sure all of your employees and subcontractors are aware of and abide by this requirement.

## 7   SCHEDULE

This scope of work must be completed in four working days or less from the time the flare is shut down in its existing location to when it is restarted in the new location.

---

3

RFP for Relocation of Existing Flare and Air Compressor          SCS ENERGY

The current project schedule is attached.  It is agreed and understood that it is the goal of the project team to complete the project according to the schedule or sooner.  Contractor shall make reasonable efforts to meet this goal.

# 8    INVOICING

Contractor shall submit invoices no more frequently than on a monthly basis in accordance with the Terms and Conditions of the Service Order.

Progress payment invoices shall include:

1.  Copies of red-lined drawings showing as-built condition as of the invoice date.

2.  Conditional waiver and release of lien and right to claim against the payment bond upon progress payment on completed form appropriate to the project location/jurisdiction.

The final payment invoice shall include:

1.  Red-lined drawings showing the final as-built condition of the facility.

2.  O&M literature where available from the manufacturer for all material and equipment supplied by Contractor.

3.  Conditional waiver and release of lien and right to claim against the payment bond upon final payment on completed form appropriate to the project location/jurisdiction.

Scope 06
Mechanical Construction at GPP site                                    ██ SCS ENERGY ██

Date: August 30, 2017

Project No.: 06214001.07

Subject:    UC Biomethane Project – Issued for Construction
            Mechanical Construction at GPP site

Please refer to the drawings, prime contract and other contract documents provided for an
overview of the project.  This scope of services includes the mechanical work at the Gas
Production Plant (GPP) site at the City of Shreveport Landfill (entrance at 10580 Woolworth Rd,
Keithville, LA 71047).

# 1    BASE SCOPE OF SERVICES

With SCS Energy acting as the general contractor, the mechanical sub-contractor (Contractor)
will provide the following scope of services.

1.  Verify location and anchor all Mechanical equipment and pipe supports in coordination
    with rigging sub-contractor (Owner and Contractor furnished).

2.  Install all instrumentation (Owner furnished).  Includes supply of impulse tubing and
    fittings.

3.  Provide all services and material necessary for complete and functional underground and
    above ground piping systems shown on the drawings and contract documents, with the
    exception of the pipeline between the existing line and the GCP site (Pipeline).  The
    Pipeline installation is covered by a separate scope of work and contract.

4.  Provide and install all piping, fittings, insulation, pipe supports, gaskets and other
    mechanical components for the following services.
    a.  All gas systems including Landfill Gas (LFG), Product Gas, Waste Gas and
        Propane located on the two sites except for Underground HDPE pipe.
    b.  Condensate
    c.  Oil
    d.  Refrigerant
    e.  Air
    f.  Water
    g.  Nitrogen

5.  Pressure testing of all installed pipe per ASME 31.3 unless noted otherwise.

6.  All work to be performed in accordance with project documents, applicable code, and
    good industry practice.

7.  Prestart-up tasks for LFG and refrigeration compressors per manufacturer's requirements.

8.  Charging of refrigeration system with R-134a refrigerant.

9.  Loading of media into carbon vessels (ACT-1 & 2) and Polishing Vessels (Carbon and Silica).

10. Clean-up of all debris generated by the Contractor.

11. Coordination of required work, inspections and testing with the work of other sub-contractors and the overall project efforts.


# 2   WORK BY OTHERS

1. **GCP Mechanical**
2. HDPE pipeline extension between existing Renovar pipeline and GCP.
3. Electrical
4. Controls
5. Pre-fabricated buildings

# 3   OWNER SUPPLIED EQUIPMENT

SCS will supply all mechanical equipment indicated on the Mechanical Equipment List for final installation and piping by the Contractor.  SCS will supply the following for installation and connection by the Contractor:

1. Valves
2. Instrumentation
3. Loose shipped vendor components as indicated on the contract and vendor drawings.


# 4   COMMERCIAL

Contractor will provide the scope of services described herein for the lump-sum amount including.

1. Scope as defined herein and in the drawings and contract documents.
2. Freight costs for contractor supplied material to job site.  Contractor to provide freight bills supporting freight costs.

Scope 06
Mechanical Construction at GPP site                    ▮ SCS ENERGY ▮

## 5   CLARIFICATIONS

1. **Sales and use taxes are to be paid by Contractor as applicable and billed to SCS in excess of the agreed upon lump sum contract.  The project qualifies for a state sales tax reduction but is not tax exempt.**
2. Non-prevailing wages are included.
3. Permit costs are excluded.
4. Subject to provisions of the prime contract between SCS and University of California.
5. **Based on normal working hours of 5 days/week, 10 hours per day.**
6. No cutting, patching, or painting other than penetrations to/from the modular control/electrical room buildings at each site as indicated on the drawings and contract documents.
7. Based on standard shipping for all material.
8. **Dumpsters for trash, not construction debris, are to be provided by others.**

## 6   DOCUMENTS

The following documents are part of the contract by reference.

1. Terms and Conditions for Service Order for Construction Services.

2. UC / SCS Agreement documents for UC project PH7006 (Prime Contract) and change orders

3. UC prime contract flowdowns – Construction.

4. SCS drawing package

5. SCS Electrical Equipment List

6. SCS Mechanical Equipment List

## 7   GENERAL ISSUES

1. The SCS service order including all exhibits and attachments shall be the governing contract document between Contractor and SCS.

2. Contractor shall comply with all SCS safety requirements as well as Parish, State and Federal safety requirements and good practice.

3. Contractor shall provide **updates to** their most recent three years of TRIR and EMR safety performance **every 6 months or in the event of serious injury or loss of life on any projects they are working on**.  Upon request, Contractor shall provide records documenting the submitted TRIR and EMR performance.

Scope 06
Mechanical Construction at GPP site                    **SCS ENERGY**

4.  All Contractor personnel on site shall:

    a.  Sign-in and sign-out on the Personnel Log maintained by the SCS Site Superintendent/Construction Manager or their designee.

    b.  Participate in daily tailgate safety meetings.

    c.  Promptly report any injury to their supervisor.

    d.  Be empowered to stop work by anyone on the site if they feel an unsafe condition exists.

    e.  Cooperate with the Landfill owner and Operator as well as other contractors to minimize any disruption of the landfill operations.

5.  Contractor shall keep their equipment, storage, and work areas clean and safe at all times. Contractor shall clean-up their work areas prior to leaving the facility at the end of each day and as required throughout the day.

6.  **The project sites are smoking free areas.  This includes all forms of tobacco, smoke, as well as e-cigarettes (vapor cigarettes).**  There is a zero-tolerance policy in effect.  No warnings will be given.  Any person found to be using prohibited substances will be immediately escorted from the site and will be banned from working on the project, no exceptions. Please make sure all of your employees and subcontractors are aware of and abide by this requirement.

# 8   SCHEDULE

The current project schedule is attached.  It is agreed and understood that it is the goal of the project team to complete the project according to the schedule or sooner.  Contractor shall make reasonable efforts to meet this goal.

# 9   INVOICING

Contractor shall submit invoices no more frequently than on a monthly basis in accordance with the Terms and Conditions of the Service Order.

Progress payment invoices shall include:

1.  Copies of red-lined drawings showing as-built condition as of the invoice date.

2.  Conditional waiver and release of lien and right to claim against the payment bond upon progress payment on completed form appropriate to the project location/jurisdiction.

The final payment invoice shall include:

SCS ENERGY

Case 2:19-cv-01134-JAK-JC   Document 1-3   Filed 11/09/18   Page 360 of 377   Page ID #:400

Scope 06
Mechanical Construction at GPP site

1.  Red-lined drawings showing the final as-built condition of the facility.

2.  O&M literature where available from the manufacturer for all material and equipment supplied by Contractor.

3.  Conditional waiver and release of lien and right to claim against the payment bond upon final payment on completed form appropriate to the project location/jurisdiction.

Date: August 30, 2017

Project No.: 06214001.07

Subject:    UC Biomethane Project – Request for Proposal
            Equipment Rigging

Please refer to the drawings, prime contract and other contract documents provided for an overview of the project.  This scope of services includes the Rigging work at both GPP and GCP sites.

# 1    BASE SCOPE OF SERVICES

With SCS Energy acting as the general contractor, the Rigging sub-contractor (Contractor) will provide the following scope of services.

1. Verify locations, clearances, access, traffic control and other requirements including the load weights and dimensions for the scope of work to be completed.

2. Provide all services and material necessary for unloading from flatbed (unless noted otherwise) trucks of all major equipment indicated on the drawings and contract documents and Mechanical Equipment List which have a weight of 2,000 pounds or more.

3. The rigging associated with the pipeline between the existing line and the GCP site (Pipeline) is excluded from this scope of work.  The Pipeline installation is covered by a separate scope of work and contract.

4. Unloading and setting of electrical equipment is also excluded as it is part of the electrical sub-contractors scope.

5. Work in coordination with the Mechanical contractor to verify location and allow for anchoring of the equipment by the Mechanical contractor.

6. All work to be performed in accordance with project documents, applicable code, and good industry practice.

7. Clean-up of all debris generated by the Contractor **including demolished existing materials.**

8. Coordination of required work, inspections and testing with the work of other sub-contractors and the overall project efforts.

## 2   WORK BY OTHERS

1. Procurement and shipping to the site of **the equipment listed in the contract documents.**
2. HDPE pipeline extension between existing Renovar pipeline and GCP.
3. Electrical
4. Controls
5. Pre-fabricated buildings fabrication, delivery and installation.

## 3   OWNER SUPPLIED EQUIPMENT

SCS will supply all mechanical equipment indicated on the Mechanical Equipment List for final installation by the Contractor.

## 4   COMMERCIAL

Contractor will provide the scope of services described herein for the lump-sum amount including.

1. Scope as defined herein and in the drawings and contract documents.
2. Freight costs, if any, for contractor supplied material to job site.  Contractor to provide freight bills supporting freight costs.
3. Provide daily rates for crane and operators as well as mobilization costs for use in the event of change orders or delays which require additional work.

## 5   CLARIFICATIONS

1. **Sales and use taxes are to be paid by Contractor as applicable and billed to SCS in excess of the agreed upon lump sum contract.  The project qualifies for a state sales tax reduction but is not tax exempt.**
2. Non-prevailing wages are included.
3. Permit costs are excluded.
4. Subject to provisions of the prime contract between SCS and University of California.
5. **Based on normal working hours of 5 days/week, 10 hours per day.**
6. Based on standard shipping for all material.
7. Utility charges, if incurred, by others.
8. **Dumpsters for trash, not construction debris, are to be provided by others.**

## 6   DOCUMENTS

The following documents are part of the contract by reference.

1. Terms and Conditions for Service Order for Construction Services.

2.  UC / SCS Agreement documents for UC project PH7006 (Prime Contract) and change orders

3.  UC prime contract flowdowns – Construction.

4.  SCS drawing package

5.  SCS Electrical Equipment List

6.  SCS Mechanical Equipment List

# 7   GENERAL ISSUES

1.  The SCS service order including all exhibits and attachments shall be the governing contract document between Contractor and SCS.

2.  Contractor shall comply with all SCS safety requirements as well as Parish, State and Federal safety requirements and good practice.

3.  Contractor shall provide their most recent three years of TRIR and EMR safety performance with their proposals.  Upon request, Contractor shall provide records documenting the submitted TRIR and EMR performance.

4.  All Contractor personnel on site shall:

    a.  Sign-in and sign-out on the Personnel Log maintained by the SCS Site Superintendent/Construction Manager or their designee.

    b.  Participate in daily tailgate safety meetings.

    c.  Promptly report any injury to their supervisor.

    d.  Be empowered to stop work by anyone on the site if they feel an unsafe condition exists.

    e.  Cooperate with the Landfill owner and Operator as well as other contractors to minimize any disruption of the landfill operations.

5.  Contractor shall keep their equipment, storage, and work areas clean and safe at all times. Contractor shall clean-up their work areas prior to leaving the facility at the end of each day and as required throughout the day.

6.  **The project sites are smoking free areas.  This includes all forms of tobacco, smoke, as well as e-cigarettes (vapor cigarettes).**  There is a zero-tolerance policy in effect.  No warnings will be given.  Any person found to be using prohibited substances will be immediately escorted from the site and will be banned from working on the project, no

Case 2:19-cv-01134-JAK-JC   Document 1-3   Filed 11/09/18   Page 364 of 377   Page ID
#:404
Scope 14
Equipment Rigging and Installation at GCP and GPP                              SCS ENERGY

exceptions. Please make sure all of your employees and subcontractors are aware of and abide by this requirement.

# 8    SCHEDULE

The current project schedule is attached.  It is agreed and understood that it is the goal of the project team to complete the project according to the schedule or sooner.  Contractor shall make reasonable efforts to meet this goal.

# 9    INVOICING

Contractor shall submit invoices no more frequently than on a monthly basis in accordance with the Terms and Conditions of the Service Order.

Progress payment invoices shall include:

1.  Copies of red-lined drawings showing as-built condition as of the invoice date.

2.  Conditional waiver and release of lien and right to claim against the payment bond upon progress payment on completed form appropriate to the project location/jurisdiction.

The final payment invoice shall include:

1.  Red-lined drawings showing the final as-built condition of the facility.

2.  O&M literature where available from the manufacturer for all material and equipment supplied by Contractor.

3.  Conditional waiver and release of lien and right to claim against the payment bond upon final payment on completed form appropriate to the project location/jurisdiction.



# ISM Industries

Marlena Garcia
16645 IH-10
Vidor, Texas 77662

Quote No. 17-032
Rev-3

Attn: Ted Wheeler

Re: UC Biomethane Facility

Mr. Wheeler:

ISM Industries (ISM) is pleased to submit our Lump Sum Proposal to furnish labor, supervision, equipment and Subs to perform the mechanical portion of the above referenced project.

Our Lump Sum Proposal to perform work as described herein is listed below.

Addendum 1- Request for Proposal, dated 6/26/17
Addendum 2- Electrical & Piping Specs, dated 7/6/17
Addendum 3- Responses to Contractor Questions, dated 7/6/17
Addendum 4- Bid Due Date Extension, dated 7/11/17

**Gas Processing Plant (GPP), located at the City of Shreveport Landfill at 10580 Woolworth Rd., Keithville, LA 71047**

## Scope 1- Demolition and Grading for Construction at GPP

1. Verify location of existing live electrical power utilities including meters, conduits and wiring providing power to the existing open flare and landfill pumps.

2. Provide all services and material necessary for demolition of the existing concrete foundations, conduits, structural steel and other existing objects as indicated in the drawings and contract documents.

3. All work to be performed in accordance with project documents, applicable code, and good industry practice.

4. Clean-up of all debris generated by the Contractor.

---



# ISM Industries

5. Coordination of required work, inspections and testing with the work of other sub- contractors, electric utility and the overall project efforts.

## Scope 2- Structural Construction at GPP Site

1. Provide all services and material necessary for complete and functional structural concrete foundation system shown on the drawings and contract documents.
2. Potholing as required to locate any underground interferences.
3. Excavation of site as required to construct the structural concrete foundations indicated on the drawings and contract documents.
4. Trenching for installation of piping and conduit within the sites. Conduit, ground grid and Piping installation by others.
5. Backfill and compaction of conduit and piping trenches.
6. Prepare site for foundation construction including Formwork and Reinforcement
7. Placement of rebar, concrete and proper provisions for curing.
8. Stripping of forms and clean up
9. Backfill, preparation for and placement and crushed aggregate base or other paving as shown on the drawings.
10. Quality assurance tasks in cooperation with testing sub-contractor.
11. Repair of defects
12. Documentation of field changes with as built mark ups of drawings as needed.
13. All work to be performed in accordance with project documents, applicable code, and good industry practice.
14. Clean-up of all debris generated by the Contractor.



# ISM Industries

---

15. Coordination of required work, inspections and testing with the work of other sub-contractors and the overall project efforts.

16. Fencing- 6' height with 3-strand barbed wire, (3) each 20' wide x 6' high swing gates, (4) each 3'-9" x 6' high swing gates

17. Bollards- 12 each

18. 18. Gate at Roadway Crossing- 16' wide x 6' high gate

### Scope 3- Structural Steel Fabrication and Installation at GPP

1. Fabricate all required steel pipe racks, pipe supports, instrument supports and miscellaneous steel fabrications for both sites included in the project.

2. Verify location of pipe support foundations (Owner furnished).

3. Provide all services and material necessary for complete and functional pipe rack and pipe support systems shown on the drawings and contract documents.

4. All work to be performed in accordance with project documents, applicable code, and good industry practice.

5. Surface protection touch up as needed, paint or galvanized per contract drawings and documents.

6. Clean-up of all foreign objects and debris generated by the Contractor.

7. Coordination of required work, inspections and testing with the work of other sub-contractors and the overall project efforts.

### Scope 4- Mechanical Underground Piping Construction at GPP, Rev. 1

1. Verify locations of relevant Mechanical equipment (Owner and Contractor furnished).

2. Install underground HDPE sump (Owner furnished) including poured concrete footing and all associated underground piping (Contractor furnished) at GPP.

3. Install underground pre-cast concrete Oil Water Separator (Owner furnished) at GPP.

---

**ISM Industries**
**16645 Vidor, Texas 77662**
**Fax Number -409-769-7748**



# ISM Industries

4. Install all instrumentation associated with this scope (Owner furnished) per manufacturer's instructions.

5. Provide all services and material necessary for complete and functional underground HDPE piping systems at the GPP as indicated on the drawings and contract documents, with the exception of the pipeline between the existing line and the GCP site (UCOP Pipeline).  The UCOP Pipeline installation is covered by a separate scope of work and contract.

6. Provide and install all piping, fittings, insulation, pipe supports, gaskets and other mechanical components for the following underground HDPE services at the GPP site.
   a. Portions of the gas systems including Landfill Gas (LFG), Product Gas, Waste Gas and located.
   b. Condensate.
   c. Water
   d. Plant Air

7. Pressure testing of all installed pipe per ASME 31.3 unless noted otherwise.

8. All work to be performed in accordance with project documents, applicable code, and good industry practice.

9. Clean-up of all foreign objects and debris generated by the Contractor.

10. Coordination of required work, inspections and testing with the work of other sub-contractors and the overall project efforts.

11. Provision of as built drawing mark ups for this scope of work.



# ISM Industries

### Scope 5- Relocation of Existing Flare and Air Compressor at the GPP Site

1. Verify locations all relevant equipment, electrical power supply and foundations (Owner and Contractor furnished).

2. Coordinate work with SCS Construction Manager, City of Shreveport Landfill operations and flare owner (Renovar) prior to and during operations.

3. Provide all services and material necessary for relocation of the existing equipment to provide functional systems in the new locations as indicated on the drawings and contract documents.

4. Provide and install all piping, fittings, insulation, pipe supports, gaskets and other mechanical components as required to disconnect at the existing locations and reconnect at the new locations the following services.

    a. Landfill Gas
    b. Condensate
    c. Compressed Air

5. Provide crane, operator, rigging accessories as needed.

6. Provide electrician as needed for disconnection of equipment from existing power feed and reconnection at the new locations.

7. All work to be performed in accordance with project documents, applicable code, and good industry practice.

8. Clean-up of all debris generated by the Contractor.

9. Coordination of required work, inspections and testing with the work of other sub-contractors and the overall project efforts.

# ISM Industries

**Fabrication :: Field Services**

# ISM Industries

## Scope 6- Mechanical Construction at GPP Site

1. Verify location and anchor all Mechanical equipment and pipe supports in coordination with rigging sub-contractor (Owner and Contractor furnished).

2. Install all instrumentation (Owner furnished). Includes supply of impulse tubing and fittings.

3. Provide all services and material necessary for complete and functional underground and above ground piping systems shown on the drawings and contract documents, with the exception of the pipeline between the existing line and the GCP site (Pipeline). The Pipeline installation is covered by a separate scope of work and contract.

4. Provide and install all piping, fittings, insulation, pipe supports, gaskets and other mechanical components for the following services.
    a. All gas systems including Landfill Gas (LFG), Product Gas, Waste Gas and Propane located on the two sites except for Underground HDPE pipe.
    b. Condensate
    c. Oil
    d. Refrigerant
    e. Air
    f. Water
    g. Nitrogen

5. Pressure testing of all installed pipe per ASME 31.3 unless noted otherwise.

6. All work to be performed in accordance with project documents, applicable code, and good industry practice.

7. Prestart-up tasks for LFG and refrigeration compressors per manufacturer's requirements.

8. Charging of refrigeration system with R-134a refrigerant.

9. Loading of media into carbon vessels (ACT-1 & 2) and Polishing Vessels (Carbon and Silica).

10. Clean-up of all debris generated by the Contractor.

11. Coordination of required work, inspections and testing with the work of other sub-contractors and the overall project efforts.

---

**ISM Industries**
**16645 Vidor, Texas 77662**
**Fax Number -409-769-7748**



# ISM Industries

## Scope 14- Equipment Rigging

1. Verify locations, clearances, access, traffic control and other requirements including the load weights and dimensions for the scope of work to be completed.

2. Provide all services and material necessary for unloading from flatbed (unless noted otherwise) trucks of all major equipment indicated on the drawings and contract documents and Mechanical Equipment List which have a weight of 2,000 pounds or more.

3. The rigging associated with the pipeline between the existing line and the GCP site (Pipeline) is excluded from this scope of work.  The Pipeline installation is covered by a separate scope of work and contract.

4. Unloading and setting of electrical equipment is also excluded as it is part of the electrical sub-contractor's scope.

5. Work in coordination with the Mechanical contractor to verify location and allow for anchoring of the equipment by the Mechanical contractor.

6. All work to be performed in accordance with project documents, applicable code, and good industry practice.

7. Clean-up of all debris generated by the Contractor.

8. Coordination of required work, inspections and testing with the work of other sub-contractors and the overall project efforts.

9. ISM is only responsible for the unloading of the equipment. The GC at the GCP site will be responsible for escorting the delivery trucks on to the job location and staging them in position to be un loaded safely

10. ISM expects to unload directly from delivery truck to its permanent location. There is no double handling allowed for. If it is required to be unloaded and then trucked in to the site there will be additional cost passed on at cost plus 10 percent.

**ISM Industries**
**16645 Vidor, Texas 77662**
**Fax Number -409-769-7748**



# ISM Industries

11. ISM has allowed for 5 weeks of crane support only based on 5-10's at the GCP site. GPP site is under ISM control and is in our cost. If ISM is asked to work beyond a Monday through Friday at the GPP site schedule then ISM will submit a change order for the additional Equipment and Labor cost for Saturday and Sunday work. This will include T and M rates for direct and indirect staff, Equipment, Perdiem. ISM will discuss personal needed if asked two work beyond our normal Monday through Friday schedule.

12. ISM has allowed for spreader bar for the big lifts only. ISM will use all Safe and Current rigging practices on all other equipment.

Project Start Date- 8/21/17
Scheduled Completion: 2/21/18

Project Schedule:  5 days per week/ 10 hours per day

---

**ISM Industries**
**16645 Vidor, Texas 77662**
**Fax Number -409-769-7748**



## ISM Industries

**Pricing:**

|  | Original | Revised-3 |
|---|---|---|
| **GPP SITE PRICING:** |  |  |
| Scope 1- Demolition and Grading for Construction at GPP | $ 68,800.00 | $ 72,240.00 |
| Scope 2- Structural Construction at GPP Site | $516,562.00 | $ 525,000.00 |
| Scope 3- Structural Steel Fabrication and Installation at GPP | $237,448.00 | $247,300.00 |
| Scope 4- Mechanical Underground Piping Construction at GPP, Rev. 1 | $275,000.00 | $288,750.00 |
| Scope 5- Relocation of Existing Flare and Air Compressor at the GPP Sit | $ 65,000.00 | $ 71,662.00 |
| Scope 6- Mechanical Construction at GPP Site | $305,000.00 | $ 314,150.00 |
| Scope 14- SCS Rigging and setting Equipment | $155,000.00 | $ 142,000.00 |
| Disposal and Haul off Adder- | $ 23,500.00 | $ 23,500.00 |

| **TOTAL-** | **$1,515,967.0** | **$1,684,602.00** |
|---|---|---|
| **If Performance/ Payment Bond estimated cost at 1.5%** |  | $25,270.00 |
|  |  | **$ 1,709,872.00** |

Should you have any questions about our proposal, please feel free to contact me at your convenience.

We appreciate the opportunity to quote this project and hope to be of continuing service to you in the future. We look forward to providing you with a safe and successful project.

Sincerely,

*Floyd Burnside*

V.P. of Construction
Cell:409.828.2229
Email:Fburnside@ismfab.com

CLARIFICATIONS

**ISM Industries**
**16645 Vidor, Texas 77662**
**Fax Number -409-769-7748**

Page 373

# ISM Industries

1. All construction activities shall be in accordance with the following codes and regulations or their approved equal:
   - ➢ American Petroleum Institute (API)
   - ➢ American Society of Civil Engineers (ASCE)
   - ➢ American Society of Mechanical Engineers (ASME)
   - ➢ American Society for Testing and Materials (ASTM)
   - ➢ Occupational Safety and Health Administration (OSHA)

2. Our proposal is based on ISM Industries Standard Commercial General Liability Insurance Policy already on file with SCS Energy.

3. Our proposal does not include the following:
   a. **Bonding fees- included at 1.5 Percent +/- .005%- Waiting on GL to get back with us on official price**
   b. Permitting fees
   c. ~~Disposal of excavated materials offsite~~ – Included – REV-1
   d. Contaminant testing of spoils
   e. Underground obstructions
   f. Procurement of equipment or materials provided by Owner
   g. Specialty machining/ milling
   h. Fireproofing of pipe supports
   i. Cathodic protection on piping
   j. Engineering services
   k. Hydro excavating
   l. Temporary power
   m. Premium time/ holidays
   n. SCADA system
   o. Frac Tanks
   p. Pigging
   q. Weather delays

      i. Any weather delays that cause rain-outs, mud-outs, etc. that cause our employees to be sent home at the start of work shift will be billed 2-hour show up time at T&M rates. ISM

---

**ISM Industries**
**16645 Vidor, Texas 77662**
**Fax Number -409-769-7748**



# ISM Industries

      Industries will document the show-up time on timesheets that will be signed by an authorized representative. To be determined at contract signing.

      ii.  Any weather delays due to wind, rain, ice, etc. for 3rd party equipment will be reimbursed to ISM Industries as per minimum daily rates set forth by equipment vendor.

      iii.  Any weather delays due to wind, rain, ice, etc. for Subcontractors will be reimbursed to ISM Industries as per minimum daily rates set forth by Subcontractor

r.  Stand-by time/ lost time

      i.  Any stand-by/ lost time due to operations will be billed to SCS Energy at T&M rates for labor, equipment, and subcontractors.

      ii.  Per Diem

s.  Taxes (Any applicable taxes will be billed with each progress billing)

4.  Our proposal is based on continuous work activities. If ISM is asked to demobilize and come back to the project site at a later date, a remobilization fee of $13,500.00 will be billed to the client. No, the fee would not apply during the time frame of 2-3 weeks. Remobilization fees would only apply if we would have to demobilize all project personnel and equipment from the project site.

5.  Our proposal is based on receiving the entire work scope. Reduction of work task items will need to be reevaluated for overall project cost. Line item totals are for accounting purposes only. ISM had to go back and add cost to items 1-6 due to not being awarded the complete project per our original clarifications. (in Black) do to all cost being broke out originally through items 1-14

6.  Our proposal includes the items listed in the scope of work only. Any additional work will be discussed with Ted Wheeler and a change order will be issued.

7.  Our proposal does not include any rework resulting to damages on the property due to acts of god or Mother Nature.

8.  Payment Terms: Net 30 days, weekly progress billing to be submitted with all back-up

9.  This proposal is valid for 30 days from date of issue.

10. ~~If while boring of underground pipe rock is hit during bore process there will be an additional charge of 15.00 a foot on top of the current pipe line cost. (15.00 x 1800) this is not included in our current number.~~ No boring is included in ISM scope at GPP site.

11. ~~Our proposal is based off of working both sites at the same time.~~ ISM is only being considered for items 1-6 and our revised proposal is based on those items.

**ISM Industries**
**16645 Vidor, Texas 77662**
**Fax Number -409-769-7748**



# ISM Industries

12. ~~Our price does not include transforming, purchasing or any other possibility of damage to wetlands while boring .~~ISM does not have any responsibility for wetlands in there proposal as the revised scope does not include any wetlands.
13. ISM will be allowed to bill 15% of contract upon executed agreement for construction that will be payable within 30 days. Regular invoicing will be per the contract and agreement of terms.
14. If ISM is selected as contractor we reserve the right to review IFC package prior to accepting the project .ISM will be allowed one week to confirm IFB vs IFC.
15. ~~ALL PRICING LISTED ABOVE INCLUDES MARK UP'US ON OUR SUB  ( I & E )~~ISM has no electrical in there scope. PER Ted Wheeler the trenching and backfill was removed 8-18-17.
16. BREAK DOWN PRICING IS FOR ACCOUNTING PURPOSES AND NOT TO BE USED FOR INVOICING. INVOICING WILL BE BASED OFF OF PROGRESSIVE BILLING.
17. ~~Please see attached I and E scope and clarifications.~~ No, I and E scope other than what is listed in clarification 15.
18. For every rain day, there will be two to 4 days added to schedule this will be communicated with CM and agreed to case by case bases based on the amount of rain. Each rain out day that extends construction schedule the client will be billed perdiem for that day as an extra.
19. No concrete is included on roadway.
20. Construction roadway at landfill to get to site shall be in drivable condition when ISM mobilizes to site. ISM will then maintain the road way for access into the facility. GPP site only
21. ISM will be given IFC packages to review and compare against IFB.
22. ISM will be given two sets of complete IFC packages for GPP site.

---

